# 14-0826-cv(L), 14-0832-cv(CON)

# United States Court of Appeals

*for the*

# Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

– v. –

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE
PAYAGUAJE, STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R.
DONZIGER, DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SPECIAL APPENDIX
## Volume 1 of 3 (Pages A-1 to A-208)

BURT NEUBORNE, ESQ.
40 Washington Square South
New York, New York 10012
(212) 998-6172

*Attorney for Defendants-
Appellants Hugo Gerardo
Camacho Naranjo and
Javier Piaguaje Payaguaje*

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

– and –

JOHN CAMPBELL
JUSTIN MARCEAU
UNIVERSITY OF DENVER,
STURM COLLEGE OF LAW
2255 East Evans Avenue
Denver, Colorado 80208
(303) 871-6000

*Attorneys for Defendants-Appellants Steven
Donziger, The Law Offices of Steven R.
Donziger and Donziger & Associates, PLLC*

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA Amazon Defense Front, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

i

# SPECIAL APPENDIX
# TABLE OF CONTENTS

**Page**

Opinion of the Honorable Lewis A. Kaplan, dated
March 4, 2014, Appealed From ............................ SPA-1

Errata to March 4, 2014 Opinion of the Honorable
Lewis A. Kaplan, dated March 6, 2014 ................ SPA-498

Second Errata to March 4, 2014 Opinion of the
Honorable Lewis A. Kaplan, dated
March 10, 2014 ...................................................... SPA-499

Appendices to Opinion of the Honorable Lewis A.
Kaplan, dated March 4, 2014 ................................ SPA-500

Judgment as to Donzinger Defendants and
Defendants Camacho and Piaguaje, dated March
4, 2014, Appealed From ........................................ SPA-589

Memorandum Opinion Granting in Part and
Denying in Part Defendants' Motion for a Stay
Pending Appeal, dated April 25, 2014 ................. SPA-594

Racketeer Influenced and Corrupt Organizations
Act .......................................................................... SPA-627

New York Uniform Foreign Country Money-
Judgments Recognition Act ................................... SPA-628

Civil Procedure Code/Código de Procedimiento
Civil (Ecuador) ...................................................... SPA-629

Collusion Prosecution Act/Ley Para El Juzgamiento
De La Colusión (Ecuador) ..................................... SPA-629

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

     Plaintiff,

   -against-           11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

Randy M. Mastro
Andrea E. Neuman
Reed M. Brodsky
William E. Thompson
Anne Champion
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

G. Robert Blakey
William J. and Dorothy K. O'Neill
Professor Emeritus
Notre Dame Law School
*Amicus Curiae*

Richard H. Friedman
FRIEDMAN | RUBIN

Zoe Littlepage
Rainey C. Booth
LITTLEPAGE BOOTH

Steven Donziger

*Attorneys for Defendant Steven Donziger and Steven R. Donziger & Associates LLP*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC
*Attorney for Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*

SPA-2

SPA-3

*Table of Contents*

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    I.      The Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        A.     Texaco's Operations in Ecuador . . . . . . . . . . . . . . . . . . . . . . . 5
        B.     Aguinda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                 1.     The Principal Plaintiffs' Lawyers in Aguinda  . . . . . . . . . . . . . 8
                      a.     Cristobal Bonifaz . . . . . . . . . . . . . . . . . . . . . . . . 8
                      b.     Steven Donziger . . . . . . . . . . . . . . . . . . . . . . . . . 9
                      c.     Joseph Kohn . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                 2.     Key Events During Aguinda . . . . . . . . . . . . . . . . . . . 11
                      a.     Forum Non Conveniens – The Aguinda Plaintiffs Attack Ecuadorian Courts as Corrupt While Texaco Defends Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
                      b.     The Start of the LAPs' Alliance With the ROE – The LAPs Agree Not to Sue PetroEcuador or the ROE . . . . . . . . . 13
                      c.     The Aguinda Plaintiffs Seek to Recuse, and Attack, Judge Rakoff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                      d.     The Environmental Management Act is Passed in Ecuador . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                      e.     Texaco Merges with a Chevron Subsidiary and Survives the Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    II.     The Lago Agrio Litigation Begins . . . . . . . . . . . . . . . . . . . . . . . . . 16
        A.     Donziger's Attitudes and Beliefs About the Ecuadorian Courts and the Conduct of Lawyers in Ecuador . . . . . . . . . . . . . . . . . . . . . . 17
        B.     The Ecuadorian Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
         C.     The LAPs' Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
                 1.     The American Lawyers . . . . . . . . . . . . . . . . . . . . . . . . . . 23
                 2.     The ADF, Selva Viva, and Luis Yanza . . . . . . . . . . . . . . . . 28
                 3.     The Ecuadorian Lawyers . . . . . . . . . . . . . . . . . . . . . . . . 30
                 4.     The Assembly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    III.    The Beginnings of Donziger's Pressure Campaign . . . . . . . . . . . . . . . . . . . . 34
        A.     Donziger's Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        B.     Donziger's Public Relations Team and NGO Allies . . . . . . . . . . . . . . 37
                 1.     The Public Relations and Lobbying Team  . . . . . . . . . . . . . 37
                 2.     Amazon Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
         C.     The Pressure Begins – The LAPs' First Scientist and the $6 Billion "Drive By" Damages Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        D.     Donziger Touts Russell's "SWAG" and Other Misleading Descriptions of Conditions in the Orienté to Put Pressure on Chevron  . . . . . . . . . . . 43
        E.     False and Misleading Representations to Incite Governmental Action Against Chevron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        F.     Donziger's Attempt to Justify His Continued Use of Russell's Disavowed

i

Estimate is Unpersuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

IV.    The First Phase of the Lago Agrio Case – The Judicial Inspections . . . . . . . . 50
       A.    The Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
       B.    The LAPs' Judicial Inspection Experts . . . . . . . . . . . . . . . . . . . . . . . . 53
       C.    The Calmbacher Episode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
       D.    The LAP Lawyers Halt Testing for BTEX and GRO Because it Is Yielding
             Unhelpful Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
       E.    Sacha-53 and the "Independent" Monitors – Donziger, in His Words, Goes
             Over to the "Dark Side" and Makes a "Bargain With the Devil" . . . . . . 60
       F.    The Termination of the LAPs' Remaining Judicial Inspections and the
             Genesis of the Global Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . 67
             1.    The LAPs Coerce the Judge to Cancel the LAPs' Remaining Judicial
                   Inspections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
             2.    Donziger Chooses Cabrera to be the Global Expert . . . . . . . . . . 72
V.     The Second Phase of the Lago Agrio Case – The Cabrera "Global Expert" Report
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
       A.    The LAPs Secretly Plan the Cabrera Report – The March 3 and 4, 2007
             Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
       B.    Donziger, Fajardo, and Yanza Put Together an "Army," Cabrera is Sworn in,
             and the LAP Team Prepares His Work Plan . . . . . . . . . . . . . . . . . . . . 83
       C.    The Field Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
             1.    The LAP Team Pays Cabrera to Ensure that He Would "Totally Play
                   Ball" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
             2.    The LAP Team Provides Cabrera with Administrative "Support" and
                   Controls his Field Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
       D.    Donziger Attempts to Deceive Judge Sand About Cabrera's Independence
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
       E.    Stratus Secretly Writes Most of the Report . . . . . . . . . . . . . . . . . . . . 103
       F.    Stratus Criticizes its Own Report to Enhance the False Image of Cabrera's
             Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
       G.    Donziger's Explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
VI.    The Pressure Campaign Continues – The LAP Team Turns Up the Heat By Pressing
       for Indictment of Former Texaco Lawyers. . . . . . . . . . . . . . . . . . . . . . . . . 119
VII.   The Third Phase of the Lago Agrio Case – 2009-2010: Evidence of the Cabrera
       Fraud Begins to Come Out, Kohn Leaves the Case, New Financing Is Found, and the
       Case Proceeds in Lago Agrio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
       A.    Donziger's Assumption that What Happens in Ecuador, Stays in Ecuador
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
       B.    The Release of Crude . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
       C.    The Section 1782 Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
             1.    The Section 1782 Action Against Stratus – Denver Counsel
                   Withdraw and Donziger and Fajardo Seek to Obstruct Justice Before
                   the Federal Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
                   a.    Donziger Retains U.S. Counsel to Represent the LAPs in
                         Denver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

|   |   | b. | Beltman Discloses the Truth to Shinder – Denver Counsel Withdraw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134 |
|---|---|---|---|
|   |   | c. | Fajardo Submits a Misleading Affidavit in Denver and Elsewhere . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140 |
|   | 2. | | The New York 1782 Proceedings – Berlinger and Donziger . . 146 |
|   | 3. | | The LAP Team Sought to Deceive This Court in the Berlinger 1782 Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147 |
| D. | | | Donziger Deceives Kohn, Refuses His Demand for an Investigation of the Facts With Respect to Cabrera, and Precipitates a Final Break . . . . . . . 149 |
|   | 1. | | Donziger Misrepresented to and Concealed From Kohn Important Information Regarding Cabrera and Stratus . . . . . . . . . . . . . 150 |
|   | 2. | | Donziger Deceives Kohn About the "Secret" Account . . . . . . . 152 |
|   | 3. | | Donziger Refuses to Cooperate With Kohn's Demand for an Investigation Independent of Donziger . . . . . . . . . . . . . . . . . . 154 |
|   |   | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156 |
|   | 4. | | Kohn Cuts Off Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158 |
|   | 5. | | Defendants' Response to Kohn's Testimony . . . . . . . . . . . . . . 164 |
| E. | | | The Search for New Funding – Patton Boggs, the Invictus Strategy, and Burford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166 |
|   | 1. | | Patton Boggs Is Retained, Develops the Enforcement Strategy, and Obtains Funding from Burford . . . . . . . . . . . . . . . . . . . . . . 166 |
|   | 2. | | The Invictus Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170 |
| F. | | | Fajardo Obtains a Broader Power of Attorney, and Donziger and Fajardo Enter Into Their First Written Retention Agreements with the LAPs . . 172 |
| G. | | | Burford Terminates the Funding Agreement . . . . . . . . . . . . . . . . . . . . . 174 |
| H. | | | Donziger and Patton Boggs Try to Fix the Cabrera Problem – the Cleansing Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175 |
| VIII. | The Judgment | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179 |
|   | A. | | Its Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179 |
|   | B. | | Chevron's Ghostwriting and Bribery Claims . . . . . . . . . . . . . . . . . . . . 182 |
| IX. | The LAPs Wrote the Judgment | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184 |
|   | A. | | Zambrano Was Not the Author . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184 |
|   | | 1. | Zambrano Was Unfamiliar With Key Aspects of the Judgment He Signed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184 |
|   | | 2. | Zambrano's Account of the Preparation of the Judgment Was Self Contradictory and Implausible . . . . . . . . . . . . . . . . . . . . . . . 187 |
|   | | 3. | Zambrano's Testimony as to the Computer on Which He Claimed the Judgment Was Entered Was Inconsistent With the Evidence . . 193 |
|   | | 4. | Zambrano's Self Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196 |
|   | B. | | Evidence that the LAPs Wrote the Judgment . . . . . . . . . . . . . . . . . . . 200 |
|   | | 1. | The LAPs' "Fingerprints" Are All Over the Judgment . . . . . . . 200 |
|   | | | a.  The Fusion Memo, the Draft Alegato, the Index Summaries, the Clapp Report and the Fajardo Trust Email . . . . . . . 201 |
|   | | | b.  The Moodie Memo . . . . . . . . . . . . . . . . . . . . . . . . . . 203 |
|   | | | c.  Selva Viva Database . . . . . . . . . . . . . . . . . . . . . . . . . 207 |

iii

2. Defendants' Failure to Provide any Explanation for the Overlap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

3. Evidence that the LAPs Began Preparing the Judgment as Early as 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

C. Ultimate Findings on this Point – The LAPs Wrote the Judgment . . . 218

X. How it All Began: Guerra Ghostwrote Orders for Zambrano and the LAPs Paid Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

A. The Guerra-Zambrano-Donziger Conflict . . . . . . . . . . . . . . . . . 220

B. Preliminary Observations on Credibility . . . . . . . . . . . . . . . . . 222

C. Guerra's Ghostwriting for Zambrano . . . . . . . . . . . . . . . . . . . . 224

1. The Guerra-Zambrano Ghostwriting Deal – Unrelated Civil Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

2. Zambrano's First Tenure Presiding Over the Lago Agrio Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

a. Guerra Reaches out to Chevron . . . . . . . . . . . . . . . . 229

b. Following Chevron's Rejection, Guerra Makes a Deal With the LAPs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

c. Guerra Drafted Zambrano's Orders in the Chevron Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

d. The LAP Team Paid Guerra for His Ghostwriting Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

D. Ultimate Findings on This Point – Guerra Was Zambrano's Paid Ghostwriter in Civil Cases and Was Paid By Donziger and the LAPs To Write Some of Zambrano's Orders in the Chevron Case . . . . . . . . . . . . . . . . . 237

XI. The Story Ends: The LAPs Bribed Zambrano to Allow Them to Write the Judgment and Issue It Under His Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

A. Zambrano's Second Tenure Presiding Over the Lago Agrio Chevron Case: The Accounts of the Three Witnesses at Trial . . . . . . . . . . . . . . . 241

1. Guerra . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

a. Guerra's Account . . . . . . . . . . . . . . . . . . . . . . . . . 241

b. Assessing Guerra's Account . . . . . . . . . . . . . . . . . . 250

2. Zambrano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

3. Donziger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a. Donziger's Account . . . . . . . . . . . . . . . . . . . . . . . 257

b. Donziger's Credibility . . . . . . . . . . . . . . . . . . . . . . 259

B. Chevron's Circumstantial Evidence Pertinent to the Alleged Bribery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

C. Other Circumstantial Evidence – The Fajardo December 2010-January 2011 Emails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

D. The Defendants' Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

1. Donziger's Testimony, Even If True, Would Not Negate the Alleged Bribe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

2. Donziger's Approval Was Necessary for the Alleged Deal With Zambrano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

a. Donziger Controlled the LAP Team . . . . . . . . . . . . . 275

b.    Donziger's Approval Was Necessary, and Given, for the 2009 Ghostwriting Deal with Guerra . . . . . . . . . . . . . . . . . . . 278

E.    Ultimate Findings on this Point – Fajardo, with Donziger's Approval, Promised Zambrano $500,000 of the Judgment Proceeds to Decide the Case for the LAPs and Sign a Judgment They Prepared . . . . . . . . . . . . . . 279

XII.    The Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
A.    The First Level Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
1.    The LAPs Contend that Chevron Set Up its Ghostwriting Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
2.    The Appellate Panel Affirms the Judgment . . . . . . . . . . . . . . . 285
3.    The Appellate Clarification Order . . . . . . . . . . . . . . . . . . 288
B.    The National Court of Justice Affirms the Judgment in All But One Respect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

XIII    The Pressure Campaign Continues . . . . . . . . . . . . . . . . . . . . . . . 292
A.    The Invictus Strategy Deployed – Attempts to Enforce the Lago Agrio Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292
B.    The Purpose of All of These Efforts . . . . . . . . . . . . . . . . . . . . 295

Prior Proceedings in this Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298
The Pleadings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298
The Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298
The Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299
Discovery and Motion Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301
Discovery and Discovery Sanctions . . . . . . . . . . . . . . . . . . . . . . . 301
The Partial Summary Judgment Motions . . . . . . . . . . . . . . . . . . . . 301
Attempts to Recuse the Judge or Require Reassignment of the Case . . . . . . . 302
The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303
Post-Trial Briefing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304
Discussion and Additional Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
I.    This Court Has Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . 307
A.    This Case Is Not Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308
B.    This Court Had Subject Matter Jurisdiction When the Action Was Brought . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311
C    The Court Would Have Subject Matter Jurisdiction Even on Defendants' Erroneous Premise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 313
II.    The Non-Statutory Claims for Equitable Relief With Respect to the Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318
A.    Equitable Relief With Respect to Fraudulent Judgments Generally . . . 318
B.    Fraud on the Court – Corruption and Coercion of Judges and Judicial Official . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 322
1.    The Bribery of Zambrano . . . . . . . . . . . . . . . . . . . . . . . 323
2.    The Coercion of Judge Yánez . . . . . . . . . . . . . . . . . . . . . 324
3.    The Corruption of Cabrera . . . . . . . . . . . . . . . . . . . . . . 325
C.    Fraud – Ghostwriting and Deception . . . . . . . . . . . . . . . . . . . 327
1.    The LAPs' Ghostwriting of All or Part of the Judgment and Zambrano's Adoption of Their Product Was Fraud Warranting

v

Equitable Relief Even Absent Bribery . . . . . . . . . . . . . . . . . . . . 327
2.   The Deception of the Lago Agrio Court By The Misrepresentations that Cabrera Was Independent and Impartial and By the Passing Off of the Ghostwritten Report as His Work Was Fraud Warranting Equitable Relief Even Absent Bribery . . . . . . . . . . . . . . . . . . . 330
D.   The Other Requirements for Relief Have Been Satisfied . . . . . . . . . . . 334
E.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
III.   The RICO Statute Applies Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
A.   RICO Applies to Prohibited Conduct Regardless of Whether a Defendant Is a Member of Organized Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340
B.   Equitable Relief Is Available in Private RICO Actions . . . . . . . . . . . . 341
IV.   The Section 1962(c) Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353
A.   The Elements of a Section 1962(c) Violation . . . . . . . . . . . . . . . . . . . . 354
B.   The Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354
C.   Donziger Conducted and Participated in the Conduct of the Affairs of the Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356
D.   The Predicate Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357
1.   Extortion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357
a.   The Elements of Extortion and Their Application Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358
b.   Much of Donziger's Conduct Was Not Protected . . . . . 360
i.   Donziger's Entitlement Argument Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 361
ii.   Donziger's Conduct is Not Protected Petitioning Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 364
c.   Donziger's Extortionate Conduct . . . . . . . . . . . . . . . . 366
i.   Donziger's Misconduct in the Litigation . . . . . . 366
ii.   Donziger Made Representations He Knew Were Materially False in Order to Exert Pressure on Chevron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367
(A)   Donziger Repeatedly Used Damages Estimates He Knew Were False or the Truth of Which He Doubted . . . . . . . . . . . . . 368
(B)   Donziger Sought to Pressure Chevron by Causing Third Parties to Act on His Misrepresentations . . . . . . . . . . . . . . . . . 372
(C)   Donziger Pressed the Republic of Ecuador to File Criminal Charges Against Chevron Attorneys in Order to Pressure Chevron into Settlement . . . . . . . . . . . . . . . . . . . . . . . 374
d.   Application of the Hobbs Act to This Conduct Is Consistent With Morrison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
2.   Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379
a.   The Elements of Wire Fraud . . . . . . . . . . . . . . . . . . . . 379
b.   The Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

3.  Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382
4.  Obstruction of Justice and Witness Tampering . . . . . . . . . . . 387
    a.  Obstruction of Justice . . . . . . . . . . . . . . . . . . . . . . . . 387
        i.   The Elements of Obstruction of Justice . . . . . . . 387
        ii.  Donziger Obstructed Justice . . . . . . . . . . . . . . 388
    b.  Witness Tampering . . . . . . . . . . . . . . . . . . . . . . . . . . 390
        i.   The Elements of Witness Tampering . . . . . . . . . 390
        ii.  Donziger Tampered with the Testimony of Mark
             Quarles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390
5.  Violation of the Travel Act Through Furtherance of Violation of the
    Foreign Corrupt Practices Act . . . . . . . . . . . . . . . . . . . . . . . . 391
    a.  The Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392
    b.  The Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393
        i.   Donziger Was a "Domestic Concern" . . . . . . . . 393
        ii.  Donziger Used Instrumentalities of Interstate
             Commerce in Furtherance of the Payments . . . . 394
        iii. Donziger's Use of the Wires Was Corrupt and
             Intended to Influence Official Action . . . . . . . 395
        iv.  The Offers, Promises, and Payments to Cabrera Were
             of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395
        v.   Donziger Facilitated the Payments Knowing They
             Would Be Given to Cabrera, a Foreign Official
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396
        vi.  The Payments Were for a Business Purpose . . . . 398
E.  There Is A Related, Continuous and Domestic Pattern . . . . . . . . . . . 399
F.  Chevron Was Injured by the Pattern of Racketeering Activity and, Absent
    Equitable Relief, Will Continue to be Injured . . . . . . . . . . . . . . . . . 401
V.  Donziger Conspired to Conduct the Affairs of the Enterprise Through a Pattern of
    Racketeering Activity in Violation of Section 1962(d) . . . . . . . . . . . . . . . . . . 406
VI. Chevron's Other State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 408
VII. Neither the Judgment Nor the Appellate Decisions in Ecuador Foreclose Liability
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409
    A.  The Ecuadorian Decisions and Rulings Are Not Admissible for the Truth of
        the Matters Asserted Therein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410
    B.  The Appellate Decisions in Ecuador Do Not Break the Chain of Causation
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 413
        1.  The Intermediate Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . 413
        2.  National Court of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416
    C.  In Any Case, the Ecuadorian Decisions May Not Be Afforded Comity or
        Other Recognition Because They Were Rendered In a Judicial System That
        Does Not Provide Impartial Tribunals or Procedures Compatible with Due
        Process in Cases of this Nature . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417
        1.  The 2004 and 2005 Judicial Purges . . . . . . . . . . . . . . . . . . . . . 420
        2.  The Election of President Correa . . . . . . . . . . . . . . . . . . . . . . . 421
        3.  The 2011 Judicial "Reorganization" . . . . . . . . . . . . . . . . . . . . 425

|  |  | 4. | U.S. Department of State Reports . . . . . . . . . . . . . . . . . . . . . . . . 428 |
|  |  | 5. | Donziger and His Colleagues Admitted the Weakness, Politicization, and Corrupt Nature of the Ecuadorian Judiciary . . . . . . . . . . . . 430 |
|  |  | 6. | President Correa's Influence in the Lago Agrio Litigation . . . 431 |
| VIII. | This Court Has Personal Jurisdiction Over the LAP Representatives . . . . . . . 434 |
|  | A. | The Personal Jurisdiction Defense Has Been Stricken . . . . . . . . . . . . . 434 |
|  | B. | In Any Case, This Court Would Have Personal Jurisdiction At Least Under N.Y. CPLR 302(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434 |
|  |  | 1. | Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 435 |
|  |  | 2. | Section 302 – Specific Jurisdiction . . . . . . . . . . . . . . . . . . . . . 443 |
|  |  |  | a. | Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443 |
|  |  |  |  | i. | Transacting Business . . . . . . . . . . . . . . . . . . . . 443 |
|  |  |  |  | ii. | "Arising Out of" . . . . . . . . . . . . . . . . . . . . . . . 446 |
|  |  |  | b. | Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 448 |
|  |  |  |  | i. | The LAP Representatives Transacted Business in New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 448 |
|  |  |  |  | ii. | The Claims in This Suit Arise Out of the Transaction of Business in New York . . . . . . . . . . . . . . . . . . 451 |
|  |  | 3. | Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 452 |
| IX. | The Other Affirmative Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 455 |
|  | A. | The Judicial Estoppel Defense is Without Merit . . . . . . . . . . . . . . . . . . 455 |
|  | B. | Defendants Have Abandoned All Other Pleaded Affirmative Defenses, Which in Any Case Lacked Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461 |
|  |  | 1. | Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462 |
|  |  | 2. | Unclean Hands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 464 |
| X. | Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 469 |
|  | A. | Chevron Has No Adequate Remedy at Law and is Threatened With Irreparable Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 469 |
|  |  | 1. | Further Proceedings in Ecuador, If Any Even Theoretically Were Available, Would Offer No Adequate Remedy . . . . . . . . . . . . 469 |
|  |  | 2. | Defense of Multiple Enforcement Actions Would Not Provide An Adequate Remedy at Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471 |
|  |  | 3. | Money Damages Are Not, and Could Not Have Been, an Adequate Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473 |
|  | B. | Chevron Is Entitled to Equitable Relief Preventing These Three Defendants From Benefitting From the Fraud on the Court and Donziger From Profiting From the RICO Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475 |
|  |  | 1. | Constructive Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475 |
|  |  | 2. | Other Equitable Relief to Prevent These Defendants From Benefitting from the Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478 |
|  | C. | Injunction Against Enforcement in the United States . . . . . . . . . . . . . . 478 |
|  | D. | This Relief Is Consistent with Naranjo . . . . . . . . . . . . . . . . . . . . . . . . 479 |
| Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 484 |
| Appendices (in separately bound volume) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1 |

SPA-11

SPA-12

x

LEWIS A. KAPLAN, *District Judge.*

*Introduction*

Steven Donziger, a New York City lawyer, led a group of American and Ecuadorian lawyers who brought an action in Ecuador (the "Lago Agrio" case) in the names of 47 plaintiffs (the "Lago Agrio Plaintiffs" or "LAPs"), on behalf of thousands of indigenous peoples of the Orienté region of Ecuador, against Chevron Corporation ("Chevron"). They claimed that Chevron was responsible for extensive environmental damage caused by oil activities of Texaco, Inc. ("Texaco"), that ended more than twenty years ago and long before Chevron acquired Texaco's stock.

After years of pressuring Chevron to settle by a variety of both legitimate and illegitimate means, Donziger and his clients obtained a multibillion dollar judgment (the "Judgment") in the Ecuadorian courts and now seek to enforce it around the world. Chevron then brought this action, contending among other things that the Judgment was procured by fraud. Following a full trial, it now seeks equitable relief against Donziger and the two of his Ecuadorian clients who defended this case in order to prevent any of them from profiting from the alleged fraud or from seeking to enforce the Judgment in the United States.

This case is extraordinary. The facts are many and sometimes complex. They include things that normally come only out of Hollywood – coded emails among Donziger and his colleagues describing their private interactions with and machinations directed at judges and a court appointed expert, their payments to a supposedly neutral expert out of a secret account, a lawyer who invited a film crew to innumerable private strategy meetings and even to *ex parte* meetings with judges, an Ecuadorian judge who claims to have written the multibillion dollar decision but who was so inexperienced and uncomfortable with civil cases that he had someone else (a former judge who had been removed from the bench) draft some civil decisions for him, an 18-year old typist who

Case 14-826, Document 98, 07/02/2014, 1263303, Page17 of 211

2

supposedly did Internet research in American, English, and French law for the same judge, who knew only Spanish, and much more.  The evidence is voluminous.  The transnational elements of the case make it sensitive and challenging.  Nevertheless, the Court has had the benefit of a lengthy trial.  It has heard 31 witnesses in person and considered deposition and/or other sworn or, in one instance, stipulated testimony of 37 others.  It has considered thousands of exhibits.  It has made its findings, which of necessity are lengthy and detailed.

Upon consideration of all of the evidence, including the credibility of the witnesses – though several of the most important declined to testify – the Court finds that Donziger began his involvement in this controversy with a desire to improve conditions in the area in which his Ecuadorian clients live.  To be sure, he sought also to do well for himself while doing good for others, but there was nothing wrong with that.  In the end, however, he and the Ecuadorian lawyers he led corrupted the Lago Agrio case.  They submitted fraudulent evidence.  They coerced one judge, first to use a court-appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the LAPs.  They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment.  If ever there were a case warranting equitable relief with respect to a judgment procured by fraud, this is it.

The defendants seek to avoid responsibility for their actions by emphasizing that the Lago Agrio case took place in Ecuador and by invoking the principle of comity.  But that warrants

Case 14-826, Document 98, 07/02/2014, 1263303, Page18 of 211

3

no different conclusion.

Comity and respect for other nations are important.  But comity does not command blind acquiescence in injustice, least of all acquiescence within the bounds of our own nation. Courts of equity long have granted relief against fraudulent judgments entered in other states and, though less frequently, other countries.  Moreover, the United States has important interests here. The misconduct at issue was planned, supervised, financed and executed in important (but not all) respects by Americans in the United States in order to extract money from a U.S. victim.

That said, considerations of comity and the avoidance of any misunderstanding have shaped the relief sought here.  Chevron no longer seeks, and this Court does not grant, an injunction barring enforcement of the Lago Agrio Judgment anywhere in the world.  What this Court does do is to prevent Donziger and the two LAP Representatives, who are subject to this Court's personal jurisdiction, from profiting in any way from the egregious fraud that occurred here.  That is quite a different matter. Indeed, the LAP Representatives' lawyer recently conceded before the Second Circuit that the defendants "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming that the judge was bribed.[1]  Defendants thus have acknowledged the propriety of equitable relief to prevent individuals subject to the Court's jurisdiction from benefitting from misdeeds for which they are responsible.  And while the Court does enjoin enforcement of the Judgment by these defendants in the United States, that limited injunction raises no issues of comity or international relations.  It is the prerogative of American courts to determine whether foreign judgments may be

---

[1] Tr., Sept. 26, 2013, at 25:3-15, *Naranjo v. Chevron Corp.*, No. 13-772-cv (2d Cir.) [DI 1496-2].

4

enforced in this country.

Donziger is intelligent, resourceful, and a master of public and media relations. An extensive public relations and media campaign has been part of his strategy from early days, and it continues. Among its objectives has been to shift the focus from the fraud on Chevron and the Lago Agrio court to the environmental harm that Donziger and the LAPs claim was done in the Orienté. Indeed, that was a principal focus of defendants' case at trial and of their post-trial briefing. But one should not be distracted from the issues actually presented in *this* case.

The Court assumes that there is pollution in the Orienté. On that assumption, Texaco and perhaps even Chevron – though it never drilled for oil in Ecuador – might bear some responsibility. In any case, improvement of conditions for the residents of the Orienté appears to be both desirable and overdue. But the defendants' effort to change the subject to the Orienté, understandable as it is as a tactic, misses the point of this case.

The issue here is not what happened in the Orienté more than twenty years ago and who, if anyone, now is responsible for any wrongs then done. It instead is whether a court decision was procured by corrupt means, regardless of whether the cause was just. An innocent defendant is no more entitled to submit false evidence, to coopt and pay off a court-appointed expert, or to coerce or bribe a judge or jury than a guilty one. So even if Donziger and his clients had a just cause – and the Court expresses no opinion on that – they were not entitled to corrupt the process to achieve their goal.

Justice is not served by inflicting injustice. The ends do not justify the means. There is no "Robin Hood" defense to illegal and wrongful conduct. And the defendants' "this-is-the-way-it-is-done-in-Ecuador" excuses – actually a remarkable insult to the people of Ecuador – do not help them. The wrongful actions of Donziger and his Ecuadorian legal team would be offensive to the

SPA-17

5

laws of any nation that aspires to the rule of law, including Ecuador – and they knew it.  Indeed, one Ecuadorian legal team member, in a moment of panicky candor, admitted that if documents exposing just part of what they had done were to come to light, "apart from destroying the proceeding, all of us, your attorneys, might go to jail."[2]  It is time to face the facts.

## Facts

### I.     The Background

The events at issue in this case took place in law offices in New York, Philadelphia, and elsewhere in the United States, a consulting firm in Colorado, a public relations firm in Washington, the Orienté, courthouses in Ecuador and all over the United States, the offices of a New York documentary film maker, news media throughout the world, and government offices in Ecuador and the United States, and other places.  They involved an array of lawyers, financial backers, scientists, judges, celebrities, media consultants, non-governmental organizations, politicians, and law school interns.  But despite the case's complex history, reach and its large cast of players, the events ultimately center on one man – Steven Donziger – and his team of Ecuadorian lawyers and U.S. and European backers.

We begin with the backdrop against which these events took place.

### A.     Texaco's Operations in Ecuador

In 1964, the Republic of Ecuador ("ROE") granted to a Gulf Oil subsidiary and to

---

[2]

PX 1279 (Mar. 30, 2010 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza, and J. Sáenz).

6

TexPet, an indirect subsidiary of Texaco, a concession to explore for and produce oil in the Orienté.[3] The Gulf-TexPet joint venture, of which TexPet was the sole operator, became known as the Consortium.[4]  In 1973, however, Ecuador's state-owned oil company, now known as PetroEcuador, acquired a 25 percent interest in the Consortium, 12.5 percent from each of TexPet and Gulf.[5] Shortly thereafter, PetroEcuador acquired Gulf's remaining equity and thus became the majority owner of the Consortium.  TexPet continued to hold a 37.5 percent interest.[6]

TexPet operated for the Consortium until June 1992, when the Concession expired. TexPet's 37.5 percent interest reverted to PetroEcuador, and TexPet began the process of winding down its operations.[7]  In connection with the termination of TexPet's Ecuadorian operations, TexPet and Texaco in 1993 entered into a Memorandum of Understanding with the ROE that provided that TexPet would be released from any potential claim for environmental harm once TexPet performed an agreed-upon remediation in the area in which it had operated.[8]  In the Spring of 1995, the parties

---

[3]      PX 210 (Napo Joint Operating Agreement); PX 3000 (Reis Veiga Direct) ¶ 14.

[4]      *Id.*

[5]      PX 211 (Agreement among the ROE, TexPet, and Gulf Oil); PX 3000 (Reis Veiga Direct) ¶ 14.

[6]      PX 212 (Agreement among the ROE, Ecuadorian Government Petroleum Corporation, and Gulf Oil); PX 3000 (Reis Veiga Direct) ¶ 14.

[7]      PX 3000 (Reis Veiga Direct) ¶ 19.

[8]      PX 222 (Dec. 14, 1994 MOU among the ROE, PetroEcuador, and TexPet), at 3; PX 3000 (Reis Veiga Direct) ¶ 29.

SPA-19

7

executed a Settlement Agreement and Scope of Work agreement[9] (the "Settlement Agreement") that laid out specific tasks TexPet was required to complete before its remediation and wind down were complete, whereupon it would be entitled to a release.[10]  From 1995 through 1998, ROE inspectors issued 52 *actas* in which they confirmed TexPet's completion of each task.[11]  The final *acta* – the 52nd Certificate – was issued in September 1998 and stated that TexPet had complied with its obligations under the Settlement Agreement.  The final release was signed on September 30, 1998.[12] It stated that TexPet had fully performed its obligations under the MOU and Settlement Agreement and that TexPet was released from all potential claims by the ROE and PetroEcuador.[13]

B.    Aguinda

While TexPet was winding down its operations in Ecuador, a group of Ecuadorian plaintiffs brought a class action against Texaco in the Southern District of New York (*"Aguinda"*)[14]

---

[9]

PX 3000 (Reis Veiga Direct) ¶ 26; PX 247 (Certificate # 052-RAT-98).

[10]

PX 223 (March 1995 Contract among TexPet, ROE, and PetroEcuador); PX 3000 (Reis Veiga Direct) ¶ 30.

[11]

PX 3000 (Reis Veiga Direct) ¶ 33; *see also e.g.*, PX 224, PX 225, PX 226, PX 237, PX 238, PX 240, PX 242, PX 243, and PX 245 (*actas*).

[12]

PX 246 (*Acta* Final by and between the Government of the ROE, PetroEcuador, Petroproduccion, and Texaco Petroleum Company).

[13]

*Id.*

[14]

*Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (filed Nov. 3, 1993) (hereinafter *"Aguinda"); see also Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 341 (S.D.N.Y. 2005).

The Court takes judicial notice of its own records. Fed. R. Evid. 201(b); *I. & I. Holding*

8

seeking billions of dollars of damages for alleged injury to the environment and health of the plaintiffs as well as certain equitable relief within Ecuador.[15] The principal lawyers for the plaintiffs were Cristobal Bonifaz, Joseph Kohn, and Steven Donziger.[16] As all three figured in the story that is at the heart of this case, we pause to identify them.

     *1.*     *The Principal Plaintiffs' Lawyers in Aguinda*

     *a.*     *Cristobal Bonifaz*

Cristobal Bonifaz, grandson of a former Ecuadorian president, practiced law in Amherst, Massachusetts in the early 1990s. His son attended law school with Steven Donziger.

In 1993, Bonifaz accepted an invitation to travel to Ecuador to meet with residents of the Orienté concerning complaints about pollution in the region and the possibility of a lawsuit.[17]

---

[15] *Corp. v. Greenberg*, 151 F.2d 570, 572 (2d Cir. 1945).

[16] *Aguinda v. Texaco, Inc.*, 945 F. Supp. 625, 626 (S.D.N.Y. 1996) *vacated sub nom. Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998).

The defendants include not only Steven Donziger, but his law firm, variously referred to as the Law Offices of Steven Donziger and Steven R. Donziger & Associates, PLLC. The sole proprietorship is not a legal entity and is indistinguishable from Donziger personally for all legal purposes. *E.g.*, *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 500 (S.D.N.Y. 2002); *Anti-Hydro Co. v. Castiglia*, 461 N.Y.S. 2d 87 (App. Div. 1983). It is undisputed that Donziger's professional company, Steven R. Donziger & Associates, PLLC, is liable to the same extent as Donziger because Donziger was its agent and acted within the scope of his employment by it. *See In re Klenk*, 612 N.Y.S. 2d 220, 220 (App. Div. 1994) ("The attorney['s] fraudulent scheme occurred while he was a partner acting in the ordinary course of business of each law firm and therefore each law firm is liable for the attorney['s] misconduct to the same extent as he is."). Accordingly, references to Donziger (unless otherwise stated) include the sole proprietorship and the professional company for ease of expression except if otherwise specifically stated.

[17] Bonifaz Dec. 30, 2010 Dep. Tr. at 37:19-22.

SPA-21

9

He took a small group of lawyers, including Donziger, and others with him.[18]  In June of that year, Bonifaz entered into a retention agreement with various individuals who soon became plaintiffs in *Aguinda*.[19]

###### b.    Steven Donziger

Donziger's interest in Latin America began when he worked as a journalist for the United Press International in Nicaragua from 1984 to 1987[20] during which he covered events in several Latin American countries.[21]  He also became fluent in Spanish.[22]

After his return from Nicaragua, Donziger[23] graduated from Harvard Law School in 1991.[24]  He then worked as a public defender[25] for two years before he accompanied Bonifaz on his

---

18

    DX 1750 (Donziger Direct) ¶ 20.

19

    PX 631 (June 27, 1993 Retention Agreement Between Bonifaz, Kohn, and plaintiffs in the *Aguinda* Litigation).

20

    DX 1750 (Donziger Direct) ¶ 2.

21

    *Id.* ¶¶ 2-5.

22

    *Id.* ¶ 2.

23

    Unless otherwise stated, "Donziger" hereafter refers collectively not only to Donziger himself, but also to defendants The Law Offices of Steven R. Donziger and Donziger & Associates PLLC.  As noted, the first is a sole proprietorship indistinguishable as a legal matter from Donziger.  The second is responsible for Donziger's personal actions because everything he did was done as  its agent and within the scope of his authority.

24

    *Id.* ¶ 1.

25

    *Id.* ¶ 3.

10

trip to Ecuador.[26]  While on that trip, Donziger traveled widely in the Napo Concession area and met

Maria Aguinda, who later became the first-named plaintiff in *Aguinda*.[27]

Although Donziger's name appears on the *Aguinda* complaint, he was not a lead

lawyer when it began.  Nevertheless, he did much of the groundwork in Ecuador, took a "handful

of trips" to the area from 1993 to 2002 "to meet with clients in the Amazon rainforest, to attend

meetings of local community groups . . . , and to take care of lawsuit-related issues."[28]  During those

trips and through case-related discovery from Texaco, Donziger made "significant headway on the

factual development of the case."[29]

c.    *Joseph Kohn*

Bonifaz knew that he needed an experienced trial lawyer to assist him.  He needed

money as well.  He therefore got in touch with Joseph Kohn, a Philadelphia attorney and partner at

Kohn, Swift & Graf, P.C. (the "Kohn firm" or "Kohn").[30]  Kohn too was retained by the *Aguinda*

plaintiffs.[31]  Kohn and Bonifaz were co-lead counsel in *Aguinda* at its outset,[32] and Kohn provided

---

[26]

  *Id.* ¶ 21.

[27]

  *Id.* ¶¶ 22, 25.

[28]

  *Id.* ¶ 28.

[29]

  *Id.* ¶ 29.

[30]

  PX 2442 (Dec. 30, 2008 Email from K. Hinton to S. Cohen and H. Glaser attaching Dec. 30, 2008 *Bloomberg* article), at 10.

[31]

  PX 5600 (Kohn Direct) ¶ 1; *see also* PX 2350 (Dec. 21, 1994 Ltr. from Bonifaz to Kohn reflecting fee sharing agreement in *Aguinda* and *Ashanga v. Texaco*; PX 631 (June 27, 1993

11

much of the funding.[33]

### 2.    Key Events During *Aguinda*

The details of *Aguinda* are largely unimportant at this stage but several points are

significant.

#### a.    Forum Non Conveniens – The Aguinda Plaintiffs Attack Ecuadorian Courts as Corrupt While Texaco Defends Them

Texaco sought dismissal of *Aguinda* on the grounds *inter alia* of *forum non*

*conveniens* and the failure to join the ROE and PetroEcuador, which it argued were indispensable

because (1) the requested equitable relief within Ecuador could not otherwise be ordered, and (2)

PetroEcuador's own actions would be at issue in the case.[34]  The *Aguinda* plaintiffs argued that New

York was the appropriate forum because Texaco was headquartered here.  They contended also that

the case could not be brought in Ecuador because Ecuador did not permit class actions or pretrial

discovery.[35]

---

Retention Agreement Between Bonifaz, Kohn, and plaintiffs in the *Aguinda* Litigation).

[32]

 PX 2350 (Dec. 21, 1994 Ltr. from Bonifaz to Kohn reflecting fee sharing agreement in *Aguinda* and *Ashanga v. Texaco*), at 1.

[33]

PX 2350 (Dec. 21, 1994 Ltr. from Bonifaz to Kohn reflecting fee sharing agreement in *Aguinda* and *Ashanga v. Texaco,* another case brought on behalf of residents of Peru), at 2-3.

[34]

Mot. to Dismiss, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Dec. 28, 1993) [DI 10], at 3.

[35]

Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Mar. 10, 1994) [DI 23], at 3 n.2.

12

On November 12, 1996, Judge Rakoff – to whom that case was assigned – dismissed the complaint on the grounds of *forum non conveniens* and international comity and because PetroEcuador and the ROE had not been joined as plaintiffs.[36]  The plaintiffs appealed the ruling and persuaded the ROE to move to intervene in the case, a motion that Judge Rakoff denied.[37]

In 1998, the Court of Appeals reversed the dismissal of *Aguinda* on the ground that the district court had failed to obtain a commitment by Texaco to submit to the jurisdiction of the Ecuadorian courts.[38]  It remanded with instructions to require "Texaco's consent to Ecuadoran jurisdiction . . . [and to] independently reweigh the factors relevant to a *forum non conveniens* dismissal."[39]

Following remand, Texaco provided the missing commitment and then renewed its motion to dismiss on *forum non conveniens* grounds.  As part of its argument that the case belonged in Ecuador and not the United States – and, as will be seen, a great irony – Texaco argued that Ecuador would be an adequate alternative forum because it had an independent judiciary that provided fair trials.[40]  With equal irony, the plaintiffs contended that Ecuador would not be an

---

[36]

> *Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996), *vacated sub nom. Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998).

[37]

> *Aguinda v. Texaco, Inc.*, 175 F.R.D. 50, 51 (S.D.N.Y. 1997).

[38]

> *Jota*, 157 F.3d at 159.

[39]

> *Id.*

[40]

> *E.g.*, Texaco Inc.'s Supp. Mem. of Law *passim*, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Mar. 10, 2000) [DI 147].

> As will appear, there is no necessary inconsistency between seeking a *forum non conveniens* dismissal in order to proceed in a foreign country and later attacking a judgment rendered

13

adequate forum because the Ecuadorian judiciary was weak and corrupt and did not provide impartial tribunals.[41]

Judge Rakoff granted the motion and was affirmed on appeal.[42]

> b.  *The Start of the LAPs' Alliance With the ROE – The LAPs Agree Not to Sue PetroEcuador or the ROE*

A second point to be made about *Aguinda* is that it provided the impetus for an arrangement whereby the LAPs in substance granted PetroEcuador and the ROE immunity from suit in exchange for assistance in *Aguinda*, an alliance that has strengthened over time.

The *Aguinda* plaintiffs were concerned by Texaco's argument that the ROE was an indispensable party in view of the complaint's prayer for an equitable decree requiring environmental remediation in Ecuadorian territory.  They obtained the ROE's agreement to seek to intervene in the case and to advise this Court that it consented to the "execution in its territory of any environmental cleanup measures that the [Southern District] Court may order [Texaco] to perform."[43]  But there was a *quid pro quo*.  The *Aguinda* plaintiffs gave the ROE and PetroEcuador a judgment reduction agreement to protect them against any award of contribution that Texaco might

---

in that foreign country as fraudulent or on other permissible grounds.  The standards governing the availability of an alternate forum for *forum non conveniens* analysis and for a collateral attack on a foreign judgment are quite different.  *See infra Discussion* § IX.A.

[41] *E.g.*, Pls.' Reply Mem. of law *passim*, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Apr. 24, 2000) [DI 151].

[42] *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001) *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002).

[43] PX 684 (Waiver of Rights Between C. Bonifaz and J. Kohn in *Aguinda v. Texaco*, No. 93 Civ. 7527 (S.D.N.Y.)), at 1-2.

14

obtain against them.[44]

    c.  *The Aguinda Plaintiffs Seek to Recuse, and Attack, Judge Rakoff*

    A*guinda* was marked also by a challenge to Judge Rakoff's impartiality and an attack

on his integrity.

    After the reversal of Judge Rakoff's initial *forum non conveniens* dismissal, the

plaintiffs moved to recuse him, claiming that his attendance at a seminar on environmental issues

created an appearance of partiality because Texaco had contributed general funding to the

organization that sponsored the seminar.[45]  Judge Rakoff denied the motion.  The Second Circuit

then denied the *Aquinda*  plaintiffs' mandamus petition, holding that no reasonable person

knowledgeable of the facts would doubt Judge Rakoff's impartiality.[46]  Some time later, Donziger

– in a video recorded for possible use in a documentary film – attacked Judge Rakoff.  He stated that

---

 [44]

    Bonifaz later testified that "this idea of an agreement not to sue arose following statements by Judge Rakoff . . . that if the Government of Ecuador intervened in the *Aguinda* litigation, that Texaco might bring counterclaims against it."  Bonifaz Mar. 1, 2011 Dep. Tr. at 14:16-22.  Bonifaz said that, at his suggestion, the ROE had agreed to intervene in the *Aguinda* case, but that it wanted an assurance from Bonifaz that it would not be sued if it did so.  According to Bonifaz, "the Procurador [Attorney General]. . . said that he will be happy to do whatever we wanted with respect to the case.  Then, following that conversation, whatever it was, I talked to a woman at his office . . . in which she said 'Well, the Procurador wants this document signed by you guys that you're not going to sue Ecuador,' because Judge Rakoff raised the issue in court that 'If you guys do that, you're going to get sued.'  So they freaked out, and so then they wanted this document signed."  Bonifaz Mar. 1, 2011 Dep. Tr. at 16:8-21.  (Defendants' objection to this testimony is overruled.  The evidence is relevant to the development of the relationship among the ROE and the defendants, which goes among other things to the likelihood that influence improperly was brought to bear on the Lago Agrio court.  The statements attributed to the ROE officials are not hearsay because they are not received for the truth of the statements but to explain why the *Aguinda* plaintiffs, most of whom are LAPs, waived claims against the ROE and PetroEcuador.)

 [45]

    *In re Aguinda*, 241 F.3d 194, 198 (2d Cir. 2001).

 [46]

    *Id.* at 198, 206.

SPA-27

15

Judge Rakoff "was corrupt too, brother.  He was – totally biased against us."[47]

As will appear, these events foreshadowed what became a pattern by the LAP team of seeking to intimidate and threaten judges by pressure tactics including *ad hominem* attacks.[48]

### d.     The Environmental Management Act is Passed in Ecuador

The pendency of Texaco's dismissal motion and then the risk that the Court of Appeals would affirm Judge Rakoff's initial *forum non conveniens* dismissal prompted other actions by the *Aguinda* plaintiffs' lawyers.  As Bonifaz later suggested, "his team" had "worked with Ecuadorian legislators to draft a law similar to U.S. superfund law," in preparation "for a possible move from U.S. courts."[49]   The legislation in question became Ecuador's Environmental Management Act of 1999 (the "EMA"),[50] which among other things created a private right of action for damages for the cost of remediation of environmental harms generally, as distinct from personal injuries or property damages to specific plaintiffs.[51]

---

[47]

PX 10A (Mar. 30, 2006 *Crude* Clip).

[48]

*See infra* § Facts II.A, IV.F.1.

[49]

DI 29-10 (Hendricks Decl. 1), Ex. 83, at 2.

[50]

Act 99–37, Registro Oficial No. 245, July 30, 1999.

[51]

*Id.*; PX 2382 (Invictus Memo), at 29 ("Art. 43.  Natural or legal persons or human groups, linked by a common interest and directly affected by the harmful action or omission, may file with the judge of competent jurisdiction actions for monetary damages and for deterioration caused to health or the environment, including biodiversity and its constituent elements.")  (citing EMA).

As noted, the issue whether Ecuador permitted class actions was hotly disputed in *Aguinda.*

SPA-28

16

> e.    *Texaco Merges with a Chevron Subsidiary and Survives the Merger*

The final event of note that occurred during *Aguinda* was the merger of a wholly owned subsidiary of Chevron with and into Texaco, with Texaco emerging as the surviving entity. Chevron thereby became the indirect owner of all of Texaco's common stock. Chevron, however, did not acquire any of Texaco's assets or assume any of its liabilities by operation of the merger.[52]

II.    *The Lago Agrio Litigation Begins*

In May 2003, about one year after the Second Circuit affirmed the dismissal of *Aguinda*, the LAPs sued Chevron (but not Texaco) for damages and for remediation of environmental harm said to have been caused by Texaco.[53]  The case was brought for the benefit of some 30,000 indigenous residents of the Concession area.  Significantly, however,  the complaint asked that any funds awarded to perform the requested remediation, plus an additional ten percent, be delivered to the Frente de la Defensa de la Amazonia (the "ADF") for use in performing any remediation ordered by the court.[54]  Thus, the LAPs sought to have the ADF placed in complete control of any and all sums recovered.  As will appear, this is significant because Donziger and some of his Ecuadorian associates controlled and still control the ADF.

---

[52]

> *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 243 & nn. 23-25 (S.D.N.Y. 2012).

[53]

> *Id.*  The EMA is cited in the complaint as creating a right on the part of natural persons and others to sue "for damage and loss and for health and environmental deterioration, including biodiversity." *Id.* at 29, 32.

[54]

> *Id.* at 29-31; PX 5600 (Kohn Direct) ¶ 4.

Case 14-826, Document 98, 07/02/2014, 1263303, Page32 of 211

17

The case initially was assigned to Judge Alberto Guerra Bastidas ("Guerra"), who then was the president of the Lago Agrio court[55] and who became an important witness at trial. Before turning to the events of the Lago Agrio proceedings, however, three subjects are important to an understanding of what transpired later: (1) Donziger's attitudes and beliefs concerning the Ecuadorian courts, (2) the many Ecuadorian judges who were assigned to the case for varying periods during the years of its existence, and (3) a brief description of the plaintiffs, their lawyers, and the structure of the LAPs' team.  As someone once said, "you can't tell the players without a scorecard."

A.    *Donziger's Attitudes and Beliefs About the Ecuadorian Courts and the Conduct of Lawyers in Ecuador*

Donziger's attitudes and beliefs about the capability, fairness, and integrity of the Ecuadorian legal system are no secret.  During *Aguinda*, he argued strenuously that Ecuador was not an adequate forum because the Ecuadorian judiciary was weak and corrupt and did not provide impartial tribunals.[56] After the Lago Agrio case began, he made repeated statements – many on camera[57] – in which he amplified this view.  For example:

---

[55]

PX 4300X (Callejas Direct) ¶ 24.

[56]

*E.g.*, Plaintiffs' Reply Mem. of Law, *passim, Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Apr. 24, 2000) [DI 151].

[57]

As will appear, these statements made on camera were recorded by a documentary film maker whom Donziger recruited to make a film about the Lago Agrio case and for which he procured millions in financing from a friend.  The film was released with the title *Crude.*

In these film clips, Donziger frequently sought to justify improper or questionable actions with respect to the Ecuadorian litigation by contending that such behavior was necessary in under the circumstances.  But there is no credible evidence to support Donziger's claims of

18

- "They're all [*i.e.*, the Ecuadorian judges] corrupt! It's—it's their birthright to be corrupt."[58]

- "These judges are really not very bright – it is like a vocational job to them, they deal with resolving disputes at a very basic level[;] there is little or no intellectual component to the law."[59]

- "Uh, in a year from now, we're not comin' down here anymore.  The case is over.  All we're doin' is writing reports and preparing for final submissions of papers.  And, really mobilizing the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career."[60]

- "[T]his is not a legal case, this is a political battle that's being played out through a legal case and all the evidence is in.  *  *  *  So, what we need to do is get the politics in order in a country that doesn't favor people from the rainforest."[61]

- "It's incredible that a judge can – you can just walk in his office, with all the media, and it's obvious what we're doing, and he doesn't have the power to say, 'get the fuck out of my office,' like at least to the press.  I mean, I've never seen such utter weakness.  It's the same kind of weakness that leads to corruption. *  *  *  These people [*i.e.*, the judges] have no power. *  *  * They don't think they can do anything."[62]

- "You know, what . . . just happened with this judge, um, is sort of sad to me

---

necessity or justification, which often hinged on unsubstantiated suppositions of misconduct by Chevron.  The Court finds that Donziger's attempts of self justification best are understood as attempts to make himself look good notwithstanding his conduct.  Those attempts are not credible given the entire record of this case and the Court's assessment of Donziger.

[58]

PX 9A (Mar. 30, 2006 *Crude* Clip).

[59]

PX 179 (Donziger Notebook).

[60]

PX 3A (Mar. 9, 2006 *Crude* Clip), at CRS-032-00-CLIP-01.

[61]

PX 11A (Apr. 3, 2006 *Crude* Clip), at CRS060-00-CLIP-04.

[62]

PX 7A (Mar. 30, 2006 *Crude* Clip), at CRS-053-02-CLIP-04.

because it represents the fact that the judicial system here is so utterly weak – like the only way you can secure a fair trial is if you do things like that, like go in and confront the judge with media around, and fight and yell and scream and make a scene, and, you know, that would never happen in the United States.  That would never happen in any judicial system that had integrity.  And it's that very weakness that, you know, let people do that.  That is also– lets people corrupt the process."[63]

•    [To a colleague]: "Please prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of.  Send it to me today."[64]

•    "[I]t's a problem of institutional weakness in the judiciary, generally, and of this court, in particular.  We have concluded that we need to do more, politically, to control the court, to pressure the court.  We believe they make decisions based on who they fear the most, not based on what the laws should dictate.  *  *  *  [I]t's a critically important moment, because we want to send a message to the court that, 'don't fuck with us anymore – not now, and not – not later, and never.'"[65]

•    "You can solve anything with politics as long as the judges are intelligent enough to understand the politics. [T]hey don't have to be intelligent enough to understand the law, just as long as they understand the politics."[66]

Though Donziger's statements are remarkably disrespectful to the judicial system he now so vehemently defends, it will be seen that they are not unlike President Correa's views of the Ecuadorian judiciary.  The *Crude* outtakes depicted also Donziger's beliefs on the role of lawyers and evidence in litigation:

•    "I once worked for a lawyer who said something I've never forgotten.  He said, 'Facts do not exist.  Facts are created.'  And ever since that day, I

---

[63]    PX 8A (Mar. 30, 2006 *Crude* Clip).

[64]    PX 779 (June 14, 2006 Email from S. Donziger to A. Ponce re: "Need plan").

[65]    PX 67A (June 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-01.

[66]    PX 81A (Undated *Crude* Clip), at CRS-129-00-CLIP-02.

20

realized how the law works."[67]

- "Science has to serve the law practice; the law practice doesn't serve science."[68]

- "[A]ll this bullshit about the law and facts but in the end of the day it is about brute force . . ."[69]

- "[A]t the end of the day, this [*i.e.*, the lack of evidence on a key point] is all for the Court just a bunch of smoke and mirrors and bullshit.  It really is."[70]

In considering these and other statements, not to mention Donziger's conduct, it is relevant to note that Donziger is a member of the New York Bar.  His conduct, whether in the United States or in Ecuador, was subject in every respect to the New York rules governing the conduct of lawyers.[71]

Finally, it is relevant to note that Donziger and his Ecuadorian associates assumed that it would be impossible to obtain evidence of their actions.  This 2007 exchange with Atossa Soltani, the head of Amazon Watch, a non-governmental organization ("NGO") supporter of Donziger and the LAPs, during a videotaped conversation about arguably questionable planned activities in Ecuador, is revealing:

"SOLTANI:            Do you guys know if anybody can, uh, subpoena these videos?  That is a – how do you [unintelligible]

---

[67]

PX 47A (Mar. 4, 2007 *Crude* Clip), at CRS 198-00-CLIP-07.

[68]

PX 24A (Jan. 16, 2007 *Crude* Clip), at CRS 158-02-CLIP 9.

[69]

PX 77A (June 13, 2007 *Crude* Clip), at CRS 361-11.

[70]

PX 43A (Mar. 4, 2007 *Crude* Clip), at CRS-195-05-CLIP-01.

[71]

N.Y. RULES OF PROF'L CONDUCT, Rule 8.5(a) (effective Apr. 1, 2009); N.Y. CODE OF PROF'L RESP., DR 1-105 (repealed effective Apr. 1, 2009).

Case 14-826, Document 98, 07/02/2014, 1263303, Page36 of 211

21

    "DONZIGER:          We don't have the power of subpoena in Ecuador."[72]

B.    *The Ecuadorian Judges*

    A total of six judges presided over the Lago Agrio Chevron case from the time it was

filed in 2003 until the Judgment was issued in February 2011.[73]  In general, the president of the

Provincial Court of Nueva Loja – an election for which, it appears, was held every two years – was

to preside over the case.  When a new president was selected, the case would be transferred either

to the newly-elected president, who would keep the case for two years or to another judge in the

court, who would keep it for four months.[74]  But the fact that six judges – two of whom presided

over the case more than once – presided over the Lago Agrio case in the eight years it was pending

reveals that the assignment system did not always work exactly as expected.

    When the Lago Agrio case was filed in May 2003, Alberto Guerra was the president

of the court and so the case was assigned to him.[75]  Guerra's term as president ended in January

2004, and the case was reassigned to the newly-elected president, Judge Efraín Novillo.[76]  Judge

Novillo presided over the case for two years.  When his term was up in January 2006, the case was

---

[72]

    PX 68A (June 6, 2007 *Crude* Clip), at CRS-35-04-CLIP-02.

[73]

    PX 2522 (List of Judges on the Lago Agrio Chevron Case).

[74]

    Tr. (Zambrano) 1715:21-23; *see also* PX 4300X (Callejas Direct) ¶ 20.

[75]

    PX 4800 (Guerra Direct) ¶ 4.

[76]

    *Id.*; PX 2522 (List of Judges on the Lago Agrio Chevron Case).

Case 14-826, Document 98, 07/02/2014, 1263303, Page37 of 211

22

transferred to Judge Germán Yánez.[77]  Judge Yánez's term on the case lasted until October 2007, when Judge Novillo took over again.[78]

In August 2008, Judge Juan Nuñez became president and the Lago Agrio case was transferred to him.[79]  Nuñez's term was cut short in September 2009, however, when he recused himself.[80]  The case then fell to Nicolás Zambrano,[81] who first had joined the Lago Agrio court on July 30, 2008 directly from a career as a prosecutor[82] and whose term was four months because he was not the president of the court.  The case then went to Judge Leonardo Ordóñez, who had just been elected president, in February 2010.[83]  Although, as president, Judge Ordóñez was to have presided over the case for two years,[84] he was removed from the case when Chevron successfully moved to recuse him in 2010.[85]

---

[77]

PX 2522 (List of Judges on the Lago Agrio Chevron Case).

[78]

Id.; PX 348 (Oct. 3, 2007 Lago Agrio Court Order).

[79]

PX 2522 (List of Judges on the Lago Agrio Chevron Case).

[80]

PX 4800 (Guerra Direct) ¶ 21; PX 4300X (Callejas Direct) ¶ 20.

[81]

Tr. (Zambrano) 1715:1-5; PX 2522 (List of Judges on the Lago Agrio Case).

[82]

PX 4124 (July 30, 2008 Personnel Action Appointing N. Zambrano as Second Judge of the Superior Court of Nueva Loja); Tr. (Zambrano) 1629:19-1630:7.

[83]

Tr. (Zambrano) 1716:13-16.

[84]

Id. 1716:22-25.

[85]

Id. 1904:22-1905:2; DX 1561 (Oct. 1, 2010 Order).

Case 14-826, Document 98, 07/02/2014, 1263303, Page38 of 211

23

Judge Zambrano took over again in October 2010[86] and issued the Judgment four months later.

C.      The LAPs' Team

1.      The American Lawyers

The lawyers for the *Aguinda* plaintiffs had laid groundwork for suing in Ecuador if the New York case were dismissed by working toward the enactment in Ecuador of the EMA.  At the outset of the Ecuadorian case, the same three American lawyers – Bonifaz, Kohn, and Donziger – played the key roles, using Ecuadorian counsel, the first of whom was Dr. Alberto Wray, to appear of record.  By the time the Lago Agrio case began, however, the respective roles of the American lawyers had changed.

Kohn, who had a lead role in the United States in *Aguinda*, had no ties to Ecuador and did not speak Spanish.[87]  While he provided most of the funding for the Lago Agrio case and related public relations activities from its inception until 2009,[88] he had little direct role in the

---

86

  PX 2522 (List of Judges on the Lago Agrio Case).

87

  PX 5600 (Kohn Direct) ¶ 10.

88

  Between May 2003 and November 2009, the Kohn firm "was the primary funder of the litigation and related U.S. public relations and other activities.  During those nearly seven years, the firm paid over $6 million in litigation expenses.  This included . . . $1.1 million that [the Kohn firm] provided to Mr. Donziger for legal services and expenses, $1.1 million that [the Kohn firm] paid to U.S. consultants, and $2.2 million that [firm] transferred by wire from bank accounts in the United States to bank accounts in Ecuador."  PX 5600 (Kohn Direct) ¶ 9; *see also* Donziger Nov. 29, 2010 Dep. Tr. at 205:10-206:4.  These payments included a monthly stipend that the Kohn firm paid to Donziger.  *See* Donziger Jan. 19, 2011 Dep. Tr. at 3547:23-3548:22.

24

litigation.  He mainly stayed abreast of some developments through Bonifaz and Donziger,[89] although, as discussed below, he sought unsuccessfully to become more involved when the case began to run into difficulty in 2009.

Bonifaz's role also changed.  While he was involved in selecting and briefing the lead Ecuadorian counsel,[90] tensions subsequently arose between Bonifaz and Donziger.  Bonifaz's role quickly faded, and he left the case in 2005 for reasons that are neither clear nor material.[91]

Although Bonifaz still was involved when the Ecuadorian lawsuit began, he no longer was in charge.  Donziger had taken over.  In 2006, Donziger wrote that he had been the "lead counsel on the [Lago Agrio] lawsuit for the last three years"[92] – *i.e.*, since it began.   He explained further that he was and had been:

> "at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S. I have close ties with almost all of the important characters in the story, including Amazon indigenous leaders, high-ranking Ecuadorian government officials, the world's leading scientists who deal with oil remediation, environmental activists, and many of Chevron's key players."[93]

He stated that he was the individual who had put together and supervised the team that was pursing

---

[89]

PX 5600 (Kohn Direct) ¶ 10.

[90]

Bonifaz Dec. 30, 2010 Dep. Tr. at 32:16-33:4.

[91]

*Id.* at 20:21-22; *see also* PX 761 (Feb. 10, 2006 Assembly Resolution Terminating C. Bonifaz).

[92]

PX 806R (Donziger Book Proposal), at 5.

[93]

*Id.*

25

the case and related activities[94] and that his role was "to be the lawyer and manage the Ecuadorian legal team, while Kohn provide[d] overall guidance and money."[95]  He described himself as the "lead lawyer in the class-action trial."[96]

There is no substantial doubt that Donziger was in charge of the important aspects of the Ecuadorian case.  He referred to the Ecuadorian lawyers as his "local counsel."[97]  They often referred to him as the "cabeza," or head, of the team.[98]  From the time the case was filed in Lago

---

[94]

Id. at 3 ("I am the person primarily responsible for putting this team together and supervising it.").

[95]

Id. at 21.

[96]

Id. at 3.

[97]

Donziger July 19, 2011 Dep. Tr. at 4764:19-23 ("Q.  When you say 'local counsel,' do you mean Pablo Fajardo, Saenz, and Prieto?  A.  Yes."); Tr. (Donziger) 2477:1-6; PX 7682 (Jan. 28, 2010 Draft Ltr. from S. Donziger to J. Tyrrell) ("It likely will involve regular travel to Ecuador as well to work with local counsel."); Tr. (Donziger) 2470:4-10 ("Q.  Isn't it a fact, Mr. Donziger, that you would give directions to local counsel in Ecuador on what to do with the litigation?  A.  On occasion I would express my opinion as to what they should do, and I would do it in forceful terms.").

[98]

DX 1306 (Donziger Notebook), at 23 ("Pablo . . . [s]till introduces me as the 'cabeza' of the lawsuit which I don't like but that is fixable.").

Chevron offered selected portions of Donziger's personal notebook as a series of individual exhibits but the defendants offered all of it as DX 1306.  The portions offered by Chevron all were admissible, even over any hearsay objection, because Donziger's statements in the notebook are nonhearsay when offered by his opposing party, Chevron. FED. R. EVID. 801(d)(1).  The situation is quite different when the entire notebook was offered by the defendants.  To the extent it was offered for the truth of the statements, it was hearsay.  No hearsay exception was established.  Nor did defendants establish that the entire notebook was admissible under the rule of completeness, FED. R. EVID. 106, which in any case would not have overcome any hearsay objection, infra Discussion § VII.C, or that any specific part was admissible for a nonhearsay purpose.  Accordingly, DX 1306, except for those portions specifically relied upon in this opinion, which are admissible for the truth of the matters asserted under FED. R. EVID. 801(d)(1), is inadmissible and stricken.

26

Agrio until at least quite recently, and perhaps even until today, Donziger has supervised the

Ecuadorian legal team, set deadlines, was involved in setting the lawyers' salaries,[99] reviewed their

court filings, directed the legal strategy, and coordinated the work between the lawyers in Ecuador

and the scientists, experts, lawyers, litigation funders, politicians, and media consultants throughout

the world.[100]  In addition, he communicates extensively with the press, and he has made tactical and

---

[99]

Donziger Dep. July 19, 2011 Dep. Tr., at 4912:19-22 ("I think [Yanza's] salary was set by mutual consent between Mr. Kohn and myself on the one hand, and Mr. Yanza on the other, when Mr. Kohn was involved in the case), id. at 4913:10-15 ("Q.  Who determined whether or not Mr. Yanza received a bonus?  A.  I think, again, it was done by mutual consent between Mr. Yanza and myself after Mr. Kohn withdrew from the case."); PX 2396R (Donziger's Responses and Objections to Chevron Corps.' First Set of Requests for Admission), at 21 ("REQUEST FOR ADMISSION NO. 3: Admit that YOU were involved in setting Pablo Fajardo Mendoza's bonuses for his work concerning the LAGO AGRIO LITIGATION. RESPONSE TO REQUEST FOR ADMISSION NO. 3: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Pablo Fajardo Mendoza's compensation."); id. at 22 ("REQUEST FOR ADMISSION NO. 5: Admit that YOU were involved in setting Pablo Fajardo Mendoza's bonuses for his work concerning the LAGO AGRIO LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 5: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Pablo Fajardo Mendoza's compensation."); id. at 23 ("REQUEST FOR ADMISSION NO. 7: Admit that YOU were involved in setting Luis Yanza's monthly salary for his work concerning the LAGO AGRIO LITIGATION. RESPONSE TO REQUEST FOR ADMISSION NO. 7: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Luis Yanza's compensation."); id. at 24-25 (same for Juan Pablo Sáenz); id. at 26 (same for Julio Prieto); id. at 23-24 ("REQUEST FOR ADMISSION NO. 9: Admit that YOU were involved in setting Luis Yanza's bonuses for work concerning the LAGO AGRIO LITIGATION. RESPONSE TO REQUEST FOR ADMISSION NO. 9: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Luis Yanza's compensation."); id. at 25-27 (same for Juan Pablo Sáenz.); id. at 26 (same for Julio Prieto).

[100]

E.g., PX 8057 (Mar. 7, 2010 Email from S. Donziger to L. Yanza, J. Sáenz, J. Prieto, L. Garr, and A. Page), at 5 ("Friends, Today is Sunday but it's urgent that we resolve the following by Monday: 1) The local motion with the court – we need a draft right away with the translation so we can review it here before submitting it in Lago Agrio.  The sooner it can be submitted the better; rush if possible friends . . . . Please friends, we are in a difficult situation; I am asking you to work today."); PX 1065 (Sept. 11, 2008 Email from S. Donziger to J. Sáenz) ("'No' is not a sufficient answer.  If you have too much work, find somebody else to do it and pay them.  I need this tonite – no bullshit, and trust me, it will help our clients more than what you are currently doing, as important as what you are doing is."); PX 1038 (June 6, 2008 Email from S. Donziger to J. Sáenz, P. Fajardo, J. Prieto, L.

SPA-39

27

strategic decisions.[101]  He largely has controlled the money.[102]  Hence, the Court finds that it has

been Donziger who, from the very beginning of the Lago Agrio case, has called the important

---

Yanza, R. Garcia) ("Juampa Get this done and don't fuck up please."); PX 2376 (Apr. 19. 2007 Email from S. Donziger to M. Regalado and M. Garcés) ("Friends: I am very, very disappointed that you had already left when I called at 5:20.  I'm applying new rules for office communication. . . . We're paying too much to put up with this type of thing.  I send a corrected press release and instead of answering me, you left."); PX 687 (Nov. 19, 2003 Memorandum from Donziger to Team Entitled "Strategic Planning Memo/Ecuador Case"); PX 7670 (Jan. 21, 2008 Email from S. Donziger to J. Prieto, J. Sáenz, L. De Heredia, P. Fajardo, A. Ponce) ("Julio, Juampa, and Pablo, and Alejandro: Please ask Lupita to give you the legal document that I gave her on Friday.  It is urgent that you take care of it."); PX 7582 (July 22, 2010 Email from S. Donziger to P. Fajardo) ("Can you send me the summary that I recently asked for? thanks."); PX 7465 (Sept. 20, 2010 Email from S. Donziger to J. Sanez, P. Fajardo, J. Prieto, L Yanza, V. Barham) ("Friends, Let's talk tonight.  Let's not do anything rash please.  Let's analyze it first as a group."); PX 3040 (Apr. 3, 2008 Email from S. Donziger to P. Fajardo, L. Yanza, M. Garces. M. Guadalupe de Heredia, J. Sáenz, J. Prieto) ("PERSONALIZE THE REIS [VEIGA] MATTER BECAUSE USING HIM IS A WEAKNESS OF CHEVRON.  PLEASE TAKE ADVANTAGE").

[101]

This of course is not to say that Donziger never consulted his Ecuadorian colleagues, both lawyers and others, and that he did not take account of their views.  But It was Donziger who made the important final decisions, giving such weight to any views expressed by others as he thought appropriate.

[102]

Although Mr. Kohn provided the money through 2009, Donziger largely controlled how and when it was spent.  Many of the payments Kohn made to the plaintiffs' team in Ecuador, scientists, consultants, PR strategists, and experts first flowed through Donziger and were subject to his approval.  Indeed, Donziger sometimes paid the Ecuadorian legal team from his personal account, for which he later was reimbursed by Kohn.  *See, e.g.*, Donziger July 19, 2011 Dep. Tr. at 4925:5-14, 4927:2-4928:2. And while Kohn ultimately bore the cost of the salaries and bonuses of Ecuadorian lawyers and agents during his time on the case, Donziger was involved in setting the amount of each.  *E.g., id.* at 4912:18-22 (Q: Who set Mr. Yanza's salary?  A:  I think it was set by mutual consent between Mr. Kohn and myself on the one hand and Mr. Yanza on the other, while Mr. Kohn was involved in the case.); *id.* at 4913:15-23 ("Q. Did Mr. Yanza receive any bonuses while Mr. Kohn was funding the litigation?  A.  I believe he did, yes.  Q.  Did Kohn agree to those bonuses?  A.  He paid them, so yeah, he agreed to them.").  Donziger testified also that he even purchased a home for Yanza.  *Id.* at 4917:3-10.  While Donziger paid for the home from his personal checking account, he was reimbursed for the payment by Kohn.  *Id.* at 4918:12-18; *see also* PX 968 (Feb. 8, 2008 Email from S. Donziger to J. Kohn and K. Wilson) ("Please send your deposit of 20,000 to the following account").

SPA-40

28

shots.[103]  The main exception to this general conclusion for the period 2003-09, during which Kohn was the principal financial backer, was that Donziger on occasion sought Kohn's acquiescence with respect to activities that required additional funds.[104]  As will appear, however, Donziger did not always tell Kohn the whole truth about what he was doing.

### 2.   The ADF, Selva Viva, and Luis Yanza

Luis Yanza is Donziger's closest friend in Ecuador.[105]  Although he is not a lawyer, he has been and remains a central figure in the LAP team.  He has long served as "the coordinator of the case for the affected communities."[106]  He has been paid throughout from funds raised to finance the case.  Donziger even purchased a residence for him out of personal funds, though this expense ultimately was reimbursed to Donziger by the Kohn firm.[107]

Yanza has been involved in some of the legal team's biggest strategic decisions,

---

[103]

Donziger and the other defendants disputed this, at least for the period early 2012 to date, both on a sanctions motion and at trial.  The Court previously rejected their argument on the sanctions motion and now rejects it again after trial.

[104]

*Infra Facts* § VII.D.

In 2010, a new source of funding, Burford Capital, invested millions of dollars in the case, at which point the law firm of Patton Boggs was given some authority, along with Donziger, over the expenditure of the money.  *Infra Facts* § VII.E.1.

[105]

PX 6872 (May 23, 2006 Ltr. from S. Donziger to D. Kuhn), at 7 ("[m]y closest friend in Ecuador and the coordinator of the case for the affected communities [is] Luis Yanza").

[106]

*Id.*

[107]

Donziger July 19, 2011 Dep. Tr. at 4912:11-21, 4914:4-24, 4917:3-10, 4918:12-18; *see also* PX 968 (Feb. 8, 2008 Email from S. Donziger to J. Kohn and K. Wilson) ("Please send your deposit of 20,000 to the following account.").

including, according to Donziger, the decision to replace the first Ecuadorian lead lawyer, Alberto Wray.[108] He was copied on nearly every important email sent among the Ecuadorian lawyers and Donziger, and has been the liaison between the lawyers and their clients. He serves also as a major point of contact between the LAP team and various Ecuadorian government officials including President Correa.[109]

Donziger and Yanza formed two entities that figure in the events that followed.

The first was the ADF, which was formed in 1993, shortly after the *Aguinda* complaint was filed, to support the case.[110] Yanza functions as its executive director and representative with respect to the Lago Agrio case.[111]

The second was Selva Viva CIA, Ltda. ("Selva Viva"), "an entity created under . . . the corporate law of Ecuador that served as a funding vehicle [in the Lago Agrio] case . . . to pay people in Ecuador who worked on the case."[112] It was founded in 2004, also by Yanza and at the

---

[108]

Donziger Dec. 23, 2010 Dep. Tr. at 1763:18-23.

[109]

*See infra Facts* § VI.

[110]

DX 1900 (H. Piaguaje Direct) ¶ 22; Tr. (Kohn) 1493:10-19.

[111]

*Id.*; PX 5600 (Kohn Direct) ¶ 3 (Yanza was the representative of the ADF with respect to the Lago Agrio case from the outset); *id.* ¶ 17 (Yanza was the head of the ADF).

[112]

Tr. (Donziger) 2635:5-9; Donziger Dec. 23, 2010 Dep. Tr. at 1817:12-17 ("Q. Selva Viva was an Ecuadorian corporation created and run by the representative of the plaintiffs; is that right? A. It was created by Yanza as a mechanism to administer the case funds."); PX 6906 (record of incorporation of Selva Viva, its entry into the Register of Companies, and the designation of Donziger as president); PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson, J. Kohn, and K. Kenny re: "critical money transfer") ("The Frente [ADF] created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente [ADF] controls Selva Viva.").

30

direction of Donziger, who was and still may be its president. Yanza controls the Selva Viva bank accounts,[113] which have been used primarily as a "pass thr[ough] mechanism to administer the case funds. . . ."[114] For many years, when the Ecuadorian team needed money, Yanza contacted Donziger and Donziger in turn requested the funds from Kohn. The Kohn firm then wired the money either directly to Selva Viva or to Donziger, who then passed it on to Selva Viva. It is undisputed that the ADF, which is controlled by Yanza and Donziger, controls Selva Viva.

      The ADF, Yanza, and Selva Viva all are defaulted defendants in this case.[115]

      *3.    The Ecuadorian Lawyers*

      When the Lago Agrio litigation commenced, the American lawyers – who were not licensed to practice law in Ecuador – hired Ecuadorian attorneys to represent the LAPs in court. The composition and leadership of the Ecuadorian legal team changed through the years – although, as will become evident, it always has been managed and overseen by Donziger.

      Pablo Estenio Fajardo Mendoza ("Fajardo") graduated from law school in 2000 and, for a time, worked for the ADF helping residents of the Orienté bring claims against oil

---

113

      *E.g.*, Donziger July 19, 2011 Dep. Tr. at 4844:22-4845:14; PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson, J. Kohn, and K. Kenny re: "Critical money transfer") ("Luis Yanza . . . runs the Selva Viva account.").

114

      PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson, J. Kohn, and K. Kenny re: "critical money transfer") ("The Frente [ADF] created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente [ADF] controls Selva Viva."); *see also* Donziger Dec. 23, 2010 Dep. Tr. at 1817:12-18 ("Q. Selva Viva was an Ecuadorian corporation created and run by the representative of the plaintiffs; is that right? A. It was created by Yanza as a mechanism to administer the case funds.").

115

      DI 1469.

companies.[116] After the Lago Agrio complaint was filed in 2003, he became one of the junior lawyers on the Ecuadorian team.  His role was relatively minor until Donziger recommended that he replace Dr. Wray,[117]  which occurred in 2005.[118]

From then on, Fajardo has been the *procurador común* – lead counsel before the courts in Ecuador – for the LAPs.[119]  And, as will be seen, Fajardo has represented the plaintiffs in court, filed briefs on their behalf, signed retention agreements with investment firms, and given interviews with the international press as their representative.[120]  He has traveled to the United States a number of times in connection with the Lago Agrio case.[121]

Fajardo is a defendant in this case and, as is discussed below, appeared *pro se* in its

---

[116]

PX 6872 (May 23, 2006 Ltr. from S. Donziger to D. Kuhn), at 7.

[117]

Tr. (Donziger) 2474:16-20, 2475:17-2476:6; PX 6872 (May 23, 2006 Ltr. from S. Donziger to D. Kuhn), at 9 ("As we surveyed our options, we decided that Fajardo was the best bet to replace Pareja even though he had never run a trial in his life and (as the graduate of an extension school) was not considered a 'real' lawyer by Chevron's legal team.").

[118]

PX 323 (Special and Judicial Power of Attorney on Behalf of Pablo Estenio Fajardo Mendoza).

[119]

*Id.*

[120]

*E.g.*, DX 1500 (Hinton Direct) ¶ 34 ("Pablo Fajardo won the CNN Hero Award. . . .").

[121]

*E.g.*, PX 1107 (Feb. 24, 2009 Email from P. Fajardo to S. Donziger and L. Yanza) ("I'm in Oregon [and] . . . . I'm supposed to give the opening address at a super important conference in the environmental world. . . ."); PX 5600 (Kohn Direct) ¶ 18 ("In 2006, Mr. Donziger, Mr. Fajardo, Mr. Yanza, and Mr. Ponce met me in my offices to discuss the case."); Donziger Jan. 14, 2011 Dep. Tr. at 2795:11-20 ("Q.  Where were you and Mr. Fajardo meeting?  A.  It was in my apartment.  Q.  In New York?  A.  Yes.  Q.  What was the purpose of Mr. Fajardo's visit to New York in May of 2010?  A.  To deal with various issues relating to the Lago case.").

32

early days.[122]  He never answered the complaint, and a certificate of default has been entered against him.[123]

A number of other Ecuadorian lawyers has been involved in the Lago Agrio case on behalf of the LAPs.  The most significant have been Alejandro Ponce Villacis ("Ponce"), Juan Pablo Sáenz, and Julio Prieto.

Yanza recruited Ponce, a lawyer based in Quito, shortly after the Lago Agrio case was filed to "provide advice on the strategy as well as draft pleadings" and consult on matters of Ecuadorian law.[124]  Although Ponce was involved in "design[ing] the strategy of the case,"[125] he left the team in 2008 when he became a partner in his firm.[126]

 Juan Pablo Sáenz and Julio Prieto report to Donziger and Fajardo, who often have called upon them to research and answer questions of Ecuadorian law,[127] translate documents (Sáenz

---

[122]

DI 128 (Feb. 23, 2011 Ltr. from P. Fajardo to Court).

[123]

DI 469 (Certificate of Default as to Fajardo, Yanza, the ADF, Selva Viva, and the 45 defaulting Lago Agrio Plaintiffs).

[124]

DX 1601 (Ponce Direct) ¶ 9.

[125]

Id. ¶ 12.

[126]

Id. ¶ 9.

[127]

E.g., PX 7735 (Apr. 10, 2007 Email From S. Donziger to J. Sáenz and A. Ponce) ("Need some manner to make theory of unjust enrichment part of damages claim.  Any ideas of how under Ecuadorian law?"); PX 2493 (Aug. 26 2008 Memorandum from G. Erion and J. Sáenz) ("Re: Chevron's Liability for Texaco in Fact and Law.").

33

is fluent in English),[128] write briefs,[129] and handle daily litigation tasks.

### 4.    The Assembly

In 2001, a grass roots organization called the Asamblea was formed in the Orienté.[130]

Humberto Piaguaje, the current leader, explained that associations were formed in each oil field.

Each association designated delegates to participate in a larger council, and leaders of each

indigenous group and one representative of settlers in each province formed an executive

committee.[131]  The executive committee has met approximately once a month, often with members

of the Ecuadorian plaintiffs' legal team.[132]  Minutes of these meetings have been taken and kept

---

[128]

PX 8057 (Mar. 7 2010 Email from P. Fajardo to S. Donziger copying others) ("Juampa [Sáenz] is translating the Callejas statement.")

[129]

PX 8057 (Mar. 7 2010 Email from J. Prieto) ("I can start on the motion [to be submitted in Denver]"); PX 7580 (Nov. 7, 2006 Email from S. Donziger to J. Sáenz, L. Schrero, and J. Prieto); PX 7468 (Nov. 11, 2010 Email from J. Sáenz to P. Fajardo and S. Donziger) ("Friends, here's the most recent draft of the Alegato.  It still needs some work."); PX 435 (Nov. 15, 2007 Email from J. Sáenz to P. Fajardo, J. Prieto, S. Donziger, and A. Anchundia) ("Colleagues, here's the first version of the famous merger memo, for your review and comments.  At the last minute I thought it would be a good idea to add something about piercing the corporate veil, which is still missing.").

[130]

DX 1900 (H. Piaguaje Direct) ¶ 26; Tr. (Donziger) 2635:11-22 ("The asamblea, I would describe it as a grassroots organization that was created by the affected communities that exist in the Napo concession area, that is where Texaco used to operate.  There is about 80 different communities, some indigenous, some farmer communities, that consider themselves to be the class of people that would benefit from any cleanup of the environmental damage.  And they organized an assembly in recent years to meet on a regular basis and to monitor the lawsuit and to work with the lawyers to make their views known about how they thought the lawsuit should be litigated, or whatever issues that they wanted to express themselves about they would.").

[131]

DX 1900 (H. Piaguaje Direct) ¶ 36.

[132]

Id. ¶ 37.

34

since 2001.[133]

Although the Asamblea "existed informally as a de-facto organization" since 2001, it changed its name in 2012 to the Union of the Assembly of those Affected by Texaco ("UDAPT" or the "Assembly").[134]   In each of its incarnations, it has worked closely with the ADF[135] in connection with the Lago Agrio case.

III.    *The Beginnings of Donziger's Pressure Campaign*

A.    *Donziger's Strategy*

Donziger's assumption of control over the litigation resulted in a fundamental change in approach.  The new approach is a lens through which virtually everything that happened after the Lago Agrio case began in 2003 must be viewed.

Donziger believed that the court of public opinion was as important as any other.[136] Once he took control of the case, the effort became "a campaign with various fronts active

---

[133]

*Id.* ¶ 38.

[134]

*Id.* ¶ 26.

[135]

The ADF is referred to also as the "Amazon Defense Coalition."  *See, e.g.*, DX 1600 (Moncayo Direct) ¶ 6.

[136]

Charles Calmbacher, one of the first experts Donziger hired to assist in the Lago Agrio litigation, testified that "a big concern of Donziger's was our public appearance.  He was convinced that he could win the case in the court of public opinion. . . . He felt, you know, if we showed any contamination, he could basically bring that out as, you know, something horrible to the people and to the Amazon and get public opinion on his side."  Calmbacher Dep. Tr. at 26:1-14.

35

simultaneously," including the media and the U.S. and Ecuadorian political spheres.[137]  He adopted an aggressive media strategy.

The importance of Donziger's media and public relations strategy is evident from the manner in which Donziger spent the millions of dollars that were obtained from investors.[138]  He outlined the campaign in a memorandum he wrote to his team in late 2003.  He explained that the team would initiate and/or utilize celebrities; non-governmental organization "pressure;" the "Ecuador government – executive, and Congress;" national, international, and Ecuadorian press; a "divestment campaign" in which the team would seek to convince institutional investors to sell Chevron stock, and even a criminal case in Ecuador in its effort to obtain money from Chevron.[139]

---

137    PX 687 (Nov. 19, 2003 Memorandum from Donziger to Team re: "Strategic Planning Memo/Ecuador Case"), at 1.

138    While the financial records are incomplete and do not permit a full and accurate accounting, PX 4900R (Dahlberg Direct) ¶¶ 8, 31-32, Donziger spent, or had primary control over spending by others from whom he raised money, at least several million dollars to make the documentary film *Crude*, to hire public relations personnel and lobbyists, to pay a former presidential speech writer to ghostwrite op-ed pieces for signature by others, and to fund ostensibly independent NGOs that publicly supported the LAPs in various ways.  *Id.* ¶¶ 7, 89-112; *see also* PX 607 (Invoices from S. Donziger to Kohn, Swift & Graf), at 58 (June 10, 2010 Invoice reflecting $7,500 fee for Paul Orzulak, West Wing Writers).  The public relations personnel and lobbying firms he hired included Karen Hinton, Ken Sunshine, Paul Orzulak, Kerry Kennedy, Lou Dematteis, Mark Fabiani, Christopher Lehane, Ben Barnes Group, and Downey McGrath Group.  PX 4900R (Dahlberg Direct) ¶¶ 89, 107.  Among the NGOs with which he worked closely, and for which he raised substantial funds, were Amazon Watch, the ADF, the Rainforest Action Network, and Selva Viva.  *Id.* ¶¶ 101-06.

139    *E.g.*, PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re: "Activity Going Forward"), at 1 ("The space is occupied by players in the worlds of law, science, environmental activism, politics, the press, lobbying, diplomacy, celebrity, shareholders, financial analysts, regulatory agencies, and many others in Ecuador – including high-level officials in Ecuador's government . . . .  We . . . see this as not just a legal case, but a political-style campaign driven by a legal case.  The battle takes place on a daily basis, 24/7 per day, with no breaks for the normal rhythms of the typical legal practice.").

In fact, many of Donziger's former co-counsel on the case expressed grave concerns over

36

Just as important as the pressure campaign directed at Chevron was an analogous campaign directed at the Ecuadorian courts.  As we have seen already, Donziger viewed the Ecuadorian courts as corrupt, weak and responsive to pressure – as institutions that, at best, "make decisions based on who they fear the most, not based on what the laws should dictate."[140]  In a particularly revealing comment, made in his personal notebook, he wrote that "*the only way the court will respect us is if they fear us – and that the only way they will fear us is if they think we have . . . control over their careers, their jobs, their reputations – that is to say, their ability to earn a livelihood.*"[141]  "[I]n the end of the day," he said, "it is about brute force" rather than "all this bullshit about the law and facts."[142]  As we shall see, he and his associates directly coerced at least one judge and mobilized demonstrations to intimidate others.  And the object always included ratcheting the pressure up on Chevron in order to extract money from it.

This focus on the media had at least one unintended effect.  Hoping to promote the LAPs' cause in the court of public opinion, Donziger in 2005 recruited a film maker to follow him and his team around in Ecuador and the United States, filming scenes for use in documentary.  That film eventually become the documentary *Crude*, which prompted extensive U.S. discovery efforts

---

his "obsession with public relations."  PX 1406 (Aug. 9, 2010 Ltr. from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje, E. Criollo), at 4; *see also* PX 1157 (Sept. 5, 2009 Email from N. Glazer to S. Donziger) ("We have a team of experienced attorneys who want to be fully integrated into and engaged with the matter . . . . And we . . . learn of case developments not from co-counsel but from press releases . . . . I feel . . . that it is extremely unprofessional, and that too much emphasis is placed on PR and not enough on other aspects.").

[140]

*Supra Facts* § II.A.

[141]

PX 184 (Donziger Notebook), at 2 of 5 (emphasis added).

[142]

PX 77A (Undated *Crude* Clip).

by Chevron that led to the disclosure of outtakes from the film. Many of Donziger's statements on camera made to the *Crude* film makers, some of which are quite revealing, are in evidence in this case.

> B.    *Donziger's Public Relations Team and NGO Allies*
>
> 1.    *The Public Relations and Lobbying Team*

As Donziger viewed (and views) his efforts to force Chevron into settlement as "a political-style campaign driven by a legal case,"[143] it is not surprising that he spent a significant part of the resources he raised for the Lago Agrio case on these efforts, and hired several public relations professionals and lobbyists with extensive political experience to work on the LAPs' behalf. He involved also, and at times financially contributed to, NGOs to support his efforts. These individuals and organizations often were mere mouthpieces, however. Donziger at all times controlled the content and timing of the LAPs' public relations.

Until quite recently, Karen Hinton was the public face of the litigation's public relations efforts. She was the "United States press coordinator" and handled media relations efforts from May 2008 to March 2013.[144] During that period, Hinton issued press releases and blog posts to generate media interest in the case, selected materials to submit to public officials, responded to

---

[143]    PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re "Activity Going Forward"), at 1.

[144]    DX 1500 (Hinton Direct) ¶¶ 2, 4. In 2009, Donziger described Hinton to one of the case's investors as follows: "Former aid[e] to Andrew Cuomo (Clinton cabinet member and currently [Attorney General] of New York). Responsible for 60 Minutes, Wash Post, Bloomberg, AP, Wall Street Journal, and interest by Andrew Cuomo in investigating Chevron for misleading shareholders." PX 1123 (Apr. 14, 2009 Memorandum from S. Donziger to R. DeLeon re "Estimated 15-month budget, Ecuador case"), at 1-2.

38

media inquiries,[145] and, eventually, handled media requests related to the discovery proceedings
Chevron launched in the United States.[146]  As Hinton understood it at the time of her retention, the
objective of her communications efforts was to "facilitate the stated goal of pushing ChevronTexaco
to settle the lawsuit in the near future."[147]  Hinton did not have ultimate control over the content of
her work, however.   The substance of her press releases always was subject to Donziger's
approval.[148]

Chris Lehane likewise worked to develop the LAPs' media and public relations
strategy as an "advisor" to Donziger[149] using "strategies and tactics . . . employed in political
campaigns . . . ."[150]  After first discussing Donziger's objectives with him, Lehane proposed to

---

[145]

DX 1500 (Hinton Direct) ¶ 4; Tr. (Hinton) 2180:22-2181:2.

[146]

Tr. (Hinton) 2169:14-15.

[147]

PX 1034 (Apr. 28, 2008 Email from K. Hinton to S. Donziger re "Proposal from Hinton
Communications"), at 3.

[148]

E.g., PX 6817 (Mar. 11, 2009 Email Chain Between K. Hinton and S. Donziger) (Donziger
tells Hinton: "do not change headlines ever without telling me. . . . in the future blind copy
me on those emails to quito. . . I need to know what is going on for purposes of managing
my own staff there and knowing what journalists there have been sent . . . I think I asked
you that before"); PX 1133 (May 5, 2009 Email from K. Hinton to S. Donziger) ("There
are people in this world – other than yourself – who know how to get things done.  I know
that's hard for you to believe, given your own incredible fascination with yourself."); PX
6814 (Dec. 3, 2009 Email chain Between K. Hinton and S. Donziger) (Donziger: "when I
send a final copy of a press release for posting, the issue of the headline is settled. never
change it at that point. tks."  Hinton: "I said I misunderstood.  Why do u always feel the
need to rub a mistake in extra hard. . . To make sure your authority is respected and
acknowledged?  It is.  Ok!").

[149]

Donziger June 28, 2013 Dep. Tr. at 845:21-23.

[150]

PX 728 (Apr. 27, 2005 Email from C. Lehane to S. Donziger and J. Kohn attaching
Ecuadorian Issues Outline), at 4.

39

Donziger a strategy to target shareholders, Congress, and "high level media" in order to "inflict[] real economic pain on the company" and "bring[] Chevron Texaco to the negotiation table."[151]  The plan was to "fully leverage" events in Ecuador, with a view to "apply[ing] shareholder pressure on Chevron."[152]  Donziger hired him, and, in exchange for his work on the case, arranged for Lehane to be given a percentage of any eventual monetary recovery.[153]

### 2. *Amazon Watch*

Another central player in Donziger's publicity campaign was Amazon Watch, an NGO that declares a dedication to protecting the rainforest and the indigenous groups that inhabit it.[154]  Amazon Watch and various of its staff – including Atossa Soltani, its founder and executive director, and Mitchell Anderson, a "field consultant" – worked with Donziger and others on the LAP team to support and publicize the lawsuit and to pressure Chevron. To that end, the organization collaborated with the LAPs to lobby regulatory agencies and elected officials,[155] sought support

---

[151]

     *Id.* at 1 (emphasis omitted).

[152]

     PX 734 (Oct. 1, 2005 Email from S. Donziger to J. Kohn re "Lehane's first press plan"), at 2; *see also* PX 694 (Aug. 16, 2004 Email from C. Lehane to S. Donziger re: "Issues Outline Document"), at 2 ("We must create an ongoing storyline that ChevronTexaco faces hidden purposely concealed economic exposure because of its unresolved role in the Ecuador . . . project.  Ultimate success will depend on our ability to organize and focus our efforts on impacting the company's bottom line.").

[153]

     June 28, 2013 Donziger Dep. Tr. at 845:24-846:4; *see also* PX 560 (Feb. 2011 Advisory Agreement between LAPs, CSL Strategies, and Mark Fabiani LLC).

[154]

     *See* PX 571 (2005 Amazon Watch Annual Report), at 5.

[155]

     PX 7426 (Feb. 9, 2008 Email from S. Donziger to M. Anderson, P. Paz y Mino, and K. Koenig re: "For Pat Doherty"); PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani

40

among Chevron shareholders for a settlement,[156] and sought media attention through press releases.[157]

Although Amazon Watch's public materials did not bear Donziger's name, Donziger himself drafted many Amazon Watch materials related to the Lago Agrio litigation.[158] Donziger not only controlled the content of Amazon Watch press releases pertaining to the litigation,[159] he drafted also complaints that Amazon Watch submitted to the SEC[160] and memoranda to be sent to elected

---

and S. Aird to C. Cox).

[156]
PX 7542 (May 25, 2009 Amazon Watch Letter to Shareholders), at 2.

[157]
See, e.g., PX 483R (Mar. 6, 2007 Amazon Watch press release) at 2 ("[An] independent damage assessment, by the U.S. firm Global Environmental Operations, estimates clean-up to cost at least $6.14 billion."); PX 472R (Apr. 26, 2006 Amazon Watch press release), at 1 ("Two rainforest leaders sparked a dramatic showdown with Chevron CEO David O'Reilly today over the oil major's devastating $6 billion toxic contamination of their ancestral lands . . . .").

[158]
See, e.g., June 28, 2013 Donziger Dep. Tr. at 834:2-5 (acknowledging that "[o]n occasions [Donziger] wrote press releases that [Amazon Watch] put out"); Jan. 18, 2011 Donziger Dep. Tr. at 3177:10-13; 3178:10-20 (Q: "You drafted the [SEC] complaint letters for Amazon Watch to send; did you not?" A: "I believe at times I did.").

[159]
See, e.g., PX 1214 (Jan. 27, 2010 Email from S. Donziger to S. Tegel, A. Soltani, K. Koenig, and M. Anderson re: "another thought"), at 1 ("Suggestions are welcome for any press release we do; final editing authority is something we would never grant to any outsider – especially somebody not in a position to understand the art and feel of this campaign and its daily developments."); PX 808 (Nov. 9, 2006 Email from S. Donziger to J. Ciplet and A. Soltani re: "suggestion"), at 1 ("I also know the press releases on the Ecuador campaign are not a terrible work burden to AW because I am writing most of them."); PX 906 (Aug. 24, 2007 Email from S. Donziger to S. Tegel, M. Anderson, A. Soltani, and K. Koenig re: "follow up on press releases"), at 1 ("[W]e are never going to outsource our editing responsibility to anybody else or any NGO . . . .").

[160]
See, e.g., PX 996 (Mar. 17, 2008 Email from S. Donziger, M. Anderson, S. Tegel, P. Paz y Mino, and A. Soltani re: "Edited SEC letter/final"), at 1 ("The final SEC letter is attached with all of AW's edits sent to me on Friday plus some additional edits of my own . . . . I think this letter will really put some heat on them.  To submit this, this is what you need to do . . . .").

41

officials regarding Chevron.[161]   Despite Donziger's authorship, the materials bore no outward indication of his involvement – documents drafted in whole or in substantial part by Donziger were sent on Amazon Watch letterhead and signed by Amazon Watch personnel.

In addition, in April 2005 Amazon Watch used funding from the LAPs[162] to launch a website that was a key conduit for Donziger's campaign.[163] Dubbed "ChevronToxico," the website posted information about the litigation as well as materials written by Donziger, Hinton, and others, some of which included deliberately misleading statements.

Hinton, Lehane, Soltani, and others at Amazon Watch became important figures in Donziger's pressure campaign against Chevron, and their names appear throughout this case. Among the campaign's first real tasks, however, was the use of a flawed $6 billion figure to attempt to convince Chevron that it was facing multibillion dollar exposure in Ecuador and that the time had come to settle.

C.   *The Pressure Begins – The LAPs' First Scientist and the $6 Billion "Drive By" Damages Estimate*

Soon after the complaint was filed in Lago Agrio in 2003, Donziger hired David Russell, an environmental engineer,[164] to generate an initial cost estimate for remediation of the

---

[161]
   *See, e.g.*, PX 7426 (Feb. 9, 2008 Email from S. Donziger to M. Anderson re: "For Pat Doherty"), at 1 ("Mitch, Attached is the memo you requested.  I put it in your name.").

[162]
   Donziger June 28, 2013 Dep. Tr. at 841:19-22.

[163]
   PX 571 (2005 Amazon Watch Annual Report), at 8; Tr. (Hinton) 2180:1-24.

[164]
   PX 3200 (Russell Direct) ¶ 1.  Prior to his involvement with the Lago Agrio case, Russell worked on projects involving remediation and strategic planning related to oil operations in

42

Concession area.[165]  Among the purposes of the estimate was to subject Chevron to the threat of a

very large recovery.[166]

     In the fall of 2003, at Donziger's direction, Russell went to the Orienté to work on

his damages estimate.[167]  There are three notable points about this estimate.

     *First*, Russell visited only about 45 of the hundreds of oil pits in the region, and based

his calculations on an extrapolation of what he observed at those sites.[168]  But he did not analyze

any soil or water samples at any of the sites he visited.[169]  And his visits to some of those sites, he

acknowledged at trial, were no more searching than driving past them at 40 or 50 miles per hour.[170]

     *Second*, Russell testified, and the Court finds, that Donziger instructed him to make

certain assumptions in calculating costs.[171]  Among them was the assumption that Texaco was fully

---

the United States and Latin America.  *Id.* ¶ 2.

[165]

   *Id.*

[166]

   *E.g.*, Tr. (Russell) 388:14-18 ("I believe . . . that Mr. Donziger was intending to use this cost estimate to get Chevron's attention and to attempt to get them to settle the case.").

[167]

   PX 3200 (Russell Direct) ¶ 5; *see also* DX 1750 (Donziger Direct) ¶ 111; Tr. (Russell) 300:8-10 .

[168]

   Tr. (Russell) 304:9-12.

[169]

   PX 3200 (Russell Direct) ¶ 5.  Donziger testified, however, that Russell was "provided with and reviewed a considerable amount of data, including historical records and maps."  DX 1750 (Donziger Direct) ¶ 111.

[170]

   Tr. (Russell) 309:4-8; PX 3200 (Russell Direct) ¶ 5.

[171]

   DX 1750 (Donziger Direct) ¶ 111; PX 3200 (Russell Direct) ¶ 9.

43

liable for all of the contamination in the region, even that caused by PetroEcuador[172] after it took over operation of the Consortium properties when TexPet left in 1992.

Third, as the report itself made clear, Russell's "cost projections [w]ere very rough."[173] He testified that this was due to "the amount of unknowns and the lack of information [he] had with regard to not only levels of contamination but the extent of those levels of contamination."[174] And he informed Donziger and other members of the LAP team as early as December 2004 that his estimates were "best guesses based upon a week of looking at the sites, without any scientific data," and encouraged the team not to "rush to judgment" based on a "guesstimate."[175] He was entirely candid at trial on the consequences of this lack of data – the quantities he used in generating the $6 billion figure were, he said, were "SWAG," an acronym for a "scientific wild ass guess."[176]

D.    Donziger Touts Russell's "SWAG" and Other Misleading Descriptions of Conditions in the Orienté to Put Pressure on Chevron

Russell's $6 billion SWAG figure quickly became a key weapon in Donziger's effort to exert pressure on Chevron and convince the company – and the world – that the damages in the

---

[172]    PX 3200 (Russell Direct) ¶ 6; see also DX 1750 (Donziger Direct) ¶ 111.

[173]    PX 2414 (Russell Damages Estimate), at 2.

[174]    Tr. (Russell) 339:4-7.

[175]    PX 3201 (Dec. 12, 2004 Email chain including D. Russell, C. Bonifaz, A. Wray, S. Donziger, and M. Pareja).

[176]    Tr. (Russell) 339:10-11.

44

Orienté were substantial and the threat of an enormous judgment against it was real.  As we shall see, Donziger and his public relations operation avidly used Russell's $6 billion figure in the media to generate leverage despite the fact that they knew that it could not withstand serious analysis.

David Russell left the LAP team in early 2005 because, among other reasons, the LAP team owed him money and refused to pay it.[177]  By that time he had made explicit to Donziger that his cost estimate had been "wildly inaccurate and that it should not be used."[178]  But that did not stop Donziger and his public relations team from using the number, over Russell's protests, to pressure Chevron through the media.[179]

---

[177]
    PX 3200 (Russell Direct) ¶ 38.

[178]
    *Id.* ¶ 14.

[179]
    *Id.* ¶¶ 12-13, 20; *see generally* PX 766 (Feb. 13, 2006 Email chain including D. Russell, L. Salazar-Lopez, and S. Donziger re: "Cease and Desist!");  PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re "Cease and Desist"), at 1-2; PX 766 (Feb. 16, 2006 Email from L. Salazar-Lopez to D. Russell re: "Cease and Desist!") (stating that Amazon Watch "respect[s] your request and have decided to take [the] report off of [the Amazon Watch] website"); PX 466R (Mar. 17, 2006 ChevronToxico press release), at 2; PX 467R (Mar. 22, 2006 Amazon Defense Coalition press release), at 1 ("Chevron is resorting to increasingly desperate measures to cover its tracks in the landmark environmental trial in Ecuador in which the oil giant faces a $6 billion clean-up tab."); PX 472R (Apr. 26, 2006 Amazon Watch press release), at 1 ("Two rainforest leaders sparked a dramatic showdown with Chevron CEO David O'Reilly today over the oil major's devastating $6 billion toxic contamination of their ancestral lands . . . ."); PX 480R (Oct. 30, 2006 Amazon Watch press release), at 1-3 (referring to "landmark $6 billion pollution trial" and remediation cost estimates of "at least $6 billion"); PX 18A (Undated *Crude* Clip), at CRS-138-02-CLIP-02; PX 788 (Aug. 15, 2006 Email from S. Donziger to D. Russell re "I asked you once . . .") ("No problem, I will contact the Frente to have that removed . . . ."); PX 476R (Aug. 25, 2006 Amazon Watch press release), at 1 ("Clean-up is estimated at $6.1 billion."); PX 494R (Aug. 30, 2007 Amazon Defense Coalition press release), at 3 ("Global Environmental Services, an Atlanta-based company that assessed the damage, called the area the 'Rainforest Chernobyl' and estimated clean-up would cost at least $6 billion.").

E.      *False and Misleading Representations to Incite Governmental Action Against Chevron*

The press was not the only intended audience for Russell's disavowed $6 billion figure and other false and misleading comparisons.  Donziger and his public relations team employed both in efforts to instigate action and put pressure on Chevron from federal and state officials and agencies.  One aim was to create the perception that the litigation threatened serious harm to the company, was material to Chevron's bottom line, and would result in a lower share price and lower profits for Chevron shareholders.  In Lehane's words, "the Ecuadorian Amazon ChevronTexaco project can be reduced, in the end, to a single strategic imperative: 'Bringing ChevronTexaco to the negotiation table by inflicting real economic pain on the company.'"[180]

To that end, Donziger in late 2005 drafted a letter[181] that ultimately was sent by Amazon Watch to the Securities and Exchange Commission ("SEC").  The letter "request[ed] that [it] open an investigation into the Chevron Corporation (CVX) for violating SEC regulations governing disclosure obligations. . . ."[182]  The letter promoted Russell's SWAG remediation estimate, stating that "[o]ne environmental remediation expert estimated that a basic clean-up would cost at least $6 billion"[183] despite the fact that Donziger knew when he wrote it that Russell had told

---

[180]    PX 728 (Apr. 27, 2005 Email from C. Lehane to S. Donziger and J. Kohn attaching Ecuadorian Issues Outline) (emphasis omitted).

[181]    PX 736 (Nov. 1, 2005 Email from S. Donziger to C. Lehane and J. Kohn re: "SEC ltr/other").

[182]    PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox).

[183]    *Id.*

46

him that it was wildly inaccurate.[184]  The letter asserted also that Chevron had "creat[ed] toxic

contamination over 30 times larger than the Exxon Valdez"[185] and decried Chevron's alleged failure

to disclose its "potential liability" to its shareholders.[186]  He used the same figure, despite subsequent

confirmation that it was exaggerated, in later testimony before a Congressional commission on

human rights, and in press releases.[187]

---

[184]

    PX 3200 (Russell Direct) ¶ 14 ("I told Donziger on several occasions from late 2004
through early 2005 that my initial cost estimate was wildly inaccurate and that it should not
be used.").

[185]

    PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox).

    In 2007, Bill Powers, a member of the LAPs' technical team, investigated the claim that the
contamination in the Orienté was 30 times larger than the contamination caused by the
Exxon Valdez.  He concluded that it was vastly exaggerated and so informed Donziger and
Soltani of Amazon Watch. PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re:
"exxon valdez 30x"); PX 862 (May 24, 2007 Email from B. Powers to S. Donziger, A.
Soltani, S. Tegel, K. Koenig and J. Ciplet re: "FOE is on our team RE: exxon valdez 30x").
Soltani responded that Amazon Watch – which had featured the Exxon Valdez comparison
in press releases – needed to "save face" and remove the references to the spill.  PX 861
(May 24, 2007 Email from A. Soltani to S. Donziger re "exxon valdez 30x").  But Donziger
insisted that they stick to the claim.  He warned that there would be "HUGE implications for
the legal case" if they disavowed the comparison to Exxon Valdez, and told Amazon Watch
that it "[w]ould terribly prejudice the people it is trying to help if it makes this change." PX
860 (May 24, 2007 Email from S. Donziger to S. Tegel re: "private").  Despite Soltani's
reservations, ChevronToxico continued to tout the claim. *See, e.g.*, PX 492R (July 4, 2007
Amazon Watch press release), at 2; PX 2309R (Aug. 28, 2009 Amazon Defense Coalition
Press Release), at 2; PX 503 (May 21, 2008 Amazon Defense Coalition press release), at 2
("30 times more pure crude than in the Exxon Valdez disaster"); PX 510 (Sept. 16, 2008
Amazon Defense Coalition press release), at 2 ("The Ecuadorians have accused Texaco . .
. of committing the worst oil-related disaster on the planet on their ancestral lands – one at
least 30 times worse than the Exxon Valdez spill."); PX 513R (Oct. 15, 2008 ChevronToxico
press release), at 2 ("All told, the amount of oil dumped in Ecuador by Texaco is at least
thirty times greater than the amount spilled during the Exxon Valdez disaster, according to
the plaintiffs in the civil suit.").

[186]

    PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox).

[187]

    PX 1130R (Apr. 28, 2009 S. Donziger Testimony before Tom Lantos Human Rights
Comm'n, Hr'g on Ecuador, Nigeria, West Papua: Indigenous Communities, Environmental

The day after the SEC letter was sent, Donziger wrote to Soltani of Amazon Watch:

"[n]ow that the SEC ltr is filed, it is key we come up with a coherent strategy to build pressure for

the April shareholder's [sic] meeting."[188]   Donziger called on Amazon Watch and others – including

Chevron shareholders (whom Amazon Watch was to address at an upcoming shareholder meeting)

– to send letters to the SEC calling for investigation into Chevron's conduct in Ecuador.[189]   Donziger

suggested that Amazon Watch "seek a meeting with [SEC chairman Christopher] Cox or one of his

deputies" in order "to press for them to open a real investigation."[190]   He insisted that Amazon

Watch could  "get a lot of legs out of this if it is exploited with a little follow-up" and emphasized

that the "key . . . to [the] strategy . . . is to keep this alive and active so it is hanging over their heads

---

Degradation, and International Human Rights Standards), at 60.

Douglas Beltman, another scientist then working for the LAPs, also challenged the accuracy of the Exxon Valdez claim.  He asked Donziger: "do you know where the 30 times number comes from?" PX 1110 (Mar. 1, 2009 Email from D. Beltman to S. Donziger re "Pls answer questions"), at 1.  Donziger replied: "*My own calculations.  If that doesn't suffice then kiss my butt.*"  *Id.* (emphasis added).

Shortly thereafter, Donziger recited the Exxon Valdez comparison in his testimony and continued to use the statistic in press releases and blog posts throughout 2009 and 2010. PX 522R (Apr. 27, 2009 Amazon Defense Coalition press release), at 2; PX 527R (Oct. 22, 2009 Amazon Defense Coalition press release), at 2 ("Experts for the plaintiffs have concluded the disaster is at least 30 times larger than the Exxon Valdez spill . . . ."); PX 529R (Dec. 30, 2009 Amazon Defense Coalition press release), at 2 ("Experts consider the disaster at least 30 times worse than the damage caused by the Exxon Valdez."); PX 533R (*The Chevron Pit* Blog Entry), at 3 ("Experts have concluded that the Chevron [sic] discharged at least 345 million gallons of pure crude oil directly into the rainforest ecosystem . . . and approximately 11 million gallons of pure crude was spilled during the Exxon Valdez disaster.").

188

PX 756 (Jan. 31, 2006 Email from S. Donziger to A. Soltani and J. Ciplet re: "Plan for SEC follow up").

189

*Id.*

190

PX 759 (Feb. 1, 2006 Email to A. Soltani, S. Aird, J. Ciplet, L. Salazar Lopez, and S. Tegel re: "imp follow up with SEC").

48

as long as possible, and so it can be used to get other shareholders to write their own letters."[191]

By the end of February 2006, Russell had sent his first cease and desist emails to Donziger and Amazon Watch.[192]  Donziger emailed Soltani to suggest that they send "the SEC letter in ASAP, making [the] slight change that another report will be coming with a multi-billion damage figure, without disavowing or mentioning Russell's report."[193]

Donziger's efforts to incite an SEC investigation did not amount to much.  After meeting with an SEC investigator, he wrote to his team that the investigator thought that "the probability of a negative judgment [in the Lago Agrio litigation] was so attenuated that they [SEC staff] did not think it [*i.e.*, the possible $6 billion exposure] was material yet."[194]  But while Donziger admitted that he "sort of fe[lt] [that the investigation he sought was] bogus," he insisted that he would " keep feeding them [the SEC] stuff" as long as the SEC was willing to continue talking with them.[195]  This was not the only time Donziger and his public relations team would reach out to the SEC in an effort to gain leverage over Chevron.[196]

---

[191]

*Id.*

[192]

PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re "Cease and Desist"), at 1.

[193]

PX 768 (Feb. 23, 2006 Email from S. Donziger to A. Soltani, L. Salazar-Lopez, S. Tegel, J. Ciplet re: "important – SEC ltr").

[194]

PX 781 (July 12, 2006 Email from S. Donziger to A. Page and D. Fisher re: "SEC investigation/Chevron").

[195]

*Id*.

[196]

Amazon Watch wrote to SEC Chairman Cox again in March 2008 to request "that the SEC impose sanctions on Chevron . . . for violations of its disclosure obligations" with respect to its liability in the Lago Agrio litigation.  In that letter, Amazon Watch stated that the case

49

F.   *Donziger's Attempt to Justify His Continued Use of Russell's Disavowed Estimate is Unpersuasive*

Donziger attempted at trial to justify his continued use of Russell's disavowed estimate by explaining that he believed in its validity and, indeed, thought at the time that the actual remediation figure was much higher than $6 billion.   He testified that he had a "more detailed cost assessment from [the] Ecuadorian technical team" that had calculated the remediation cost to be over $15 billion as well as estimates by a "junior lawyer" that the "remediation proposal [would] come in at about $20 billion."[197]  That these estimates were so much higher than $6 billion, Donziger claimed, satisfied him that it was acceptable to continue using Russell's cost estimate notwithstanding the fact that Russell demanded repeatedly that he stop doing so.  But Donziger's claim is far fetched and the Court finds that Donziger in fact never believed it.  The only estimates of which there was any evidence were prepared under Donziger's direction by junior lawyers who worked for him.[198]  As Donziger acknowledged, their purpose was to "make media/court/CVX

---

was "[c]oming to a [c]lose" and touted "the appointment of an independent special master to assess culpability and ascertain the monetary value of the damages caused."  *See* PX 497R (Mar. 18, 2008 Ltr. from A. Soltani to C. Cox), at 2.  The letter stated also that Chevron's liability "appears to have increased substantially" such that the "materiality threshold as understood by SEC guidance is reached."  *Id.* at 5.  Donziger largely drafted this letter for Amazon Watch as well.  *See* PX 996 (Mar. 17, 2008 Email from S. Donziger, M. Anderson, S. Tegel, P. Paz y Mino, and A. Soltani re: "Edited SEC letter/final"), at 1 ("The final SEC letter is attached . . . .").

[197]   DX 1750 (Donziger Direct) ¶ 118.

[198]   They were prepared by Donziger's associate, Aaron Marr Page, and his wife, Daria Fisher, and were to be submitted under the name of Fausto Peñafiel.  DX 731 (Apr. 14, 2006 Email from A. Maest), at 4 ("Fausto can be the author of this if you'd like to submit it?"); DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page and D. Fisher re: "excellent work on remediation/questions"); PX 8014 (Edits by S. Donziger, "The Cost of Remediating the Former Texaco Concession: An Order of Magnitude Estimate," signed by Fausto Miguel Peñafiel Villareal).  Mr. Peñafiel, one of the LAPs' party-nominated experts, introduced Donziger to Fernando Reyes, whose involvement in the case will be explained below.  *See*

50

[Chevron] itself start thinking in terms of billions"[199] and potentially to use the figure to pique the SEC's interest in the litigation.[200]  There is no evidence of any competent study during this time period by any qualified person that supports Donziger's claim.

*   *   *

We have touched here only on part of Donziger's earliest efforts beyond the litigation itself, which have continued unabated for years since.  We shall touch on other examples later.  But we turn now to the Lago Agrio case itself, which already had begun.

IV.    *The First Phase of the Lago Agrio Case  – The Judicial Inspections*

A.    *The Process*

Judge Guerra opened the evidentiary phase of the Lago Agrio litigation on October 21, 2003.[201]  It began with the parties submitting requests for the types and scope of evidence that

Reyes Dep. Tr. at 17:2-17.  Page and Fisher are lawyers, not scientists.  They worked on the estimates under Donziger's direction.  PX 8014 (Edits by S. Donziger, "The Cost of Remediating the Former Texaco Concession: An Order of Magnitude Estimate," signed by Fausto Miguel Peñafiel Villareal), at 3 ("Daria, a suggesti[o]n: [I] would put this at end in a footnote or leave out altogether; texaco will see this and slam you . . . Remember that this is not science, this is an active litigation and this needs to be written to protect fausto and this part leaves him exposed.  Always think how they will come back at us.").  Their sole objective – in Page's words – was "to exceed the $6 billion figure, while still passing the laugh test."  DX 731 (Apr. 15, 2006 Email from D. Fisher to S. Donziger and A. Page, re: "excellent work on remediation/questions"), at 3.

[199]

PX 3240 (Apr. 20, 2006 Email from A. Page to S. Donziger re: "DOJ ltr").

[200]

DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page and D. Fisher re: "excellent work on remediation/questions"), at 1 ("[W]ill releasing this now help with the SEC . . . ?").

[201]

PX 4300X (Callejas Direct) ¶¶ 25, 26.

SPA-63

51

the Lago Agrio judge should consider.  Adolfo Callejas – Chevron's local counsel in Ecuador – explained that:

> "Under Ecuadorian civil procedure, the parties must submit all of their evidentiary requests in a defined period; in the case of summary verbal proceedings, that period is six days.  While all of the evidence does not have to be provided within that time frame, all requests for then-existent documents, witness testimony, expert assessments, judicial inspections of a place or thing, and other proof must be requested by both parties by the statutory deadline. . . . My legal team and I submitted a number of evidentiary requests on Chevron's behalf during the initial six-day evidentiary period, as did the lawyers for the Lago Agrio Plaintiffs.  Although there were numerous requests for documents and for witness testimony from both sides, the bulk of the requests were for judicial inspections of a total of 122 sites, including well sites and production stations, in the former Concession area and nearby oilfields."[202]

Guerra granted both sides' evidentiary requests.[203]

Each side identified a technical expert to negotiate the procedures that would govern the judicial inspection process.  Sara McMillen, Chevron's lead scientist on the Lago Agrio case,[204] assumed this role for Chevron, while David Russell, who then still was working for Donziger,  took the lead on behalf of the LAPs.[205]  The parties ultimately agreed upon and submitted to the court a sampling and analysis plan.[206]

> "For most of the judicial inspections, experts were nominated by each side.  At each judicial inspection site, these nominated experts took samples under the supervision

---

[202]

    *Id.* ¶¶ 28-29.

[203]

    PX 317 (Oct. 29, 2003 Lago Agrio Court Order).

[204]

    PX 3300 (McMillen Direct) ¶ 2.

[205]

    PX 4300X (Callejas Direct) ¶ 31; PX 3300 (McMillen Direct) ¶ 14.

[206]

    PX 4300X (Callejas Direct) ¶ 31.

of the judge at that site, sent their samples to a laboratory for testing and analysis, and then each submitted a written report of his or her findings and conclusions to the Ecuadorian Court. The Ecuadorian court also appointed a third set of experts, known as the Settling Experts, who were to resolve any disputes between each sides' experts reports and findings. The Settling Experts attended the judicial inspections."[207]

It is relevant to note that the Lago Agrio court formally appointed the party-nominated experts, but each nominating party paid or provided the funds to pay the experts it nominated. The parties were to share any compensation and expenses of settling experts, each side to submit its half to the court, which then would pay it to the settling expert.[208]

At each judicial inspection, the party that requested the inspection was to present any arguments it had concerning the site. The opposing party would rebut.[209] Each side was to have the right also to request that the court include relevant documentation or other evidence in the record. Following each side's oral presentation, the court itself inspected the site, "registering comments and observations and allowing the parties and the experts to identify the areas where they intended to take samples."[210] The court's secretary was to transcribe the proceedings at the inspection sites, and the transcript of the proceedings – including a list of all the documents presented at the inspection – was to be finalized and signed by the parties.[211] The finalized document was called an *acta*, and was to be made part of the official court record. The documents within the record, which

---

[207]    PX 3300 (McMillen Direct) ¶ 11.

[208]    PX 4300X (Callejas Direct) ¶ 33.

[209]    *Id.*

[210]    *Id.*

[211]    *Id.*

53

of course included many papers in addition to the *actas,* were grouped into *cuerpos,* or books, each of which contained about 100 pages of material.[212]

Following the inspections, each party's experts were to submit their reports, to which the opposing party's expert would have an opportunity to respond.[213] If the settling experts had been called upon to resolve conflicting reports produced by the party-nominated experts, the settling experts' results would be included as well.[214] The parties' nominated experts' reports, rebuttal reports, and any reports by settling experts were to be submitted to the court and made part of the record.

The first judicial inspection took place on August 18, 2004.[215] As will appear, the process of inspecting 122 sites moved very slowly and never ultimately was completed.

B.    *The LAPs' Judicial Inspection Experts*

Russell was in charge of choosing the plaintiffs' experts.[216] He "created budgets for the scientific investigation, purchased equipment, hired, trained, managed, and paid members of the Ecuadorian plaintiffs' field team, and hired and interfaced with the plaintiffs' outside

---

[212]

   Tr. (Zambrano) 1720:3-5.

[213]

   PX 4300X (Callejas Direct) ¶ 34.

[214]

   *Id.* ¶ 33.

[215]

   *Id.* ¶ 31.

[216]

   Russell himself could not serve as an expert because he did not speak Spanish.  PX 3200 (Russell Direct) ¶ 7.

54

laboratories."[217]


C.    *The Calmbacher Episode*

        The first judicial inspection expert that Russell and Donziger hired, in the summer

of 2004, was Dr. Charles Calmbacher, an industrial hygienist who previously had worked with

Russell on other projects.[218]  Calmbacher was instructed to inspect and write the reports for the LAPs

with respect to the first four judicial inspection sites.[219]  He traveled to Ecuador four times to meet

with the plaintiffs' team and participate in those inspections.[220]

        Calmbacher became ill on his last trip and returned to the United States before he

completed his reports.[221]  Before he left, he gave the plaintiffs' team his unfinished drafts, but

continued working on them from the United States.[222]  When Calmbacher was unable to finish the

drafts within the deadlines Donziger set, Donziger fired him.[223]  Even after he was fired, however,

Calmbacher insisted to Donziger that he would still be the one to "write the Perito [expert] reports"

---

217

        *Id.* ¶ 24.

218

        PX 3200 (Russell Direct) ¶ 26; Calmbacher Dep. Tr. at 13:23-14:1,18:10-14.

219

        PX 3200 (Russell Direct) ¶ 26. These sites were Sacha-6, Sacha-21, Sacha-94, and
        Shushufindi-48.

220

        Calmbacher Dep. Tr. at 49:17-20

221

        *Id.* at 61:9-16.

222

        *Id.* at 61:19-23.

223

        DX 1750 (Donziger Direct) ¶ 110; PX 2417 (Oct. 24, 2004 Email from C. Calmbacher to S.
        Donziger and D. Russell).

55

because he needed to "comply with [his] obligation to the court and to maintain [his] professional integrity with the Ecuadorian court."[224]  He wrote to Donziger and Russell:

> "It also has been stressed to me that it is highly unusual for a perito [expert] to allow others to contribute to the writing of a report.  Comments or review is acceptable, but the perito's opinion and findings are final.  I therefore have and feel no obligation to allow your team of textile engineers and associated cron[i]es to review or edit my reports.  I am assured, as perito of the court, that I am completely within my rights to write and submit my report independent of whose who have nominated me for appointment as perito.  My sole obligation is to tell the truth, as I see it, to the court, no matter the consequences for either party."[225]

Calmbacher finished two of the reports and sent them to the LAP lawyers in Ecuador.[226]  The reports were edited and reformatted by them and sent back to Calmbacher for his signature.[227]  Calmbacher agreed with the conclusions reached by the reformatted and edited reports and told the plaintiffs' team that he "had no problem signing [them] because that's what [he] felt."[228]  But those reports were not the reports that the LAP team eventually filed.

Calmbacher testified that:

> "[w]hat happened after that . . . was they asked me to initial some [blank] papers on the corner so [the report] could be printed on that because it had to be initialed.  I said, no, I don't think so.  David [Russell] implored . . . me to do that, that it was honest, it was fair, it was okay.  So I did it.  I think it was about 30 pages.  And I FedEx'd it down . . . I overnighted it.  That was the last I've heard on the project.

---

[224]  PX 2417 (Oct. 24, 2004 Email from C. Calmbacher to S. Donziger and D. Russell).

[225]  *Id.*

[226]  Calmbacher Dep. Tr. at 62:5-10; PX 2417 (Oct. 24, 2004 Email from C. Calmbacher to S. Donziger and D. Russell).

[227]  Calmbacher Dep. Tr. at 62:5-10.

[228]  *Id.* at 62:5-18.

56

I have not been contacted or anything else."[229]

On February 14 and March 8, 2005, respectively, the LAP team submitted to the Lago Agrio court what purported to be the reports of their nominated expert for the judicial inspections of the Shushufindi 48 and Sacha 94 sites.[230] They bore the signatures and initials of, and purported to have been written by, Dr. Calmbacher.[231]  The reports found that "highly toxic chemicals" contaminated the area and that TexPet's remediation was "inadequate or insufficient."[232] When shown these reports at a deposition several years later, however, Dr. Calmbacher testified: "I did not reach these conclusions and I did not write this report."[233] He never concluded that TexPet had failed to remediate any site[234] or that any site posed a health or environmental risk.[235]  Thus, someone on the LAP team used the blank pages Calmbacher had initialed and his signature pages

---

[229]

Id. at 62:18-63:8.  Evidence presented at trial suggests that it was more than Russell's imploring that convinced Calmbacher to initial the documents.  Donziger was threatening not to pay Calmbacher for the work he performed if he did not sign.  Russell sent an email to Donziger on March 1, 2005 that he had "communicated [Donziger's] threat to Calmbacher," and that Russell had "also advised him that it was in his interest to comply by signing the documents and sending them to [Donziger]."  PX 721 (Mar. 1, 2005 Email from D. Russell to S. Donziger).

[230]

PX 249 (Judicial Inspection Report for Sacha Well 93); PX 250 (Judicial Inspection Report of the Shushufindi 48 Well).

[231]

Id.

[232]

PX 249 (Judicial Inspection Report for Sacha Well 93), at 32.

[233]

Calmbacher Dep. Tr. at 113:1-25, 114:22-116:18, 117:2-20.

[234]

Id. at 115:15-19.

[235]

Id. at 115:20-24.

Case 14-826, Document 98, 07/02/2014, 1263303, Page72 of 211

57

to submit over his name two reports that contained conclusions he did not reach.

There clearly have been tensions between Calmbacher and Donziger.  The reasons for those tensions, and for the ultimate split between the two, are not clear, and their accounts differ. Donziger contends that he fired Calmbacher because he missed deadlines for his two reports and displayed "other [unspecified] unprofessional conduct."[236]  Calmbacher admits that Donziger was frustrated that his reports were late, but contends also that he at times disagreed with members of the LAPs' team on the format of the reports and that he voiced his concerns to the LAP team and "probably ruffled feathers."[237]  Nevertheless, the Court sees no sufficient basis to conclude that any ill feeling that Calmbacher may have harbored colored his testimony with respect to reports filed in his name on the Shushufindi 48 and Sacha 94 sites.  It credits Dr. Calmbacher's testimony that those reports were not the reports he wrote and did not reflect his views.  This means that someone on the LAP Ecuadorian legal team revised his draft reports, printed them on the blank pages that Dr. Calmbacher initialed, and filed them with knowledge of the falsity.

The judicial inspections continued despite Dr. Calmbacher's departure, and the LAP team hired other experts to take his place.  But their troubles in this sphere did not end.

D.      *The LAP Lawyers Halt Testing for BTEX and GRO Because it Is Yielding Unhelpful Results*

As noted previously, among the problems that faced the LAP team in the Lago Agrio case is that PetroEcuador had operated in the Concession area from 1992, when TexPet left Ecuador,

---

[236]      DX 1750 (Donziger Direct) ¶ 110.

[237]      Calmbacher Dep. Tr. at 85:19-25.

58

forward and, in addition, had been a member of the Consortium earlier.  The LAPs already had entered into an agreement with the ROE and PetroEcuador pursuant to which they were obliged to reduce the amount of any judgment they might obtain against Texaco by the amount of any contribution judgment that Texaco might obtain against the ROE and PetroEcuador.  Moreover, the prospect of proof that PetroEcuador, an ROE owned entity, was responsible for substantial pollution in the Oriente would not have been viewed favorably by the ROE.  The LAPs therefore had an interest in obtaining a judgment that Chevron was entirely responsible for any and all pollution liability and remediation responsibility.

In late 2004, Russell met in New York with Donziger, Bonifaz, Wray, and perhaps others to discuss the LAPs' strategy for the remaining judicial inspections.[238]  Russell reported that "the fact that [they were] finding BTEX, which is benzene, toluene, ethylbenzene, and xylene; and GRO, which is gasoline range organics," in the samples they were testing from the Concession area was "much more indicative of contamination from PetroEcuador rather than Texaco because these compounds are volatile and degrade quickly in hot, wet, warm environment such as in the jungle."[239]  As Texaco had not operated in the Concession area since 1992, it was highly unlikely that any BTEX and GRO that ever had been attributable to Texaco's operations still would have been present.[240]  PetroEcuador's continuing operations probably were the cause.

---

[238]

DX 1750 (Donziger Direct) ¶ 113; Tr. (Russell) 394:6-19.

[239]

Tr. (Russell) 394:22-395:2.

[240]

Tr. (Russell) 407:17-19 ("We found BTEX and GRO, and that was indicative of recent contamination rather than contamination which would have been ten or perhaps 20 years old from Texaco.").

59

According to Russell, whom the Court found to be a credible witness, the "senior lawyers" – Donziger, Bonifaz and Wray – requested that the LAP team stop testing for BTEX and GRO because testing for these compounds "would be counterproductive to the case because it argues for more recent contamination and that implies PetroEcuador rather than Texaco."[241] Accordingly, Russell and his team "stopped analyzing for those compounds [and] started instead substituting a less reliable measure which was total petroleum hydrocarbons," or TPH.[242]  The methods the team used to test for TPH, however, were unable to distinguish between TPH attributable to recent activity and activity that occurred a considerable period earlier.[243]  Moreover, they were subject to a further problem, namely that "TPH methods currently in use can show up naturally occurring compounds as an indication of petroleum, so give you a false positive."[244]

---

[241]

      PX 705 (Nov. 4, 2004 Email from D. Russell to E. Camino, S. Donziger, M. Pareja, and A. Wray); *see also* Tr. (Russell) 407:21-408:9.

[242]

      Tr. (Russell) 408:7-9.  Donziger testified that "the conclusion of the conversation [in Manhattan] was that if we were looking for a sample analysis that would more precisely evidence the scope of Texaco's contamination, testing for total TPH was the more appropriate test to use. . . . Accordingly, we adopted a focus on sampling for TPH rather than BTEX or GRO, although we kept a balanced portfolio of chemical analyses."  DX 1750 (Donziger Direct) ¶ 114.

      The Court does not credit this testimony.  It is contrary to Russell's testimony on this technical point, a point on which his testimony was not challenged.  Donziger, for reasons discussed below, is not a credible witness.  Wray and Bonifaz both were deposed, but the deposition testimony of these two witnesses that was submitted at trial is silent about this meeting.

[243]

      Tr. (Russell) 408:22-409:2.

[244]

      *Id.* 408:10-14.

SPA-72

60

E.      *Sacha-53 and the "Independent" Monitors – Donziger, in His Words, Goes Over to the "Dark Side" and Makes a "Bargain With the Devil"*

As mentioned, the court appointed several "settling experts" at the beginning of the judicial inspection process, whose job it was to resolve any conflicts between the parties' nominated inspection experts' reports.  "The decision to request a settling report was solely in the Court's discretion," and it ordered only one such report before the LAPs' judicial inspections were terminated – that of the Sacha-53 well site.[245]

The Sacha-53 site was important for the LAPs because, as Donziger explained to his colleagues in a contemporaneous email, it was a "Texaco 'remediated site'" – *i.e.*, a site that Texaco had remediated pursuant to its agreement with the ROE as a prerequisite to obtaining the release discussed previously – "so[, in Donziger's words, it would provide] the first definitive scientific proof in the case to put the lie to their claim they remediated."[246]  But Donziger soon learned that the settling experts' conclusions with respect to Sacha-53 would not be favorable to the LAPs.  So Donziger sought to provide an outwardly credible criticism of the anticipated settling expert report in order to undermine its conclusions.

In late 2005, Donziger met Ramiro Fernando Reyes Cisneros ("Reyes"), a petroleum and environmental engineer in Ecuador,[247] at a cocktail party for the launch of a book Reyes had

---

[245]

PX 4300X (Callejas Direct) ¶ 39.

[246]

PX 708 (Nov. 11, 2004 Email from S. Donziger to C. Bonifaz, J. Kohn, J. Bonifaz, A Wray, and M. Pallares).

[247]

DI 658-18 (Reyes Decl.) ¶ 3.  The Reyes declaration is an exhibit to Reyes' deposition, where he attested to its accuracy.  The declaration was designated by the plaintiff and received in evidence.  Defendants had the opportunity to cross-examine him concerning the declaration at the deposition.  It therefore is properly before the Court.

SPA-73

61

published on oil in the Amazon.[248]  Also present was Gustavo Pinto, the president of the Association of Geological, Mining, Petroleum and Environmental Engineers ("CIGMYP") of Ecuador.[249]  At Donziger's request, Reyes and Pinto met with Donziger and Fausto Peñafiel – then a consultant for the LAP team – on the following day to discuss the Lago Agrio case.[250]

Donziger and Peñafiel outlined the judicial inspection and settling expert process for Reyes and Pinto and told them that "[t]he settling experts were going to issue a report on the judicial inspection of Sacha 53."[251]  "Donziger proposed the idea of bringing in an 'independent institution' to monitor the work of the settling experts."[252]  He wanted the independent monitors to make "recommendations" concerning the inspections to the judge presiding over the Lago Agrio case.[253]  He inquired whether CIGMYP would perform that function.[254]  He informed Pinto and Reyes that the LAP team would pay them for that work.  His "initial wish was . . . to have the association's monitorship be oriented to show that the results that were being obtained were favorable . . . to the

---

[248]   *Id.* ¶ 10.

[249]   *Id.*

[250]   *Id.*  The fact of the meeting is corroborated by Reyes' notes from the meeting, PX 739 (Reyes annotations regarding Nov. 17, 2005 meeting), and Donziger's own notebook, PX 174 (Donziger Notebook), at 1; *see also* Reyes Dep. Tr. at 18:15-22.

[251]   DI 658-18 (Reyes Decl.) ¶ 11.

[252]   *Id*.

[253]   Reyes Dep. Tr. at 21:10-16.

[254]   *Id.* at 19:2-9.

62

plaintiffs."[255]

On November 18, 2006, Donziger reached a secret understanding with Pinto and Reyes pursuant to which he would pay them to "monitor" the settling expert report on Sacha-53. Donziger wrote about the meeting in his notebook:

> "Deal with Gustavo Pinto – *feel like I have gone over to the dark side*. First meeting like that I was not eaten alive. Made modest offer, plus bonus. *Agreed to keep it between us, no written agreement.* Independent monitoring."[256]

Lest there be any doubt, Donziger admitted at a deposition that the "modest offer" he made was of money[257] and that the reference to an agreement "to keep it between us" meant that the fact that Pinto and Reyes would be working for the LAPs was to be kept confidential,[258] including from the judge.[259] He conceded also that it was "possible" that the "modest offer" agreed upon was $50,000, although he professed not to recall the amount.[260]

A week later, the same four men met again and finalized the deal. They agreed that Pinto and Reyes would lead the "independent monitorship" and would be paid a fee plus a potential

---

[255]

      *Id.* at 55:6-10, 20-22.

[256]

      PX 174 (Donziger Notebook), at 1(emphasis added).

[257]

      Donziger Dec. 29, 2010 Dep. Tr. at 2105:19-2106:17.

[258]

      *Id.* at 2108:18-2019:9; Donziger Jan. 29, 2011 Dep. Tr. at 3846:6-17.

[259]

      Donziger Jan. 29, 2011 Dep. Tr. at 3847:19-25.

[260]

      Donziger Dec. 29, 2010 Dep. Tr. at 2109:24-2110:4, 2110:11-14, 2110:20-2111:13.

SPA-75

63

bonus if the plaintiffs won the case.[261]  "There never existed a formal contract between CIGMYP, Pinto, [Reyes], Donziger, or Peñafiel, and all the participants in the meeting agreed that payment by plaintiffs to CIGMYP, to Pinto and to [Reyes] for this monitorship would remain secret."[262] Secrecy was essential because Donziger and the LAP team knew that an appearance of independence and neutrality was essential in order for the expected efforts of Pinto and Reyes to be taken seriously by Chevron and the court.[263]

In fact, the agreement was for Reyes and Pinto to work covertly for the LAP team and to keep their relationship with the LAPs secret from the judge.[264] And Donziger well understood that the arrangement was improper.  He wrote in his notebook on February 6:

> "Talked to Gustavo this morning about the [settling expert] report.  I keep thinking we pay them so little, and they know the court's peritos [experts] make so much, why will they want to keep doing this for us?  *This was my one bargain with the devil*, but we can't win with the devil b/c they can always pay more.  Really frustrating, feel really boxed in."[265]

Nonetheless, the deal and, as Donziger recorded, the secret payment were made.  He wrote in his notebook:  "50 k came today – meet on roof to plan payment [to] [Pinto].  Luis [Yanza]

---

261

    *Id.*; Reyes Dep. Tr. at 28:7-16.  Reyes's journal entry from that day states "Letter stating Thursday 17 CIGMYP Board resolved to set up a scientific-technical monitorship (of) remediation process of Texaco case.  Invite them to a work meeting.  Acknowledging his appointment as settling expert, we express support of developments within bounds of professional ethics and technical results."  DI 658-18 (Reyes Decl.) ¶ 12.

262

    DI 658-18 (Reyes Decl.) ¶ 12.

263

    *Id.* ¶ 15.

264

    *Supra* notes 260-61.

265

    PX 177 (Donziger Notebook) (emphasis added).

64

has his doubts; I explained we are not paying for time, but for value.  Juan came later to collect the [money]."[266]  Juan was a member of the LAP team (likely Juan Pablo Sáenz) and was used to deliver the money to Pinto because Pinto "didn't want to be paid directly."[267]

Pinto and Reyes met with the settling experts a week after they made the deal with Donziger.[268]  They "discussed the expert report on the inspection of Sacha 53, which the [settling experts] had been working on, and . . . asked when the[] [settling experts] could provide the monitors a draft of the report.  They never did, at least not to [Reyes].  The meeting . . . was basically to review the technical aspects of the report the settling experts were preparing on Sacha 53."[269]  Although Reyes and Pinto never received an advance draft of the report, they knew from these discussions what the report would conclude.  And they conveyed that information to Donziger and the LAP team.

In order for their "monitorship" to have the desired effect, Reyes and Pinto had to be appointed by the court.  They therefore wrote a letter to Judge Germán Yánez, then the judge presiding over the Chevron case, detailing their credentials and their proposed role.[270]  They did not, however, disclose that they were being paid by the LAPs' team.[271]

---

[266]

PX 175 (Donziger Notebook).

[267]

Donziger Dec. 29, 2010 Dep. Tr. at 2120:2-11, 2120:25-2111:12.

[268]

DI 658-18 (Reyes Decl.) ¶ 13.

[269]

*Id.*; *see also* PX 741 (Reyes annotation regarding the Nov. 29, 2005 meeting).

[270]

DI 658-18 (Reyes Decl.) ¶ 14; PX 746 (Jan. 20, 2006 Ltr. from G. Pinto to Judge Yánez).

[271]

*See* PX 746 (Jan. 20, 2006 Ltr. from G. Pinto to Judge Yánez).

65

Judge Yánez did not respond to the letter, so Pinto and Reyes went to meet with him in his office.[272]  Before doing so, they showed Donziger an advance copy of the comments on the settling experts' work that they intended to make to the judge.[273]  When they met with the judge, they explained the need for the monitorship and expressed their desire to become involved in the case.  But the judge "did not express any interest in what [they] were telling him about the case."[274]

To jump slightly ahead for a moment, the settling experts' report was published in February 2006.[275]  It concluded – consistent with the fears that led Donziger to the "independent monitorship" scheme – that Texaco had fully remediated the Sacha-53 site.  Donziger characterized the report as "disastrous" for the LAPs' team.[276]  He instructed Reyes and Pinto to prepare a report that "established that the findings of the settling experts' report on Sacha 53 were wrong, that they lacked objectivity and were biased toward Chevron, and therefore the report should be discounted."[277]  The report that Pinto and Reyes drafted, however, did not reach those conclusions.  Instead, they concluded that, while the settling experts had "failed to strictly follow their judicial

---

272

DI 658-18 (Reyes Decl.) ¶ 17.

273

Donziger Jan. 29, 2011 Dep. Tr. at 3849:25-3850:8.

274

DI 658-18 (Reyes Decl.) ¶ 17.

275

PX 1530 (Jan. 17, 2006 Ltr. from G. Pinto and F. Reyes to Lago Agrio court) (referring to "[t]he Report [which] was prepared by the Settling Experts Mr. Galo Albán, Eng., Dr. Luis Albuja, Mr. Gerardo Barros, Eng., Mr. Jorge Jurado, Eng., Mr. Johnny Zambrano, Eng., and is dated Feb. 1, 2006.").

276

DX 1306 (Donziger Notebook), at 71 of 87.

277

DI 658-18 (Reyes Decl.) ¶ 20; Reyes Dep. Tr. at 51:2-11.

66

mandate" and that some of the data submitted by both parties had deficiencies, "the report contained enough information for the Court to make its own ruling."[278]  Donziger was extremely disappointed in what he called Reyes' and Pinto's "tepid" response and instructed them not to file it with the court.[279]

The Reyes–Pinto arrangement suggests that Donziger and his team were worried that the evidence would not support their claim, at least to the extent they had hoped.  The one settling expert report that was in the process of completion concerned a site they expected would expose what Donziger characterized as Texaco's "lie," but he learned it would reach the opposite conclusion.  When the likelihood that the report would reach that opposite conclusion became known, Donziger – in his own words – went over "to the dark side"[280] by recruiting and paying new experts to pose as "independent monitors" and to criticize the settling experts' conclusions to the court without disclosing that the LAPs were paying them.  Moreover, it must be noted that Donziger did not address – much less offer any innocent explanation of – these events, either in his written direct testimony or on the witness stand.

In the end, Donziger's arrangement with Reyes and Pinto – his first "bargain with the devil"[281] – ultimately did not work out for him.  The judge was not interested and the report Reyes and Pinto wrote did not meet Donziger's expectations.  But it was not his last such bargain.

---

[278]

DI 658-18 (Reyes Decl.) ¶ 20; PX 1530 (Feb. 1, 2006 Draft of Reyes and Pinto Report).

[279]

DI 658-18 (Reyes Decl.) ¶ 20; Reyes Dep. Tr. at 53:19-54-7; PX 191 (Donziger Notebook).

[280]

PX 174 (Donziger Notebook), at 1.

[281]

PX 177 (Donziger Notebook).

By this time the LAPs were up to something new, which, if it succeeded, would reduce the risk of unwanted results from the many uncompleted judicial inspections.

F.    *The Termination of the LAPs' Remaining Judicial Inspections and the Genesis of the Global Assessment*

Extensive evidence demonstrates that Donziger and the rest of his team concluded that Dr. Wray had made a terrible mistake in committing to judicial inspections of so many sites.[282] They were costly and took a great deal of time.[283]  Moreover, as the unfolding Sacha-53 crisis demonstrated, they were risky – the party-nominated experts could disagree, and the settling experts might agree with Chevron.  For these reasons, the LAPs on January 27, 2006 – shortly before the publication of the Sacha-53 settling expert report – moved to eliminate 26 of the remaining judicial inspections that the LAPs had requested, ostensibly because they were unnecessary.[284]  The judge then presiding swiftly denied the motion.[285]

---

[282]    *E.g.*, PX 176 (Donziger Notebook), at 2 ("This goes back to Alberto's errors: . . . asking for too many inspections rather than controlling the process"); PX 195 (Donziger Notebook), at 2 ("The problem is that Wray made some dumb-fuck agreement with Callejas at the first inspection where they agreed the perito for the [global expert] would come from somebody who had actuado en [acted in] the trial.").

[283]    *E.g.*, Tr. (Ponce) 2317:15-2318:8 (recommending LAPs seek to terminate inspections because they were costly and the evidence was very favorable without the remaining inspections) (The Court credits Ponce's testimony as to cost.  As the accuracy of his opinion concerning the results of the inspections conducted thus far is not material here, the Court makes no finding on that point either way); DX 1601 (Ponce Direct) ¶ 16 (same); PX 184 (Donziger Notebook), at 3 of 5.

[284]    PX 4300X (Callejas Direct) ¶ 40; PX 328 (July 21, 2006 Motion, quoting plaintiffs' Jan. 27, 2006 motion), at 3-4.

[285]    PX 4300X (Callejas Direct) ¶ 41.

SPA-80

68

The LAPs responded by filing several motions challenging the court's decision, initiated a press campaign that questioned the judge's handling of the case and accusing him of bias in favor of Chevron, and began to organize several demonstrations outside the courthouse to protest his rulings.[286]  The point of all of this, as Donziger wrote in his journal, was that the LAPs:

> "need a massive protest on the court, and only after that should we talk to the judge about what he needs to do.  The judge needs to fear us for this to move how it needs to move, and right now there is no fear, no price to pay for not making these key decisions."[287]

So the issue of reducing the LAPs' judicial inspections continued to percolate through the spring of 2006.  Moreover, a new ingredient entered the LAPs' internal discussions of the issue – the idea not only of dropping all of the remaining LAP judicial inspections, but of substituting a single, supposedly impartial, global expert.

The idea of a global expert did not immediately persuade Donziger.  On May 31, 2006, he wrote in his notebook:

> "Yesterday we had a 5-hour [meeting] and it was extremely intense and frustrating.  Went through options on Global [Expert] – had Plans A through E, and I realized how difficult this aspect of the case is going to be.  *Bottom line problem is we will have no control over the [expert], who will be appointed by the judge.  Pablo and our legal team keep insisting that the solution is for the judge to appoint someone who is favorable to us, but I don't trust this approach so far.*"[288]

In other words, he was concerned that he perhaps could not control a single global expert.  He worried that such an expert would not be "willing to do work that holds oil companies accountable.

---

[286]

    *Id.*

[287]

    PX 182 (Donziger Notebook), at 2 of 3.

[288]

    PX 181 (Donziger Notebook), at 1 (emphasis added).

SPA-81

69

. . . Which gets back to my point that we need a foreigner as the expert for the global.  No Ec[uadorian] is going to come through and hold them accountable for billions – it is just not going to happen. . . . *Without that insurance, I just don't see how we can go forward with the global [expert].*"[289]

1.      *The LAPs Coerce the Judge to Cancel the LAPs' Remaining Judicial Inspections*

The LAP team, in Donziger's words, often "talk[ed] to the judge about what he needs to do" in private.[290]

In July 2006, the LAPs filed another motion, this time seeking to relinquish all of their remaining inspections, not just the 26 they in January had sought to eliminate.[291]  Donziger wrote in his notebook that:

> "Our issues first and foremost are whether the judge will accept the renuncia of the inspections.  If this happens – and Pablo thinks it will, but I and Aaron [Marr Page] think he is overoptimistic – then we have to face the prospect of more of the wasteful, time-consuming, and expensive inspections. [sic] If it doesn't happen, then we are in all-out war with the judge to get him removed."[292]

But the "all-out war" to remove the judge proved unnecessary.

Donziger and the LAP team knew that Judge Yánez was in a weakened state.  He

---

[289]

  PX 182 (Donziger Notebook), at 2 of 3 (emphasis added).

[290]

  PX 169R (Donziger Notebook), at 28.

[291]

  PX 328 (July 21, 2006 Motion).  The motion, filed by Fajardo, explained *inter alia* that further judicial inspections were unnecessary because, it claimed, the evidence of contamination was clear and abundant.

[292]

  PX 184 (Donziger Notebook), at 3.

recently had been accused of "trading jobs for sex in the court"[293] and was worried about his reputation and perhaps career. They were determined to use that to their advantage. As Donziger wrote in his notebook at the time, Fajardo informed Donziger that

> "there is the feeling in the court that we are behind the [sexual harassment] complaint[] against Yánez . . . , which we are not, even though we have much to complain about, which is sort of ironic. I [*i.e.*, Donziger] asked if this theory in the court hurt or helped us, and both Pablo and Luis said it helped us. *At which pt I launched into my familiar lecture about how the only way the court will respect us is if they fear us – and that the only way they will fear us is if they think we have . . . control over their careers, their jobs, their reputations – that is to say, their ability to earn a livelihood.*"[294]

So the LAP team "wrote up a complaint against Yánez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need."[295] Donziger explained in an email to Kohn that Fajardo then met with the judge, who "said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. . . . The judge also . . . wants

---

[293]

     PX 785 (July 26, 2006 Email from S. Donziger to J. Kohn).

[294]

     PX 184 (Donziger Notebook), at 2 (emphasis added).

[295]

     PX 185 (Donziger Notebook), at 2. Donziger testified that he "never threatened Judge Yánez or any other judge that we would file a complaint against that judge if he did not rule in our favor." DX 1750 (Donziger Direct) ¶ 122.

     This testimony is inconsistent with Donziger's contemporaneous writings in his notebook and his July 26, 2006 email to Kohn. Moreover, while Donziger testified that *he* never threatened the judge, he did not say that no one else on his team did or that he did not authorize or approve such threats. The Court finds that Donziger knowingly was complicit both in the preparation of a misconduct complaint against Judge Yánez and in threatening the judge with the filing of the complaint unless the judge did what the LAPs' wished him to do. It was part of Donziger's strategy to instill fear in that judge by convincing him that "we [the LAPs] ha[d] . . . control over [his] career[], [his] job[], [his] reputation[] – that is to say, [his] ability to earn a livelihood." PX 184 (Donziger Notebook), at 2.

to forestall the filing of a complaint against him by us, which we have prepared but not yet filed."[296]

Faced with this coercion,[297] Judge Yánez granted the request to cancel the LAPs' remaining judicial inspections.  Donziger and Fajardo succeeded also in convincing the judge that he should "fear" the LAP team.[298]  After Judge Yánez issued the order, Donziger on September 13, 2006, wrote that the judge "told Luis [Yanza] that we needed to back him now as he fights for survival on the court.  So instead of a strong judge who sees the validity of the case, we now might have a weak judge who wants to rule correctly [*i.e.*, for the LAPs] for all the wrong, personal reasons.  Need to get going on the inspections (looking for [expert]) and [global expert]."[299]

This last statement – that Donziger recognized his "[n]eed to get going on the inspections (looking for [expert]) and [global expert]" – demonstrates that his earlier misgivings about a global expert had been overcome and that Donziger was looking for an expert to appoint to that pivotal role.  The explanation for this change of heart is plain.  Donziger's "[b]ottom line problem [about pursuing a global expert idea had been that] we will have no control over the [expert], who will be appointed by the judge."[300]  But the coercion of Judge Yánez eliminated that "bottom line problem."  Donziger had found himself with "a weak judge who wants to rule correctly

---

[296]

    PX 785 (July 26, 2006 Email from S. Donziger to J. Kohn).

[297]

    A defense expert on Ecuadorian law testified, and the Court holds, that threatening a judge to get him to appoint Cabrera or another court officer would be a crime under Ecuadorian law.  DI 1400-4 (Albán Dep.), Ex. D at 48:1-12.

[298]

    PX 184 (Donziger Notebook), at 2.

[299]

    PX 185 (Donziger Notebook).

[300]

    PX 181 (Donziger Notebook).

72

for all the wrong, personal reasons,"[301] among them the fear that the LAPs would file their judicial misconduct complaint against him at a time when he least could withstand it.  Donziger therefore expected to be able to select and to control the global expert.  That is exactly what then took place.

### 2.    *Donziger Chooses Cabrera to be the Global Expert*

With these pieces in place, Donziger and the LAP team moved on to finding a compliant global expert.  The idea was that the global expert – just like the "monitoring" experts, Reyes and Pinto, who ultimately had not been appointed – in fact would work for the LAPs but would appear to be independent and neutral.  This required Donziger to find someone who, in Donziger's own words, would "totally play ball with" him.[302]

Donziger began quietly vetting candidates to fill the post.[303]  Initially, the lead candidate for the job was Reyes,[304] with whom Donziger already was acquainted from the Sacha-53 episode.

> "[] Donziger, [] Fajardo, and [] Yanza together . . . explained to [Reyes] that having a single expert to carry out a global assessment was important to the plaintiffs because they acknowledged that the judicial inspection process had not yielded data to support their claims of contamination.  They also said they believed it would be

---

301

    PX 185 (Donziger Notebook), at 2.

302

    PX 191 (Donziger Notebook), at 4.

303

    *E.g.*, PX 2426 (Sept. 19, 2006 Email from S. Donziger to C. MacNeil Mitchell, R. Herrera, and E. Bloom) ("Here is the info on the possible experts from Ecuador.").

304

    *Id.*; *see* Donziger Dec. 29, 2010 Dep. Tr. at 2130:18-23.

73

easier to manage a single expert than many."[305]

Donziger met with Reyes in December 2006 "to do a hard vet."[306]  Before settling on Reyes as the global expert, Donziger was determined to ensure that Reyes would "*totally play ball with us and let us take the lead while projecting the image that he is working for the court.*"[307] He needed also to persuade Reyes to take the assignment.  So Donziger told Reyes "that if he did this he likely would never work in the oil industry again in Ecuador, at least for an American company, but that he could be a national hero and *have a job the rest of his life being involved in the clean-up.*"[308]  And he reminded Reyes that, as the global expert, he would  "need . . . to state that Chevron was the only party responsible for environmental damages and the harm to the local community."[309]

Donziger's statement to Reyes that he would "have a job the rest of his life being involved in the clean-up" warrants emphasis.  The Lago Agrio complaint identified the ADF, which is controlled by Donziger and Yanza, as the entity to which the LAPs wanted any recovery money

---

[305]
    DI 658-18 (Reyes Decl.) ¶ 22.

[306]
    PX 191 (Donziger Notebook).

[307]
    *Id.* (emphasis added).

[308]
    *Id.* (emphasis added).

[309]
    DI 658-18 (Reyes Decl.) ¶ 25.  Reyes responded that in his book he had "advocated for joint responsibility between the Ecuadoran government and Texaco environmental impacts, which could be used against" him, but Donziger "dismissed these concerns and said none of them would prevent [Reyes] from serving as an expert."  *Id.* ¶ 26.

SPA-86

74

paid.[310]  Thus, in promising Reyes that he would "have a job the rest of his life being involved in the clean-up" if he took the assignment and gave the LAPs what they wanted, Donziger promised something that he expected to be able to deliver – long-term, remunerative employment paid for by the ADF.

While Donziger was vetting Reyes, Fajardo and Yanza met with Judge Yánez to get him to appoint Reyes as the global expert.  But Judge Yánez was troubled because he felt "bound by an agreement Wray made with Callejas [Chevron's local counsel] in the first inspection to use [experts] already appointed by the court."[311]  This would have excluded Reyes.  In consequence, the LAP team believed that the choice would be between José Echeverria and Richard Cabrera Stalin Vega ("Cabrera"), both of whom previously had been designated as settling experts.[312]  Of the two, Donziger's choice was Cabrera.  Donziger wrote:

> "Richard [Cabrera] served in the last inspection, and he was found by Fernando Reyes, who has turned out to be a good friend of the case.  Richard showed some surprising independence, telling the judge quietly that Texaco's sampling was bullshit.  The question is, do we push for Reyes himself or Richard?  At first, I thought the idea Reyes would not be the [expert] was a case killer.  I simply am loathe to spend much more money on the case not knowing if we can get a damage claim before the court, which essentially would prevent us from winning the case before a decision can even be made.  I trust Reyes; I don't know Richard even though he looks promising.  So I met Richard with Reyes on Sat afternoon in the Hotel Quito, one of my endless series of meetings.  He is a humble man, not very sophisticated, but he seemed smart and under-stated – maybe the perfect foil for

---

[310]

PX 316 (Lago Agrio Complaint), at 31.

[311]

PX 194 (Donziger Notebook), at 1; PX 195 (Donziger Notebook) ("The problem is that Wray made some dumb-fuck agreement with Callejas at the first inspection where they agreed the [expert] for the [global inspection] would come from somebody who had actuado en the trial.").

[312]

PX 195 (Donziger Notebook).

Chevron, but there is no way to know for sure so there is risk.  Reyes thin[k]s we should go with Richard, and we can help him."[313]

Accordingly, Donziger, Cabrera, Reyes, and other LAP lawyers met to discuss the possibility of Cabrera being appointed global expert.[314]

On February 27, 2007, Donziger, Yanza, and Fajardo met with Cabrera and Reyes to do another "hard vet" of Cabrera and to give him the "hard sell."  Just as he had done with Reyes, Donziger, again in his own words,  "did the build up about the importance of the case, what it means for history, how we can do something that we will always be remembered for, what it would mean for the country and world, etc."[315]  This sort of encouragement, Donziger noted "always works at the opportune moment."[316]  But that, the Court finds, is not all he said.  The quoted entry from his notebook summarized "the build up" he gave Cabrera in terms almost identical to the summary he wrote of his "build up" to Reyes.  It is logical to infer, and the Court finds, that Donziger made the same implicit promise of lifetime work on the remediation to Cabrera that he had made previously to Reyes.  In any case, Cabrera agreed to the plan.

Meanwhile, the LAP team continued to meet *ex parte* with Judge Yánez[317] to have

---

313

    *Id.*; *see also* DI 658-18 (Reyes Decl.) ¶ 31 ("Donziger asked me to introduce him to Cabrera, and I arranged a meeting which took place on Feb. 9 or 10, 2007, at Hotel Quito . . . .").

314

    DI 658-18 (Reyes Decl.) ¶¶ 33-34.

315

    PX 197 (Donziger Notebook), at 2.

316

    *Id.*

317

    *E.g.*, PX 200 (Donziger Notebook) ("On Friday night, Pablo and Luis met with the judge near the airport in his barrio in a restaurant. I was supposed to be there, but I couldn't find it[.]  I was really pissed off at the news they reported – that the judge still did not want to

him appoint their new choice, Cabrera, as the global expert.  By February, the LAPs were "100%

sure the judge would app[oin]t Richard [Cabrera] and not Echeverria."[318]  On March 19, 2007, the

judge announced the appointment.[319]  But Donziger and the LAP team were so sure of Cabrera's

appointment that they proceeded on the basis that Cabrera would be appointed even before the

appointment was announced and Cabrera sworn in.

V.      *The Second Phase of the Lago Agrio Case – The Cabrera "Global Expert" Report*

     A.      *The LAPs Secretly Plan the Cabrera Report – The March 3 and 4, 2007 Meetings*

            Donziger, Fajardo, and Yanza called the entire LAP team together for a meeting on

March 3, 2007.[320]  This included several American technical experts with whom Donziger had been

---

rule, he needed protection, that a magistrate from the Supreme Ct was coming on Thursday to check him out given the denuncias, etc.  The different pieces of the strategy to get us home have to work in concert, and the one element out of sync at the moment is the fact we don't have the order to begin the [global inspection].  This is the one thing left; if we can get thru this, we should be home free.").

318

PX 197 (Donziger Notebook). And they were certain well before that that Judge Yánez would grant their request to appoint a single global expert.  In an email on January 9, 2007 to the LAPs' legal team, Fajardo described a meeting he had had with the judge, to whom he referred as "the Big Boss."  "I had a short meeting today with the Big Boss (you know who I'm talking about); we discussed the start of the Global Assessment.  The idea is to perform a symbolic act at a well or station in Lago Agrio for the start of the Global Assessment.  The Expert will be sworn in at that act, and the judge will set the deadline for the Expert to deliver his report to the Court."  PX 821 (Jan. 9, 2007 Email from P. Fajardo to S. Donziger and others).

319

PX 335 (Mar. 19, 2007 Lago Agrio Court Order), at 2.

320

DI 658-18 (Reyes Decl.) ¶ 34.  Ann Maest testified that she met Cabrera for the first time in March 2006.  Maest Dep. Tr. at 68:12-17; *see also* PX 636 (Screenshot from *Crude* Clip of Mar. 3, 2007 Meeting including Cabrera, Yanza, and Fajardo).  She clearly was mistaken as to the year.

consulting – Charlie Champ, Dick Kamp, and Ann Maest,[321] a scientist at E-Tech, an organization that was working with the LAPs[322] and who worked also for the Boulder, Colorado-based environmental consulting firm, Stratus Consulting ("Stratus").[323]  The purpose of the meeting, as will appear in more detail, was to plan the global expert report.  So sure were Donziger and Fajardo of Cabrera's appointment that the supposedly independent and impartial Cabrera, as well as Fernando Reyes, were present.

Donziger explained the importance of the meeting to the *Crude* camera even before the meeting began:

> "Today is . . . a very important day 'cause we're meeting with . . . *our* team of Ecuadorian technical people and *our* American consultants . . . to figure out how to . . . pull all that information together for the final report *we're gonna submit to the court*, that is gonna ask for damages that'll very likely be in the multiple billions of dollars."[324]

Thus, Donziger in an unguarded moment,[325] acknowledged that the report ultimately submitted would be the product of the LAPs and their "team of Ecuadorian technical people and . . . American

---

[321]

  PX 201 (Donziger Notebook) ("March 7, 2007 . . . Sat had all-day Tech meeting in the office . . . Richard and Fernando there, as was Ann, Dick, and Champ.").

[322]

  Maest Dep. Tr. at 42:17-34; *see also* PX 633 (Mar. 5, 2010 Email from S. Donziger to E. Englert, M. Hoke, and J. McDermott) ("E-tech is a scientific consulting entity we worked with before we hired Stratus.  When Stratus came in the summer of 2007, we stopped working with E-tech.").

[323]

  Maest Dep. Tr. at 50:5-7.

[324]

  PX 33A[S] (Mar. 3, 2007 *Crude* Clip), at CRS-187-01-01 (emphasis added).

[325]

  As will appear, Mr. Donziger had obtained the financing for the film maker and had influence over the content of the film.  *Infra Facts* § VII.B.  It thus is not too surprising that he spoke as candidly as he often did when the camera was rolling.

SPA-90

78

consultants."

Parts of the meeting were recorded by the film makers.  Yanza began by introducing the participants and setting out the general agenda.[326]  He introduced Cabrera to the full team for the first time.[327]  Fajardo set forth the plan for the final phase of the evidentiary period, explaining that, while Cabrera was likely to be appointed the global expert, "the work isn't going to be the expert[']s.  All of us bear the burden."[328]  Maest then asked whether "the final report [was] going to be prepared only by the expert?"[329]  Fajardo responded, "what the expert is going to do is state his criteria, alright?  And sign the report and review it.  But all of us, all together, have to contribute to the report."[330]  Maest commented, "But . . not Chevron," which provoked laughter.[331]  The video clips of the meeting ended with Donziger commenting, they could "jack this thing up to $30 billion in one day."[332]

Reyes – who had been Mr. Donziger's first choice for appointment as global expert – testified that:

"At the meeting, Mr. Fajardo, Mr. Yanza and Mr. Donziger dropped any pretense

---

[326]

PX 35A (Mar. 3, 2007 *Crude* Clip), at CRS-187-01-02.

[327]

*Id.*

[328]

PX 39A (Mar. 3, 2007 *Crude* Clip), at CRS-191-00-CLIP-03.

[329]

*Id.*

[330]

*Id.*

[331]

*Id.*

[332]

PX 42A (Mar. 3, 2007 *Crude* Clip), at CRS-193-00-CLIP-01.

SPA-91

79

that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards.  On the contrary, it was obvious that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it. The purpose of the meeting was to establish all the conditions for controlling and managing the expert's work, in secret, in accordance to the plaintiffs' interests."[333]

The next day, Donziger met over lunch with some of his American experts to discuss the work plan.[334]  The meeting, parts of which also were taped, confirmed that Donziger and the LAPs would go far to control the process and conceal their involvement from Chevron and the court. At one point, one of the experts commented, "I know we have to be totally transparent with Chevron, and show them what we're doing," to which Donziger responded "[n]o, no. . . . they will find out . . . [but] not in the moment. . . ."[335]  Maest replied, "Yeah, we don't have to give them our plan . . . . I don't think, do we?" and Donziger answered "[w]ell, it's a little unclear. . . . No one's ever done this before . . . . This is so crazy . . . . *Our goal is that [Chevron] do[es]n't know shit . . .* and that's why they're so panicked by this."[336]  Another expert commented that "having [Cabrera] there yesterday, in retrospect, was totally bizarre."[337]  Donziger quickly told him not to talk about

---

[333]
    DI 658-18 (Reyes Decl.) ¶ 35.

[334]
    PX 43A (Mar. 4, 2007 *Crude* Clip), at CRS-195-05-CLIP-01; PX 201 (Donziger Notebook), at 1 of 2 ("On Sunday lunch, went to Mosaico (the four gringos, including me), and spent four hours there talking things through.").

[335]
    PX 46A (Mar. 4, 2007 *Crude* Clip), at CRS197-00-CLIP 3.

[336]
    *Id.* (emphasis added).

[337]
    *Id.*

SPA-92

80

that and told the film crew "that was off the record. . . ."[338]  Thus, right from the start, Donziger evidenced his intent that the intimate relationship he had forged with Cabrera would not be allowed to see the light of day.

The group discussed also the existing data.  When Maest noted that "right now all the reports are saying it's just at the pits and the stations and nothing has spread anywhere at all," Donziger replied, "That's not true.  The reports are saying the ground water is contaminated because we've taken samples from ground water."[339]  Maest responded, "[t]hat's just right under the pits," to which Donziger responded:

> "Yeah, but, that is evidence. . . . *Hold on a second, you know, this is Ecuador, okay . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want.  Sorry, but it's true.* . . . Okay.  Therefore, if we take our existing evidence on groundwater contamination which admittedly is right below the source . . . . And wanted to extrapolate based on nothing other than, our, um, theory that it is, they all, we average out to going 300 meters in a radius, depending on the . . . gradient.  We can do it.  We can do it.  And we can get money for it. . . . And if we had no more money to do more work, we would do that.  You know what I'm saying? . . . *And it wouldn't really matter that much.* . . . *Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit.  It really is.  We have enough, to get money, to win.*"[340]

Following the March 3-4 meetings, the LAPs wrote the work plan that supposedly was to be done by Cabrera.  On March 21, 2007,  Fajardo sent the initial draft to Donziger for his

---

[338]

    *Id.*

[339]

    PX 43A (Mar. 4, 2007 *Crude* Clip), at CRS-195-95-CLIP-01.

[340]

    *Id.* (emphasis added). The Court makes no finding as to whether the groundwater contamination was widespread or existed "just right under the pits." As noted, the existence or absence of contamination in the Orienté was not at issue in this trial.

approval.[341]  It laid out all of the required tasks including such things as the selection of sites to be studied, field work, drafting of the report, and its submission to the court.  It assigned responsibility for each item, in most cases to members of the LAP team or their hired consultants.  Cabrera was allotted responsibility for relatively little.  The drafting of the report was assigned to "[t]he Expert with the support team," the latter being a reference to the LAP personnel.  Review of the initial draft of the report was to be done by the "Legal team," meaning the LAP lawyers.  And following the final item on the list, submission to the court, the LAPs wrote, "Everyone silent," the point of course being that no one was to disclose the control over and overwhelming participation in the process by the LAP team.  Indeed, Donziger admitted on cross-examination that he instructed all those associated with the preparation of the Cabrera Report to keep their work highly confidential.[342]

Before Cabrera officially was sworn in, however, the LAP team faced another possible hitch in its plan.  Fajardo learned that Judge Yánez was considering appointing two global experts – one for Chevron and one for the LAPs.  The LAP team was very concerned – they had worked hard to have the judge appoint the expert they had vetted and chosen and who would "totally play ball" with them.  Fajardo reported Judge Yánez's plan to Donziger and others in an email titled "Code Orange."  He wrote: "What is new is that in view of the other restaurant's challenge, the cook has the idea of putting in another waiter, to be on the other side. This is troublesome. I suggest we

---

[341]
        PX 843 (Mar. 21, 2007 Email from P. Fajardo to S. Donziger and L. Yanza) (attaching draft of work plan).

[342]
        Tr. (Donziger) 2558:16-20.

        Donziger at trial denied any knowledge of the fact that the March 21, 2007 work plan said "everyone silent" following the entry for submission of the report to the court. *Id.* 2558:21-2559:1.  That denial is patently incredible, however, as the work plan was submitted to Donziger, who led the entire effort.

82

activate alarms, contacts, strategies, pressures in order to avoid this happening. It is necessary to do it urgently."[343]  Fajardo wrote that the "Lago Agrio messenger is waiting until this afternoon to meet with the cook, to hear his position."[344]  Donziger testified in a deposition that the LAP team used code names "to prevent any reader of those documents from knowing exactly who it was [he] w[as] talking about. . . ."[345]  He admitted at trial that the "cook" referred to the judge; the waiter referred to Cabrera; and the "other restaurant" referred to Chevron.[346]

Not surprisingly in light of the position in which Donziger, Fajardo, and others had put Judge Yánez, the "messenger" – most likely  Fajardo – caused Judge Yánez to drop the idea of appointing two experts.  And they took additional steps to control his activities.

On April 17, 2007, Luis Yanza wrote to Donziger: "We have met with Richard [Cabrera] and everything is under control.  We gave him some money in advance."[347]

Shortly thereafter, the LAP team set up a new, "secret" bank account through which they surreptitiously could pay the supposedly independent expert.[348]  As Yanza once explained to Donziger, the purpose of the secret account was for Donziger and Kohn to "send . . . money to the

---

[343]
　　　PX 845 (Mar. 26, 2007 Email from P. Fajardo to S. Donziger and others).

[344]
　　　*Id.*

[345]
　　　Donziger Jan. 29, 2011 Dep. Tr. at 3817:13-23.

[346]
　　　Tr. (Donziger) 2549:10-2550:12.

[347]
　　　PX 850 (Apr. 17, 2007 Email from L. Yanza to S. Donziger).

[348]
　　　PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger).

secret account to give it to the Wuao."[349]  The "wuao" or "wao" was another code name the LAP team created to refer to Cabrera.[350]  As we shall see, Donziger and Yanza later put that secret account to considerable use.

Having secured Cabrera's selection and his agreement to cooperate with them, the LAP lawyers likely believed that they had paved their path to victory.  But their problems were not over.

B.   *Donziger, Fajardo, and Yanza Put Together an "Army," Cabrera is Sworn in, and the LAP Team Prepares His Work Plan*

Cabrera was selected in April 2007, but he had not been sworn in by June.  The field work had not yet begun.  Donziger and his colleagues feared their plan was in danger.

Donziger and Fajardo visited Judge Yánez on June 4, 2007, to inquire why the swearing in was taking so long and to encourage him to allow the expert to get to work in the field.  Remarkably, the audio of this *ex parte* meeting with the judge was recorded by the *Crude* camera crew.[351]

Very early in the meeting, Donziger said to the judge: "Let's speak frankly.  What do we do to start" the process with Cabrera?[352]  The judge replied that it "is already about to start,"

---

[349]

PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger and P. Fajardo).

[350]

Tr. (Donziger) 2550:13-19.  As will be seen, the LAP team also used the term "huao" in correspondence to refer to Cabrera.

[351]

The images indicate that the recording was done from the hallway outside the judge's chambers. PX 61 (June 4, 2007 *Crude* Clip).

[352]

PX 61A (June 4, 2007 *Crude* Clip), at CRS354-02-CLIP-05.

SPA-96

84

but that Chevron had filed "two books" of "suggestions" and issues regarding the process by which Cabrera's field work was to be carried out, and the judge needed to rule on them.[353]  One such "suggestion" was that Chevron lawyers be permitted to attend Cabrera's inspections.  Donziger replied that "we are fine with that."[354]  Judge Yánez responded: "Yes, but the only thing that must be made clear is . . . the expert is appointed by the court."[355]  There must be "parameters so that he can – this is going to be done right, isn't it?  And the situation can't be made too creative.  Yes, because, I know that tomorrow you'll leave but I'll still be here, right?"[356]  Donziger assured Judge Yánez that he, Donziger, would not "desert" the judge, and stressed that the judge could not let Chevron's complaints about the expert or threats to appeal Judge Yánez's ruling delay the swearing in any further.[357]

Donziger and Fajardo left the meeting frustrated with the delay and worried that Judge Yánez was slipping away from their control.  They discussed the need to pressure the judge to swear in Cabrera and get the process going.  Donziger said: "To me, this is already a matter of combat . . . I think we actually have to put an army together . . . ."[358]  Fajardo agreed: "We have to

---

[353]  *Id.*

[354]  *Id.*

[355]  *Id.*

[356]  *Id.*

[357]  *Id.*

[358]  PX 63A (June 4, 2007 *Crude* Clip), at CRS346-00-CLIP-02.

have demonstrations, have protests.  I think that has to be done right now. . . ."[359]  He continued: "*the idea is to teach a lesson to this judge and to the next one.  I mean, teach the court a lesson.  A message to the court.*"[360]

The next day, Donziger met with Yanza and Atossa Soltani of Amazon Watch and explained the situation:

> "I think that, analyzing the outlook of this case, we are losing strength with the court. Uhm, this case has pretty much been asleep for five months. It's weird. I mean, *we got – we were getting, like, everything, for a while, that we wanted. You know, we got the cancellation of the inspections. You know, we we're getting the peritaje global, the final phase*. But then, like, suddenly everything was in place and he won't swear in the *perito*, which is needed to start the hundred and-twenty day period. It's been, like, weeks and weeks and weeks of delays. You know, after sort of analyzing the situation, we believe that the judge is trying to stall the case until the end of the year, until the new guy comes in . . . So, you know – but it goes way beyond the problem of any individual judge, 'cause it's possible the next person could come in and . . . and not want to deal with it and do the same.  You know, it's a problem of institutional weakness in the judiciary, generally, and of this court, in particular.  *We have concluded that we need to do more, politically, to control the court, to pressure the court.  We believe they make decisions based on who they fear the most, not based on what the laws should dictate.*  So, what we want to do is take over the court with a massive protest that we haven't done since the first day of the trial, back in October of 2003."[361]

He added that the protest would occur during the last week in June and emphasized that "it's a critically important moment, because *we want to send a message to the court that, 'don't fuck with us anymore – not now, and not – not later, and never. . . . [N]o one fears us right now.  And, until*

---

[359]

    *Id.*

[360]

    *Id.* (emphasis added).

[361]

    PX 67A (June 6, 2007 *Crude* clip), at CRS-350-04-CLIP-01 (emphasis added).

86

*they fear us, we're not gonna win this case.*  I'm convinced."[362]  Indeed, on June 13, 2007, he

suggested that Fajardo and Yanza "inform the judge now that we're going to have the big march and

maybe *ask for his recusal during that march so that he'll get scared now.*"[363]

   As it turned out, the June 4 visit to Judge Yánez by Donziger and Fajardo quickly had

its desired effect, and Donziger's fears as to whether Cabrera would be sworn in and thus authorized

to begin his work as global expert proved short-lived.  Cabrera was sworn in on June 13, 2007.[364]

At his swearing-in, Cabrera promised to execute his duties "faithfully and in accordance with

science, technology and the law and with complete impartiality and independence vis-a-vis the

parties."[365]

   Roughly two weeks later, Cabrera submitted what purported to be his work plan to

the court.[366]  While this was more abbreviated than the detailed March 21 plan initially prepared by

the LAP team, it too in fact had been written by the LAP team.[367]  It listed categories of experts who

---

[362]

   *Id.* (emphasis added).

[363]

   PX 872 (June 13, 2007 Email from S. Donziger to P. Fajardo and L. Yanza) (emphasis added).

[364]

   PX 342 (Cabrera Certificate of Swearing In).

   Donziger obviously was unaware when he wrote his own June 13 email (PX 872) that Cabrera had been or would be sworn in on that day.  It is unclear whether the threat he had suggested to Fajardo and Yanza was made before the swearing in took place.

[365]

   PX 342 (Cabrera Certificate of Swearing In), at 3.

[366]

   PX 277R (Cabrera Work Plan).

[367]

   Donziger Jan. 31, 2011 Dep. Tr. at 4132:11-18 ("Q.  Now, in the spring of 2007 it was the plaintiffs' team that drafted Mr. Cabrera's work plan, correct?  A.  We drafted a work plan that we gave to him.  Q.  That he then adopted, correct, sir?  A.  I believe he used most of

87

would assist in collecting samples in the field and analyzing data[368] – all of whom secretly would be named by the LAP team.[369]

C.    *The Field Work*

Shortly before Cabrera was sworn in, Donziger and Fajardo had discussed the need to "scale up" the "battle" once that occurred by "organiz[ing] pressure demonstrations at the court and [providing] vigilance" to "protect" the expert.[370]  They proceeded with the plan once Cabrera was sworn in.  They decided that a "pressure demonstration" would take place the day Cabrera was set to begin "his" work in the field.

On June 26, 2007, Donziger emailed the producer and cameraman of the *Crude* documentary to fill them in on the plan.  He wrote that "Richard [Cabrera] the new expert [would be] tak[ing] sampling [during the following week] for the first time in Lago, and a ton of people will be there to protect him from the Chevron lawyers. . . ."[371]  He suggested that the crew "film us getting ready for the big march.  The march will be the biggest in the history of the [ADF] . . . [yo]u can capture the main characters (me, Pablo, Luis) early in the morning Tuesday greeting the

---

it, if not all of it.").

368

PX 277R (Cabrera Work Plan), at 11.

369

Donziger Jan. 31, 2011 Dep. Tr. at 4132:20-22.

370

PX 67A (June 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-01 (emphasis added).

371

PX 875 (June 26, 2007 Email chain between S. Donziger, M. Bonfiglio, and J. Berlinger).

Case 14-826, Document 98, 07/02/2014, 1263303, Page103 of 211

communities as they travel to lago from the hinterlands. . . ."[372]  And he noted that "[t]he other thing that would be good to capture is our private 'army' which has been very effective.  Yesterday they followed a Texaco lawyer into the judge's chambers and had a confrontation.  This is a critical part of our strategy that is allowing the case to go forward . . ."[373]

The demonstration occurred on July 3, 2007, and culminated with a speech by Yanza.[374] Cabrera began his site inspections the following day, surrounded by Donziger's "army."[375] Over the next three months, Cabrera visited sites and collected samples.[376]

Chevron was skeptical of Cabrera from the day he was named.  It thought him unqualified and that he lacked relevant experience, and it voiced its concerns to the court.[377] Chevron's lawyers became even more suspicious when Cabrera took samples at various sites because they observed what seemed to them to be collaboration and familiarity between Cabrera – the supposedly independent global expert – and the LAP team.[378]  In addition, "unlike the Lago Agrio Plaintiffs' representatives, Chevron lawyers and . . . technical team members were often

---

[372]

    *Id.*

[373]

    *Id.*

[374]

    PX 78 (July 3, 2007 *Crude* Clip), at CRS405; PX 79A (July 3, 2007 *Crude* clip).

[375]

    PX 3300 (McMillen Direct) ¶ 27.

[376]

    *Id.*

[377]

    PX 4300X (Callejas Direct) ¶ 48.

[378]

    PX 3300 (McMillen Direct) ¶¶ 27-28.

89

blocked from observing up close Cabrera's inspections."[379]  Thus, "[t]hroughout Mr. Cabrera's proposed appointment, swearing in, field work and the ultimate submission of his reports, Chevron repeatedly petitioned the Court to address its concerns over Cabrera's lack of impartiality and independence and his suspected collusion with the Lago Agrio Plaintiffs' representatives."[380]  The Lago Agrio court never intervened.[381]  It merely reminded Cabrera "that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth" and asserted that "[t]he transparency of the expert's work will be ensured."[382]

Chevron had reason to be suspicious of Cabrera's field work, which was anything but transparent.   Among other things, Donziger later admitted that the LAP team "had [also] been involved in Mr. Cabrera's site selection" and his "sampling protocols."[383]  Indeed, he conceded that he could not recall a single site Cabrera sampled that the LAPs had not "recommended" to him.[384] Nor was that all.

> 1.    *The LAP Team Pays Cabrera to Ensure that He Would "Totally Play Ball"*

The LAP team paid Cabrera.  Some of the payments they made to him were official,

---

[379]

PX 4300X (Callejas Direct) ¶ 49.

[380]

*Id.* ¶ 52.

[381]

*Id.*

[382]

PX 348 (Oct. 3, 2007 Lago Agrio Court Order).

[383]

Donziger Dec. 29, 2010 Dep. Tr. at 2203:4-6; 2203:11-17; Tr. (Donziger) 2457:22-2548:4.

[384]

Tr. (Donziger) 2548:9-17; Donziger Jan. 29, 2011 Dep. Tr. at 3726:23-3727:4.

90

court-approved payments made through the court process, which worked like this: on several occasions, Cabrera filed a letter with the court, requesting payment for work he performed or was about to perform.[385]  The court approved the amount, and ordered the LAPs, who had requested the global expert, to pay it.  The LAP team then wrote Cabrera a check for that amount, which was filed with the court and then given to Cabrera.[386]

But the court-approved payments were not the only ones the LAPs made to Cabrera. They paid him also outside the court process.  And they began paying him even before he had begun to perform his duties.

After Cabrera was named as the global expert but before he was officially sworn in, the LAPs agreed to set up a new, "secret" bank account through which they surreptitiously would pay Cabrera.[387]  Yanza and Donziger began the process of opening the secret account in June 2007.

---

[385]  PX 4300X (Callejas Direct) ¶¶ 50-57.  This process was consistent with Articles 9 and 14 of Ecuador's Rules Governing the Activities and Fee Schedule of Experts in the Civil, Criminal and Similar Areas of the Judiciary.  *See* DI 1413-9, at 21.

[386]  For example, on June 25, 2007, Cabrera filed a request with the court for $59,349 "[t]o complete the work I am to perform within the deadline Your honor has set . . . ."  PX 277 (June 25, 2007 Ltr. from R. Cabrera to Lago Agrio court).  The following day, the Lago Agrio court approved the payment.  PX 344 (June 28, 2007 Court Approved Payment of $59,349 from LAPs to Cabrera), at 2 of 5.  Two days later, the LAPs paid Cabrera $59,349.  *Id.* at 1.

On October 15, 2007, Cabrera wrote to the court asking it to order the LAPs to pay him $97,000.  PX 350 (Oct. 15, 2007 Ltr. from R. Cabrera to Lago Agrio court).  The court ordered the LAPs to pay Cabrera $97,000 a week later.  PX 354 (Oct. 22, 2007 Lago Agrio Court Order).  The LAPs paid Cabrera the $97,000 in at least three installments.  PX 356 (Nov. 22, 2007 Court Approved Payment of $30,000 from LAPs to Cabrera); PX 361 (Jan. 24, 2009 Court Approved Payment of $25,000 from LAPs to Cabrera); PX 367 (May 10, 2008 Court Approved Payment of $33,000 from LAPs to Cabrera).

[387]  PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger); PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger and P. Fajardo).

Case 14-826, Document 98, 07/02/2014, 1263303, Page106 of 211

Yanza informed Donziger that "[t]o open the account we need at least 2 thousand dollars.  Due to the urgency, I suggest that amount (or more, 5 or 10 thousand) be sent to my personal account and I will transfer it to the new secret account."[388]  Donziger responded "I'm not sure it should be your account. [A]re you sure?"[389]  Yanza assured Donziger that "the first transfer is just to open the other account.  Once we have the other account I'll immediately transfer all the money to that account and we start operating with that account."[390]  He later made clear that he would open the secret account in someone else's name.[391]

The LAP team ultimately decided to repurpose a preexisting account the ADF held at Banco Pichincha to serve as the secret account.[392]  Between August 2007 and February 2009, Donziger had Kohn make three separate payments totaling $120,000 via wire transfer to the secret account.[393]  A large portion of this money was paid to Cabrera via direct account-to-account transfers

---

[388]

PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger).

[389]

*Id.*

[390]

*Id.*

[391]

*Id.* He considered opening the account in the name of either "Lupe" or "Donald," referring to Lupeta de Heraldaia and Donald Moncayo, both of whom work for the LAPs through Selva Viva.  Woods Sept. 14, 2011 Dep. Tr. at 439:10-440:23; Tr. (Moncayo) 2058:23-24.

[392]

PX 578 (Banco Pichincha Account Statement for ADF) (account number 3921429800); PX 912 (Sept. 12 2007 Email from L. Yanza to P. Fajardo re: "Secret account") (identifying secret account as account number 3921429800).

[393]

PX 578 (Banco Pichincha Account Statement for ADF), at 6-7; PX 618 (Wire Transfers), at 4-5; PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson and J. Kohn re "Critical money transfer") ("Pls transfer 50,000 to the following account in Ecuador.").

at Banco Pichincha.[394]  For example, on August 9, 2007, Yanza sent Donziger an email in which he included the account information for the secret account and wrote that "[Kohn] ha[s] to deposit 50k [into the secret account] so we can pay the advances to the consultants so they will start their work as soon as possible.  I hope it is deposited by Wednesday at the latest.  I'll be in touch that day to arrange all of this with Huao."[395]  Six days later, Kohn transferred $50,000 into the secret account.[396]  Two days after that, $33,000 was transferred to Cabrera from the secret account.[397]  And on September 12, 2007, Yanza emailed Donziger stating that he "need[ed] 50,000 more by Monday at the latest."[398]  He followed up on that request five days later, telling Donziger: "I hope you make that deposit right away because I offered to give the Wao another advance tomorrow and I don't want to look bad."[399]  That same day, Kohn transferred $49,998 into the secret account.[400]  And on February 8, 2008, Yanza emailed Donziger and asked for a transfer to the secret account, stating

---

[394]
PX 578 (Banco Pichincha Account Statement for ADF), at 6; PX 590 (Aug. 17, 2007 Transfer Receipt) (showing transfer of $33,000 to Cabrera); PX 591 (Aug. 17, 2007 Ltr. from J. Fajardo to Banco Pichincha Manager); PX 593 (Banco Pichincha Record of Cash Transactions for the ADF).

[395]
PX 894 (Aug. 9, 2007 Email from L. Yanza to S. Donziger re: "bank information urgent").

[396]
PX 2427 (Oct. 26, 2007 Email from K. Wilson to S. Donziger) (reflecting payment of $50,000 to Frente de la Amazonia Aug. 15, 2007).

[397]
PX 578 (ADF Account Statement), at 6; PX 590 (Aug. 17, 2007 Transfer Receipt); PX 591 (Aug. 17, 2007 Ltr. from J. Fajardo to Banco Pichincha Manager); PX 593 (Banco Pichincha Record of Cash Transactions for the ADF).

[398]
PX 912 (Sept. 12, 2007 Email from L. Yanza to S. Donziger).

[399]
PX 917 (Sept. 17, 2007 Email from L. Yanza to S. Donziger).

[400]
PX 578 (ADF Account Statement), at 6.

SPA-105

93

"[h]opefully, [Kohn] transfers 25."[401]  Later that day, Donziger emailed Kohn, asking him to deposit $20,000 into the Frente's secret account.[402]  Kohn transferred the money to the secret account four days later.[403]

Defendants have contended that the secret payments they made to Cabrera were "advanced funds to cover expenses incurred for work performed so that his work would not stop."[404] And Donziger testified at trial that the secret account was "to pay [Cabrera] for work performed outside of the court process due to the paralysis that existed in the court. . . ."[405]  He maintained also that such payments were "appropriate" under Ecuadorian law.[406]

In fact, experts are prohibited under Ecuadorian law from "requir[ing] or receiv[ing] anything of value, whether directly or indirectly, from the parties in the case . . . since their fees must be established in advance by the competent judge."[407]  The attempt to justify their payments to Cabrera outside the court process – that is, without an application by Cabrera to the court

---

[401]

PX 967 (Feb. 8, 2008 Email from L. Yanza to S. Donziger).

[402]

PX 968 (Feb. 8, 2008 Email from S. Donziger to J. Kohn and K. Wilson).

[403]

PX 578 (ADF Account Statement), at 7; PX 618 (Banco Pichincha Account Statement for ADF).

[404]

PX 2411 (Donziger Defs.' Second Supplemental Responses to Chevron's Interrogatories), at 34.

[405]

Tr. (Donziger) 2550:20-25.

[406]

Tr. (Donziger) 2551:16-20.

[407]

DI 1413-9 (Art. 15 of Rules Governing the Activities and Fee Schedule of Experts in Civil, Criminal and Similar Areas of the Judiciary), at 21.

94

followed by court approval followed by payment – as necessary "to keep the process going" is not persuasive.  While such advances might have been both understandable, if irregular, had they been made openly and in response to proven delays by the court in acting on payment requests, there is no persuasive evidence of either.  Defendants' expert, moreover, testified that secret payments to Cabrera without the knowledge of the court to alter the result of the expert's report would have been crimes under Ecuadorian law.[408]  Indeed, the Ecuadorian Criminal Code provides that "[a]nyone who bribes a[n] . . . expert . . . or who knowingly uses false . . . experts in a court proceeding . . . will be punished as guilty of false testimony or perjury."[409]

All of the circumstances – including the fact that a court-approved payment process existed but that the LAP team secretly paid Cabrera outside of that process, used a secret account to do so, worried in emails about whether any of the money should go through Yanza's personal account even temporarily, and used code names as they did it – indicate that the secret payments were illegal or at least improper,[410] that the LAP team knew that, and that they attempted to conceal

---

[408]    DI 1413-12 (Albán Dep. Tr.), at 31:25-32:2, 54:7-23.

[409]    DI 1413-4 (ECUADOR CRIM. CODE Art. 359), at 48-49.

[410]    The fact that at least some of the money the LAPs paid Cabrera changed hands before Cabrera took the oath of office in June 2007 is not significant.  They knew that he was to act in an official capacity before any of the payments were made.  The money was intended to influence his official actions once he was sworn in.  In those circumstances, the payments were wrongful.  *See, e.g.*, 18 U.S.C. § 201 (the prohibition against bribing a public official extends to a "person who has been selected to be a public official," defined as "any person who has been nominated or appointed to be a public official, or has been officially informed that such person will be so nominated or appointed"); 18 U.S.C. § 201 (the prohibition against government officials receiving compensation for representational services extends to agreements to receive or acceptance of compensation before the term of employment begins); *Crandon v. United States*, 494 U.S. 152, 163 (1990) (discussing the inclusion in Sections 201 and 203 of pre-employment compensation or bribes); N.Y. PENAL LAW §§ 10.00(15), 200.10, 200.11, 200.12, 200.15 (proscribing the receipt of bribes by public

95

their payments.  Whatever else these payments may have included, if anything, at least part of them were made as part of even more extensive efforts to ensure that Cabrera "would totally play ball with" the LAPs and with other U.S. consultants whom the LAPs had hired to draft the report Cabrera would file under his name.

> 2.   *The LAP Team Provides Cabrera with Administrative "Support" and Controls his Field Work*

The LAPs provided Cabrera more than payments from the secret account.  Three days before Cabrera began his field work, Fajardo sent an email to Donziger and Yanza, informing them that Cabrera that morning had called him "about a little mistake in the contract, [and] he seemed a bit upset. . . ."[411]  Fajardo suggested that Donziger get in touch with Cabrera

> "to offer some Support, which . . . should be the following:
>
> 1.  That we help him get an office, if he hasn't yet, we shouldn't let him go through that hassle, it is our obligation to help him.  Leaving him alone would be irresponsible of us, we could give him someone to help him, he'll feel better.
>
> 2.  I recommend that Julio [Prieto]'s girlfriend be his assistant, I think she's a really bright girl, *and since she's Julio's girlfriend, there would be no problems*, she knows something about law and could help him in many

---

servants, defined to include those who have "been elected or designated to become a public servant"); *see also United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008) ("Although defendants' Sixth Amendment rights attached only upon indictment, the district court properly considered pre-indictment state action that affected defendants post-indictment. When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment."); *United States v. Solow*, 138 F. Supp. 812,  813-16 (S.D.N.Y. 1956) (Weinfeld, J.) (destruction prior to service of subpoena of evidence material to known investigation constitutes obstruction of justice).

411

PX 877 (July 1, 2007 Email from P. Fajardo to L. Yanza and S. Donziger re: "WORRIED").

SPA-108

96

aspects, ***plus we'd have this situation more or less controlled.* . . .**

> 3.  Even though it's not our obligation, but I think it's our duty to help him get insurance.  We must understand that he has no structure and we do.  I think that he now needs to get to the heart of his work. . . ."[412]

Donziger replied that he was "on it."[413]

Donziger and Fajardo believed that supporting Cabrera in every way was necessary to maintaining the "control" over him upon which Donziger insisted.  So they entered into a contract with Cabrera, provided him with a secretary (Prieto's girlfriend), obtained life insurance for him,[414] and provided other support.  To ensure that Cabrera continued to cooperate with them, they needed to make clear that they supported him.  And their "support" was not limited only to administrative matters.  They also supported and controlled his work in the field.

Shortly after Cabrera began his inspections, he filed a letter with the Lago Agrio court in which he complained that Chevron's representatives had interfered with his first inspection at the sampling site and were "insulting [Cabrera], trying to affect [his] reputation, dignity, and impartiality."[415] He wrote that, in the future, "[i]f upon arriving at a site or well that [he] need[ed] to sample [he] f[ou]nd alterations . . . [he] reserve[d] the right to replace that and all tampered sites with other sites that have not been altered, without the new sites having to be on the list that was

---

412    *Id.* (emphasis added).

413    *Id.*

414    *Id.*; PX 881 (July 11, 2007 Email from J. Prieto to P. Fajardo and S. Donziger re: "insurance for the wao").

415    PX 279 (July 12, 2007 Ltr. from R. Cabrera to Lago Agrio court), at 2.  This exhibit was not offered or received for the truth of Cabrera's statements.

97

provided in the work plan."[416]

Read in concert with the LAP team's internal correspondence, Cabrera's letter to the court – in which he "reserve[d] the right" to visit new sites and collect new data – was meant to lay the groundwork for the LAP team's maintenance of control over Cabrera's field work.  Indeed,  on July 17, 2007, Donziger sent an email to Yanza and Fajardo, the subject of which was "Ideas for meeting with Richard [Cabrera]."[417]  He wrote:

> "These are the [l]atest ideas:
>
> 1) That we think that <u>Richard</u> should suspend his work in the field and we should not pay the team until after the recess.  *We just need to tell the team and Texaco that he's going to start all over after the recess so there is nothing strange, everything appears normal.*
>
> 2) When I get there, we'll re analyze the work and budget with <u>Richard</u>.  And we'll adjust with a much smaller team.  My tendency is to stop <u>Richard</u> from working much more in the field. . . or, if he continues doing it, *he should continue under the most strict control with an extremely limited number of samples . . . And we'll change the focus of the data at our offices.*
>
> 3) It is key to have deadlines to receive drafts from all the consultants, such as the biologists, the water man, and so on.  Personally, I don't want to wait for the 'final' product to determine if the work is useful or not, or we will be screwed because they will ask for even more money to make the changes if we are not properly informed of everything during the process."[418]

Donziger's email underscores the fact that the LAP team had chosen the sites which Cabrera was to visit and, when the team's funds began to run low, sought to limit the number of sites even further.  All the while, the LAPs knew that – for the samples he did collect – they could simply

---

[416]

    *Id.*

[417]

    PX 883 (July 17, 2007 Email from S. Donziger to L. Yanza and P. Fajardo).

[418]

    *Id.* (emphasis added).

"change the focus of the data at [their] offices."

The "team" to which Donziger referred included Stratus and other consultants and scientists who were hired to perform technical work supposedly to have been done by Cabrera.[419] One of those consultants was Uhl, Baron, Rana & Associates, Inc. ("UBR"), an environmental consulting firm Kohn and Donziger had hired and paid to develop a potable water report.[420]  As will be seen, the report UBR prepared ultimately became an appendix to the Cabrera Report.[421]  It was attributed to Juan Villao Yepez, an employee of UBR, who was identified as a supposedly independent expert on Cabrera's supposedly independent technical team.[422]  The fact that the LAP team had hired and was paying UBR was not disclosed to the Lago Agrio court.

The authorship of the Cabrera Report and its appendices will be discussed more fully below.  The importance of Donziger's July 17, 2007 email for present purposes is that it shows that the LAP team worried about how they could continue to pay the team of U.S. environmental consultants they had assembled and hired to perform Cabrera's work for him.  And the team worried also about maintaining control over the sites Cabrera inspected, the samples he took, and the data

---

[419]

        *See, e.g.*, PX 2481 (July 19, 2007 Email from S. Donziger to L. Yanza and P. Fajardo re: "Very important") ("If we use the American consultants here, it is [sic] necessary for Huales to pay directly or can Kohn pay them?  It might be a problem.  Another option is for the locals to adopt the work they do and are paid here, and the locals there.").

[420]

        *See, e.g.*, PX 632 (July 18, 2007 Retention Agreement between J. Kohn and UBR); PX 2430 (July 24, 2007 Statement Reflecting $5,000 payment from J. Kohn to UBR).

[421]

        PX 310 (Cabrera Report), at 4347 of 6124; Donziger Jan. 8, 2011 Dep. Tr. at 2537:12-17 ("Q.  Now, the work that Uhl Baron did for yourself and Mr. Kohn ultimately became Annex O-R of the Cabrera Report, correct?  A.  I believe so, either verbatim or something very similar.").

[422]

        PX 310A (Cabrera Report), at 6085 of 6124.

99

the samples produced.  So five days after Cabrera sent the letter to the court stating that he reserved the right to visit new sites and collect new data,[423] Donziger informed Fajardo that Cabrera should collect an extremely limited number of samples and that (1) the focus of the data could be "change[d] . . . at [the LAPs'] offices" and (2) the data ultimately would be analyzed and summarized by the consultants the LAPs were paying to prepare Cabrera's report.[424]  This two-pronged attack enabled the LAP team to get what it wanted – fewer testing sites, lower costs, and control over the samples and results they elicited – while allowing Cabrera to blame the need for changes to his work plan on Chevron.

Donziger noted also in his July 17, 2007 email to Fajardo that the LAPs' hired consultants needed to be required to submit their drafts to the LAP team early on.  Donziger wanted control over the consultants' reports from their inception.  He did not want to risk waiting until their work was "final" and ready to be included in the report to discover that it ultimately was not "useful" to the LAPs.

---

[423]

PX 279 (July 12, 2007 Ltr. from R. Cabrera to Lago Agrio Court), at 2.

[424]

PX 883 (July 17, 2007 Email from S. Donziger to L. Yanza and P. Fajardo).

100

D.    *Donziger Attempts to Deceive Judge Sand About Cabrera's Independence*

During this period, a case entitled *Republic of Ecuador v. ChevronTexaco Corp.*[425] was pending in this Court before Honorable Leonard B. Sand.  The details of that case are not particularly germane here.  One, however, is significant because it provides further evidence of Donziger's (1) awareness that the LAPs' control over Cabrera and their extensive participation in the activities with which he was charged, as a supposedly independent expert, were wrongful, and (2) determination to maintain the false appearance that Cabrera was independent when he most certainly was not.

In mid-September 2007, the ROE and PetroEcuador were due to submit supplemental papers in support of a motion to dismiss Chevron's counterclaims and to renew their own motion for summary judgment.  Donziger had been given by the ROE's lawyers a draft of a declaration proposed for signature by Mark Quarles and submission to Judge Sand.  Quarles was one of the outside consultants hired by the LAPs to, among other things, work on the global expert report supposedly done by Cabrera.  Paragraph 5 subpart 3 of the draft read as follows:

---

[425]

No. 04 Civ. 8378 (LBS).

Chevron Corporation briefly changed its name to Chevron Texaco before rechanging it to Chevron.  *See* Chevron Corp. Annual Report 2000 (Form 10–K) (Mar. 28, 2001), *available at* http://www.sec.gov/Archives/edgar/data/93410/000009341001000015/0000093410-01-000015.txt; ChevronTexaco Corp. Annual Report 2001 (Form 10–K) (Mar. 27, 2002), *available at* http://www.sec.gov/Archives/edgar/data/93410/000095014902000568/f80065e10-k405.htm; Chevron Corp., Annual Report 2005 (Form 10–K) (Mar. 1, 2006), *available at* http://www.sec.gov/Archives/edgar/data/93410/000095014906000076/f16935e10vk.htm. the Court takes judicial notice of the fact that Chevron, following the acquisition of the shares of Texaco, was renamed Chevron-Texaco Corporation and then later changed its name back to Chevron Corporation.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that courts may take judicial notice of "documents filed with the SEC . . . 'to determine what the documents stated'").

> "3.    In the event Chevron or the Plaintiffs had been allowed to participate in developing Cabrera's sampling strategy and selection of sites/methods, a degree of biasness [sic] would have been introduced into the sampling plan. Given that Chevron and the Plaintiff were not involved in the workplan preparation, Cabrera's plan should represent no bias."[426]

On the evening of September 16, 2007, Donziger emailed the draft declaration to Quarles with Donziger's comments and requested Quarles to revise the declaration accordingly.[427] Donziger's proposal with respect to paragraph 5, subpart 3, was as follows (with the original draft in normal type and Donziger's comments and requested changes in boldface):

> "3.    **[I would delete para in favor of the following language, if true: Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant.  At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan.**
> [In the event Chevron or the Plaintiffs had been allowed to participate in developing Cabrera's sampling strategy and selection of sites/methods, a degree of biasness would have been introduced into the sampling plan. Given that Chevron and the Plaintiff were not involved in the workplan preparation, Cabrera's plan should represent no bias.  **–would delete para]**"[428]

The foregoing demonstrates that Donziger did not want Quarles to say that participation by either side in Cabrera's sampling strategy or site or method selection would have introduced bias into the process.  So he suggested to Quarles that he assert,  "if true," that Cabrera neither had entertained suggestions from nor even met with the LAPs regarding his work plan.  But Donziger by this time knew that the statements he proposed that Quarles make in his declaration

---

[426]

PX 915 (Sept. 16, 2007 Email from S. Donziger to M. Quarles re: Quarles Affidavit), at 6 of 9.

[427]

*Id.*

[428]

*Id.* at 5-6 of 9 (emphasis in original).

**SPA-114**

102

would have been false.  Among other things, Donziger had been at the March 3, 2007 meeting with Cabrera and others at which the LAPs laid out the plan they had prepared.  Donziger knew also that the LAPs controlled Cabrera's site selections and that Cabrera in all other respects was "totally playing ball" with the LAPs.  His inclusion of the words "if true" were nothing more than a misguided attempt to cover himself, should the blatant inaccuracy of the declaration itself ever be discovered, by permitting him to assert that he had relied on Quarles and that the falsity of the declaration had not been Donziger's fault.

The subparagraph that Donziger wanted changed was altered before the Quarles declaration was filed on the following day, September 17, 2007.  The final version (which, with renumbering of certain paragraphs, appeared as subparagraph 1 of paragraph 7) was this:

> "1.    Mr. Cabrera and his team have acted independently from <u>both</u> the plaintiffs and the defendant at the three (3) Phase II inspections that were witnessed on September 6 - 7, 2007.  In fact, armed guards were present to accompany Cabrera and his team and to prevent plaintiff and defendant personnel from interfering with the execution of the sampling plan."[429]

Thus, Quarles was not prepared to go as far as Donziger wished, either because he knew that Donziger's assertions were false or because he knew that he lacked personal knowledge sufficient to justify him in saying what Donziger proposed.

In any case, the Quarles declaration as filed was intended by Donziger to convey the idea that Cabrera was working independently of the plaintiffs.  It did so to some extent, though not to the degree Donziger wished.  Even its limited message was inaccurate, and Donziger knew it.  In fact, Quarles testified that if he had known that the LAPs had drafted Cabrera's work plan and

---

[429]    PX 918, at 3-4 (emphasis in original); *Republic of Ecuador v. ChevronTexaco Corp.*, No. 04 Civ. 8378 (LBS) (S.D.N.Y. filed Sept. 17, 2007) [DI 225], at 3-4 of 6.

SPA-115

103

that Cabrera had worked directly with the plaintiffs, he would not have signed even the modified

declaration.[430]

E.        *Stratus Secretly Writes Most of the Report*

Ann Maest was a significant figure in the ensuing events.  She first met Donziger and

the LAP team in 2006, and eventually suggested that Donziger speak to Stratus' leadership to

discuss retaining the firm in connection with the Cabrera Report.[431]  Donziger then met with Stratus'

president, Josh Lipton, Maest, Stratus' executive vice president and chief financial officer Douglas

Beltman, and other Stratus personnel in Boulder, Colorado in April 2007.[432]  Donziger explained the

history of the Lago Agrio litigation and the status of the evidentiary phase of the case.[433]   He

---

[430]

Quarles Sept. 1, 2010 Dep. Tr. at 115:20-116:04, 118:20-25, 121:21-122:05.

[431]

PX 848 (Apr. 10, 2007 Email from S. Donziger to J. Lipton and A. Maest) ("Josh – Ann Maest suggested I write to reconnect about the Ecuador case against Chevron . . . . The case is winding down fast, and we need to prepare a damages assessment . . . . I am interested in a 'global' discussion of how Stratus might be able to take on some or all of this."). Donziger wrote in his notebook on April 12, 2007 "Need to see Stratus in Denver to get help, but worried about the money. . . .  Maest was down.  Unclear if we can pull it all together in the time frame allotted."  PX 204 (Donziger Notebook); *see also* PX 5200 (Lipton Direct) ¶ 13 ("On April 10, 2007 Donziger contacted me via email at Dr. Maest's suggestion and described his need for technical assistance on a damages assessment.").

[432]

PX 5200 (Lipton Direct) ¶ 15 ("I met with Donziger on April 26, 2007 at Stratus's office in Boulder, Colorado."); PX 851 (Apr. 23, 2007 Email from S. Donziger to J. Lipton and A. Maest re: Meeting Thursday); PX 2466 (Apr. 22, 2007 Memorandum from S. Donziger to J. Lipton re: Overall Ecuador Work Plan); PX 59A (Apr. 26, 2007 *Crude* Clip), at CRS-269-01-04 (April 2007 meeting with Stratus).

[433]

PX 5200 (Lipton Direct) ¶ 15.

Case 14-826, Document 98, 07/02/2014, 1263303, Page119 of 211

104

explained also what he envisioned Stratus' role would be.[434]  He said that he needed Stratus' help preparing the damages claim and explained that, while the LAP team had already done some testing in the field and had produced a tentative remediation plan, it was "spotty" and needed "to be significantly beefed up."[435]

Stratus entered into a retention agreement with Kohn on August 20, 2007.[436]  The agreement specified that Stratus would "provide regular updates on the progress of our work with Mr. Steven Donziger via phone or email."[437]  Doug Beltman was identified as the Stratus project manager and officer-in-charge of the firm's "Ecuador Project."[438]

Throughout the rest of 2007 and early 2008, Beltman, Maest, and others at Stratus consulted with Donziger and worked on preparing the damages assessment.[439]  Donziger and Stratus personnel exchanged hundreds of emails regarding draft outlines of the Cabrera Report as well as

---

434

     PX 59A (Apr. 26, 2007 *Crude* Clip), at CRS-269-01-04 (April 2007 meeting with Stratus).

435

     *Id.*

436

     PX 633 (Mar. 5, 2010 Email from S. Donziger to E. Englert and M. Hoke), at 2-10.

437

     *Id.* at 8.

438

     PX 5200 (Lipton Direct) ¶ 19.

439

     *See, e.g.*, PX 942 (Dec. 10, 2007 A. Maest handwritten notes re: "Call with Steven and Doug re Damages Assessment"); PX 945 (Dec. 20, 2007 A. Maest handwritten notes re "Ecuador GW Sampling"); PX 951 (Dec. 27, 2008 A. Maest handwritten notes re "Call with Steven and Doug - Ecuador"); PX 954 (Jan. 9, 2008 A. Maest handwritten notes re "Needed for Trip"); PX 956 (Jan. 15, 2008 A. Maest handwritten notes re "Meeting in Quito"); *see also* PX 957 (Jan. 16, 2008 Memorandum "Potential tasks for Stratus Consulting").

schedules for the drafting, review, analysis, translation, and completion of the annexes.[440]  But it is clear that Donziger had the final word on every annex and every piece of the report[441] – even in arriving at the actual damages figures.[442]

Based on data given to them by Donziger and the LAP team, their visits to Ecuador, and their own analyses, Beltman, Maest and their team at Stratus wrote the bulk of the Cabrera Report.  As Donziger later admitted, much later, after Stratus had come clean about its involvement, it was "the general idea" "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera."[443]  In January 2008, Beltman sent a first draft of

---

[440]

*E.g.*, PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: "Annex tracking table") (attaching table tracking author, language, and status of review of each annex); PX 1521 (chart tracking translation of annexes); PX 8026 (Feb. 20, 2008 Email from D. Beltman to A. Maest, J. Peers, and S. Donziger re: "annex on TexPet cleanup"); PX 8027 Mar. 10, 2008 Email from D. Beltman to S. Donziger and A. Maest re: "Another annex: ecological risks"); PX 8028 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: "Draft annex on historical data") ("For your review.  English and Spanish versions."); PX 8029 (Mar. 4, 2008 Email from D. Beltman to S. Donziger re: "extrapolation annex without maps"); PX 8030 (Mar. 13, 2008 Email from D. Beltman to S. Donziger and A. Maest re: "Lost ecosystem value") ("Steven: Attached is the Spanish version of our annex on the value of the rainforest lost at wells and stations.").

[441]

*See id.*; PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: Annex tracking table) (attaching table tracking author, language, and status of review of each annex, including column for "SD review").

[442]

*E.g.*, PX 936 (Nov. 17, 2007 Email from S. Donziger to D. Beltman re: "Unjust Enrichment") ("pls read our submission carefully and make sure you don't say or even suggest anything that backs away from the figures.  Remember, we said in the submission that the unjust enrichment would be on the order of billions of dollars (for everything, not just dumping).").

[443]

Donziger Dec. 29, 2010 Dep. Tr. at 2253:5-11.

106

an outline of the Cabrera Report to Donziger and Maest for their comments.[444]  In February 2008

– six weeks before Cabrera's report was to be filed – Maest and Beltman traveled to Ecuador to meet

with Cabrera, Donziger, and other members of the LAPs' team.[445]  Beltman wrote to the Stratus

team in Boulder that

> "The project is at a key point right now.  We have to write, over the next 2 to 3
> weeks, probably the single most important technical document for the case.  The
> document will pull together all of the work over the last 15 or so years on the case
> and make recommendations for the court to consider in making its judgment.  We
> (the case attorneys, the case team in Quito, and Stratus) have put together a very
> ambitious outline for this report.  The people in the Quito office are working on some
> parts, and we're working on others."[446]

The report to which he referred, of course, was the one that Cabrera would submit

to the Lago Agrio court.  At Donziger's direction, Stratus wrote its portions in the first person as

though they were written by Cabrera.[447]  Beltman emailed that draft to Donziger on February 27,

2008,[448] and continued to work on it through March.[449]  Other members of the Stratus team worked

---

[444]

PX 962 (Jan. 24, 2008 Email from D. Beltman to S. Donziger and A. Maest) (attaching draft outline, named "Outline.v1.doc," for the report); *see also* PX 2433 (Feb. 8, 2008 Email from D. Beltman to S. Donziger, A. Maest, and others) (attaching updated draft outline "based on what we talked about last Friday).

[445]

PX 1648 (Feb. 22, 2008 Email from D. Beltman to Stratus employees re: "CONFIDENTIAL – Ecuador Project Update") ("Greetings from Ecuador").

[446]

*Id.*

[447]

Donziger Dec. 29, 2010 Dep. Tr. at 2253:5-11.

[448]

PX 978 (Feb. 27, 2008 Email from D. Beltman to S. Donziger re: "Start on report text; human tox annex").

[449]

*E.g.*, PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: "Annex tracking table").

Case 14-826, Document 98, 07/02/2014, 1263303, Page122 of 211

107

at Beltman's direction and drafted portions of the annexes that would accompany Cabrera's report,[450] often collaborating with members of the LAPs' Ecuadorian team in doing so.[451]  All of the portions of the report that Stratus prepared were in English, were written in Cabrera's voice, and later were translated into Spanish for submission to the court.[452]

Beltman, Maest, and others at Stratus continued to provide comments on and material for the Summary Report and the annexes to Donziger and the LAP team up to March 30, 2008, two days before it was to be filed.[453]  On that day, Beltman provided comments to Donziger on a draft

---

[450]

> *E.g.*, PX 1649 (Mar. 1, 2008 Email from D. Beltman to M. Carney re: "eco risk annex") ("Hey Mike: Great job on the ecorisk annex.  The link below has some edits and comments. We are well on our way, but it's going to take a bit more work."); PX 981 (Mar. 4, 2008 Email from A. Maest to J. Peers re: "Yet another updated perito db").

[451]

> *E.g.*, PX 2468 (Mar. 4, 2008 Email from J. Sáenz to D. Beltman); PX 1014 (Mar. 27, 2008 Email from J. Peers to L. Villacreces, P. Fajardo, and J. Prieto re: "corrected figures – Exhibit Ecological Impact").

[452]

> PX 1050 (July 28, 2008 Email from D. Beltman to B. Lazar re: "english translations"); PX 2436 (Mar. 10 2008 Email From D. Beltman to A. Maest and J. Peers re: "Report help") ("Unfortunately, I've been too busy on annex stuff to work much on [the report], and it has to go to the court in 2 weeks and get translated. . . . My goal is to have the entire report drafted by COB Tuesday.  Based on how things are going, our current translators will take more than a week to turn it around, which puts us at next week Tuesday, if we're lucky."); PX 980 (Feb. 29, 2008 Email from D. Beltman to info@translatingspanish.com and A. Maest re: "Ecuador project") (attaching two annexes for translation); PX 994 (Mar. 12, 2008 Email from info@translatingspanish.com to D. Beltman and A. Maest); PX 2437 (Mar. 12, 2008 Email from D. Beltman to info@translatingspanish.com re: "Big Report").

[453]

> *See* PX 1003 (Mar. 19, 2008 Email from B. Lazar to D. Beltman re: "eco loss"); PX 1005 (Mar. 20, 2008 Email from L. Gamboa to D. Beltman re: "Infomacion"); PX 1007 (Mar. 20, 2008 mail from L. Gamboa to D. Beltman re: "A modest change"); PX 1008 (Mar. 21, 2008 Email from A. Maest to J. Peers and D. Beltman re: "Most recent versions of report and three annexes"); PX 1011 (Mar 22, 2008 Email from B. Powers to D. Beltman, S. Donziger, and A. Maest re: "Status?"); PX 1653 (Mar. 22, 2008 Email from D. Beltman to J. Peers, M. Carney, and A. Maest re: "TPH figures in pits, out of pits"); PX 1013 (Mar. 25, 2008 Email from D. Beltman to J. Sáenz and S. Donziger re: "new pieces").

damages table to be used in the Summary Report.[454]  The table set the total estimated damages at $16.3 billion.[455]

The last draft of the Cabrera Report was saved on the morning of March 30, 2008.[456] Beltman, who was in Ecuador at the time, later recalled seeing the Report and annexes "boxed and packed up in the offices of the plaintiffs' lawyers in Ecuador . . . the day before the report was filed."[457]  On April 1, 2008, Donziger downloaded the final version of the report from a secret email account Fajardo had created for him.[458]

Later that day, Cabrera – accompanied by the LAPs, their supporters, and members of the press[459] – walked into the Lago Agrio court and filed the report he claimed to have written.[460] It consisted of an executive summary and 21 annexes and set the amount of damages at $16.3

---

[454]

PX 1018 (Mar. 30, 2008 Email from S. Donziger to D. Beltman re "what do u think of this?").  The next day, Donziger emailed the chart to criscadena@hotmail.com.  PX 1020 (Mar. 31, 2008 Email from S. Donziger to ciscadena@hotmail.com re: "chart").

[455]

PX 1018 (Mar. 30, 2008 Email from S. Donziger to D. Beltman re: "what do u think of this?").

[456]

PX 1017 (Apr. 1, 2008 Email from gringograndote@gmail.com to S. Donziger re: "Informe Final"); PX 4100 (Lynch Direct) ¶¶ 8, 15.

[457]

Tr. (Shinder) 1294:25-1295:9.

[458]

Tr. (Donziger) 2554:16-22; PX 1017 (Apr. 1, 2008 Email from gringograndote@gmail. com to S. Donziger re: "Informe Final").

[459]

PX 4300X (Callejas Direct) ¶ 56.

[460]

PX 310A (Cabrera Report).

109

billion.[461]  It stated that "[t]his report was prepared by the Expert Richard Stalin Cabrera Vega for

purposes of providing professional technical assistance to the Nueva Loja Superior Court of Justice

. . . ."[462]

        We now know, and Donziger eventually admitted,[463] that the Cabrera Report was not

written by Cabrera.  It was written almost entirely by Stratus and others working at the direction of

Stratus and Donziger.  Indeed, all of the damage amounts in the Cabrera Report came verbatim from

Stratus' drafts.[464]  And the annexes drafted by Stratus or its subcontractors were falsely attributed

to experts on Cabrera's purportedly independent team, who had been selected by Donziger and the

LAP team.[465]  But, while Donziger reviewed and commented on every aspect of the Cabrera Report

and its annexes before they were filed, there is no evidence that Cabrera himself ever did.

---

[461]  *Id.* at 7.

[462]  *Id.* at 1.

[463]  Donziger Jan. 8, 2011 Dep. Tr. at 2433:8-14 (Cabrera "adopted pretty much verbatim what had been provided to him" by Stratus).

[464]  PX 1019 (Mar. 31, 2008 Email from S. Donziger to criscadena@hotmail.com) ("Table of Calculated Damages/Main Report"); Donziger Jan. 8, 2011 Dep. Tr. at 2507:24-2508:7 ("Q. That was the damage table that was going to . . . appear in the Cabrera report, correct? A. I believe so.  Q.  And that is something that you are working on drafting as of March 30th of 2008, correct?  Q. I believe so, yes."); *see also* PX 976 (Feb. 26, 2008 Email from D. Beltman to M. Carney, T. Hodgson, J. Peers, A. Maest, P. Sowell, E. English, D. Mills, C. Rodgers and copying L. Cross re: "Ecuador annex schedule") (discussing work plan to complete Report and attaching chart listing who was responsible for each annex and to whom each should be attributed).

[465]  PX 976 (Feb. 26, 2008 Email from D. Beltman to M. Carney, T. Jodgson, J. Peers, A. Maest, P. Sowell, E. English, D. Mills, C. Rodgers and copying L. Cross re: "Ecuador annex schedule") (attaching chart listing who was responsible for each annex and to whom each should be attributed).

Immediately after the Cabrera Report was filed, Donziger, Fajardo, and their team began trumpeting it to the press as the work of an independent, court-appointed expert who had conducted his work with the assistance of an independent team of scientists.  The ADF issued a press release on April 2 – which Donziger had prepared before the Cabrera Report was filed – titled "Court Expert Smacks Chevron with Up To $16 billion in Damages for Polluting Indigenous Lands in Amazon."[466]   Another release stated that "an *independent* expert has proposed that Chevron pay a minimum of $7 billion and up to $16 billion . . . . Cabrera, the court appointee who is a respected geologist and environmental consultant, was assisted by a team of technical specialists."[467]   And another stated that the "expert report [] was prepared with the help of 15 scientists under the supervision of [an] Ecuadorian environmental consultant."[468]

Two weeks after the report was filed, Fajardo gave a press conference, with Donziger at his side, in which he stated that "what scares Chevron the most, is that this *independent, court-appointed expert, who doesn't . . . respond to either side of the case* has determined that to repair this damage it will be between seven billion and sixteen billion dollars."[469]  Donziger and the plaintiffs' team falsely stressed Cabrera's "independen[ce]"[470] to maximize the leverage on Chevron, although they well knew that the claim of independence was a lie.

---

[466]
    *Compare* PX 1023 (Apr. 1, 2008 Email from S. Donziger to J. Kohn re: "DRAFT ONLY – DO NOT SHOW TO ANYBODY"), *with* PX 498R, 499R (Apr. 2, 2008 Press Release).

[467]
    PX 498R (Apr. 2, 2008 Press Release) (emphasis added).

[468]
    PX 501 (Apr. 14, 2008 Press Release).

[469]
    PX 2237A (*Crude* Clip), at CRS 481 (emphasis added).

[470]
    PX 502 (Apr. 16, 2008 Press Release).

111

F.    *Stratus Criticizes its Own Report to Enhance the False Image of Cabrera's Independence*

Stratus' work was not complete the day the Cabrera Report was filed.  Donziger and his team knew that Chevron would respond to the Report and that they would need to defend it.  So the day after it was filed, Beltman emailed Donziger with a list of items that Stratus would be working on moving forward.  Among the items he listed was to "lin[e] up some experts to review and defend the report," to "prepare [the plaintiffs'] comments on Cabrera report to submit to the court," and to "write report on Cabrera's report as response to Chevron's anticipated report on Cabrera's report."[471]  Thus, having written the bulk of the Cabrera Report, Stratus began preparing to (1) respond to it on behalf of the LAPs as if the Cabrera Report actually had been written by Cabrera,[472] and (2) write a response for Cabrera to issue to anticipated Chevron criticisms of the report that Stratus secretly had written.  The plan was to maximize the deception.

The goal for the LAP team's response was to create the impression that it was dissatisfied with the Report and that Cabrera had not gone far enough in assessing damages – notwithstanding the fact that the LAP team, including Stratus, itself had written it.  Fajardo wrote to the team the day after the Report was filed:

"Several international agencies have called me. I have told them the following, among other things:

a. According to my cursory reading of the report: I think it is a good report, but it is incomplete. For example, the cost of groundwater clean up is not

---

[471]
      PX 1030 (Apr. 2, 2008 Email from D. Beltman to S. Donziger and A. Maest re: "List of items for moving forward").

[472]
      *See, e.g.*, PX 1040 (June 10, 2008 A. Maest Handwritten notes re: "Ecuador Meeting"); PX 1664 (Aug. 10, 2008 Email from D. Beltman to J. Peers, A. Maest, D. Mills, D. Chapman, and J. Lipton re: "Status of Cabrera comment work").

economically quantified. It does not determine what Texaco should pay for the [e]ffect on the culture of the indigenous peoples, it includes an item for recovery, but there is no item for sanctions. It does not include an estimate of the financial damage caused to the economy of rural residents, and it does not say what should be done so rural residents can recover a decent life.

b. For these reasons, the plaintiffs are waiting for the judge to give us the report, we will analyze it in depth, and we will ask the Expert to complete this report, which does not meet our expectations…

c. The report is a step toward justice, but we are not happy because of what's missing.

. . . . *I think it is good to maintain a uniform line, PLEASE, WE ARE NOT HAPPY…*"[473]

On September 15, 2008, Chevron responded to the Cabrera Report.  It challenged its findings, asked that the court strike the Report in its entirety and sought a hearing on errors the Report allegedly contained.[474]  It questioned also Cabrera's independence and accused Cabrera of working improperly with the LAP team.

The LAPs filed their comments – which had been written by Stratus and other members of the LAP team – on September 16, 2008, the day after Chevron's response was filed.[475]  Although the comments largely endorsed Cabrera, they noted that he "did not consider more documentary information in his report"[476] and claimed that his "omissions" "broadly favor[ed] the

---

[473]

PX 1028 (Apr. 2, 2008 Email from P. Fajardo to LAP team re: "GOSSIP AND SUGGESTIONS").

[474]

PX 311 (Chevron Sept. 15, 2008 Motion); PX 4300X (Callejas Direct) ¶ 57.

[475]

PX 311 (Chevron Sept. 15, 2008 Motion).

[476]

PX 312 (LAPs' Comments on Cabrera Report), at 17.

113

interest of [Chevron]."[477]

This appearance of dissatisfaction with the Cabrera Report was important because it supported the false pretense that Cabrera had acted independently. It also provided a basis upon which Cabrera later could admit errors in his initial report and increase his damages assessment. Indeed, the LAP team already was preparing Cabrera's supplemental filings.

On October 7, 2008, Cabrera wrote to the Court:

"President, I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality. I am therefore perfectly willing to appear before the Superior Court of Justice and answer questions or provide whatever is necessary to remove any doubts on the work carried out with a multi-disciplinary and honest team. . . . I was appointed as expert by the President of the Superior Court of Justice of Nueva Loja; I do not take orders from either of the parties to the lawsuit. . . . This means, President, that I am not, nor will I be, subject to the views or whims of either of the parties; I act in accordance with rulings by the judge, with the law and with my principles."[478]

This of course was blatantly false and misleading. Moreover, the assertion that "neither of the two parties is fully satisfied with" the Report corroborates the conclusion that the response to the report that Stratus wrote on the LAPs' behalf – that is, Stratus' criticism of its own work product that had been submitted over Cabrera's name – was intended to feed the false impression that Cabrera had been independent. That was a key part of Donziger's strategy.

In November 2008, Cabrera submitted a supplemental report, in which he purportedly responded to the comments and questions submitted by the LAPs. The supplemental report acknowledged certain omissions and added another $11 billion to the initial damages assessment

---

[477]
    *Id.* at 2.

[478]
    PX 299 (Oct. 8, 2008 Ltr. from R. Cabrera to Lago Agrio court), at 7-8.

in the Cabrera Report.[479]  This report, just like the one it was supplementing, had been written by

Stratus and the LAP team.[480]

        Cabrera in February 2009 issued also a response to Chevron's petition. He wrote:

> "Your Honor, I don't know how long I will have to keep responding to the same
> requests from the parties. . . . [M]y opinion and my clarifications are clear; they are
> based on field and bibliographic research, statistical analyses, laboratory analyses,
> and scientific commentaries which are serious, objective, and deeply impartial. . . .
> *The entire expert investigation procedure was completed by me personally.*"[481]

Again, Cabrera did not disclose Stratus' and the LAP team's role in drafting the Cabrera Report and

its supplement.[482]

---

[479]

        PX 4300X (Callejas Direct) ¶ 59.

[480]

        PX 1075 (Oct. 27, 2008 Email chain between D. Beltman, A. Maest, and J. Peers re:
"Ecuador, Doug- you should read this") ("We received a request from Tania for an update
on where we are in responding to a set of the questions to the [Expert] assigned to us"); PX
1668 (Oct. 29, 2008 Email from D. Beltman to J. Peers and A. Maest re: "Plan for rough
estimate of groundwater damages"); PX 1078 (Oct. 31, 2008 Email from A. Maest to D.
Beltman and J. Peers re: "Reinjection and gas capture questions"); PX 1080 (Nov. 6, 2008
Email from D. Beltman to S. Donziger re: "Clapp").

[481]

        PX 303 (Feb. 5, 2009 Ltr. from R. Cabrera to Lago Agrio court), at 1-2 (emphasis added).

[482]

        There is another sidelight to the tale of the Cabrera Report.

        In the course of preparing the Cabrera Report and ensuing documents, Stratus, Donziger, and
the LAP team dealt not only with new material prepared by Stratus, but with material that
the LAPs already had in hand from other experts they had employed.  They divided some
of the available material among the Cabrera Report itself, the response that Stratus prepared
for Cabrera to make to the comments on the Cabrera Report submitted on behalf of the
LAPs, and perhaps other documents.  With so many cooks in the kitchen, there was bound
to be confusion, and at least one now obvious mistake was made.

        Donziger and Stratus hired Richard Clapp to prepare two reports.  PX 1080 (Nov. 6, 2008
Email from D. Beltman to S. Donziger re: "Clapp") ("[Clapp] has done two reports that I
know of.  A long while back, he wrote up a summary of the toxic effects of the chemicals
in crude oil and drilling fluids, and it was incorporated into the expert report as an annex
pretty much as is.").  One of Clapp's reports was submitted "pretty much as is" as an annex
to the Cabrera Report, although it was attributed to someone else.  *Id.*  Beltman explained

In the last analysis, the facts concerning the Cabrera Report are crystal clear. The remaining LAP judicial inspections were cancelled, the global expert proposal adopted, and Cabrera appointed in consequence of the coercion of and pressure placed upon Judge Yánez. As Donziger admitted in a *Crude* outtake, Judge Yánez "never would have done [that] had we not really pushed him."[483]

Cabrera was not even remotely independent. He was recruited by Donziger. He was paid under the table out of a secret account above and beyond the legitimate court-approved payments. He was promised work on the remediation for life if the LAPs won. The LAPs gave him an office and life insurance, as well as a secretary who was a girlfriend of one of the LAP team members. Stratus and, to some extent others, wrote the overwhelming bulk of his report and his responses to Chevron's objections, as well as to the deceitful comments Stratus had written on its own report. And, in accordance with Donziger's plan to ratchet up the pressure on Chevron with a supposedly independent recommendation that Chevron be hit with a multibillion dollar judgment, he repeatedly lied to the court concerning his independence and his supposed authorship of the report.

---

to Donziger that Clapp had written also another piece, which Stratus had sent to the LAP team in Ecuador, "but it did not appear in the [LAPs'] comments on the Cabrera report, which means it will probably appear in the expert's response to the comments." *Id.* Beltman and Donziger were adamant, however, that Clapp's authorship of both reports remain secret. *Id.* ("I don't think we should hand out either one as Clapp's thereby distributing proof."). Clapp informed Beltman and Donziger at one point that he was planning to use his initial report in a piece Donziger asked him to write. PX 1082 (Nov. 18, 2008 Email from R. Clapp to D. Beltman re: "Ecuador trip report and health summary"). Beltman immediately wrote to Donziger: "We have to talk to Clapp about that [report] and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by him. You want to talk to him, or me?" *Id.* The fact that Clapp had written the annex was not revealed until years later, in discovery actions filed in the United States.

[483]

PX 2478A (June 13, 2007 *Crude* Clip).

G.    *Donziger's Explanation*

The foregoing facts were not seriously disputed at trial.  None of Fajardo, Yanza, nor Cabrera – all of whom were centrally involved – submitted to a deposition or testified at trial. Donziger, however, over time has attempted to avoid responsibility in a variety of ways including denial followed by various explanations, justifications and evasions in efforts to portray these events in a benign light.  None has merit.

As will be seen, Donziger initially attempted to keep his and his confederates' role in the Cabrera episode and Report secret – even from some of his co-counsel – and vehemently denied any accusation that the LAPs had been involved in drafting the Cabrera Report.  By late 2010, however, the truth of the Report's authorship had been revealed to such a degree that Donziger no longer could deny it.  So he began to offer a new explanation: Stratus wrote the bulk of the report, he acknowledged, but that was acceptable under Ecuadorian law.  He testified at trial: "Although I often have been confused about the issues involved,[484] I now believe the process used to create the executive summary of the Cabrera report was fundamentally consistent with Ecuador law, custom and practice as it was occurring in the *Aguinda* case.  Certainly, I never understood that any actions I took or of which I was aware at the time were impermissible in Ecuador."[485]

Donziger's belated admission and explanation is incomplete and unpersuasive.  It does not square with the facts.  He does not explain why, for example, he went to such great lengths to keep the firm's involvement secret if he believed Stratus' drafting of the Cabrera Report was

---

[484]
The Court does not credit this claim of confusion.  Donziger was the architect of all that occurred with respect to the Cabrera Report and is intimately familiar with all the details.

[485]
DX 1750 (Donziger Direct) ¶ 91.

permissible. Nor does he (nor can he) square his statement that the "process used to create" the report was consistent with Ecuadorian law, custom and practice with the fact that the Lago Agrio court on multiple occasions instructed Cabrera to conduct his work impartially and independently of the parties.[486]

Nor is Donziger's explanation consistent with the fact that Cabrera himself – most likely at the direction of the LAP team – wrote to the court several times to deny any coordination with the LAPs. On July 23, 2007, in response to objections by Chevron, Cabrera wrote to the court: "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."[487] In October of that year, he wrote again: "I have performed my work with absolute impartiality, honesty, transparency and professionalism. I reject the descriptions or attacks that have been leveled against me alleging that I am biased toward one of the parties, and I also reject the unfounded accusations that I am performing my work surreptitiously. That is completely untrue."[488] Later that month, he

---

[486]

On October 3, 2007, for example the court issued an order which stated that Cabrera "is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth. . . . The Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report." PX 348 (Oct. 3, 2007 Lago Agrio Court Order), at 2. And on October 22, 2007, the court issued an order stating that "Richard Cabrera[] is informed that he must personally prepare and work on the expert report, taking into account the scientific, technical, and legal standards of both a universal nature and those in effect here." PX 352 (Oct. 22, 2007 Lago Agrio court Order), at 6-7.

[487]

PX 281 (July 23, 2007 Ltr. from R. Cabrera to Lago Agrio court).

[488]

PX 283 (Oct. 11, 2007 Ltr. from R. Cabrera to Lago Agrio court); *see also* PX 286 (Oct. 30, 2007 Ltr. from R. Cabrera to Lago Agrio court) ("I have fully and faithfully complied with the instructions you gave in each order and at the meetings that were held during the sample collection process.").

wrote again: "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency."[489]

Indeed, the LAPs' lawyers themselves, in responding to Chevron's objections in Ecuador concerning Cabrera's independence, wrote that the objections were "based completely on the baseless concept of a 'conspiracy' of which there is no evidence, for this reason the [objection] is completely unfounded and must be rejected as well as sanctioned given that it was lodged for the sole purpose of damaging the Lago Agrio Plaintiffs' case and tarnishing the good name of the distinguished Superior Court of Nueva Loja."[490]   Donziger does not explain why his legal team dissembled to the court about their arrangement with Cabrera if there was nothing wrong with it.[491]

The Court rejects Donziger's excuses entirely.  He knew at all times that his actions were wrongful and illegal.

---

[489]
      PX 287 (Oct. 31, 2007 Ltr. from R. Cabrera to Lago Agrio court).

[490]
      PX 354 (Oct. 29, 2007 Motion).

[491]
      One of defendants' Ecuadorian law experts testified as follows: "Q.  So if I understood you, if Cabrera received information from a U.S. firm called Stratus and the plaintiffs submitted it and he adopted it, his obligation was to say in his report 'This information came from Stratus'? [colloquy omitted] A.  . . . I'm being asked for an opinion that were not the subject of my [written] opinion.  But nonetheless, I reaffirm if the Court-appointed expert were to incorporate information that is not his and did not expressly acknowledge that, the – the expert would be lying.  And if that is proved, he would be subject to a criminal – criminal proceedings for providing false testimony."  DI 1413-12 (Albán Dep. Tr.), at 66:14-67:3.  Further: "Q.  For example, when the expert passes off someone else's work as his own without attributing it to the person who submitted it? [objection omitted].  A.  I answered previously that the expert's silence on the true source or origin of that information would constitute false testimony."  *Id.* at 107:9-16.

      The same expert testified that the passing off of Cabrera's ghostwritten work plan was inappropriate, DI 1400-4 (Albán Dep. Tr.), at 112:8-17, and that Cabrera's attendance at the March 3, 2007 meeting and the discussion about ghostwriting his report and keeping that information from Chevron was "irregular, arbitrary and illegal."  *Id.* at 126:1-16.

SPA-131

119

VI.     *The Pressure Campaign Continues  – The LAP Team Turns Up the Heat By Pressing for Indictment of Former Texaco Lawyers.*

While all this was going on, political events in Ecuador took place that came to have major implications for the Lago Agrio case.  The background begins with the fact that the LAPs had been concerned from the very outset of the Lago Agrio case with the possibility that the release signed by the ROE in its final agreement with Texaco would wipe out or prejudice the LAPs' claim. So in 2003, the LAPs began pressing for a criminal prosecution of Texaco lawyers based on alleged fraud in connection with the release and the conclusion of the Texaco-ROE relationship.  Their purpose was plain – to force Chevron to settle the lawsuit.  As Donziger wrote in his personal notebook on October 4, 2005:

> "Idea to pressure the company, get major press in U.S. . . . and compel the Ec govt to act against the company legally to nullify the remediation contract."[492]

He emphasized two days later that:

> "[t]he key issue is criminal case. Can we get that going? What does it mean? I really want to consolidate control with contract before going down a road that I think *could force them to the table for a possible settlement.*"[493]

The LAPs initially did not have much success.  The Prosecutor General in 2006 issued a report requesting the dismissal of the charges of falsification of documents, stating that he had found no evidence to support them.[494]  Around the same time, the prosecutor issued a report finding no improper conduct on the part of Pallares and Reis Veiga, the Texaco lawyers, and

---

[492]

PX 170 (Donziger Notebook).

[493]

PX 172 (Donziger Notebook) (emphasis added).

[494]

PX 252 (Order by Dr. Cecilia Armas Erazo de Tobar in Preliminary Criminal Investigation).

SPA-132

120

requested dismissal of the investigation.[495]  Despite the prosecutors' requests, however, Ecuador's highest court did not terminate the investigations.[496]

The court's action coincided with a political development in Ecuador – the 2006 election of Rafael Correa as president.  President Correa's influence over the judiciary is described elsewhere.   For present purposes, however, Donziger explained the fundamental change that the election had worked.  The LAPs had "gone basically from a situation where we couldn't get in the door to meet many of these people in these positions [in the government] to one where they're actually asking us to come and asking what they can do. . . ."[497]  The LAPs "ha[d] connections" with the new administration, Donziger said. "[T]hey love us and they want to help us . . . ."[498]

In March 2007, President Correa met with Yanza, Ponce, and others and offered "all the endorsement of the National Government to the Assembly of Affected by the oil company Texaco."[499]  The following day, the media agent for the LAP team who was present for the meeting reported to Donziger that:

---

[495]
>PX 256 (Submission by Dr. M. Vega Carrera in Preliminary Criminal Investigation No. 25-2004); PX 259 (Filing by W. Pesantez in Cause No. 25- 2004); PX 261(Prosecutor General's Ratification of Dismissal of Criminal Action).

[496]
>PX 3000 (Reis Veiga Direct) ¶ 77; PX 258 (Filing by J. German in Preliminary Criminal Investigation No. 146-2003).

[497]
>PX 16A (Dec. 6, 2006 *Crude* Clip), at CRS138-01.

[498]
>*Id.*; *see also* PX 192 (Donziger Notebook) ("Met interim [Attorney General] with Luis [Yanza], APV [Ponce], Raul. 'The door is always open' he said to Luis – a far cry from the days of the protests, fighting our way into the halls of power.  Think of what has happened in ten years – how we have gone from fighting on the outside of power, to being on the inside.").

[499]
>PX 484R (Mar. 20, 2007 ROE Press Release), at 1 of 3.

"THE PREZ WAS VERY UPSET AT TEXACO.  HE ASKED THE ATTORNEY GENERAL TO DO EVERYTHING NECESSARY TO WIN THE TRIAL AND THE ARBITRATION IN THE U.S. . . . THIS SATURDAY HE WILL REPORT ON THE MATTER ON NATIONAL TELEVISION, OFFICIALLY NOW.  AT THAT TIME HE WILL CLARIFY SEVERAL POINTS IN ORDER NOT TO HURT US IN THE TRIAL."[500]

In a further note, the LAPs' media agent wrote that President Correa "GAVE US  FABULOUS SUPPORT.  *HE EVEN SAID THAT HE WOULD CALL THE JUDGE.*"[501]  Fajardo and Prieto met with ROE officials the following week and asked for assistance in providing President Correa with a basis for reopening the "investigation for . . . the responsible parties."[502]

A month later, President Correa boarded a helicopter with Yanza, Fajardo, and others and toured the Lago Agrio oil fields.[503]  He issued a press release that same day calling upon the "District Attorney of Ecuador to allow a criminal case to be heard against the Petroecuador officers who approved the" Final Release.[504]  Donziger, who was in Colorado meeting with Stratus, noticed that President Correa had not mentioned the Texaco lawyers in his statement and reflected that it might be the right moment "to ask for the head of Pérez-Pallares [a Texaco lawyer who had been involved in Texaco's agreements with the ROE] – given what the President said."[505]  He explained

---

[500]

PX 844 (Mar. 21, 2007 Email from M. Eugenia Yepez Relegado to S. Donziger re: "report") (emphasis in original); *see* Tr. (Ponce) 2303:20-2304:2.

[501]

*Id.*  (capitals in original, other emphasis added).

[502]

PX 54A (Mar. 29, 2007 *Crude* Clip), at CRS-221-02-CLIP-01.

[503]

PX 487R (Apr. 25, 2007 ROE Press Release).

[504]

PX 489R (Apr. 26, 2007 ROE Press Release).

[505]

PX 58A (Apr. 26, 2007 *Crude* Clip), at CRS-268-000-CLIP-01.

SPA-134

122

that the President was "basically calling for the heads of government officials that signed off on the remediation, and he's totally with us."[506]

President Correa took to the radio on April 28, 2007, denouncing the "homeland-selling" lawyers defending Chevron-Texaco, "who for a few dollars are capable of selling souls, homeland, family, etc," and calling for criminal prosecution of anyone who had signed the "shameless" Final Release.[507]

Fajardo met with President Correa again in June 2007.  He reported that the president had informed him that "the current . . . Prosecutor General . . . is . . . a little nervous.  Because, since the political forces of the National Congress have changed . . . he is afraid of being removed. . . . So, the President thinks that if we put in a little effort at the Public Prosecutors' office, the Attorney General will yield, and will re-open that investigation into the fraud of . . . the contract between Texaco and the Ecuadorian Government."[508]

Notwithstanding the pressure from the LAPs and President Correa, the Prosecutor General refused to re-open the case.  But his refusal cost him dearly.  He immediately was removed from office and replaced by Dr. Washington Pesántez – President Correa's college roommate and the district prosecutor who previously had recommended the dismissal of the criminal charges twice before.[509]  Several months later, however, and following a meeting with Fajardo, Pesántez agreed

---

[506]
 *Id.*

[507]
 PX 853 (Apr. 28, 2007 Transcript of Correa Radio Address).

[508]
 PX 75A (June 8, 2007 *Crude* Clip), at CRS376-03-CLIP-01.

[509]
 PX 358 (Nov. 29, 2007 Official Register of the Government of Ecuador: Mandate No. 1 of the Constituent Assembly), at 3; PX 259 (Mar. 13, 2007 Filing by W. Pesantez in Cause No.

to reopen the criminal case.[510]  Fajardo reported to Donziger on March 11, 2008: "I have an appointment with the Prosecutor tomorrow morning, we are insisting that he reopen the criminal investigation against Texaco for the remediation."[511]  And a few weeks after that, Fajardo wrote to Donziger and members the Ecuadorian LAP team:  "We received an email from Esperanza [M]artinez, Alberto Acosta's advisor . . . . [i]t says 'on March 25, 2008, the investigation was reopened, with the objective of gathering new and sufficient information, if applicable, filing a criminal action.' . . . . This is urgent . . . let's get in all possible evidence . . . . If things work out, our buddy Ricardo could go to jail . . . ."[512]

        While the LAPs were the driving force behind the criminal case, Donziger instructed his team to deny any involvement in it – and to tell the ROE officials to do the same.  He wrote to the LAP team in August 2008: "We [must] explain to all the ministers and to Correa that they shouldn't say ANYTHING publicly about the case except that the government has nothing to do with it.  That is key."[513]  And a month later he instructed Fajardo that:

        "The party line when the media or anyone else asks about the Prosecutor's case
        should be: 'The criminal case against Chevron's lawyers and against public officials
        is not our battle. We are totally focused on winning the civil case, which has nothing

---

[510]       25-2004), at 10; PX 261 (Prosecutor General's Ratification of Dismissal of Criminal Action), at 12; PX 300 (Reis Veiga Direct) ¶ 96.

[511]       PX 992 (Mar. 11, 2008 Email from P. Fajardo to S. Donziger).

[512]       Id.

[513]       PX 1033 (Apr. 23, 2008 Email string between S. Donziger, P. Fajardo, A. Ponce, J. Sáenz, J. Prieto, and L. Yanza re: "URGENTE").

        PX 1058 (Aug. 11, 2008 Email from S. Donziger to LAP team re: "Problem") (emphasis in original).

to do with what the <u>Prosecutor</u> does. . . .' DON'T GET IN THE BATTLE – THIS IS VERY IMPORTANT IF WE SAY THAT WE AGREE WITH THE PROSECUTOR'S OFFICE, IT COULD BE USED TO UNDERMINE THE INTERESTS OF OUR CLIENTS IN THE US."[514]

Donziger perhaps sought to keep the team's involvement secret for an additional reason as well – he realized it could harm him personally.  He later wrote to his team in a different context that "[i]n the US, threatening to file a criminal case to get an advantage in a civil case is considered a violation of ethical rules of the profession."[515]

Over the ensuing years, President Correa's support for the LAP team grew more vocal.  And while we jump ahead of developments in the lawsuit itself, it is useful to complete the tale of the attempted criminal prosecution of Texaco lawyers before returning to the civil litigation.

On July 4, 2009, President Correa stated in his weekly presidential radio address that he "really loathe[d] the multinationals . . . . Chevron-Texaco would never dare do in the United States what it did in Ecuador."[516]  A few months later he stated in a radio broadcast: "Of course I want our indigenous friends to win."[517]

On April 29, 2010, the Prosecutor General's office issued an opinion formally accusing Reis Veiga and Pérez-Pallares of the crime of *falsedad ideologica*.[518]  The opinion cited,

---

[514]

PX 1069 (Sept. 19, 2008 Email from S. Donziger to P. Fajardo and others re: "important suggestions about the media") (emphasis in original).

[515]

PX 8058 (Jul. 18, 2010 Email from S. Donziger to J. Sáenz, J. Prieto, and P. Fajardo).

[516]

PX 1149 (July 4, 2009 Transcript of President Correa's Weekly Radio Program).

[517]

PX 2494 (Sept. 12, 2009 Reuters Article).

[518]

PX 272 (Prosecutor's Office Opinion in connection with Instruccion Fiscal No. 09-2008-

among other things, the Cabrera Report as evidence of Texaco's contamination.[519]  Nevertheless, on June 1, 2011, the First Criminal Division of the National Court of Justice in Ecuador formally dismissed the charges.[520]

President Correa's alliance with the LAPs and animosity toward Chevron did not go away with the dismissal of the criminal charges.  He since has publicly attacked Chevron in multiple press releases, television and radio broadcasts, speeches, and presentations throughout the world.[521] He has referred to Chevron's attorneys as "homeland-selling lawyers."[522]  He has labeled Chevron an "enemy of the court."[523]  After the Judgment was issued, he praised it has an "historic" ruling[524] And, as will be seen, President Correa's support for the LAP team has been used to benefit defendants in this case as well.

---

[519]    DRR).
         *Id.* at 95.

[520]
         PX 407 (June 1, 2011 Opinion of National Court of Justice, First Criminal Division).

         It is more likely than not that this occurred because the pendency of the criminal charges had become disadvantageous to Donziger and the LAPs in U.S. litigation because it was a factor in the success of Chevron and the former Texaco lawyers in obtaining discovery here that the LAPs wished to prevent.  *See, e.g.*, *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK), 2013 WL 646399, at *9-10 (S.D.N.Y. Feb. 21, 2013) (describing circumstances).

[521]
         *E.g.*, PX 7511 (Aug. 17, 2013 *Agence France-Presse* Article); PX 7516 (Sept. 14, 2013 Tr. of Pres. Correa Statement); PX 7518 (Sept. 16, 2013 El Telegrafo Article); PX 7519 (Sept. 17, 2013 *El Telégrafo* Article); PX 7520 (Sept. 21, 2013 Tr. of Pres. Correa Statement); PX 7526 (Sept. 28, 2013 Tr. of Pres. Correa Statement).

[522]
         PX 853 (Apr. 28, 2007 Tr. of Pres. Correa's Weekly Radio Program).

[523]
         PX 7511 (Aug. 17, 2013 *Agence France-Presse* Article).

[524]
         PX 2503 (Feb. 19, 2011 *Ultimahora* Article).

SPA-138

126

VII.   *The Third Phase of the Lago Agrio Case – 2009-2010: Evidence of the Cabrera Fraud Begins to Come Out, Kohn Leaves the Case, New Financing Is Found, and the Case Proceeds in Lago Agrio*

Up to this point, this opinion has proceeded more or less chronologically.  In 2009, however, important sequences of events, each with its own relevant chronology, began taking place. In order better to explain the facts, this section addresses the important sequences, each in its own chronological order.  But it is important to bear in mind that everything that went on during this period – in Ecuador, the United States, and elsewhere – was interrelated.

A.   *Donziger's Assumption that What Happens in Ecuador, Stays in Ecuador*

Relatively early in the Lago Agrio case, Donziger made a critical assumption.  He assumed that Chevron never would be able to obtain evidence of what transpired in Ecuador. Evidence that he thought so appears in a June 2006 exchange he had with Atossa Soltani, head of Amazon Watch, that was recorded by the *Crude* film makers.

On that occasion, Donziger and Yanza – with the cameras recording every word – related to Soltani their plans for creating what they called a private army, ostensibly to protect the court against corruption, a euphemism for surrounding the court with LAP supporters to pressure it to do what they wished.  For present purposes, however the important part of the conversation was this exchange between Soltani and Donziger:

| | |
|---|---|
| "SOLTANI: | Do you guys know if anybody can, uh, subpoena these videos?   That is a – how do you [unintelligible] |
| DONZIGER: | We don't have the power of subpoena in Ecuador. |
| SOLTANI: | What about U.S.?   These guys . . . [referring to the film makers] |

127

| DONZIGER: | An army – it's not an armed army– it's a group of people to watch over the court . . . |
| SOLTANI: | I just want you to know – I just want you to know that it's – it's illegal to conspire to break the law." |

Following a round of laughter, Donziger responded that "[n]o law's been conspired to be broken."[525]

Donziger's belief that Chevron would not be able to obtain discovery from Ecuador has proved true to a large extent. Indeed, defendants repeatedly have refused to produce documents from Ecuador, claiming that Ecuadorian law prevents them from doing so. And this in serious respects has impeded Chevron's efforts to litigate its case. But the assumption that what happens in Ecuador, stays in Ecuador fails to the extent that one hires an American film crew to capture many of his litigation-related moves over the course of three years in Ecuador and the United States. And it did not account for the fact that certain of the important players in this case – most notably the *Crude* film makers, Stratus, and Donziger himself – were U.S. residents and therefore subject to U.S. rules of discovery.

Beginning in 2009, Chevron began obtaining subpoenas under 28 U.S.C. § 1782 to require production of documents and testimony from persons in the United States who had relevant evidence. Thus, while defendants did not produce meaningful discovery from Ecuador, Chevron obtained some evidence of what transpired there.

B.      *The Release of Crude*

The documentary film called *Crude* was made because Donziger in 2005 recruited

---

[525]      PX 68A (June 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-02.

Case 14-826, Document 98, 07/02/2014, 1263303, Page143 of 211

128

film maker Joe Berlinger to portray the LAPs' case against Chevron.[526] The film featured Donziger quite prominently.   Donziger provided Berlinger, cameraman Mike Bonfiglio, and other crew members expansive access to himself, his team and some of its activities for nearly the next three years.[527]   The ultimate product, *Crude,* first was released in January 2009.[528]

The *Crude* team's independence from Donziger and the LAPs' lawyers – to the extent there was any at all – was limited.[529]   For one thing, Donziger recruited the film's main source of funding: his former classmate Russell DeLeon.[530]   As Donziger wrote: "R[u]ss is funding the case. Russ is funding the movie.  And Russ wants to fund more cases and more movies."[531]   Through his

---

[526]

Berlinger testified in a related proceeding that "During the summer of 2005, a charismatic American environmental lawyer named Steven Donziger knocked on my Manhattan office door.  He was running a class-action lawsuit on behalf of 30,000 Ecuadorian inhabitants of the Amazon rainforest and was looking for a filmmaker to tell his clients' story."  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 302-03 (2d Cir. 2011) (quoting  *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 287 (S.D.N.Y. 2010)) (emphasis omitted).

[527]

The video was shot in Ecuador and in the United States during the period approximately January 2006 through September 2008.  PX 1 (*Crude* Annotated Tape Log).

[528]

Tr. (Donziger) 2567:22-25.

[529]

Donziger often instructed Bonfiglio and Berlinger to stop filming when he did not like what was being said.  *E.g.*, PX 46A (Mar. 4, 2007 *Crude* Clip), at CRS197-00-CLIP 3.  In the months leading up to *Crude*'s release in January 2009, Donziger and Fajardo were in close contact with Berlinger and Bonfiglio – to discuss budgeting, to coordinate press strategy, and to ensure that the film makers and the LAP team were putting forth the same message. Donziger wrote to Bonfiglio that "there will be certain questions asked of us that you might want to advise us on how to position – such as funding sources, questions of bias, etc.  [W]e need to show independence from each other but we should be on the same page as to how that will play out."  PX 1090 (Dec. 23, 2008 Email from S. Donziger to M. Bonfiglio).

[530]

PX 203 (Donziger Notebook).

[531]

*Id.*

129

creation and sole ownership of a production company called Crude Investment, Inc., DeLeon contributed approximately 60 percent of the film's total funding.[532]

Nonetheless, just as they had done with Cabrera, Donziger and his team attempted to create the appearance that the film was independent, while they controlled or influenced its content from behind the scenes. Ironically, this ultimately contributed to the "outing" of their true role with respect to Cabrera.

In December 2008 – one month before *Crude* first was exhibited – Donziger received a director's cut of the film.[533] One scene showed Dr. Carlos Beristain – a member of Cabrera's supposedly neutral staff – working directly with the LAPs and their lawyers, including Donziger. Donziger requested that Berlinger delete the Beristain images and other material.[534] Fajardo made the same request to Bonfiglio, emphasizing that if the scene with Beristain were left in the film, "the entire case will simply fall apart on us. . . . Those two guys [Beristain and Adolfo Maldonado, another supposed neutral] must not appear in the documentary at all! Please, remove them from it. It really isn't much, but it can complicate the entire case for us."[535]

Berlinger and Bonfiglio initially did not comply, and the film – with the Beristain

---

[532]

PX 4900 (Dahlberg Direct) ¶ 97.

[533]

Donziger Dec. 22, 2010 Dep. Tr. at 1569:16-19; PX 2465 (Dec. 13, 2008 Email from S. Donziger to A. Woods re: "tell me what u think of this"). Donziger testified that he sent this list also to Berlinger. Donziger Dec. 22, 2010 Dep. Tr. at 1570:21-1571:5.

[534]

Donziger Dec. 22, 2010 Dep. Tr. at 1571:6-1572:2. The list included also a note that the film's "scene of me [Donziger] telling Trudie [Styler] to only use Texaco is gratuitous and not necessary." PX 2465 (Dec. 13, 2008 Email from S. Donziger to A. Woods re: "tell me what u think of this").

[535]

PX 1091 (Dec. 25, 2008 Email from P. Fajardo to M. Bonfiglio).

SPA-142

130

scene – was shown at a film festival.[536]  But Fajardo persisted, again imploring Berlinger and Bonfiglio to "remove the images" of Beristain "before the film is shown more widely, and before it is sold to a distribution company."[537]  He explained that the images were "*so serious that we could lose everything . . . .* "[538]  Berlinger ultimately removed the Beristain images from the scene, and they were not included in the version released on DVD.[539]  They were left, however, in the version of the film that streamed over Netflix.  Someone at Chevron noticed.

> The deleted images seemed to Chevron to confirm its suspicion that Cabrera had been neither neutral nor independent.  Parenthetically, the attempt to have them removed evidenced the Donziger and Fajardo's awareness that their relationship with Cabrera and his staff had been improper and, indeed, could prove fatal to the Lago Agrio case.  As Fajardo wrote, "we could lose everything."

---

[536] PX 1097 (Jan. 22, 2009 Email from P. Fajardo to M. Bonfiglio).

[537] *Id.*

[538] *Id.*

[539] PX 1097 (Jan. 22, 2009 Email from J. Berlinger to M. Bonfiglio and A. Spiegel).

SPA-143

131

C.      *The Section 1782 Proceedings*

   1.      *The Section 1782 Action Against Stratus – Denver Counsel Withdraw and
           Donziger and Fajardo Seek to Obstruct Justice Before the Federal Court*

In December 2009, Chevron brought a Section 1782 proceeding against Stratus and

related individuals in the District of Colorado.[540]  It argued that discovery was appropriate because

similarities between the Cabrera Report and documents published by people working with Stratus,

as well as documents produced by Stratus in a mediation proceeding, suggested that Stratus had

written all or at least part of the Cabrera Report.[541]  It contended that it was entitled to discovery to

determine the degree to which that in fact was so as well as the LAPs' involvement in the process.[542]

   Realizing that disclosure of Stratus' documents would reveal the LAP team's

relationship with Cabrera, the LAPs' lawyers immediately sought to (1) prevent Chevron from

obtaining discovery from Stratus, and (2) minimize the effects of any discovery that it might obtain.

   a.      *Donziger Retains U.S. Counsel to Represent the LAPs in Denver*

   Shortly after Chevron filed the Colorado Section 1782 action against Stratus,

Donziger retained attorneys John McDermott of Denver firm Brownstein Hyatt Faber Schreck, LLP,

and Jeffrey Shinder of the New York City-based Constantine Cannon firm as counsel for the LAPs

---

[540]

   *Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.).

[541]

   *Id.*, DI 2 (Chevron Corp. Mem. in Support of § 1782 Application), at 8 & n.7.

[542]

   *Id.*

Case 14-826, Document 98, 07/02/2014, 1263303, Page147 of 211

132

to oppose the Section 1782 petition.[543]   Donziger assured them that Cabrera had been an "independent" "court-appointed Special Master."[544]  And Shinder, whom Donziger sought to interest also in the much larger engagement of seeking to enforce the Ecuadorian judgment that the LAPs already expected, testified that:

> "the purported independence of the expert [Cabrera] was important in our [*i.e.*, his and Donziger's] conversations. It was of obvious significance. It was of significance to me in evaluating the possibility of being enforcement counsel that the process had integrity and it was the kind of process that would withstand scrutiny should we take that judgment and try to enforce it in an American court, and that the expert was supposedly independent and had done a review of the evidence that had procedural integrity was consequential and something we discussed."[545]

So, before agreeing to represent the LAPs, Shinder wanted to know if anything Chevron had alleged in its Section 1782 application was true.  He met with Donziger in New York City in January 2010 to discuss the proceeding and his potential retention.

Shinder observed that Donziger was "worried, borderline sort of panicked over" the 1782 proceeding.[546]  Shinder asked him:

> "[']Steven, what am I going to find?[']  I need access to the facts. [Donziger] denied [Chevron's] allegations.   And the facts as he portrayed them to me were that Chevron was trumping up this allegation that Stratus had essentially ghostwritten the

---

[543]   PX 1213 (Jan. 23, 2010 Email from S. Donziger to J. Shinder); PX 2356 (Feb. 26, 2010 Email from E. Engelhart to S. Donziger re: "Chevron petition") (attaching draft engagement letter); Donziger Dec. 29, 2010 Dep. Tr. at 2353:17-2354:21, 2381:15-18.

[544]   Tr. (Shinder) 1262:2-9; PX 7608 (Jan. 19, 2010 Email from S. Donziger to J. McDermott), at 14; PX 1241 (Mar. 5, 2010 Email from S. Donziger to J. Shinder), at 2 of 4 ("selection of Cabrera was made independently by the court," "Cabrera conducted dozens of independent site inspections and lab analyses").

[545]   Tr. (Shinder) 1262:14-23.

[546]   *Id.* 1272:21-22.

SPA-145

133

Cabrera report by sort of drawing improper inferences from materials that had been properly submitted to Mr. Cabrera through the process in Ecuador, that Cabrera had independently taken in those materials, and independently chose to incorporate them into his report. . . . I had been told that there was no, quote unquote, relationship between Stratus and Mr. Cabrera. That to the extent there were any similarities between the Cabrera report and work that Stratus had done, that that was the result of Mr. Cabrera's independent judgment . . . . "[547]

A few weeks after their New York meeting, Donziger sent Shinder a list of "responses to allegations that Chevron was making against the Lago Agrio plaintiffs and in, particular, Cabrera and his report."[548] The list contained several purported responses to what Donziger called Chevron's "misrepresentations" about the Cabrera Report:[549]

"Fact: The Amazon Defense Coalition (ADC) [*i.e.*, the ADF] has never made *any* payments to Dr. Cabrera, or any other court official, beyond what has been required by court under Ecuadorian procedural rules to satisfy the costs of the trial. . . .

Fact: The Cabrera report is an independent review and assessment of the voluminous evidence in the case. Some small analyses provided by the parties through regular court procedures were adopted by Cabrera after his own independent assessment determined they were technically sound and consistent with the evidence. This process is entirely proper, routine, and consistent with the practice of judges and experts in the United States and other countries. . . .

Fact: Representatives of the ADC never conducted Dr. Cabrera's field work or prepared samples for him. During the course of Dr. Cabrera's site assessments both sides were allowed to observe his work and suggest places for his team to sample for evidence of contamination. . . . "[550]

---

[547]

*Id.* 1268:17-1269:21.

[548]

*Id.* 1275:5-7; PX 1224 (Feb. 9, 2010 Email from S. Donziger to J. Shinder re: "interested in your thoughts").

[549]

PX 1224 (Feb. 9, 2010 Email from S. Donziger to J. Shinder re: "interested in your thoughts").

[550]

*Id.*

Case 14-826, Document 98, 07/02/2014, 1263303, Page149 of 211

134

These assertions were false or misleading.  The LAPs did pay Cabrera outside the court process via the ADF secret account.[551]  Cabrera was not independent.  And the LAP team, through Stratus,  performed all or much of "his" work.  But Shinder did not know any of that at the time.  He relied on Donziger's representations that Cabrera had been independent and neutral.  He did, however, ask Donziger about the "small analyses" that apparently had been provided to Cabrera by the parties.[552]  Donziger told him that the LAPs had provided to Cabrera "approximately 3,000-plus pages of documents . . . [c]onsistent with the process that had been set up, that the court had approved, both parties had an opportunity to submit materials to Cabrera, and the plaintiffs had properly availed themselves of that opportunity and sent 3,000-plus pages to Cabrera."[553] Shinder requested that Donziger provide those materials to him.  He never did.[554]

> b.  *Beltman Discloses the Truth to Shinder – Denver Counsel Withdraw*

Nonetheless, relying on Donziger's representations about Cabrera's independence

---

[551]

Amazon Defense Coalition seems to have been used interchangeably with Amazon Defense Front in references to the Frente de la Defensa de la Amazonia.  *E.g.*, PX 2389R (Hugo Camacho Naranjo's Objections and Responses to Chevron Corps' First Set of Requests for Prod. of Documents) ¶ 31; PX 700 Defin. 5; PX 1504 (included papers).

[552]

Tr. (Shinder) 1276:2-11.

[553]

Tr. (Shinder) 1276:4-10; *see also* PX 1244 (Mar. 8, 2010 Email from S. Donziger to J. Shinder and L. Minnetto) ("With respect to the Stratus documents . . . we have determined that a package of material (approx. 3,000 pages) was submitted by local counsel to the court in early 2008 in response to a court order asking both parties to turn over any materials they thought might assist Cabrera in carrying out his mandate.  While we do not know (yet) precisely what documents may have been submitted, all documents would only have been submitted directly to Cabrera to assist him in preparation of his report . . . .").

[554]

Tr. (Shinder) 1276:12-15.

SPA-147

135

and the propriety of the Report, Shinder entered into a retention agreement with Donziger and the LAPs and set to work.[555]   He soon set up a day of meetings in Colorado with individual Stratus personnel, the last of which was with Doug Beltman.[556]   Shinder testified that the interview with Beltman was scheduled to last two hours, and he

> "need[ed] every minute of the two hours to interview him. I had sort of accumulated some sense during the day, although it was incomplete, and certainly paled in comparison with what I heard from Mr. Beltman, that Stratus's involvement in the Cabrera report was much deeper and much more problematic than had been characterized to me.  I approached the interview in a way, I wanted to maintain a kind of collegial, conversational tone so Mr. Beltman and I could develop a good rapport, which I think was achieved. I asked him a lot of detailed follow-ups, contextual follow-ups on things, a lot of questions about his time in Ecuador, how he met Mr. Cabrera, Stratus's work in terms of what they were doing on the case. And over time and the climax, if you will, it was about an hour and 45 minutes in, it became a very forthcoming interview, and about an hour and 45 minutes in *he essentially, quite explicitly . . . admitted to having written significant portions of the Cabrera report.*"[557]

And once "the truth came out . . . there were additional . . . lurid details that [Beltman] admitted to, such as Stratus had essentially . . . ghostwritten the Cabrera report, then Stratus acting as experts for the plaintiffs wrote comments to their own work, and then wrote the Cabrera report's responses to their own comments."[558]   Beltman told Shinder that "everything he did was sort of under the

---

[555]

PX 1255 (Mar. 15, 2010 Email from A. Woods to L. Minnetto, J. Shinder, and S. Donziger) (attaching retention agreement).

[556]

Tr. (Shinder) 1285:12-22.

[557]

*Id.* 1288:6-1292:7 (emphasis added).

[558]

*Id.* 1292:11-17.

136

instruction and supervision of Mr. Donziger and the lawyers who were handling the case."[559]

The following day, Shinder spoke with his firm's ethics counsel and one of the managing partners. They "agreed that the firm could not continue to represent Mr. Donziger and the Lago Agrio plaintiffs."[560]  Shinder immediately called Donziger and informed him that the firm had decided to withdraw.[561]  He told Donziger that he "thought that to the extent there was an underlying case to be made regarding the environmental damage in Ecuador, that the conduct that I learned had irretrievably wounded it, that it could not rely on the Cabrera report since it was not independent, and I was not his lawyer anymore, so I wasn't going to counsel him on what, if anything, to do to try to fix the situation, but it bothered me, and it still bothers me, that we'll never know whether or not there was a case to be made against Chevron."[562]

---

[559]

    *Id.* 1295:25-1296:2.

    The testimony of Shinder, Donziger, Stratus attorney Martin Beier, and Beltman conflicted as to whether Donziger was present during this meeting.  *See* DX 1750 (Donziger Direct) ¶ 104 (not present); Donziger Jan. 29, 2011 Dep. Tr. at 3639:4-8 (same); Beier Dep. Tr. at 83:1-4 (meeting included Beltman, Beier, Shinder, Page); *id.* at 90:7-11 (meeting included "Jeff Shinder, Doug Beltman, Aaron Marr Page, Joe Silver.  At the very beginning, possibly before the meeting formally convened, Steven Donziger was there.  But he left and was not present during the interview"); Beltman Oct. 6, 2010 Dep. Tr. at 383:20-21 (Donziger present).

    The Court finds that he was not.

[560]

    Tr. (Shinder) 1298:1-4.

[561]

    *Id.* 1298:5-8.

[562]

    *Id.* 1298:21-1299:4; PX 1262 (Mar. 19, 2010 Email from J. Shinder to S. Donziger re: "Constantine Cannon Withdrawal").

    The Brownstein firm withdrew as well.  After Shinder's withdrawal, John McDermott of the Brownstein firm asked to speak with him.  Donziger gave Shinder permission to speak to McDermott and told Shinder he could be fully forthcoming about reasons for his withdrawal.

Donziger fully understood the significance of Beltman's revelations given the falsehoods Donziger and his LAP team repeatedly had told about Cabrera and his report. The very next day he wrote a second of his infrequent memos to "file" that purported to describe the recent withdrawals of counsel.[563] Indeed, a few weeks later, Donziger drafted a letter to "fellow counsel," which he apparently never sent, in which he acknowledged that:

> "The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court. Under this perspective, treating Cabrera like a U.S.-

---

PX 1264 (Mar. 19, 2010 Email chain Between J. Shinder and S. Donziger); Tr. (Shinder) 1301:15-25.   Shinder spoke with McDermott two or three days later, and informed him of what Shinder had learned during his interview with Beltman. *Id.* at 1302:10-1303:1.   On March 21, 2010, the Brownstein law firm withdrew as well. PX 1269 (Mar. 21, 2010 Email from J. McDermott to S. Donziger re: "Chevron v. Stratus"). McDermott wrote to Donziger: "Based upon what we have learned regarding Stratus and Cabrera, including the troubling information we gathered in our call with you and Andrew [Woods] and conversations with Jeff Shinder, and our as yet unresolved questions regarding Ecuadorian laws of privilege or confidentiality of materials submitted to the court, we are in an untenable position." *Id.*

563

PX 1270 (Mar. 22, 2010 S. Donziger memo to file re: "Denver action/ethical issues").

He wrote that "[w]hile Shinder noted that it was not unusual for court experts to adopt factual findings of the parties, he thought Beltman described a much broader role where Stratus was preparing materials in conjunction with local Ecuadorian counsel to be used and/or adopted by Cabrera in his report." The memo went on to state that Shinder had "made these conclusions without being aware of various court orders in Ecuador asking for the parties to turn over materials to assist him in the preparation of his report, or being aware generally that the parties in the Ecuador litigation . . . generally work very closely with the parties." *Id.* It claimed also that Donziger was "unclear whether the facts a[s] described by Beltman would be considered acceptable or improper by an Ecuadorian court. . . . [and] whether the role of Stratus was consistent with Ecuadorian rules and procedures, per representations by local counsel." *Id.* In fact, however, there were no such uncertainties in Donziger's mind. He had chosen Cabrera for the global expert position because Cabrera would cooperate with the LAPs. He and Fajardo procured his appointment by coercing Judge Yánez. They had caused Stratus to write all or most of his report and then falsely passed that report off – both to the court and to the world press – as the independent work of a neutral, court-selected expert. The Court finds that he had no illusions about the impropriety of what he and his colleagues had done.

> style expert as we did [and even that is questionable] will be seen as a violation of local court rules. Whether the court will see these facts as no big deal, improper, some sort of procedural defect that can be corrected, or (as the [Chevron] lawyers will surely assert) a fraud is uncertain. Our side believes we can weather the storm with good advocacy in both the court and the media, in Ecuador and in the U.S. However, it was not lost on us that our local counsel seemed concerned about how the information would land in Ecuador and what impact it would have on the case, and to them personally. They fully expect that Chevron would refer the information to the national prosecutor for action."[564]

But he once again tried to justify his actions by referring to another perspective that allegedly had been offered by unidentified "local counsel," viz.:

> "that given the customs and practices of the *Aguinda* case, nothing improper happened. The information in the Cabrera report is sound, and is consistent with the high quality of work that Stratus has done as a world class environmental consultancy. As you know, all of the court appointed experts in the judicial inspections have been working closely with the parties in one form or another for several years with full knowledge of the court, and Cabrera was no different. Chevron's experts, including U.S. citizens appointed by the judge at Chevron's request were working with Chevron's counsel. Even though Cabrera was not an expert put forth by the parties, given that the plaintiffs unilaterally sought the global expert report and are paying him, that Chevron boycotted the process, and that the court ordered the parties to turn over materials to Cabrera and otherwise assist him then the role of local counsel and Stratus was well within our rights and custom under the rules and practices of the *Aguinda* case as they had evolved since its inception almost seven years ago."[565]

And this indeed was essentially the position that Donziger took at trial, where he argued that his belief in the second "perspective" justified the LAP team's actions with respect to Cabrera. He contended also that, while he was unsure at the time, he now believes "the process used to create the executive summary of the Cabrera report was fundamentally consistent with Ecuador law. . . ."[566]

---

[564]    PX 1291 (Donziger Memo to "Fellow Counsel").

[565]    *Id.*

[566]    DX 1750 (Donziger Direct) ¶ 91.

139

Donziger's attempt to cover himself in his memo by reference to "another perspective," and his comparable position at this trial, are fabrications and unpersuasive even in their own terms.  They are fabrications because he received no alternative perspective from local counsel, identified or otherwise.[567]  They are fabrications because no "customs and practices of the *Aguinda* case," even if there had been any comparable practices, could have justified what was done with Cabrera.  If similar things were done with comparable experts, they all were wrongful; their acceptability did not improve with the volume of misconduct.  They are fabrications because there were no comparable practices.  Yes, lawyers work with their own experts, both here and probably in Ecuador.  That is accepted because everyone knows that party-nominated experts are selected and paid by their clients.  That built-in bias is above board and considered in evaluating the testimony of party-paid experts.[568]  But Cabrera was a court-appointed expert, sworn to be independent and impartial.  And Donziger fully understood that Cabrera was neither independent nor impartial –

---

[567]

    Fajardo understood that the collusion between the LAP team and Stratus on the one hand and Cabrera on the other, not to mention the manner in which Cabrera was appointed and paid, was improper.  As we have seen, he implored Bonfiglio and Berlinger to remove the images of Beristain and Maldonado from *Crude* precisely because the presence of those images could lead to discovery of what really had happened.  And he was under no illusion that there was any benign explanation for that.  He told Bonfiglio that if the images of Beristain and Maldonado were left in the film, "the entire case will simply fall apart on us . . . . Those two guys [Beristain and Adolfo Maldonado, another supposed neutral] must not appear in the documentary at all!"  PX 1091 (Dec. 25, 2008 Email from P. Fajardo to M. Bonfiglio).  He explained that the images were "so serious that we could lose everything. . . ."  PX 1097 (Jan. 22, 2009 Email from P. Fajardo to M. Bonfiglio).

    As we will see momentarily, Prieto and other lawyers in the LAPs' Ecuador office were even more aware of the improprieties that had been committed.

[568]

    There is only one respect in which Cabrera was even arguably comparable to a party-nominated expert in either country.  Although he was court-appointed, the LAPs were responsible for providing the Court with funds to pay him through an open process described above.  The secret payments, however, were improper.

140

Donziger was personally responsible for making sure that he was neither and for having him paid under the table, above and beyond the open, court-approved payments. Moreover, it was Donziger who decided to ghostwrite the Cabrera Report using his own paid consultants and to hide and misrepresent the facts concerning the Cabrera-Stratus-LAP relationship.

In sum, Donziger knew at every step that what he and the LAP team did with Cabrera was wrong, deceptive, and illegal.

c.      *Fajardo Submits a Misleading Affidavit in Denver and Elsewhere*

The District of Colorado granted Chevron's Section 1782 application for the issuance of a subpoena on March 4, 2010.[569] The LAP team, realizing that production by Stratus was extremely likely in view of that ruling, was anxious to "minimize the effects" of the court-ordered production of Stratus' documents.[570] In one of those blinding rays of candor that can occur even in clouds of lies, Prieto, one of the LAPs' lawyers in Ecuador, wrote to Donziger, Fajardo, and others on March 30, 2010 as follows:

> "Today Pablo [Fajardo] and Luis [Yanza] were kind enough to tell us what was going on in Denver, and the fact that certainly ALL will be made public, including correspondence . . . . Apparently this is normal in the U.S. and there is no risk there, but *the problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail), and we are not willing to minimize our concern and to sit to wait for whatever happens. For us it is NOT acceptable for the correspondence, the e-mails, between*

---

569

*Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.), DI 22.

570

PX 1279 (Mar. 30, 2010 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza, and J. Sáenz).

> *Stratus and Juanpa [Sáenz] and myself to be divulged.*"[571]

Thus, Prieto recognized that the disclosure of Stratus' documents would reveal what actually had gone on between Cabrera and the LAPs, that this disclosure would "destroy[] the [Lago Agrio] proceeding," and that "all of us, your attorneys, might go to jail." Nor was he alone in this view – Brian Parker, then an intern at the Selva Viva office, was told by other lawyers working on the case that the Cabrera Report "would be worth zilch" and that Donziger "might get in trouble or lose his license."[572] So Prieto implored Donziger and Fajardo to prevent the disclosure of the emails between Stratus, Sáenz and himself.[573]

Prieto had reason to worry. Less than a month after the District of Colorado granted Chevron's Section 1782 application against Stratus, Chevron filed a 1782 application against Berlinger (the "*Crude* 1782"), seeking the issuance of subpoenas for the outtakes from the *Crude* film.[574] More will be said on the *Crude* 1782 below. For present purposes it is important to note only that, even with production from Stratus imminent, this filing created the added possibility that Chevron would obtain footage of Cabrera and members of his team working directly with members of the LAP team.

The LAP team quickly developed a plan to "cleanse" the Cabrera Report in Ecuador – that is, to provide an alternative evidentiary basis for the Lago Agrio case against the possibility

---

[571]

> *Id.* (emphasis added).

[572]

> Parker Dep. Tr. at 136:1-5.

[573]

> Donziger much later tried to put a very different spin on Prieto's "go-to-jail" email. We conclude below that his attempt was untruthful. *Infra Facts* § XI.A.3.b.iii.

[574]

> *In re Chevron Corp.*, 10 MC 1 (LAK) (S.D.N.Y.), DI 1 (filed Apr. 9, 2010).

142

that the Cabrera Report would be stricken or discredited or be relied upon as evidence of fraud in a foreign court where the LAPs would seek enforcement of any favorable judgment.  The idea was to have a new expert or experts repackage, or cleanse, the Cabrera Report.  But the LAPs needed to delay the Section 1782 proceeding in Denver as long as possible in order to do that.  So, a month after the District of Colorado granted Chevron's Section 1782 petition, the LAPs filed a motion for a protective order with respect to the subpoena.  They claimed that the subpoenaed documents and testimony were protected from disclosure by the attorney-client privilege and work product protection.[575]  The motion later was supported by a declaration of Pablo Fajardo (the "Fajardo Declaration").[576]

The Fajardo Declaration purported to explain to the Denver court what had happened with the Cabrera Report and that it was acceptable under Ecuadorian law.  The LAPs' American lawyers debated what the affidavit should reveal and whether Fajardo should be the one to sign it.  When a lawyer from Patton Boggs – a firm that had been brought on by the LAPs in early 2010 and the involvement of which will be discussed more fully below –  circulated a draft of the affidavit to Donziger and other lawyers on May 3, 2010, one lawyer from Emery Celli Brinckerhoff & Abady, LLC, which also represented the LAPs, responded:

> "I don't quite get the purpose of this affidavit. Pablo mentions one document submission [to Cabrera] but not the other. *If he's submitting an affidavit about what happened, why omit the most important part?* It seems misleading at best. *I just don't see how he can sign an aff. that documents his submissions to Cabrera without mentioning that he sent documents that originated from Stratus which is the one thing the judge is going to want to know . . . . [And] I wouldn't emphasize too much that Cabrera was independent and court-appointed. Once [Fajardo] says that in an*

---

[575]

      *Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.), DI 68.

[576]

      *Id.* DI 99 (filed May 5, 2010).

143

*American court, we'll never be able to back off from it.*"[577]

Another LAP American lawyer expressed his concern that Fajardo might "be subject to deposition[.] This is why we struggled with who would sign the declaration. If Steve [Donziger] signs, he will most certainly be deposed. Same for any other counsel in the US. We figured that with [Fajardo], they likely would not slow down the process by deposing him."[578]

The Fajardo Declaration that ultimately was filed gave an anodyne description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected. It stated that "[i]n addition to the information collected from the vast amount of field inspections he performed, Mr. Cabrera was also free to consider materials submitted to him by the parties. Both plaintiffs and Chevron were asked to supply Mr. Cabrera with documents."[579] It stated also that "to the extent that Mr. Cabrera put into his report any of the information that [Fajardo] supplied to him, it would be viewable by Chevron or any other member of the public that reviewed Mr. Cabrera's Report."[580]

The Fajardo Declaration was highly misleading. It failed to mention that Fajardo, with Donziger's approval, had threatened the judge with a misconduct complaint unless the judge agreed to their demands to cancel the LAPs' remaining judicial inspections. And while it

---

[577]    PX 1319 (May 3, 2010 Email from I. Maazel to others) (emphasis added).

[578]    PX 1316 (May 3, 2010 Email from E. Westenberger to others).

[579]    PX 1326 (Fajardo Decl.) ¶ 16.

[580]    *Id.* ¶ 19.

144

acknowledged that the LAPs had "delivered materials to Mr. Cabrera,"[581] it did not mention the

March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's Report and indicated, in

Cabrera's presence, that the work would be done by them.  Nor did it reveal that Stratus and the

LAPs' counsel in fact had written most of the Cabrera Report.  In other words, it omitted what the

Emery Celli lawyer said was "the most important part"—that Fajardo "sent documents that

originated from Stratus."[582]   The declaration similarly neglected to report that the LAPS "chang[ed]

the focus of [Cabrera's] data at [their] offices."[583] And it, of course, failed to disclose that the LAPs

had made secret payments to Cabrera outside the court process.

Notwithstanding the Fajardo Declaration, the District of Colorado denied the LAPs'

motion for a protective order and ordered Stratus to turn over its documents.[584] Following the ruling,

however, the LAP team – including Donziger – brainstormed ways to delay further the production

of Stratus' documents and, realizing that production was inevitable, to mitigate its effects.  One of

the LAPs' American lawyers sent an email to the LAP team emphasizing that "Stratus will be under

a court order to produce all materials it gave Cabrera. Stratus will not risk a contempt motion, it will

comply.  Unless we want the Stratus/Cabrera revelation to come out in CO, which seems like the

---

[581]

   *Id.* ¶ 18.

[582]

   PX 1319 (May 3, 2010 Email from I. Maazel to S. Donziger, E. Westenberger, A. Wilson, E. Yennock, J. Abady, E. Daleo, and J. Rockwell re: "Draft Affidavit").

[583]

   PX 883 (July 17, 2007 Email from S. Donziger to L. Yanza and P. Fajardo).

[584]

   *See Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 0047, DI 154 (filed May 25, 2010).

Case 14-826, Document 98, 07/02/2014, 1263303, Page160 of 211

145

worst possible place, we need to make our submission in Ecuador and fast."[585] Another lawyer responded, "[w]hat about the following? Appeal; move for stay; if we win with [the District of Colorado] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal."[586]  In other words, delay.

The "submission in Ecuador" to which the lawyer referred was a petition the American legal team had been drafting and planned to file –in Fajardo's name –in the Lago Agrio court (the "Fajardo Petition").[587]  The Fajardo Petition, which Donziger characterized as a "very general and admittedly less than adequate statement,"[588] was filed with the Lago Agrio court on June 21, 2010.[589]  It informed the court that the LAPs had made submissions to Cabrera but did not "confess to having authored specific portions of the report."[590]  It conceded, however, that the LAPs had given Cabrera "proposed factual findings and economic valuations of the environmental and

---

[585]     PX 1363 (May 27, 2010 Email chain Between S. Donziger and Patton Boggs Attorneys re: "Mini-revelation").

[586]     *Id.*

[587]     PX 384 (Fajardo Petition).

[588]     PX 1382 (June 20, 2010 Email from S. Donziger to U.S. lawyers re: "important update on Ecuador submission"), at 2-3.

[589]     PX 384 (Fajardo Petition).

[590]     PX 1371 (June 14, 2010 Email from J. Abady to U.S. lawyers re: "Current Thinking on Ecuadorian Submission").

other damages Texpet's practices and contamination caused."[591]

It thus went farther than the Fajardo Declaration filed in Denver. But that too was deceptive. There was no disclosure of the fact that Cabrera was handpicked by Donziger because he would cooperate with the LAPs, that the report was planned and written by the LAPs and Stratus, and that Cabrera "play[ed] ball" by simply affixing his name to it, acting all the while under the false pretense – fostered by the LAPs – that the report was Cabrera's independent work.

Nonetheless, the LAPs later told U.S. courts that, in filing the Fajardo Petition, they had "fully disclosed" their relationship with Cabrera. The LAPs filed the Petition twice in this Court and once in the Second Circuit.[592]

2.    The New York 1782 Proceedings – Berlinger and Donziger

Following the start of the Stratus 1782 proceeding, Chevron brought two more Section 1782 actions in New York.

The first was against Berlinger. It sought, among other things, production of the out takes – the video shot in connection with the making of *Crude* that was not included in the film.[593] That discovery was ordered and the decision affirmed by the Court of Appeals.[594] The record here

---

[591]    PX 384 (Fajardo Petition), at 6-7.

[592]    PX 2514 (filing in Second Circuit); PX 2515 (filing in 10-MC-00001); PX 2516 (filing in 10-MC-00002).

[593]    *See In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).

[594]    *Id.*

147

contains important evidence from those out takes, which were contemporary recordings of the words and deeds of Donziger and his allies both in Ecuador and in the United States.

The other Section 1782 proceeding brought in New York was against Donziger. It sought to compel production of documentary evidence and testimony. Although Donziger and the LAPs resisted fiercely, this Court ordered the requested discovery, and the Court of Appeals affirmed.[595] Donziger was obliged to produce a trove of documents and emails relating to the Lago Agrio case and to give a deposition. Much of the evidence in this case was obtained in that proceeding.

>    3.    *The LAP Team Sought to Deceive This Court in the Berlinger 1782 Proceeding*

The LAPs filed the misleading Fajardo Declaration in fifteen Section 1782 proceedings in courts across the United States, including this one.[596] But perhaps their first act of deception in this Court occurred in April 2010, when Chevron sought discovery from Berlinger.

As noted, Chevron filed the *Crude* 1782 petition on April 9, 2010. Five days later, Donziger prepared his draft letter to "fellow counsel," in which he admitted that the LAP team's contacts with Cabrera violated the "traditional Ecuadorian law perspective."[597] Despite this admission by Donziger, his co-counsel offered a completely different explanation to this Court.

---

[595]

> *In re Chevron Corp.*, 749 F. Supp. 2d 141, 170 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

[596]

> *See* PX 1326-1340, 2479 (Fajardo Decls.).

[597]

> PX 1291 (Donziger Draft Letter to "Fellow Counsel").

SPA-160

148

On April 23, 2010, the LAP team filed its opposition to the *Crude* 1782, describing the Beristain meeting with Donziger as an "innocuous meeting, which is of no relevance to anything. . . ."[598]  This, of course, was untrue.  As discussed, Fajardo had emailed Berlinger and Bonfiglio shortly after the film first was exhibited, explaining that the presence of the images of Beristain and Maldonado were "so serious that we can lose everything"[599] and that Beristain "must not appear in the documentary at all" or "the entire case will simply fall apart on us."[600]  But at a hearing on April 30, 2010, counsel for the LAPs repeated this falsehood.  He told the Court that Chevron's application for production of the out takes was "frivolous" because the meeting with Beristain was "unimportant," akin to a group of New York lawyers attending a party together.[601]

Notwithstanding the LAPs' misrepresentations, the Court granted Chevron's application for discovery from Berlinger on May 6, 2010 and was affirmed on appeal.  Berlinger produced 600 hours of raw footage to Chevron.  The out takes included footage of the LAP team's March 3 meeting with Cabrera, scenes of the LAPs' representatives – including Donziger – meeting *ex parte* with Ecuadorian judges[602] and lengthy statements by Donziger in which he expressed his highly critical view of the Ecuadorian judicial system.  Some of these scenes have been discussed

---

[598]

   *In re Chevron Corp.*, 10 MC 00001 (LAK), DI 24 (filed May 13, 2010), at 8.

[599]

   PX 2454 (Aug. 3, 2010 Email between S. Donziger and J. Berlinger re: "GRACIAS").

[600]

   PX 1090 (Dec. 25, 2008 Email from P. Fajardo to M. Bonfiglio).

[601]

   *In re Chevron Corp.*, 10 MC 00001 (LAK) (S.D.N.Y. Apr. 30, 2010), Hr'g Tr. 39:16-20; 40:20-23.

[602]

   *See* PX 1 (*Crude* Annotated Tape Log).

already and some will be mentioned below.  It is important to note here, however, that the revelation

of these scenes came at around the same time Stratus began producing documents to Chevron.

Donziger and his co-counsel knew by then that they could no longer deny what had happened with

Cabrera, and they knew they had to figure out a way to salvage their case.

But before we get to that, there is another story that must be told.  The full extent of

the LAPs' contacts with Cabrera threatened to surface even before the Section 1782 applications

were filed.  And Chevron's allegations were causing serious strife within the LAP team between

those who always were aware of the truth underlying the Cabrera Report (Donziger, Fajardo, Yanza,

and others) and those who intentionally were kept in the dark, most significantly, Joseph Kohn.

D.      *Donziger Deceives Kohn, Refuses His Demand for an Investigation of the Facts With
        Respect to Cabrera, and Precipitates a Final Break*

As far as Donziger was concerned, Kohn's role in the Lago Agrio case was to pay

for it.  Kohn largely acquiesced for years; he was not involved in the day-to-day decisions and

actions and relied on Donziger to keep him apprised of important events.  Donziger, however, was

selective with what he told Kohn and when he told him, and he actively misled him in important

respects.  This led to a break in relations and is important for several reasons.

*First*, Donziger misled Kohn, his financial backer and supposed co-counsel,

concerning the Cabrera Report and related matters.  This demonstrates his full awareness that what

transpired between and among Donziger, the LAP Ecuadorian lawyers, Cabrera and Stratus had been

highly improper. It is further evidence that Donziger's claim that he believed otherwise is untrue.

*Second*, the manner in which Donziger dealt with Kohn further confirms that

Donziger was in entire control of the Lago Agrio case and all related activities.

*Third*, the break in relations between Donziger and Kohn resulted in the loss of Donziger's principal financial backer and led to the search for another. That search in turn quite possibly resulted in still further deception of a financing source and led to the appearance on the scene of Patton Boggs LLP.

> 1. *Donziger Misrepresented to and Concealed From Kohn Important Information Regarding Cabrera and Stratus*

As discussed previously, Donziger and Kohn formally retained Stratus in the spring of 2007.[603] Kohn, in accordance with the Stratus contract, understood "that materials prepared by Stratus on behalf of the Ecuadoran plaintiffs would be 'for submittal to the court,' on the record, and that the global damages expert would then review and consider whether to accept, or reject, or rely upon in some way any or all of Stratus's findings in his own report."[604] But he was kept in the dark about most of what was important regarding Cabrera – the LAPs' role in selecting him, securing his appointment, and ensuring that he would cooperate with them – and about Stratus' true role.

Kohn and Donziger did agree in the spring of 2006 that "it would be best to limit or end the judicial inspections and move onto the second evidence-gathering phase of the litigation: the global damages expert report and final submissions."[605] But Donziger did not tell Kohn that Donziger and "his Ecuadoran co-counsel vetted candidates to be the global damages expert prior to the court ordering the end of judicial inspections and the beginning of the court expert phase of trial.

---

[603]    PX 5600 (Kohn Direct) ¶ 29; PX 633 (Aug. 20, 2007 Stratus Contract), at 1-9.

[604]    PX 5600 (Kohn Direct) ¶ 29 (quoting PX 633 (Aug. 20, 2007 Stratus Contract)).

[605]    *Id.* ¶ 27.

151

[Kohn] was not aware that Fernando Reyes was one of the candidates Mr. Donziger and his Ecuadoran co-counsel vetted. [He] was not aware that Fernando Reyes suggested to Mr. Donziger that he choose Mr. Cabrera to be the court expert."[606]

Nor did Donziger inform Kohn that Donziger, the Ecuadorian LAP lawyers, and their U.S. technical consultants met with Cabrera on March 3, 2007 to plan out Cabrera's "work."[607]  He was not told that Stratus actually was writing the report to be submitted under Cabrera's name.[608] Indeed, Kohn believed – based on statements by Donziger – that "at all times, the Ecuadoran plaintiffs' consultants' materials were being submitted publicly to the Ecuadoran court through a proper, legal process consistent with Ecuadoran law."[609]

Kohn did learn that, "[e]ven before the Cabrera Report was filed in 2008, Chevron representatives began suggesting that Mr. Cabrera was not an independent expert. [Kohn] raised these allegations with Mr. Donziger on several occasions. [But] Mr. Donziger consistently denied [that] there was anything improper in connection with Mr. Cabrera, or that there was any basis for Chevron's allegations that Mr. Cabrera was not independent."[610]

After the Cabrera Report was filed, Donziger continued to deceive Kohn regarding

---

[606]

    *Id.* ¶ 73.

[607]

    *Id.* ¶ 74.

[608]

    *Id.* ¶ 31 (Kohn "did not review drafts of Stratus' work being submitted in Ecuador. [He did] not recall reviewing any draft documents beginning with 'I, Richard Cabrera.' [He] was not involved in any discussions about Stratus's work being attributed to Mr. Cabrera or otherwise being used in a non-transparent manner.").

[609]

    *Id.*

[610]

    *Id.* ¶ 50.

152

Stratus' role and the propriety of the LAP team's collaboration with Cabrera.  In the days following

the issuance of the Report, Donziger sent to Kohn several press releases, some in draft form, all of

which referred to Cabrera as an "independent" expert."[611]  And while Kohn was aware that Cabrera

filed a second, supplemental report that increased his damages estimate by $11 billion, Donziger did

not disclose to Kohn that Stratus had written the supplemental report.[612]


### 2.     Donziger Deceives Kohn About the "Secret" Account

While he was misleading Kohn about the Cabrera operation, Donziger and other

members of the LAP team continued to pump him for money.  "[B]etween June 2005 and November

2009, KSG [the Kohn firm] made approximately 51 separate wire transfers from [its] U.S. bank

account to [Selva Viva's primary account at] Banco Pichincha . . . in amounts ranging from $10,000

to $100,000."[613] In 2007, however, Donziger began referring in emails to Kohn to a second account

at Banco Pichincha.[614]  He asked Kohn to transfer money into this second account on three occasions

in 2007 and 2008.[615]  When Kohn's assistant asked Donziger why he wanted the money transferred

to a new account, Donziger explained that it was because the payments involved "separate case-

---

[611]

     PX 1023 (Apr. 1, 2008 Email from S. Donziger to J. Kohn); PX 1032 (Apr. 4, 2008 Email from S. Donziger to J. Kohn).

[612]

     PX 5600 (Kohn Direct) ¶ 33.

[613]

     *Id.* ¶ 37.

[614]

     *Id.* ¶ 38; PX 897, 917, 965, 968, 984 (Emails to Kohn Referring to Second Selva Viva Account).

[615]

     PX 5600 (Kohn Direct) ¶ 38.

153

related piece[s] of work that [are] being run by the Frente [*i.e.*, the ADF] . . . . This separate account will be used for [the] same purpose under the same control of the Frente and Yanza, and will be accounted for the same way with receipts."[616]

       We now know that this second account had a special purpose.  It was the "secret" account the LAPs set up in order surreptitiously to pay Cabrera outside the court process.[617]  But Donziger did not tell Kohn that – in fact, he led Kohn to believe that Cabrera was being "paid directly by the court . . . as is customary and required in Ecuador."[618]  Thus, "[i]n accordance with . . . instructions from Mr. Donziger, [Kohn] wire transferred $120,000 total from its U.S. bank account to this second account in Ecuador on August 15, 2007 ($50,000), September 17, 2007 ($50,000), and February 12, 2008 ($20,000)."[619]  As noted, $33,000 of that money was transferred directly from the secret account into Cabrera's account without Kohn's knowledge just before Cabrera formally was named.[620]

---

[616]

       PX 897 (Aug. 14, 2007 Email from S. Donziger to J. Kohn, K. Wilson, K. Kenny re: "Critical money transfer").

       Kohn testified that he understood that the "second account was simply an administrative or ministerial matter, no different from any business or firm having more than one bank account."  PX 5600 (Kohn Direct) ¶ 39.

[617]

       The record is silent as to what other covert purposes, if any, it served.

[618]

       PX 5600 (Kohn Direct) ¶ 30.

[619]

       *Id.* ¶ 38.

[620]

       *See supra Facts* § V.C.1.

154

3.      *Donziger Refuses to Cooperate With Kohn's Demand for an Investigation Independent of Donziger*

By late 2008, Kohn was worried about the likelihood of obtaining a judgment in the plaintiffs' favor and of enforcing such a judgment if it were obtained.  Chevron's allegations concerning the Cabrera Report were surfacing.[621]  As will be detailed below, Chevron had begun to allege that the judge presiding over the Lago Agrio case had been caught on video accepting a bribe.[622]  And, despite prior assurances from Donziger that a judgment would issue in Ecuador by 2006 or 2007,[623] the case seemed to "be dragging on indefinitely."[624]  Kohn attempted to take a more active role.[625]

Donziger "rebuffed these efforts."[626]  He "refused to provide [Kohn] with copies of his files, including all the court filings [Kohn] had requested; he cancelled or postponed meetings at the last minute; and generally he refused to substantively engage with [the Kohn firm]."[627]  He repeatedly attempted to "prevent [Kohn lawyers] from meeting with members of the Ecuadoran legal team by first delaying or rescheduling meetings, and then ultimately stating [that Kohn

---

[621]     PX 5600 (Kohn Direct) ¶¶ 20, 50.

[622]     *Infra Discussion* § IX.B.2.

[623]     PX 5600 (Kohn Direct) ¶ 20.

[624]     *Id.*

[625]     *Id.*

[626]     *Id.*

[627]     *Id.* ¶ 54.

155

lawyers] were not allowed to speak directly with the Ecuadoran legal team."[628]  When Kohn in early

2009 suggested a meeting with the Ecuadorian legal team to discuss the final brief the LAPs would

submit to the Lago Agrio court, Donziger "kept putting it off and even became irate when a lawyer

in [the Kohn] firm . . . communicated with Mr. Sáenz directly."[629]  Sáenz "appeared to acquiesce to

this control, telling" the Kohn firm "Steven is our point of contact, so please coordinate with him

about the best way to proceed." [630]  And in a memorandum to Kohn and others at his firm, Donziger

made clear that he was the boss and that the Kohn firm would not be allowed to step on his toes:

> "It is critical that you understand the larger context of how this effort is being
> managed and thereby understand how [the Kohn firm] can best add value.  The legal
> and political 'space' around this case in both Ecuador and the U.S. has been
> intricately constructed over the last several years by those involved on a fulltime
> basis. The process is managed by myself, Pablo Fajardo, and Luis Yanza. All of us
> work on this on a full-time basis and we speak among ourselves frequently. We also
> manage [t]he client relationships and in my case I have raised significant funds for
> both the case in chief and ancillary activities.  *All activities from [the Kohn firm]*
> *must be coordinated through this process, which in practice means coordinated*
> *through me.*
>
> *   *   *
>
> Given this context, the 'value added' of the [Kohn] team needs to be focused on
> discrete tasks within the existing structure, not overall management of this complex,
> delicate, intricate and multi-cultural process. The learning curve at this point is way
> too great to even start down that road. . . .That said, your input and thoughts are
> valued and I have no doubt your contributions can be immense if you are willing to
> work within this structure and complete tasks (such as legal research, draft reports)
> by specific deadlines and be real about what you can and cannot do. *But be clear: I*
> *am not going to consult with each of you on each and every aspect of this effort,*
> *unless you want to come work out of my office on a fulltime basis, which I am sure*

---

[628]

    *Id.*

[629]

    *Id.* ¶ 55.

[630]

    PX 1185 (Nov. 13, 2009 Email from J. Sáenz to L. Yanza, P. Fajardo, and J. Kohn).

156

*you would rather not do. . . .*"[631]

Kohn and other lawyers at his firm repeatedly expressed their frustration among themselves and to Donziger at his refusal to provide them with information about what was going on in Ecuador, or to allow them to be meaningful participants in the decision-making process.  This frustration eventually led to Kohn's withdrawal from the case.  But there was another event in particular that precipitated the withdrawal.

Kohn was becoming aware of Chevron's allegations concerning the LAPs' contacts with Cabrera.[632]  Fearing that their case was in jeopardy, Kohn proposed to Donziger that they retain an American lawyer to conduct an investigation, on behalf of the LAPs but independent of Donziger and the LAPs' Ecuadorian team, into "Chevron's allegations of misconduct by the Ecuadoran plaintiffs' team," including the Cabrera Report.[633]  He suggested Kenneth Trujillo – a Spanish-speaking former Assistant United States Attorney and former City Solicitor of Philadelphia,[634] to "make inquiries into what knowledge members of the [LAP] legal team . . . may have of improprieties involving the judge and/or government or ruling party officials, as well as with respect to allegations leveled by Chevron Corporation, the defendant in that litigation, of improper contacts

---

[631]

PX 1146 (July 2, 2009 Memo from S. Donziger to Kohn team re: "Activity Going Forward") (emphasis added).

[632]

PX 5600 (Kohn Direct) ¶¶ 50-52.  Kohn testified that he participated in two mediation sessions with Donziger and attorneys for Chevron in late 2007 and early 2009.  At both of those sessions, Chevron's attorneys "asserted that the Ecuadoran plaintiffs' team had improper contacts with Mr. Cabrera." *Id.* ¶ 52.

[633]

*Id.* ¶ 22.

[634]

*Id.*; PX 1155 (draft retention agreement with K. Trujillo).

SPA-169

157

between members of *Aguinda* legal team and various Ecuadorian judges, court-appointed experts, or government officials."[635]

Kohn testified that Donziger initially appeared receptive to the idea of hiring an independent investigator and that he, Donziger, and Trujillo participated in at least one conference call to discuss Trujillo's possible engagement.[636]  A few days later, however, Donziger emailed Kohn to say that he did not think going forward with an investigation was a good idea.[637]  Donziger wrote:

> "I talked to Pablo and Luis about your idea of hiring the former prosecutor for the purposes you described. There is a consensus such a move would be adverse to the client's interests and unwise for a host of reasons. *Neither I, nor the legal team in Quito, will cooperate with such an investigation nor continue working with a firm that insists on doing such an investigation*.  I can explain details when we talk.  If you go forward with retaining somebody for this purpose, please notify me immediately so I can notify the clients."[638]

Kohn did not go forward with retaining Trujillo because he knew that an investigation would be ineffective without Donziger and the Ecuadorian legal team's cooperation.[639]

Squabbles occur among co-counsel for all sorts of reasons and that they rarely are subjects of interest or concern to courts.  This one, however, was different.  Donziger blocked

---

[635]

  PX 1155 (draft retention agreement with K. Trujillo).

[636]

  PX 5600 (Kohn Direct) ¶ 22.

[637]

  *Id.*; PX 1156 (Sept. 4, 2009 Email from S. Donziger to J. Kohn re: "idea to retain a lawyer").

[638]

  PX 1156 (Sept. 4, 2009 Email from S. Donziger to J. Kohn re: "idea to retain a lawyer") (emphasis added).

[639]

  PX 5600 (Kohn Direct) ¶ 22.

158

Kohn's efforts to become more involved, and especially blocked the suggestion that a lawyer independent of Donziger and the LAP Ecuadorian lawyers look into what really had happened with Cabrera and other alleged improprieties, in order to conceal to the extent possible the truth about what had taken place.  The Court finds these events probative of Donziger's consciousness of guilt.

4.      *Kohn Cuts Off Funding*

Two months after Donziger rejected Kohn's proposal for the Trujillo investigation, Kohn informed Donziger that he no longer would pay Donziger's monthly expenses for his work on the Lago Agrio case.[640]  Donziger responded that Kohn had no role on the case other than to pay for it.[641]  Kohn replied that, although he previously had

> "requested you to adjust your requested monthly figure several times since the work in Ecuador was reduced and more time was spent here . . . you did not.  Since then you have continued to send us expenses for all travel, meals, staff and anything else without any thought.  In terms of the legal work on the case, you have consistently tried to exclude us from discussions, meetings etc, including preventing meetings

---

[640]

PX 1181 (Nov. 9, 2009 Email Chain Between J. Kohn and S. Donziger).

Donziger and Kohn had a fee sharing arrangement, and Kohn was under no obligation to pay Donziger's expenses.  *Id.*

[641]

*Id.*

Donziger wrote:  "As a general matter, your firm's primary obligation is to finance the case; my firm's primary obligation is to run the case on a day to day basis, maintain relations with the clients, handle press and political aspects in both Ecuador and the U.S., and make sure we are set up for an enforcement action and financing going forward. In other words, I am doing a substantial portion of the actual work. If you break it down by time and value, I think I am doing the overwhelming amount of work on this case. I am not going to keep doing a substantial portion of the work AND take over your responsibility for financing while maintaining our same equity arrangement."  *Id.*

159

with the lawyers in Ecuador we have been requesting for many months."[642] Kohn stated also that he had "consistently said [he was] willing to discuss proposals for other funding."[643]  He had even identified and spoken with firms that were willing to come in and help on a "lawyerly and businesslike basis."[644] But Donziger repeatedly declined to respond to Kohn's offer. Kohn wrote: "I conclude you are not interested in doing so because you perceive them as our friends who you could not control, or would not simply take orders from you."[645]

On November 10, 2009, Kohn wrote to Fajardo and Yanza regarding the possibility of further settlement negotiations with Chevron.[646]  He argued that settlement discussions were advisable and that a settlement of $700 million would "provide for virtually 100% clean-up" of the Orienté, as well as funds for other projects.[647]  Fajardo and Yanza replied that they did not wish to engage in settlement discussions at that time. They stated that "all budget and strategy decisions must be made by Mr. Donziger."[648]  They also "raised certain issues about slowness in [Kohn's] payment of certain bills over time, or that [Kohn] had not funded certain things or met certain

---

[642]     *Id.*

[643]     *Id.*

[644]     *Id.*

[645]     *Id.*

[646]     PX 1184 (Nov. 10, 2009 Ltr. from J. Kohn to L. Yanza and P. Fajardo).

[647]     *Id.*

[648]     PX 5600 (Kohn Direct) ¶ 60 (citing PX 1187 (Nov. 19, 2009 Ltr. from J. Kohn to L. Yanza and P. Fajardo)).

160

commitments."[649]

Kohn responded on November 19, 2009, that "[t]he working relationship between [him] and . . . Steven ha[d] steadily deteriorated over the past years" and that Kohn had "paid all necessary litigation expenses, as well as many wasteful and unnecessary expenses incurred due to Steven's extravagance and decisions."[650]  He explained that:

> "[B]y far, the largest single component of the 'budget' is Steven's demand for fees and expenses, and there, in my opinion, lies the root of the current problem, and the reason why this current crisis arises . . . . At the same time as we have spent enormous sums of money on the case, Steven has denied us access to documents, information and the legal team, despite our repeated requests.  He has made it impossible for us to effectively discharge our duty as attorneys and has interfered with the attorney-client relationship."[651]

Kohn concluded by stating that "unless or until such agreements are reached, [Kohn] considers that due to Steven's influence and interference, there is no longer an attorney-client relationship with our firm and we will withdraw from any further representation related to the case and notify the vendors and other appropriate entities of that fact."[652]

Several months later, Kohn spoke with Jeffrey Shinder by telephone.  Shinder explained to Kohn that he had withdrawn from representing the LAPs in the Denver Section 1782 proceeding against Stratus and his reasons for doing so.[653]  Shortly thereafter, Kohn met with

---

[649]

    Tr. (Kohn) 1463:18-1464:18.

[650]

    PX 1187 (Nov. 19, 2009 Ltr. from J. Kohn to L. Yanza and P. Fajardo).

[651]

    *Id.*

[652]

    *Id.*

[653]

    PX 5600 (Kohn Direct) ¶ 63.

Donziger – at Donziger's request – in New York.[654]  Donziger asked Kohn if he was "interested in

joining a [new] committee of lawyers representing the Ecuadoran plaintiffs."[655]  Kohn replied that

he had spoken with Shinder about the LAPs' contacts with Cabrera and that he "would not discuss

anything with [Donziger] unless he – and anyone of the Ecuadoran team that had contact with Mr.

Cabrera – 'came clean' about what happened with Mr. Cabrera."[656]  Donziger admitted to Kohn that

"someone on the Ecuadoran team 'may' have provided 'some' documentation to Mr. Cabrera, and

if it came out, it could be embarrassing for the Ecuadoran plaintiffs' team."[657]

On April 13, 2010, Kohn wrote to Fajardo and Sáenz, informing them that he had

become aware of "very disturbing recent events related to the case taking place in the U.S."[658]

Because "Steven stopped providing [Kohn] with information, consulting with [Kohn], or following

any of [Kohn's] advice," he was reaching out to the Ecuadorian lawyers directly.[659]  Kohn noted,

among other things, that:

> "Steven . . . hired other firms to deal with the depositions of Stratus.  He informed
> me last week, without providing any details or facts, that the information Stratus may
> provide will be damaging to the case and highly embarrassing.  We have no
> knowledge of what he is talking about except what Steven has now reluctantly told
> us: that it involves communications with Cabrer[]a, something that surprised us and

---

[654]     *Id.* ¶ 64.

[655]     *Id.*

[656]     *Id.*

[657]     *Id.*

[658]     PX 1290 (Apr. 13, 2010 Ltr. from J. Kohn to P. Fajardo, J. Sáenz, and L. Yanza).

[659]     *Id.*

SPA-174

162

that we find quite disturbing if true. This conduct - the contacts with Cabrer[]a (if they took place), and the failure to properly oppose or prepare for these depositions, has and will cause severe damage to the case."[660]

Accordingly, Kohn informed the lawyers that Donziger and possibly others needed to withdraw in order to salvage the case.[661]  Moreover, the LAPs' Ecuadorian legal team, he asserted, needed to open their files to the Kohn firm and allow themselves to be interviewed by an independent attorney.[662]

Later in April 2010 – and after the Colorado district court had granted Chevron's Section 1782 application with respect to the Stratus documents, but before any documents had been produced – Kohn met in Philadelphia with Fajardo, Yanza, and Humberto Piaguaje at the Ecuadorians' request.[663]  Kohn asked them about their interactions with Cabrera.  Fajardo responded that they had provided documents to Cabrera in accordance with a court order and that Chevron's allegations were false.[664]  A few days later, on May 3, 2010, Kohn received an unsolicited email from Fajardo, in which he clarified that he "did not mention [one] detail" regarding "the information [the LAPs] shared regarding the process in Ecuador."[665]  Fajardo wrote that "[b]ased on the same order of the judge, by which we submitted information to Expert Cabrera, we proceeded to submit

---

[660]
    *Id.* at 2.

[661]
    *Id.*

[662]
    *Id.*

[663]
    PX 5600 (Kohn Direct) ¶ 66.

[664]
    *Id.*

[665]
    PX 1312 (May 3, 2010 Email from P. Fajardo to J. Kohn).

SPA-175

163

a packet of information, mainly the input of Stratus, around the middle of March 2008."[666]  Fajardo

assured Kohn that "there is no illegality in the process of delivering information."[667]  This email,

quite interestingly, preceded the filing of Fajardo's misleading declaration in the Stratus litigation

in Denver by only two days.[668]

On July 29, 2010, Kohn received a letter from representatives of the LAPs purporting

to terminate their attorney-client relationship with the Kohn firm.[669]

After evidence of the Cabrera fraud and other events began to emerge from Section

1782 proceedings, Kohn "disavowed any financial interest in the Ecuadoran judgment."[670]  Kohn

testified at trial: "I relied on Mr. Donziger to tell me the truth about what was going on in the

Ecuadoran litigation . . . and I now know that Mr. Donziger did not tell me the truth.  It is now clear

to me that Mr. Donziger deceived and defrauded me, and that, as a result, we continued to pay

millions of dollars to that litigation that we never would have paid had we known the truth."[671]

---

[666]

   *Id.*

[667]

   *Id.*

[668]

   *Chevron Corp. v. Stratus Consulting, Inc.*, 10 Civ. 0047, DI 99 (D. Colo. filed May 5, 2010).

[669]

   PX 5600 (Kohn Direct) ¶ 68.

[670]

   *Id.* ¶ 25.

[671]

   *Id.* ¶ 81.

5.      *Defendants' Response to Kohn's Testimony*

Donziger for the most part failed to respond to Kohn's testimony.  He did not offer any explanation for why he had not provided Kohn with accurate information concerning Cabrera, Stratus, himself, and the Ecuadorian LAP lawyers.  His questions to Kohn at trial suggested that Kohn could and should have taken steps to obtain information concerning Ecuadorian law from sources other than Donziger, such as hiring an Ecuadorian law expert to investigate the Cabrera Report.[672]  Thus, Donziger appeared to argue that Kohn's failure to learn the truth of what happened in Ecuador and whether it was proper under Ecuadorian law was his own fault.

That of course is understandable in view of the fact that litigation by Kohn to recover the money he advanced to Donziger is quite possible.[673]  And it is not this Court's function to decide the merits of any such claim here.  But it is its duty to find the facts to the extent they are material to *this* case.   And it finds that Donziger's arguments, to the extent they are material here, are not persuasive.

Kohn *had* proposed hiring such an expert in 2009, Kenneth Trujillo, but Donziger and the Ecuadorian lawyers were unwilling to allow him to conduct a meaningful investigation.[674]  Moreover, whether or not Kohn sought independently to verify the limited information he received from Donziger does not change the fact that Donziger misrepresented to him vital facts about the

---

672

   Tr. (Kohn) 1448:19-21.

673

   Kohn testified that he has "preserved through tolling agreements [his] firm's right to pursue litigation to recover amounts paid [to Donziger and Stratus] in connection with the Ecuadoran litigation."  PX 5600 (Kohn Direct) ¶ 25.

674

   Tr. (Kohn) 1449:10-19.

165

case in Ecuador.  And when Kohn did try to find out what had gone on, Donziger prevented him from doing so because, the Court finds, Donziger understood full well that what he and his associates had done was wrong.

The LAPs called one witness whose testimony differed slightly from Kohn's on certain points.  Humberto Piaguaje, the "executive coordinator of the asamblea,"[675] testified that Fajardo, Yanza, and Piaguaje, during their April 2010 Philadelphia meeting with Kohn, asserted that there were "decisions that [Kohn] made that were above the interests of the members of the assembly for the struggle that they were involved in."[676]  According to Piaguaje, the Assembly subsequently decided to terminate Kohn "[b]ecause he did not abide by some of the things that had been suggested at the meeting."[677]

Thus, through Piaguaje's testimony, defendants appear to suggest that Kohn was fired because he was taking actions that the LAPs had not ratified and because he would not abide by his clients' wishes.  But they fail to mention a single action Kohn took of which they did not approve (besides his decision to stop funding the case).  And they fail to explain how what they describe as their decision to fire him changes the fact that Kohn repeatedly was lied to about Cabrera and other important events.  Accordingly, the Court does not credit Piaguaje's claim.

---

[675]     Tr. (H. Piaguaje) 2678:10-13.

[676]     *Id.* 2698:11-16.

[677]     *Id.* 2699:20-24.

E.      *The Search for New Funding – Patton Boggs, the Invictus Strategy, and Burford*

By the end of 2009, Kohn no longer was supporting the lawsuit and the LAPs were in financial difficulty.  Although Donziger had secured a $500,000 investment from Russell DeLeon in June 2009,[678] he knew that much more would be needed to keep the case going.  Moreover, the LAP team's internal emails make clear that they expected to obtain a large judgment soon – a timetable that proved inaccurate – and Donziger knew he would need substantial U.S. legal help to mount a credible enforcement threat.  The story of how he found it is important.  It led to the refinement of the enforcement strategy that the LAP team planned to follow to collect the Judgment.

1.      *Patton Boggs Is Retained, Develops the Enforcement Strategy, and Obtains Funding from Burford*

As of late 2009, Donziger's plan for enforcement of the judgment he expected shortly to obtain was simple – to seek enforcement in the United States.  That is what he then told Jeffrey Shinder, whom he considered hiring to run the enforcement effort.[679]  But around the same time, he began working with H5, a litigation services firm in New York, to secure financing.[680]  In November

---

678

　　　　PX 543 (Jun. 30, 2009 Investment Agreement between R. DeLeon, S. Donziger, and J. Kohn) § 7.2.

679

　　　　Shinder testified as follows with respect to a late 2009 conversation with Donziger: "Q. Did you come to speak to Mr. Donziger in the fall of 2009?  A.  Yes, I did.  Q.  Generally, do you recall what legal services Mr. Donziger was looking for?  A.  I do.  He was looking for enforcement counsel, lawyers in the United States who were going to take a judgment that he anticipated getting from the court in Ecuador and getting it enforced in the United States against Chevron, and that was the role we were auditioning for.   Q.  Did you say enforcing in the United States?  A.  Yes.  Q.  Did Mr. Donziger say that to you?  A.  Yes."  Tr. (Shinder) 1253:6-18.

680

　　　　PX 3100 (Bogart Direct) ¶ 5; PX 541 (Nov. 1, 2009 Ltr. from N. Economou to S. Donziger and L. Yanza).

167

2009 – the same month in which Kohn officially informed Donziger he no longer would finance the Lago Agrio case – Nicolas Economou of H5[681] reached out to Burford Capital LLC ("Burford") "to solicit investment capital for international judgment enforcement activities in connection with the Lago Agrio litigation."[682] Economou introduced Burford to Donziger, who "described himself [to Burford] as the lead U.S. lawyer for the LAPs and also the overall strategist behind the Litigation."[683]   Burford "rapidly made it clear that [the Lago Agrio case]  was outside its usual investment parameters and that Burford could only even consider the matter if highly regarded US litigation counsel were involved."[684]

So Donziger – with the assistance of Economou and Burford – expanded the search for "highly regarded US litigation counsel."   In January 2010, Economou and Burford chief executive Christopher Bogart had a meeting with Donziger, James Tyrrell, a senior partner of Patton Boggs, and Eric Westenberger, another partner at the firm.[685]   In early February, Patton Boggs proposed to Donziger a "multi-jurisdictional strategy" for "expeditiously delivering the Aguinda Plaintiffs [LAPs] their due recovery."[686]   The proposal called for attacking Chevron "on multiple fronts – in the United States and abroad."   And the point of the multi-front strategy was explicit:

---

[681]

PX 541 (Nov. 1, 2009 Ltr. from N. Economou to S. Donziger and L. Yanza).

[682]

PX 3100 (Bogart Direct) ¶ 5.

[683]

*Id.*

[684]

*Id.*

[685]

Tyrrell Dep. Tr. at 81:13-23.

[686]

PX 1389 (Response to Request for Information), at 7 of 88.

Case 14-826, Document 98, 07/02/2014, 1263303, Page183 of 211

168

> "[S]wift recovery is of paramount importance . . . A thoughtfully crafted, multi-front approach, not only increases the odds of obtaining expedient and significant recovery, it also serves the related purpose of keeping Chevron on its heels."[687]

The point of the multi-front strategy thus was to leverage the expense, risks, and burden to Chevron of defending itself in multiple jurisdictions to achieve a swift recovery, most likely by precipitating a settlement.

Before the month of February was out, Patton Boggs "had secured a leading role in the [l]itigation, with Jim Tyrrell as the lead partner."[688]  "Burford thus began more significant diligence and commenced commercial negotiations over investment terms."[689]

Patton Boggs quickly became heavily involved in the Lago Agrio litigation, both in the United States and in Ecuador.  By July 2010, it had "assist[ed] Ecuadorian counsel in sustaining and prosecuting plaintiffs' claims against [Chevron] in Ecuador, and defend[ed] multiple ancillary 28 U.S.C. § 1782 actions across six U.S. jurisdictions."[690]  It also had "drafted . . . briefs filed in both U.S. Courts and the Lago Agrio Court, performed a sizeable document review in connection with the Colorado § 1782 proceedings [against Stratus]" (although PB did not appear formally in that action), and led efforts to retain Ecuadorian law experts.[691]

In conducting its due diligence, Burford largely relied on Patton Boggs to keep it

---

[687]  *Id.*

[688]  PX 3100 (Bogart Direct) ¶ 6; PX 1391R (July 12, 2010 Ltr. from J. Tyrrell to S. Donziger) ("PB's work on behalf of the plaintiffs . . . first commenced in February 2010").

[689]  PX 3100 (Bogart Direct) ¶ 7.

[690]  PX 1391R (July 12, 2010 Ltr. from J. Tyrrell to S. Donziger).

[691]  *Id.*

169

apprised of events in the litigation, to assess the merits of the LAPs' case, and to come up with a coherent enforcement strategy that would be undertaken once the LAPs received a judgment in their favor. Moreover, "it was agreed [with Burford during its due diligence] that Patton Boggs would provide its analysis on . . . [a] judgment enforcement strategy to Burford, and that Burford would not try independently to perform that work, although Burford remained in close and active contact with Tyrrell and . . . Westenberger about their work."[692]

The enforcement strategy was key to inducing Burford to invest in the case. So Patton Boggs prepared a document setting forth the LAPs' plan, a document that was entitled "Invictus" and that has become known as the "Invictus Memo."[693] The Invictus Memo found favor with Burford, which was not surprising in light of the fact that Burford had "a special relationship with and respect for Jim [Tyrrell] and Patton Boggs. . . ."[694] In September 2010, Burford's investment committee approved the investment and a funding agreement was signed,[695] pursuant to which Burford was to invest a total of $15 million in three separate tranches – $4 million on November 1, 2010,[696] and two subsequent tranches each of $5.5 million. In return, Burford was

---

[692]

PX 3100 (Bogart Direct) ¶ 4.

[693]

PX 2382 (Invictus Memo).

[694]

PX 2382 (Sept. 5, 2010 Memo from C. Bogart to Burford Investment Comm.), at 3.

[695]

PX 3100 (Bogart Direct) ¶ 8.

[696]

Id. ¶ 25; PX 2456 (Nov. 2, 2010 Email from C. Bogart to S. Donziger, N. Economou, and W. Carmody) ("I confirm that we have funded Patton Boggs' London account.").

170

given a 5.545 percent interest the Judgment, less certain costs and expenses.[697]


### 2.      The Invictus Strategy

 The Invictus strategy is significant not only because Burford relied on it in approving the investment, but because the LAP team has been carrying it out since the Judgment was rendered in 2011.

Invictus built on the LAPs' previous intention to seek to enforce the anticipated favorable judgment in the United States and the Patton Boggs proposal to Donziger.  It set out a plan to enforce it "quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad."[698]  It noted that "[o]btaining recognition of an Ecuadorian judgment in the United States is undoubtedly the most desirable outcome."[699]  But Invictus recognized also that enforcement in the United States could prove difficult. It emphasized that "Patton Boggs' current and former representation of numerous, geographically diverse foreign governments means that barriers to judgment recognition in a given country may not necessarily preclude enforcement there."[700]  It further elaborated that "Patton Boggs [would] use its political connections and strategic alliances to ascertain which nations' governments are not beholden to Chevron, so as to minimize the prospect

---

[697]      PX 552 (Burford Funding Agreement).

[698]      PX 2382 (Invictus Memo), at 15.

[699]      *Id.* at 22.

[700]      *Id.*

171

of adverse governmental interference in the enforcement process."[701]   And it touted the benefits of

what it called a "keystone" strategy.   It explained that:

> "proceeding as an initial matter in a jurisdiction housing the highest concentration of Chevron's domestic assets would offer certain obvious advantages, including efficiency. Nonetheless, it is more important for Plaintiffs to proceed *initially* in a jurisdiction that promises the most favorable law and practical circumstances. To that end, Plaintiffs' Team will identify and potentially target certain 'keystone' nations - that is, nations that enjoy reciprocity, or, better yet, are part of a judgment recognition treaty - with nations that serve as the locus for greater Chevron assets. For instance, while enforcing western judgments in the Middle East is notoriously challenging, certain countries in that region have entered into relevant treaties with European nations. If the Aguinda Plaintiffs are able to obtain conversion of the judgment in one of those European nations, this *may* open the door to enforcement in the Middle Eastern target nation."[702]

Invictus noted also that the LAPs would identify Chevron-related entities – such as subsidiaries and

joint ventures – and "target" them with enforcement actions also.[703]

The Invictus Memo made clear that the LAPs' enforcement strategy contemplated

an initial multi-pronged attack on Chevron, its assets, and subsidiaries in multiple jurisdictions

outside the United States followed by proceedings here.   Although Burford was enticed by the

Invictus strategy, however, it did not stick around long enough to see it implemented.

---

[701]

    *Id.*

[702]

    *Id.* at 21 (emphasis in original).

[703]

    *Id.* at 26.

172

F.    *Fajardo Obtains a Broader Power of Attorney, and Donziger and Fajardo Enter Into Their First Written Retention Agreements with the LAPs*

There is a final point to be made about the Burford story: it led to a broadening of Fajardo's power of attorney from the LAPs and the execution of a formal retention agreement between Donziger and the LAPs. Both are relevant.

On November 5, 2010, four days after he signed the Burford Funding Agreement on the LAPs' behalf, Fajardo obtained a new power of attorney ("POA") from the LAPs.[704] The reason, among others, for the broadened POA was that Donziger had secured funding by promising investors a share in the LAPs' recovery from a judgment. The Funding Agreement with Burford made clear that Burford's return on its investment would be paid from the LAPs' share of any recovery on a judgment net of the portion allocated to the attorneys' fees.[705] Moreover, Donziger recently had agreed to amend his March 2010 funding agreement with Russell DeLeon by "deleting the[]reference [of DeLeon's recovery] to percentage of Attorney Fees" and changing it to "1.75% of Net Plaintiff recovery."[706] It was unclear, however, whether Fajardo had had the authority under his previous POA to sign such agreements on the LAPs' behalf. Indeed, DeLeon had raised that

_____

[704]      PX 392 (Fajardo Nov. 2010 Power of Attorney), at 1-2.

The new POA was "a broadening or extension of the power of attorney that was previously granted to [Fajardo], for which reason the [LAPs] ratif[y] and approve[] each and every one of the actions performed by the attorney Pablo Fajardo Mendoza . . . in . . . legal actions in . . . court of law, national or foreign, financial or administrative actions and that have been performed directly or through other persons legally authorized by him for the defense of his/her interests." *Id.*

[705]      Donziger Jan. 31, 2011 Dep. Tr. at 4075:10-16.

[706]      PX 1402 (July 27, 2010 Email from R. DeLeon to S. Donziger re: "Amendment to Agreement").

question with Donziger.[707]   Nor was that the only such problem.[708]   In order to address these concerns and to ensure that the funding agreements with Burford and DeLeon would be enforceable, the LAP team drafted a broader POA for Fajardo.  It drew up also a retention agreement between Donziger and the LAPs, which was signed in January 2011.[709]  The retention agreement explicitly vested in Donziger the responsibility of "coordinating the overall legal strategy of the Plaintiffs to pursue and defend all aspects of the Litigation."[710]

More will be said on this agreement below in connection with other matters.  But for now it suffices to note only this.  Although Fajardo, as a matter of form and convenience, signed Donziger's agreement in his capacity as attorney-in-fact for the LAPs, the Court finds that no change in the substance of the relationship was intended or occurred, at least in any time period relevant to this case.  Donziger remained firmly in charge.  The paperwork done in early 2011 was undertaken principally to ensure that the new investors, who were to receive portions of any recovery net of attorney fees, had a written paper trail that led back to the LAPs individually.   While those concerned with the documentation were at it, Donziger and Fajardo, who both had contingent fee arrangements, obtained written agreements of their own.

---

[707]
    *Id.* ("Does Pablo have authority to sign for [the LAPs]?  If so, how can this be clarified?").

[708]
    Donziger and Fajardo had signed also retention agreements with various U.S. law firms on the LAPs' behalf.  Donziger Jan. 18, 2011 Dep. Tr. at 3207:1-22.

[709]
    PX 558 (Donziger Jan. 2011 Retention Agreement).

[710]
    *Id.* at 2.

174

G.    *Burford Terminates the Funding Agreement*

Burford funded the $4 million first tranche under the Funding Agreement in November 2010.  It never funded the others.  On September 23, 2011, Burford informed the LAPs that it was terminating the Funding Agreement.[711]  It claimed it had been misled, by Patton Boggs and Donziger, principally regarding Cabrera.[712]  There is evidence that Patton Boggs in turn pointed the finger at Donziger.[713]

During its due diligence, Burford specifically had asked Donziger and Patton Boggs whether Chevron's allegations about the LAPs' relationship with Cabrera were a cause for concern.[714]  Donziger and Patton Boggs assured Burford that they were not.  They told Bogart that the LAPs' contacts with Cabrera had been "limited" and were "lawful under Ecuadorian law."[715]  But subsequent events – including testimony given by Donziger in the Section 1782 proceeding in this Court – "flatly contradict[ed]" those representations.[716]  Had Burford known the truth about the

_____

[711]

PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza).

[712]

*Id.*

[713]

Tyrrell of Patton Boggs informed Bogart shortly after Donziger's depositions in January 2011 that Donziger had not "told the truth" to Patton Boggs about the LAPs "voluminous" contacts with Cabrera when he retained the firm.  PX 1473 (Bogart Notes of Jan. 27, 2011 Call with J. Tyrrell).  (The notes are received as evidence of Tyrrell's state of mind but not for the truth of the matters stated.)

[714]

PX 3100 (Bogart Direct) ¶ 18.

[715]

*Id.* ¶ 38; PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza).

[716]

PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza).

175

Cabrera Report, it asserted, it would not have invested in the Lago Agrio case. Indeed, as Bogart testified at trial, it "would have walked away immediately."[717] The failure to disclose the truth about Cabrera, Burford stated, "[i]n addition to breaching the Funding Agreement . . . amount[ed] to fraud."[718]

The question whether Patton Boggs misled Burford concerning the Cabrera episode one day may be important to a Chevron claim against Patton Boggs in a related action or in any litigation that may arise between Burford and Patton Boggs. But those cases are not now before the Court, and the answer to that question is not material to the resolution of this one. Two things are plain here, however. *First*, the romancing of Burford led to the development of the Invictus strategy of proceeding on multiple fronts, especially in foreign courts, rather than bringing a single enforcement against Chevron in the United States. *Second*, there is not much doubt that Donziger misled Burford – either by misstating or failing to disclose material facts – in his determination to raise money to pay for the litigation.

H.      *Donziger and Patton Boggs Try to Fix the Cabrera Problem – the Cleansing Experts*

As noted, after the Denver court granted the Section 1782 application against Stratus, the LAP lawyers knew they no longer could ignore the LAP team's involvement in drafting the Cabrera Report, as the truth soon was to be exposed. So they planned to hire a new expert to address Cabrera's findings in the hope of providing alternative grounds for the damages evaluation. One

---

[717]      PX 3100 (Bogart Direct) ¶ 18.

[718]      *Id.* ¶ 36 (quoting PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza)).

of the LAPs' lawyers explained that:

> "The path for an Ecuadorian decision will be simple. We would hope the judge
> would say/rule: There has been much controversy surrounding the Cabrera report,
> and objections to it. [Perhaps: The court did not anticipate that there was the degree
> of collaboration between plaintiffs' counsel and Cabrera, that there may have been.
> Given these issues, the court is not relying on Cabrera for its ruling.] However, the
> Court now has additional submissions from the parties . . . The court finds the new
> report (demonstrating damages of $—billion) to be persuasive, reliable and accurate
> and therefore rules . . . ."[719]

He stated also:

> "Simply put, our local team is convinced that a court ruling – relying solely on
> Cabrera – is potentially imminent if we don't get something on file immediately. .
> . . If we cop to having written portions of the report, the details of exactly how that
> might have been accomplished will be for another day, when and if the relevant
> people are deposed as part of the 1782s, but hopefully by that time, the process of
> having both sides cure this with new submissions will be under way and render the
> details of the Cabrera report a thing of the past.  We will have already admitted that
> we authored portions of the report; the details of how that was accomplished might
> be inter[]esting for Chevron, but u[lt]imately irrelevant because of our admission and
> alternative grounds for a damage evaluation."[720]

But the LAP team knew that it had to move quickly. It needed to submit the Fajardo

Petition[721] – and convince the court to grant it – before the Lago Agrio court issued a ruling relying

solely on the Cabrera Report.  On June 14, 2010, Donziger emailed Tyrrell and Westenberger of

Patton Boggs:

> "The Ecuador team is getting nervous that there is an increasing risk that our
> 'cleansing' process is going to be outrun by the judge and we will end up with a

---

[719]   PX 1371 (June 14, 2010 Email from J. Abady to E. Yennock, E. Westenberger, E. Daleo, J. Tyrrell, I. Moll, S. Donziger, B. Narwold, I. Maazel, A. Wilson, A. Celli, N. Economou, J. Brickell re: "Current Thinking on Ecuadorian Submission") (brackets in original).

[720]   *Id.*

[721]   PX 384R (Fajardo Petition).

SPA-189

177

decision based entirely on Cabrera.  Absent our intervention ASAP, they believe the judge could issue *autos para sentencia* in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem."[722]

The Fajardo Petition was filed one week later.[723]  It asked the Lago Agrio court to allow the parties to submit "supplementary information to aid th[e] Court in the process of assessing the global damages."[724]  The court granted the LAPs' request on August 2, 2010.[725]  Shortly thereafter, the American LAP team began "brainstorming" whom they would retain to draft the supplemental submissions.[726]  As one Patton Boggs lawyer explained in an email to Donziger and others, "our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera). . . ."[727]

Patton Boggs ultimately hired the Weinberg Group to manage the cleansing process.[728]  Donziger and Patton Boggs lawyers told the Weinberg Group that "the defendants in the case had made allegations of veracity of the [Cabrera] report and involvement by another consulting firm in connection with the independent expert, and that because of these questions of veracity that

---

[722]

PX 1370 (Jun. 14, 2010 Email from S. Donziger to J. Tyrrell, E. Westenberger, and E. Daleo).

[723]

PX 384R (Fajardo Petition).

[724]

*Id.* at 2.

[725]

PX 387 (Aug. 2, 2010 Lago Agrio Court Order).

[726]

PX 1410 (Aug. 18, 2010 Email from A. Small to S. Donziger, E. Westenberger and J. Abady re: "Brainstorming on Expert Issues").

[727]

*Id.*

[728]

Dunkelberger Dep. Tr. at 10:9-15.

**SPA-190**

178

they wanted to supplement or have an outside third party look at some of the same data and prepare a report."[729]  Westenberger of Patton Boggs and Donziger told employees of the Weinberg Group that Cabrera "wrote the report and was an independent expert. . . ."[730]  The Weinberg Group was not told that Cabrera had met with the LAPs' representatives without the Lago Agrio court's knowledge.[731]  And it was not told that Stratus had worked with the LAPs' lawyers to write the Report under Cabrera's name.[732]

The Weinberg Group recruited a team of experts to work on drafting the cleansing reports.[733]  It coordinated the preparation of seven reports, all of which were submitted to the Lago Agrio court on September 16, 2010,[734] and at least some of which were reviewed and commented upon by Donziger.[735]  Although the reports purported to "supplement" the Cabrera Report, some of them relied upon it directly.[736]  One of the cleansing experts later testified that he was given the Cabrera Report, which he "accepted . . . at face value and used  as a starting point to do [his] own

---

[729]  *Id.* at 51:6-14.

[730]  *Id.* at 60:19-61:11.

[731]  *Id.* at 250:2-24.

[732]  *Id.* at 81:24-82:7.

[733]  *Id.* at 91:16-22.

[734]  Donziger Jan. 30, 2011 Dep. Tr. at 4065:16-22.

[735]  Donziger Jan. 31, 2011 Dep. Tr. at 4067:11-21.

[736]  Tr. (Donziger) 2577:4-11.

179

evaluation."[737]  Another testified that, based on statements by employees at the Weinberg Group, it "was [his] baseline understanding" that the Cabrera Report had been prepared by a "neutral" expert,[738] that he relied on the cost and data information provided in the Report, and that his "results depend, in part, on the accuracy of [the Cabrera Report's] data series and his cost figures.[739] Indeed, as one Patton Boggs attorney wrote to Donziger, the cleansing should "address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[740]

VIII.    *The Judgment*

    A.    *Its Contents*

        With the cleansing reports in the Lago Agrio record, the 188-page single spaced Judgment was issued on February 14, 2011 by then-Judge Zambrano.[741]  It found Chevron liable for at least seven categories of harm to the environment and human health.  It awarded $8.646 billion plus another $8.646 billion to be paid unless Chevron issued a public apology within 15 days.

---

[737]

    Allen Dep. Tr. at 90:4-10.

[738]

    Shefftz Dep. Tr. at 68:14-24.

[739]

    *Id.* at 63:18-64:9.

[740]

    PX 1410 (Aug. 18, 2010 Email from A. Small to S. Donziger, E. Westenberger, and J. Abady re: "Brainstorming on Expert Issues").

[741]

    PX 400 (Lago Agrio Judgment).

180

The Judgment professed to disclaim reliance on the Cabrera Report.[742]  It stated also that the author or authors had "not considered the conclusions presented by the experts in their reports, because they contradict each other despite the fact that they refer to the same reality. . . ."[743]

The Judgment mentioned some of Chevron's charges of misconduct by Donziger, many of which were based on his statements recorded in *Crude* out takes.[744]  It characterized his statements regarding the Ecuadorian judiciary as "disrespectful." It went on, however, to state that there was "no record in the case file of any power of attorney granted to him by the plaintiffs . . . . Therefore, insofar as concerns the merits of his statements, they [a reference to Chevron's arguments] are rejected . . . and the Court does not recognize anything that Mr. Donziger might say or do when he is in front of the cameras or in any other act."[745]  Thus, it purported to disregard as irrelevant all of Donziger's alleged misconduct, without considering what actually occurred, because he did not hold a formal power of attorney from his clients.

Finally, the Judgment ordered that the LAPs establish a trust for the benefit of the ADF "or the person or persons that it designates" and that Chevron pay the damages awarded to that trust.[746]  It directed that the trust's board of directors be made up of the "representatives of the Defense Front," *i.e.*, the ADF, and provided that the board would choose the contractors who would

---

[742]

     *Id.* at 49-51.

[743]

     *Id.* at 94.

[744]

     *Id.* at 50-52.

[745]

     *Id.* at 51.

[746]

     *Id.* at 186.

181

perform the remediation.[747]  Thus, the Judgment did exactly what the complaint had asked – it put the ADF in complete control of any proceeds of the Judgment.

Chevron issued no apology.  Instead, it filed a motion for clarification and expansion of the Judgment three days after it was issued.[748]  It requested further explanation of several of the Judgment's conclusions, including the conclusion that Chevron and Texaco had merged and that Chevron was liable as Texaco's successor.[749]  It questioned also the Judgment's award of punitive damages, "which are not defined in the Ecuadorian legal system," and were "completely identical to the items indicated in the Cabrera Report," which the Judgment purported to exclude from its consideration.[750]

The Lago Agrio court issued a clarification order on March 4, 2011.[751]  It held *inter alia* that "the occurrence of the merger has been proved beyond any reasonable doubt by the public statements and actions of the representatives of the merged companies"[752] and reiterated that "the Court decided to refrain entirely from relying on Expert Cabrera's report when rendering judgment . . . . [T]he report had NO bearing on the decision.  So even if there was fraud, it could not cause any

---

[747]
          *Id.* at 187.

[748]
          PX 2502 (Chevron Motion for Clarification and Expansion of the Lago Agrio Judgment).

[749]
          *Id.* at 2-3.

[750]
          *Id.* at 23.

[751]
          PX 429 (Mar. 4, 2011 Judgment Clarification Order).

[752]
          *Id.* at 3.

182

harm to" Chevron.[753]  The clarification order stated that the punitive damage award was based on

Chevron "misconduct during these proceedings" and that it was "in accordance with Article 18 of

the Civil Code" and the "universal principles of law to sanction someone who well deserved it, to

set an example."[754]

        B.     *Chevron's Ghostwriting and Bribery Claims*

        Chevron contends that Zambrano did not write the Judgment, that the LAPs prepared

it, and that the LAPs bribed Zambrano to decide the case in their favor and to sign the judgment they

had prepared.  The evidence concerning those contentions and its analysis are extensive.  The Court

here summarizes its findings before proceeding to the detailed discussion of how it reached them.

        The first major point is that the Court finds that Zambrano did not write the

Judgment, at least in any material part.  The LAP team wrote it, and Zambrano signed it.  The

following sections explain the Court's bases for that conclusion.

        In Part IX.A, the Court examines Zambrano's trial testimony and finds that it was not

credible.  Zambrano neither could recall nor explain key aspects of the 188 page opinion despite his

claim that he alone wrote it.  He was a new judge with very little civil experience, so much so that

he admittedly had another former judge ghostwrite orders for him in civil cases.  He was unfamiliar

with – and on occasion bewildered by – certain of the most important concepts and evidence with

which the opinion dealt.  His testimony was internally inconsistent and at odds with other evidence

in the record.  He was an evasive witness.  Finally, Zambrano had economic and other motives to

---

[753]

       *Id.* at 8-9.

[754]

       *Id.* at 9.

testify as he did. His livelihood, what remains of his reputation after having been removed from the bench, and perhaps even his personal safety hinged on his protecting the legitimacy of the $18 billion Judgment by claiming authorship.

Having concluded that Zambrano did not write the Judgment, the Court turns in Part IX.B to the question who did. It examines the overwhelming and unrefuted evidence establishing that portions of at least eight of the LAP team's internal work product documents appear verbatim or in substance in the Judgment. These documents never were filed with the Lago Agrio court or made part of the official case record. Defendants utterly failed to explain how or why their internal work product – their "fingerprints" – show up in the Judgment. As will be seen, the most logical conclusion is that members of the LAP team wrote at least material portions of the Judgment, and probably substantially all of it, and that they copied from their own internal files in doing so. And direct evidence from the LAPs' internal emails – dealt with in Part XI.B.3 – suggests that the LAP team had been preparing since at least 2009 to write a draft judgment to pass to the judge, this despite the fact that one of their own Ecuadorian law experts testified that the submission of proposed judgments to an Ecuadorian judge is improper.

The next question is how it came to pass that Zambrano decided the case for the LAPs and signed a judgment they prepared for him. The Court in Parts X and XI examines Chevron's contention that the Judgment was the result of a corrupt scheme in which the LAPs promised to pay Zambrano $500,000 from the proceeds of the Judgment in exchange for his deciding the case their way and permitting them to write the Judgment. In doing so, it details each of the witnesses' accounts of what happened in Lago Agrio in the years and months leading to the Judgment, considers the evidence corroborating or conflicting with each account, and assesses the

SPA-196

184

credibility of each witness.  Having concluded based entirely on direct and uncontroverted evidence that the LAPs wrote the Judgment, the Court credits Guerra's explanation that they got Zambrano to sign it by bribing him.  Although Guerra's credibility is not impeccable, that portion of his account was corroborated extensively by independent evidence.  Donziger and Zambrano provided *no* credible evidence to support their versions of what transpired.

IX.     *The LAPs Wrote the Judgment*

    A.     *Zambrano Was Not the Author*

Zambrano testified at trial.  He claimed that he "was the one who exclusively drafted" the Lago Agrio Judgment, that "no one . . . helped [him] to write the judgment," and that he did all the research for the Judgment.[755]  He flatly denied that he considered anything that was not in the official court record.

The Court rejects Zambrano's claim of authorship, let alone sole authorship, as unpersuasive for a host of reasons.

    1.     *Zambrano Was Unfamiliar With Key Aspects of the Judgment He Signed*

Even at the most general level – that is, without considering the inconsistencies between Zambrano's deposition (taken days before his trial testimony) and his trial testimony, the internal inconsistencies in his trial testimony, and the inconsistencies between his testimony and other evidence – Zambrano was a remarkably unpersuasive witness.

As an initial matter, Zambrano was unable to answer basic questions about the

---

[755]     Tr. (Zambrano) 1608:12-16.

SPA-197

185

Judgment that he ostensibly wrote and that he came to New York to defend.

The Judgment states that "benzene . . . is the most powerful carcinogenic agent considered in this decision."[756]  But when Zambrano was asked "what substance the judgment says is, quote, the most powerful carcinogenic agent considered," he could not recall.[757]  Instead, he said that "[t]he hexavalente is one of the chemicals that if it is exceeded in its limits, it becomes cancer causing, carcinogenic."[758]

Zambrano was asked also which report the Judgment stated is "statistical data of highest importance to delivering this ruling."[759]  He responded "[t]he report by the expert Barros."[760]  But the Judgment stated that the "Relative Risk established in" the study entitled *Cáncer en la Amazonía Ecuatoriana* "is statistical data of highest importance to delivering this ruling . . . ."[761]

Zambrano was unable also to recall the theory of causation on which the Judgment

---

[756]

PX 400 (Lago Agrio Judgment), at 107.

[757]

Tr. (Zambrano) 1611:15-18 .

[758]

He perhaps meant to refer, incorrectly in response to this question, to hexavalant chromium, which is a different known carcinogen.  *See id.* 1610:21-23.

[759]

*Id.* 1613:1-16 (quoting PX 400 (Lago Agrio Judgment), at 134).

[760]

*Id.*

[761]

PX 400 (Lago Agrio Judgment), at 134.

The Judgment does not identify by name the author of the study *Cáncer en la Amazonía Ecuatoriana*.  Defendants nowhere suggest that Barros was the author this study.

SPA-198

186

relied.[762]  And, although the English word "workover" appears twice in the Judgment,[763] Zambrano testified that he does not speak English,[764] did not know what "workover" means,[765] and could not explain why the word was in the Judgment.[766]

TPH – which stands for total petroleum hydrocarbons – appears over 35 times in the Judgment.[767]  Indeed, the Judgment awards plaintiffs over $5 billion for TPH cleanup.[768]  But when Zambrano was asked at his deposition what TPH stands for, he testified that "it pertains to hydrocarbons, but I don't recall exactly."[769]

Zambrano's inability to recall every detail of a 188-page decision of course would not itself prove that he had not written it.  But the aspects of the Judgment he was unable to recall were not insignificant details – they included the identification of a substance for the presence of which the Judgment awarded $5 billion, the identity of a substance that the Judgment described as the most powerful carcinogenic agent it considered, and the source of the most important statistical

---

[762]

Tr. (Zambrano) 1614:7-10; PX 400 (Lago Agrio Judgment), at 88.

[763]

PX 399 (Lago Agrio Judgment (Spanish)), at 20-21.

[764]

Tr. (Zambrano) 1614:11-12.

[765]

*Id.* 1712:12-13.

[766]

*Id.* 1713:8-11.

[767]

*See, e.g.*, PX 400 (Lago Agrio Judgment), at 100, 101, 102, 104.

[768]

*Id.* at 181.

[769]

Tr. (Zambrano) 1615:1-10.

Case 14-826, Document 98, 07/02/2014, 1263303, Page202 of 211

187

data.  It is extremely unlikely that a judge who claims to have spent many months reviewing the record[770] and to have written this lengthy and detailed decision would not recall such important aspects – especially when, as will be seen, that Judgment was hailed by the president of Ecuador as the most important decision in the country's history.  When this is taken together with the evidence discussed below, it is significant.

> 2.  *Zambrano's Account of the Preparation of the Judgment Was Self Contradictory and Implausible*

In a declaration submitted to this Court in March 2013, Zambrano stated:  "I confirm that I am the only author of the judgment that I issued on February 14, 2011 . . . . *I did not receive support or assistance from Dr. Alberto Guerra or from any other person . . . .*"[771]  He made the same statement in a declaration to Ecuadorian prosecutors.[772]  At trial, however, he testified that he actually had received assistance from someone else – a Ms. Calva who, he claimed, typed almost every word of the Judgment as he dictated to her.[773]  He paid her $15 per day for her transcription

---

[770]

  Zambrano testified that he set to work on the Judgment right after he began his second tenure on the case with the benefit of the notes he had made during his brief prior tenure.  He claimed that he read the entire court record in order to render his decision and  that he finished doing so "[w]ay before January 2011 . . . [and] [b]y that time . . . [he] w[as] already polishing the draft of the judgment." *Id.* 1736:21-1737:2

[771]

  PX 6330 (Zambrano Mar. 28, 2013 Decl.) ¶ 14 (emphasis added).

[772]

  PX 6391 (Zambrano Sept. 2013 Decl. to Ecuadorian Prosecutors), at 1 ("I am the only author of the decision issued on February 14, 2011, that I have not had any help from any person. . . .").

[773]

  Zambrano testified:  "I would begin dictating by taking a document from here, another one from over there.  So you have an idea as to what the office was set up . . . the cuerpos of the trial were laid out.  On some of them I had the corresponding annotations.  On some occasions I would sit on the piece of furniture that was next to her desk.  I would dictate.

188

services.[774]   Moreover, as his testimony proceeded, he claimed that Ms. Calva did even more.

In fact, Calva's existence first was disclosed by Guerra.  Other aspects of Guerra's testimony will be explored more fully below.  For present purposes, it suffices to note that Guerra testified that the daughter of an attorney friend of Zambrano, Arturo Calva, retyped drafts of orders in the Chevron case into Zambrano's computer at Zambrano's office.[775]  Several days after Mr. Guerra testified, defendants moved for leave to add Ms. Calva as a witness.[776]

At that point, Zambrano changed his story.  He mentioned Ms. Calva during the following week, both at his deposition and at trial, claiming for the first time that he had dictated the entire Judgment to Calva.

In addition to Zambrano's failure to mention Calva in his declaration and statement, Zambrano's testimony at trial regarding her role was internally inconsistent.  For example, Zambrano first testified that "nobody helped [him] do the research [he] needed to do to write and

---

[774]   Other times I would stand up because I would reach for a document or refer to a cuerpo or some other writing.  I wold refer to notes that I had made and in my mind I was developing the idea I wanted to state so she would type it accurately."  Tr. (Zambrano) 1661:16-1662:10.

Calva was not a court employee.  Her father was a lawyer in Lago Agrio who often appeared before then-Judge Zambrano.  Tr.(Zambrano) 1659:23-1660:13.  Zambrano hired her at his personal expense in mid-November 2010, *id.* 1664:12-15, to help him with the Judgment in the Chevron case because, he said, "it was a very voluminous trial. [Calva] was an excellent typist; she was very good at typing.  She also know very much about the computing system.  She had just graduated . . . and her mother asked me if she could help me in some kind of situation, and precisely I needed help.  That's why I made the proposal to her that I could give her $15 per day, and the mother accepted willingly."  *Id.* 1818:8-15.

[775]   PX 4800 (Guerra Direct) ¶ 46.

[776]   DI 1642 (Oct. 30, 2013 LAPs Mot. to Amend Witness List).

189

author the judgment."[777]  But when he later was asked how he had found French, British, Australian, and American authorities that were cited in the Judgment, Zambrano explained that Ms. Calva, an 18-year old whom he paid $15 per day, was "the one who would go onto the internet.  She would look for a specific subject . . . she would print them out so that I would read them later."[778]   In any case, however, there was no credible explanation of how Calva, as Zambrano claimed, found French, British, Australian, and American legal authorities on the Internet given that there is no evidence that she had any legal training or spoke French or English.  Nor was there any reasonable explanation of how Zambrano could "read . . . later," much less deal intelligently with, any such French or English language authorities in light of the fact that he reads neither French nor English, has no legal training in the common law, and even had very little experience with civil matters in Ecuador.[779]

Finally, Zambrano was adamant that Calva typed only what he dictated orally to her.

---

[777]   Tr. (Zambrano) 1608:14-16.

[778]   *Id.* 1616:23-1617:4; *see also id.* 1619:4-6, 1620:1-4.

Zambrano later testified that he never performed internet searches himself.  *Id.* 1684:7-10

[779]   Defendants contend that Zambrano did not have to read the French sources cited in the Judgment because he "copied [them] from [an] Ecuadorian Supreme Court case which went through and discussed Colombian, Argentinean, and French law."  Tr. (summation) 2902:7-11.  But Zambrano's testimony at trial suggested that he never actually had read that case.  He was unable to recall its name, the names of the parties, or what it was about – even after being shown a copy of the decision by defense counsel.  Tr. (Zambrano) 1885:1-20, 1887:10-23.  And even if the supreme court case could have explained the French language authorities that are cited in the Judgment, it does not explain the American, English, or Australian ones.  PX 1141 (June 18, 2009 Email from P. Fajardo to J. Prieto, J. Sáenz, and S. Donziger attaching *Torres de Concha v. Petroecuador*).  It nowhere cites or discusses cases or law from those countries.  *Id.*

190

He "never show[ed] Ms. Calva any document for her to type from."[780]  But the 188-page Judgment

contains many complicated words, citations, and numerical sequences.  The sampling data cited in

the Judgment consists of strings of alphanumeric sequences with dashes, periods, underscores, odd

spacing, and parentheses in them.  For example:

> "con resultados como  3142 y 466 en Auca 1 en AU01-PIT1-SD2-SU2-R(220-240
> cm)_sv y AU01-A1-SD1-SU1-R(60-100cm)_sv; 2450 y 876 en Cononaco 6 en
> CON6-A2-SE1_sv  y  CON6-PIT1-SD1-DU1-R(160-260cm)_sv;
> 154.152,73.6325,70.4021 en Shushufindi 18, en SSF18-A1-SU2- R(O.Om)_sv,
> SSF18-PIT2-SD1-SU1-R(1.5-2.0m)_sv; y SSF18-A1- SU1-R (0.0 m)_sv)."[781]

It is not credible that Zambrano dictated these sequences to Calva orally and that

Calva then typed them exactly into the draft without looking at any underlying document.

Moreover, as will appear, the Judgment contains portions of eight documents from the LAPs'

internal files, many of them *in haec verba*.  Even assuming that Zambrano actually prepared the

Judgment, as he claims, he certainly would not have dictated these pre-existing documents to Ms.

Calva rather than giving them to her with markings indicating exactly what he wanted her to copy.

Of course, Ms. Calva readily could have confirmed or denied Zambrano's account.

When her name surfaced, the Court granted defendants' motion to add her as a witness.[782]

Defendants advised the Court that she had obtained a visa to come to the United States for that

purpose.[783] But defendants failed to call her or to explain her absence.  While the Court does not

---

[780]  Tr. (Zambrano) 1879:23-25.

[781]  PX 399 (Lago Agrio Judgment (Spanish)), at 109.

[782]  DI 1681 (Nov. 5, 2013 Lago Agrio Court Order).

[783]  Tr. 2333:16-2335:10.

SPA-203

191

draw any inference as to the substance of the testimony she would have given, her absence is worthy of note.

There is still another consideration.  Judge Ordóñez began presiding over the Lago Agrio case on March 12, 2010 and was expected to continue for two years.  Chevron moved to recuse him on August 2010.  He opposed the motion, and he was not recused until October 1, 2010.[784]  Zambrano did not assume jurisdiction of the case as the presiding judge until October 11, 2010.[785]  Moreover, he did not issue *autos para sentencia* – the order closing the evidentiary phase of the case, inviting final argument, and declaring the case ready for decision[786] – until December 17, 2010.[787]  Thus, the intervals between the issuance of the Judgment on February 14, 2011 and (1) *autos para sentencia*, (2) Zambrano's assumption of jurisdiction as the presiding judge, and (3)  the initial recusal were (1) less than two months, (2) about four months, and (3) about six months, respectively.

The Lago Agrio court record at the point at which the case was decided contained over 200,000 pages.  While the 200,000 page figure no doubt overstates in some measure the part of the record that remained relevant to a decision on the merits,[788] the reasonable conclusion is that

---

[784]

   PX 6374 (Oct. 1, 2010 Lago Agrio Court Order).

[785]

   PX 2546 (Oct. 11, 2010 Lago Agrio Court Order).

[786]

   Tr. (Zambrano) 1911:2-5.

[787]

   PX 397 (Dec. 17, 2010 Lago Agrio Court Order).

[788]

   Zambrano testified that he read every page of the Lago Agrio record to render the decision and that this was required by Ecuadorian law.  Tr. (Zambrano) 1719:24-1720:16.  Even assuming that reading every page would have been required as a formal matter of Ecuadorian law, the Court does not find it credible that Zambrano, or many other judges,

the relevant part was quite large.[789]  Moreover, the Judgment is a 188 page, single spaced document of considerable complexity that purports to rely on innumerable pieces of evidence, many of them lengthy documents themselves.  The preparation of the Judgment in the time available, even assuming that the author or authors began as soon as Chevron moved to recuse Judge Ordóñez, would have been a Herculean task for anyone.  To have done so without any assistance save an 18-year old typist, as Zambrano claimed, would have rendered its accomplishment in the relevant time period even less likely.  And to have done so by dictating orally virtually every word, without the typist copying anything at all from other documents, as Zambrano claimed, would have made it still less probable.[790]  The likelihood that Zambrano would have been capable of doing what he said he did, much less capable of doing it in the way he said he did it, is quite small.

---

[789] would have read portions of the record that were not relevant to the decision of the case in the course of preparing a decision.  It implies no criticism of any such omission, which is a different matter from Zambrano's apparent lack of candor in claiming that he actually had done that.  Accordingly, the Court finds Chevron's argument that Zambrano could not even have read every page of the record during the total time over which he was assigned to the case (*see* PX 4200 (Rayner Direct) *passim*), though quite probably correct, immaterial on the authorship issue.

[790] One of Donziger's former associates wrote to Sáenz that the Lago Agrio record in January 2010 – more than a year before the case was decided – contained "more than 200,000 pages of trial evidence, 62,000 scientific analyses produced by independent laboratories contracted by both parties, testimony from dozens of witnesses, and 101 judicial field inspections . . . ."  PX 1211 (Jan. 7, 2010 Email From L. Garr to J. Sáenz).

Zambrano's contention that he was aided by notes and materials he had collected during his first tenure on the case, *i.e.*, in the roughly four month period starting in September 2009, is undermined by the fact he claimed to have destroyed those notes and materials.  While that was understandable in light of Zambrano's removal from the bench, as he could not have any further use for them, there remains a lack of anything to corroborate that part of his story.

Case 14-826, Document 98, 07/02/2014, 1263303, Page208 of 211

**SPA-205**

193

> **3.** *Zambrano's Testimony as to the Computer on Which He Claimed the Judgment Was Entered Was Inconsistent With the Evidence*

Zambrano's testimony as to his alleged authorship of the Judgment was contradicted persuasively on yet another point by other evidence.

Zambrano testified that the only computer on which he and Calva wrote the Judgment was the new computer in his office at the Lago Agrio court.[791]  But this is contradicted by objective evidence.

On October 24, 2013, a week into trial, defendants moved for leave to call Milton Efrain Jaque Tarco, a witness not previously identified.[792]  They explained that Tarco is a police expert in computer forensics[793] and then submitted a declaration signed by Tarco in support of their motion (the "Tarco Declaration").[794]  Tarco there stated that he had been asked to examine and

---

[791]

    Tr. (Zambrano) 1679:5-7, 1680:3-6; PX 6371 (Tarco Decl.).

[792]

    DI 1601 (Oct. 24, 2013 LAPs Mot. for Leave to Amend the Witness List).

[793]

    PX 6371 (Tarco Decl.) ¶ 1.

[794]

    *Id.*  This statement was admissible against defendants as an adoptive admission by virtue of their submission of his declaration in support of their motion to call him as a witness.  *See* FED. R. EVID. 801(d)(2)(B); *see also* 2 Kenneth S. Broun, MCCORMICK ON EVIDENCE § 261 (7th ed.) ("When a party offers in evidence a deposition or an affidavit to prove the matters stated therein, the party knows or should know the contents of the writing so offered and presumably desires that all of the contents be considered on its behalf since only the portion desired could be offered. Accordingly, it is reasonable to conclude that the writing so introduced may be used against the party as an adoptive admission in another suit."); *see, e.g., Attorney Gen. of U.S. v. Irish N. Aid Comm.*, 530 F. Supp. 241, 252 (S.D.N.Y. 1981) *aff'd*, 668 F.2d 159 (2d Cir. 1982) (finding letters written to defendant that defendant had specifically adopted or incorporated by reference in its reply to the summary judgment motion admissible under F.R.E. 801(d)(2)(B)); *Diaz v. Silver*, 978 F. Supp. 96, 120 (E.D.N.Y. 1997) *aff'd*, 522 U.S. 801 (1997) and *aff'd sub nom. Acosta v. Diaz*, 522 U.S. 801 (1997) and *aff'd sub nom. Lau v. Diaz*, 522 U.S. 801 (1997) (referee's report admissible under 801(d)(2)(B) where state legislature submitted it to the Department of Justice in seeking preclearance under the Voting Rights Act).

SPA-206

194

analyze the "computer equipment . . . that Dr. Nicolas Augusto Zambrano Lozada allegedly used" to write the Lago Agrio Judgment.[795]

Tarco explained in his declaration – which, to jump ahead, ultimately was received in evidence only as to two narrow points[796] – that he had been provided with both computers that had been in Zambrano's office during the time in which Zambrano claimed he had written the Lago Agrio Judgment, which Tarco called PC-01 and PC-02.[797] He created forensic copies of each of the computers and analyzed their contents.[798] Because "relevant information for [the Judgment] was found [only] in computer PC-02," Tarco limited his discussion to that computer.[799]

Although the Court granted defendants' motion for leave to add Tarco to their witness list, defendants ultimately did not call him at trial. There appears to be at least one reason why they did not.

Tarco's declaration was received to establish the serial numbers of each of the computers that had been in Zambrano's office – PC-01 and PC-02.[800] Chevron expert Spencer

---

[795]
 PX 6371 (Tarco Decl.) ¶ 2.

[796]
 Tr. 2781:20-2789:1.

[797]
 PX 6371 (Tarco Decl.) ¶ 5.

[798]
 *Id.* A "forensic copy" is "the exact image that is created of all of the data and information from the hard drives in a computer at a certain moment." *Id.*

[799]
 *Id.* ¶ 6.

[800]
 *Id.* ¶ 5.

SPA-207

195

Lynch testified, using records obtained from the Lago Agrio court[801] and from Hewlett-Packard,[802] testified that the computer that the Tarco Declaration identified as the one that contained data relevant for the Judgment (PC-02) – a file called PROVIDENCIAS – was the *older* of the two computers.[803] PC-01 – which Tarco stated did not contain any documents relating to the Lago Agrio case – was the new computer.[804] Thus, the Tarco Declaration, insofar as it was received in evidence, contradicted Zambrano's testimony that "[i]t was on this new computer that the whole writing of the judgment was done."[805]

---

[801]

See PX 4108 (Lago Agrio Court Delivery Record of Furniture and/or Office Equipment); PX 4110 (same); PX 4109 (Lago Agrio Court Department of Fixed Assets Control of Fixed Assets for N. Zambrano); PX 4110 (Lago Agrio Court Record of Delivery of Furniture and/or Office of Equipment).

[802]

See PX 4122 (HP Shipment Detail).

[803]

Tr. (Lynch) 2808:9-11, 2813:4-13.

[804]

Lynch determined that the "old" computer was manufactured by HP in October 2006 (PX 4119 (Serial Number & Subassembly Tracking)), and given to Zambrano two years later. PX 4110 (Lago Agrio Court Record of Delivery of Furniture and/or Office of Equipment); Tr. (Lynch) 2812:22-2813:3. The new computer – on which Zambrano testified the Judgment was typed in full – was manufactured by HP in September 2010. PX 4121 (Serial Number and Subassembly Tracking). The Judicial Council of the Lago Agrio court purchased the new computer on November 26, 2011. PX 7772 (Ltr. No. AF-001-2013 from A. Jimenez).

Moreover, the new computer had not even been shipped by HP by October 10, 2010 – the date on which the Tarco declaration stated that the PROVIDENCIAS file was created. Tr. (Lynch) 2819:25-2820:5. It was not received by the Ecuadorian Judicial Council until November 26, 2010, PX 7772 (Ltr. No. AF-001-2013 from A. Jimenez), almost two months after Zambrano was reassigned to the Chevron case.

[805]

Tr. (Zambrano) 1679:5-7; *see also id.* 1658:14-1659:6.

196

4.    *Zambrano's Self Interest*

It is relevant to understand also the nature and extent of Zambrano's personal motives to support the LAPs and to deny Chevron's accusations.  They are economic and political, and the two are interrelated.

One personal motive is quite simple – employment.  Zambrano had been in government service almost his entire adult life, first in the Air Force, then as a prosecutor from 1994 until he was appointed a judge in 2008.[806]  In February 2012, he was removed from the bench for misconduct.[807]  In May 2012, the Judiciary Council again found Zambrano guilty of judicial misconduct in another incident and imposed the further sanction of removal from office to be "recorded in his personnel file since he [then wa]s no longer part of the judicial branch."[808]  Following his removal, he was unemployed.[809]  Moreover, we infer that Zambrano's employment prospects in the legal field were quite limited and that the likelihood that he would be hired by the government after the Judiciary Council removed him from office as a judge for two incidents of misconduct was nil.

On January 28, 2013, Chevron filed a motion in this case to which it attached a declaration by Guerra that set forth his contention that Zambrano had been bribed.  On March 13,

---

[806]

Id. 1894:25-1902:4; PX 4124 (July 30, 2008 Zambrano Judicial Appointment).

[807]

PX 411 (Feb. 29, 2012 Order).  The Plenary Judicial Council found that Zambrano and Judge Ordóñez, previously mentioned, overturned a detention order and released from custody a defendant who had been apprehended in a truck containing 557 kilograms of cocaine.  Id.

[808]

PX 6321 (May 22, 2012 Order), at 8.

[809]

Tr. (Zambrano) 1801:23-25.