# 14-826-CV

## 14-832-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

———————◆◆———————

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

—v.—

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants,*

(*Caption continued on inside cover*)
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
## VOLUME I OF XXXV
## (Pages SA1 to SA95)

THEODORE B. OLSON, ESQ.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8668

WILLIAM E. THOMSON, III, ESQ.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

RANDY M. MASTRO, ESQ.
ANDREA E. NEUMAN, ESQ.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff-Appellee Chevron Corporation*

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

# TABLE OF CONTENTS

PAGE

## Docket Entries

Exhibits to Declaration of Kristen Hendricks in Support of Motion for
 Preliminary Injunction, filed February 6, 2011

    Exhibit 1 to Hendricks Declaration—
    Unreleased footage from the film *Crude* .......................................... SA1
    (Dkt. 6-2)

    Exhibit 2 to Hendricks Declaration—
    Transcript of unreleased footage from the film *Crude* ....................... SA2
    (Dkt. 6-10)

    Exhibit 22 to Hendricks Declaration—
    Excerpts from a statement made by Rafael Correa at a press
    conference in Lago Agrio, Ecuador, dated April 27, 2007, and a
    certified English translation thereof .................................................. SA9
    (Dkt. 20-6)

Exhibit B Part 2 to Affirmation of Sheldon Elsen In Support of
 Opposition to Preliminary Injunction, filed February 8, 2011

    Excerpts from Brief for Defendant-Appellee in *Aguinda v.*
    *Texaco, Inc.*, No. 01-7756(L) (2d Cir.), dated December 20,
    2001 ........................................................................................... SA21
    (Dkt. 62-3)

Exhibit 513 to Second Supplemental Declaration of Kristen
 Hendricks in Support of Motion for Preliminary Injunction,
 filed February 15, 2011

    Email from Douglas Beltman to Lorena Gamboa,
    dated March 9, 2008 ..................................................................... SA92
    (Dkt. 108-13)

ii

PAGE

Chevron Corporation's Amended Complaint, filed April 20, 2011 .......... SA96
    (Dkt. 283)

Exhibits to Declaration of Kristen L. Hendricks in Support of
    Chevron Corporation's Motion for an Order of Attachment and
    Other Relief, filed November 29, 2011

    Exhibit 1031 to Hendricks Declaration—
    Expert Opinion of John A. Connor, P.E., P.G., B.C.E. E. titled
    "Remediation Activities and Environmental Conditions in the
    Former Petroecuador-Texaco Concession, Oriente Region,
    Ecuador," dated September 16, 2010...............................................SA327
    (Dkt. 355-13)

    Exhibit 1044 to Hendricks Declaration—
    Email chain between Michael San Sebastian and David Mills
    with the subject "Follow up," dated August 25, 2008 ....................SA429
    (Dkt. 355-22)

    Exhibit 1052 to Hendricks Declaration—
    Report prepared by Dr. R. Wasserstrom and titled "Disputing the
    Statements Made on Alleged Cultural Damages Caused to
    Indigenous Peoples by the Petroecuador-Texaco Consortium,"
    dated October 1, 2010.................................................................SA433
    (Dkt. 355-25)

    Exhibit 1053 to Hendricks Declaration—
    Report prepared by Eduardo Bedoya, PhD, titled "The
    Demographic Situation of the Cofalin," dated April 2, 2006...........SA447
    (Dkt. 355-25)

Declaration of Mary Beth Maloney in Further Support of Plaintiff
    Chevron Corporation's Motion for an Order of Attachment and
    Other Relief, filed December 20, 2011...........................................SA455
    (Dkt. 370)

iii

PAGE

Exhibits to Declaration of Anne Champion in Support of Chevron
    Corporation's Motion for Summary Judgment or Partial
    Summary Judgment on Defendants' Affirmative Defenses of Res
    Judicata and Collateral Estoppel, filed March 2, 2012

    Exhibit 2185 to Champion Declaration—
    2006 U.S. State Department Country Report on Human Rights
    Practices - Ecuador, dated March 6, 2007 ......................................SA477
    (Dkt. 401-8)

    Exhibit 2208 to Champion Declaration—
    Article titled "Ecuadorean President Rafael Correa's assault on
    media freedom," published by the Washington Post, dated
    January 11, 2012 ........................................................................SA482
    (Dkt. 402-1)

    Exhibit 2210 to Champion Declaration—
    Article titled "Judge in Ecuador libel case flees country,"
    published by the Miami Herald, dated February 23, 2012...............SA485
    (Dkt. 402-1)

    Exhibit 2211 to Champion Declaration—
    Article titled "Ecuador's Assault on Free Speech," published by
    the New York Times, dated February 21, 2012...............................SA488
    (Dkt. 402-2)

    Exhibit 2323 to Champion Declaration—
    Article by Mario Vargas Llosa, titled "The leader's honor,"
    published by El Pais, dated February 26, 2012, and a certified
    English translation thereof............................................................SA493
    (Dkt. 402-14)

Exhibit 3103 to Declaration of Jason B. Stavers in Support of
    Chevron Corporation's Motion for Partial Summary Judgment on
    All Claims, Counterclaims and Affirmative Defenses, and
    Summary Judgment on Defendants' Affirmative Defense of
    Collateral Estoppel, filed January 28, 2013

iv

PAGE

CSR Press Release titled "Chevron Offering Bribes to
Ecuadorian Judges, Investigation Reveals,"
dated January 21, 2013 ...............................................................SA507
(Dkt. 754-1)

Exhibits to Declaration of Anne Champion in Support of Plaintiff
Chevron Corporation's Motion to Sanction and Hold the
Donziger Defendants and LAP Representatives in Contempt of
Court for Disobeying the Court's Discovery Orders, filed March
12, 2013

Exhibit 3504 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendant Steven Donziger, dated
June 7, 2012 ..................................................................................SA511
(Dkt. 895-1)

Exhibit 3505 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendants The Law Office of
Steven R. Donziger, and Donziger & Associates, PLLC,
dated June 7, 2012........................................................................SA514
(Dkt. 895-1)

Exhibit 3506 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendant Hugo Gerardo Camacho
Naranjo, dated June 7, 2012.........................................................SA517
(Dkt. 895-1)

Exhibit 3507 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendant Javier Piaguaje
Payaguaje, dated June 7, 2012 .....................................................SA520
(Dkt. 895-1)

v

PAGE

Declaration of Steven Donziger in Support of Donziger's Opposition
to Chevron's Motion for Partial Summary Judgment on All
Claims, Counterclaims, and Affirmative Defenses, and Summary
Judgment on Defendants' Affirmative Defense of Collateral
Estoppel, filed March 18, 2013 ....................................................SA523
(Dkt. 922)

Exhibit 3725 to Declaration of Jason B. Stavers in Further Support of
Plaintiff Chevron Corporation's Memorandum of Law in
Response to Motions by Counsel for Defendants for Leave to
Withdraw as Counsel, filed May 11, 2013

Excerpt from a hearing transcript from the action *Chevron Corp.
v. Page*, No. RWT 11-395 (D. Md.)), dated January 25, 2013 .........SA526
(Dkt. 1141-4)

Exhibit 96 to Declaration of Jason B. Stavers on Behalf of Chevron
Corporation in Support of Its Notice Pursuant to Rule 44.1 of the
Federal Rules of Civil Procedure of Intent to Raise Issues of
Foreign Law, filed September 11, 2013

Excerpts from the June 8, 2013 Deposition of Dr. Farith Ricardo
Simon Campaña .........................................................................SA530
(Dkt. 1413-12)

Excerpts from the oral argument before the U.S. Court of Appeals for
the Second Circuit in *In re Naranjo*, No. 13-772 (2d Cir.), dated
September 26, 2013 ....................................................................SA542

Exhibit 4310 to Declaration of Jason B. Stavers in Opposition to
Defendants' Motion to Impose Termination Sanctions, filed
September 30, 2013

Report by Douglas Farah titled "The Current Situation of
Ecuador, and the Rule of Law and Criminalization in
[REDACTED]" ..........................................................................SA555
(Dkt. 1475-10; 1475-11)

vi

PAGE

Exhibit D to Declaration of Jason B. Stavers in Support of Chevron's
   Supplemental Statement in Response to Defendants'
   Supplemental Submission Pursuant to Rule 44.1, filed November
   20, 2013

   Excerpts from May 24, 2013 deposition transcript of Juan Pablo
   Alban Alencastro...........................................................................SA589
   (Dkt. 1751-4)

Exhibit G to Declaration of Jason B. Stavers ISO Opposition to
   Defendants' Motion to Stay, filed March 31, 2014

   Ruling from the Supreme Court of Gibraltar in
   *Chevron v. James Russell DeLeon and Torvia Limited*,
   dated March 14, 2014 ...................................................................SA596
   (Dkt. 1894-7)

**Designated Deposition Testimony**

Excerpts from the Deposition Testimony of Charles Calmbacher,
   dated March 29, 2010 ....................................................................SA669

Excerpts from the Deposition Testimony of Hugo Gerardo Camacho
   Naranjo, dated May 14, 2013 ........................................................SA677

**Trial Testimony**

PX 3000 Direct Testimony of Ricardo Reis Veiga .................................SA682

PX 3100 Direct Testimony of Christopher Bogart..................................SA726

PX 3200 Direct Testimony of David L. Russell .....................................SA745

PX 3300 Direct Testimony of Sara McMillen ........................................SA789

PX 3700 Direct Testimony of Robert A. Leonard, PhD ..........................SA826

PX 3800 Direct Testimony of Patrick Juola, Phd ..................................SA856

vii

PAGE

PX 3900 Direct Testimony of Samuel Hernandez, Jr. .............................SA868

PX 4000 Direct Testimony of James I. Ebert, PhD ................................SA917

PX 4100 Direct Testimony of Spencer Lynch ........................................SA928

PX 4200 Direct Testimony of Keith Rayner, PhD .................................SA976

PX 4300X Direct Testimony of Adolfo Callejas Ribadeneira ................SA995

PX 4400 Direct Testimony of Yerim Kim ...........................................SA1037

PX 4700 Direct Testimony of Sandra Elena ........................................SA1082

PX 4800 Direct Testimony of Alberto Guerra Bastidas .......................SA1126

PX 4900R Direct Testimony of Troy A. Dahlberg ..............................SA1187

PX 5000 Direct Testimony of James Spigelman, AC QC.....................SA1331

PX 5100 Direct Testimony of Michael Green......................................SA1338

PX 5200 Direct Testimony of Dr. Joshua Lipton ................................SA1360

PX 5600 Direct Testimony of Joseph C. Kohn ...................................SA1371

PX 5800 Direct Testimony of Rhonda I. Zygocki...............................SA1400

PX 6000 Direct Testimony of Weston Anson .....................................SA1410

PX 6200 Direct Testimony of Vladimiro Álvarez Grau .......................SA1430

DX 1500 Direct Testimony of Karen Hinton .......................................SA1570

DX 1600 Direct Testimony of Donald Rafael Moncayo Jimenez .........SA1585

DX 1601 Direct Testimony of Alejandro Ponce-Villacis .....................SA1606

viii

PAGE

DX 1750 Direct Testimony of Steven Donziger ...................................SA1616

DX 1800 Direct Testimony of Javier Piaguaje Payaguaje ....................SA1679

DX 1900 Direct Testimony of Humberto Piaguaje .............................SA1695

Trial Transcript, dated October 15–November 26, 2013 ......................SA1715

    Opening Statements....................................................................SA1718

    Examination of Ricardo Reis Veiga ............................................SA1770

    Examination of Christopher Bogart..............................................SA1926

    Examination of David L. Russell...................................................SA1997

    Examination of Sara McMillen .....................................................SA2124

    Examination of Robert A. Leonard ..............................................SA2342

    Examination of Adolfo Callejas Ribadeneira................................SA2367

    Examination of Troy Dahlberg....................................................SA2511

    Examination of James Spigelman.................................................SA2587

    Examination of Alberto Guerra...................................................SA2604

    Examination of Jeffrey Isaac Shinder..........................................SA2943

    Examination of James Ebert .......................................................SA3022

    Examination of Michael Green ...................................................SA3042

    Examination of Yerim Kim.........................................................SA3053

    Examination of Joseph C. Kohn .................................................SA3091

ix

PAGE

Examination of Patrick Juola ....................................................SA3231

Examination of Samuel Hernandez ............................................SA3243

Examination of Sandra Elena....................................................SA3250

Examination of Nicolas Zambrano .............................................SA3295

Examination of Keith Rayner....................................................SA3659

Examination of Rhonda Zygocki.................................................SA3670

Examination of Weston Anson....................................................SA3694

Examination of Vladimiro Alvarez Grau ......................................SA3699

Examination of Donald Rafael Mancayo Jimenez.........................SA3751

Examination of Karen Hinton ....................................................SA3843

Examination of Alejandro Ponce-Villacis ....................................SA3913

Examination of Joshua Lipton ...................................................SA4037

Examination of Javier Piaguaje Payaguaje ...................................SA4063

Examination of Steven Donziger.................................................SA4154

Examination of Humberto Piaguaje.............................................SA4365

Examination of Daniel Blank.....................................................SA4440

Examination of Spencer Lynch ..................................................SA4485

Closing Statements..................................................................SA4527

x

PAGE

**Trial Exhibits**

**PX 4** Unreleased footage from the film *Crude* featuring Steven Donziger discussing judge and HAVOC inspection, dated March 30, 2006 ...................................................................................SA4664

**PX 4A** Transcript of unreleased footage from the film *Crude*..............SA4665

**PX 5** Unreleased footage from the film featuring Steven Donziger discussing judge and HAVOC inspection *Crude*, dated March 30, 2006 ...................................................................................SA4667

**PX 5A** Transcript of unreleased footage from the film *Crude* ..............SA4668

**PX 6** Unreleased footage from the film *Crude* featuring Steven Donziger confronting Ecuadorian judge about the HAVOC inspection, dated March 30, 2006 .................................................SA4671

**PX 6A** Transcript of unreleased footage from the film *Crude*..............SA4672

**PX 7** Unreleased footage from the film *Crude* featuring Steven Donziger discussing judge and HAVOC inspection, dated March 30, 2006 ...................................................................................SA4677

**PX 7A** Transcript of unreleased footage from the film *Crude*..............SA4678

**PX 8** Unreleased footage from the film *Crude* featuring Steven Donziger discussing judge and HAVOC inspection, dated March 30, 2006 ...................................................................................SA4680

**PX 8A** Transcript of unreleased footage from the film *Crude*..............SA4681

**PX 9** Unreleased footage from the film *Crude* featuring Steven Donziger discussing judge and HAVOC inspection, dated March 30, 2006 ...................................................................................SA4682

**PX 9A** Transcript of unreleased footage from the film *Crude*..............SA4683

xi

PAGE

**PX 11** Unreleased footage from the film *Crude* featuring Donziger discussing political nature of Lago Agrio litigation, dated April 3, 2006 ....................................................................................SA4685

**PX 11A** Transcript of unreleased footage from the film *Crude*.............SA4686

**PX 15** Unreleased footage from the film *Crude* featuring Steven Donziger discussing pressure campaign against Chevron's executives, dated July 24, 2006 ....................................................SA4689

**PX 15A** Transcript of unreleased footage from the film *Crude*.............SA4690

**PX 16** Unreleased footage from the film *Crude* featuring Steven Donziger discussing Ecuadorian officials, dated December 6, 2006....................................................................................SA4698

**PX 16A** Transcript of unreleased footage from the film *Crude*.............SA4699

**PX 18** Unreleased footage from the film *Crude* featuring Steven Donziger discussing the appointment of a global damages expert, dated December 6, 2006....................................................SA4701

**PX 18A** Transcript of unreleased footage from the film *Crude*.............SA4702

**PX 39** Unreleased footage from the film *Crude* featuring Steven Donziger and the Lago Agrio Plaintiffs' team meeting with Richard Cabrera, dated March 3, 2007 ........................................SA4705

**PX 39A** Transcript of unreleased footage from the film *Crude*.............SA4706

**PX 42** Unreleased footage from the film *Crude* featuring Steven Donziger and the Lago Agrio Plaintiffs' team meeting with Richard Cabrera, dated March 3, 2007 ........................................SA4711

**PX 42A** Transcript of unreleased footage from the film *Crude*.............SA4712

xii

PAGE

**PX 43** Unreleased footage from the film *Crude* featuring Steven
Donziger and others discussing the global inspection report,
dated March 4, 2007 ................................................................. SA4716

**PX 43A** Transcript of unreleased footage from the film *Crude* ............. SA4717

**PX 47** Unreleased footage from the film Crude featuring Steven
Donziger and others discussing the global inspection report,
dated March 4, 2007 ................................................................. SA4727

**PX 47A** Transcript of unreleased footage from the film Crude ............. SA4728

**PX 67** Unreleased footage from the film *Crude* featuring a meeting
among Steven Donziger, Atossa Soltani, and Luis,
dated June 6, 2007 ................................................................... SA4732

**PX 67A** Transcript of unreleased footage from the film *Crude* ............. SA4733

**PX 81** Unreleased footage from the film *Crude* featuring Steven
Donziger discussing judges and politics in Ecuador, dated
November 21, 2006 ................................................................... SA4737

**PX 81A** Transcript of unreleased footage from the film *Crude* ............. SA4738

**PX 169#** Steven Donziger's Notebook ................................................. SA4742

**PX 172** Excerpt from Steven Donziger's Notebook,
dated October 6, 2005 ............................................................... SA4861

**PX 174** Excerpt from Steven Donziger's Notebook,
dated November 18, 2005 ........................................................... SA4864

**PX 177** Excerpt from Steven Donziger's Notebook,
dated February 6, 2006 .............................................................. SA4866

**PX 184** Excerpt from Steven Donziger's Notebook,
dated July 25, 2006 ................................................................... SA4867

xiii

PAGE

**PX 191** Excerpt from Steven Donziger's Notebook,
dated December 16, 2006 ........................................................... SA4872

**PX 223** Contract for Implementing of Environmental Remedial Work
and Release from Obligations, Liability and Claims by and
between the Government of Ecuador, Petroecuador, and Texaco
Petroleum Company, dated May 4, 1995, and an English
translation thereof .................................................................... SA4877

**PX 234** Letter from Ambassador E. Terán to Judge Rakoff regarding
"*Maria Aguinda, et al. v. Texaco Inc.*," dated June 10, 1996 ........ SA4933

**PX 312** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated September 16, 2008, and an
English translation thereof ........................................................... SA4934

**PX 314#** Comments on the Report of the Court-Appointed Expert
Richard Cabrera Vega in the Case of *Maria Aguinda y Otros v.
Chevron Corp.*, dated December 1, 2008 ...................................... SA5198

**PX 316** Complaint filed in *Maria Aguinda Salazar, et al. v. Chevron
Corp.*, dated May 7, 2003, and English translation thereof ........... SA5214

**PX 354** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated October 29, 2007, and an
English translation thereof ........................................................... SA5246

**PX 363** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated April 4, 2008, and an English
translation thereof .................................................................... SA5249

**PX 366** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated April 25, 2008, and an English
translation thereof .................................................................... SA5260

**PX 390** Special Power of Attorney and Legal Mandate Authorized by
A. Payaguaje and Others in Favor of: Attorney Pablo Fajardo,
dated November 5, 2010, and an English translation thereof ........ SA5265

**PX 391** Lago Agrio Plaintiffs' Filing authorizing Special Power of Attorney and Legal Mandate to Pablo Fajardo, dated November 8, 2010, and an English translation thereof ................................. SA5314

**PX 394** Official Circular by A. Mera, Legal Counsel to the Office of the President of the Republic of Ecuador, dated November 18, 2010, and an English translation thereof ...................................... SA5369

**PX 446** PCA Case No. 2009-23, In the Matter of an Arbitration before a Tribunal Constituted in Accordance with the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investments, signed 27, August 1993 (the "Treaty") and the Uncitral Arbitration Rules 1976 between: 1. Chevron Corporation, 2. Texaco Petroleum Company, and The Republic of Ecuador—First Interim Award on Interim Measures, dated January 25, 2012 ................................................................ SA5563

**PX 448** Order issued in the Provincial Court of Justice of Sucumbios, dated October 15, 2012, and an English translation thereof ....... SA5581.1

**PX 450** PCA Case No. 2009-23, In the Matter of an Arbitration before a Tribunal Constituted in Accordance with the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investments, signed 27, August 1993 (the "Treaty") and the Uncitral Arbitration Rules 1976 between: 1. Chevron Corporation, 2. Texaco Petroleum Company, and The Republic of Ecuador - Fourth Interim Award on Interim Measures, dated February 7, 2013 .......................................... SA5581.26

**PX 470#** ChevronToxico article titled "Chevron Hires Hit Man Anthropologist To Rewrite Indigenous History In Amazon - Shoddy Scholarship Infects Report Submitted To Court to Hide Possible Genocide Committed By Chevron Against Cofan," dated April 24, 2006 ................................................................... SA5582

xv

PAGE

**PX 497#** Letter from Amazon Watch to Christopher Cox, Chairman
of the U.S. Securities and Exchange Commission, dated March
18, 2008 ................................................................................SA5588

**PX 527R** ChevronToxico article by Amazon Defense Coalition titled
"Acclaimed Film About Chevron's Eco-Disaster In Ecuador To
Open In Nation's Capital," dated October 22, 2009.....................SA5593

**PX 558** Retainer agreement among the Lago Agrio Plaintiffs, El
Frente de Defensa de la Amazonia, the Asamblea de Afectados
por Texaco, and Donziger & Associates, PLLC, dated January 5,
2011......................................................................................SA5597

**PX 583** Banco Pichincha Account Summary for Selva Viva, dated
June 14, 2005, and an English translation thereof.........................SA5610

**PX 687** Memorandum from Steven Donziger regarding "Strategic
Planning Memo/Ecuador Case," dated November 19, 2003 ..........SA5791

**PX 737** Email string from Steven Donziger to Jennifer DeLury Ciplet,
copying Atossa Soltani regarding "SEC letter,"
dated November 2, 2005 ............................................................SA5794

**PX 754** Letter from Atossa Soltani and Sarah Aird to Christopher
Cox, dated January 30, 2006.......................................................SA5796

**PX 763** Email from David Russell to Steven Donziger regarding
"your letter to AW," dated February 14, 2006 ..............................SA5798

**PX 764** Letter from David Russell to Steven Donziger regarding
"Cease and Desist," dated February 14, 2006, .............................SA5801

**PX 774** Email string from Aaron Page to Steven Donziger, copying
alejandrop@usfq.ec regarding "genocide issue/important," dated
March 27, 2006 ........................................................................SA5803

**PX 779** Email from Steven Donziger to Ponce Villacis regarding
"Need plan," dated June 14, 2006 ...............................................SA5804

xvi

**PX 781** Email string from Daria Fisher to Steven Donziger regarding
"SEC investigation/Chevron," dated July 12, 2006......................SA5805

**PX 788** Email from Steven Donziger to David Russell regarding
"I asked you once…," dated August 15, 2006 .............................SA5807

**PX 806R** Email from Steven Donziger to David Kuhn regarding
"Book Proposal attached," dated November 3, 2006....................SA5809

**PX 843** Email from Pablo Fajardo to Steven Donziger, copying Luis
Yanza regarding "PLANES PARA EL EXAMEN PERICIAL,"
dated March 21, 2007, and an English translation thereof.............SA5849

**PX 858** Email string from S. Donziger to E. Fajardo Mendoza,
copying L. Yanza "re 'PREOCUPACION CONFIDENTIAL'"
['CONCERN CONFIDENTIAL"], dated May 10, 2007, and an
English translation thereof.......................................................SA5861.1

**PX 883** Email from Steven Donziger to Luis Yanza and Pablo Fajardo
regarding "Ideas para reunion con Richard [Ideas for meeting
with Richard]," dated July 17, 2007, and an English translation
thereof. ...................................................................................SA5862

**PX 906** Email string between Pablo Fajardo and Steven Donziger
regarding "follow up on press releases," dated August 24, 2007,
and an English translation thereof................................................SA5867

**PX 909** Email string between Steven Donziger and Pablo Fajardo
regarding "Imputado con la situacion HAVOC [Pissed off with
HAVOC situation]," dated September 3, 2007, and an English
translation thereof ....................................................................SA5876

**PX 918** Declaration of Mark Anthony Quarles, P.G., dated September
17, 2007, filed in *Republic of Ecuador v. ChevronTexaco Corp*,
04 Civ. 8378 (LBS) (S.D.N.Y.)....................................................SA5881

**PX 931** Email from Steven Donziger to Chris Lehane regarding "let's
talk," dated October 29, 2007 ....................................................SA5887

xvii

**PX 976** Email from Douglas Beltman to Michael Carney, T. Hodgson, Jennifer Peers, Ann Maest, Preston Sowell, Eric English, David Mills, C. Rodgers regarding "Ecuador annex schedule," dated February 26, 2008 ....................................................................SA5888

**PX 1018** Email from Douglas Beltman to Steven Donziger regarding "what do u think of this?," dated March 30, 2008, and an English translation thereof ....................................................................SA5899

**PX 1028** Email from Pablo Fajardo to Juan Pablo Saenz, Julio Prieto, Luis Yanza, Steven Donziger, Maria Eugenia Garces, Maria Guardalupe Yepez, and M. de Heredia regarding "SCHISMES Y SUGERENCIA [GOSSIP AND SUGGESTIONS]," dated April 2, 2008, and an English translation thereof ...................................SA5904

**PX 1103** Email from Juan Pablo Saenz to Steven Donziger regarding "Nuevo Boletin/importante [New Press Release/important]," dated February 2, 2009, and a English translation thereof ............SA5907

**PX 1108** 2008 U.S. State Department Country Report on Human Rights Practices—Ecuador, dated February 25, 2009 ...................SA5918

**PX 1130R** Excerpts from the hearing before the House of Representatives, Tom Lantos Human Rights Commission, on Ecuador, Nigeria, West Papau: Indigenous Communities, Environmental Degradation, and International Human Rights Standards, dated April 28, 2009...................................................SA5929

**PX 1146** Memo from Steven Donziger to Kohn Team regarding "Activity Going Forward," dated July 2, 2009 .............................SA5932

**PX 1156** Email from Steven Donziger to Joseph Kohn regarding "idea to retain a lawyer," dated September 4, 2009 ...............................SA5935

**PX 1171** Email chain between Andrew Woods and Juan Pablo Saenz regarding "RE: document organization," dated October 19, 2009................................................................SA5936

xviii

PAGE

**PX 1204#** Report titled "Invictus Report" on funding enforcement of the Lago Agrio judgment and distributing its proceeds, dated 2010..................................................................SA5938

**PX 1269** Email from John McDermott to Steven Donziger copying Erica Englert and Michael Hoke regarding "Chevron v. Stratus," dated March 21, 2010 ...............................................SA5973

**PX 1279** Email from Julio Prieto to Steven Donziger, Juan Pablo Saenz, Luis Yanza and Pablo Fajardo regarding "Protection Action," dated March 30, 2010, and an English translation thereof ......................................................................SA5974

**PX 1316** Email string among Eric Westenberger, Andrew Wilson, Ilaan Maazel, Edward Yennock, Steven Donziger, Laura Garr, and Jonathan Abady regarding "Draft affidavit," dated May 3, 2010...................................................SA5977

**PX 1319** Email from J. Rockwell to Edward Yennock, Eric Westenberger regarding "Draft Affidavit," dated May 4, 2010...................................................SA5982

**PX 1347** Email chain among Jay Horowitz and Andrew Wilson, copying Jonathan Abady, Steven Donziger, Ilaan Maazel, Eric Westenberger, Edward Yennock, Eric Daleo, and J. Rockwell regarding "Rule 60(b) and Stratus Materials," dated May 16, 2010...................................................SA5989

**PX 1348** Email chain among Steven Donziger and Andrew Wilson, copying Ilaan Maazel, Jonathan Abady, Eric Westenberger, Jay Horowitz, Eric Daleo, and Edward Yennock regarding "Colorado Disclosures?," dated May 17, 2010 ...............................SA6001

**PX 1363** Email chain among Steven Donziger, Eric Westenberger, Ilaan Maazel, Andrew Wilson, Jim Tyrrell, Steven Donziger, Eric Daleo, Edward Yennock, Jonathan Abady, M. Jasinski, Ingrid Moll, B. Narwold, Julie Brickell, Laura Garr, and Andrew Woods regarding "Mini-revelation," dated May 27, 2010.............SA6003

xix

PAGE

**PX 1385** Email from Eric Westenberger to Eric Daleo, copying
Edward Yennock, Steven Donziger and Jim Tyrrell regarding
"Tomorrow's Production to Chevron," dated July 1, 2010............SA6005

**PX 1399** Email from Eric Westenberger to Steven Donziger, copying
Eric Daleo and Edward Yennock regarding "Ecuador Filing,"
dated July 22, 2010 ....................................................................SA6007

**PX 1502** Email string among Steven Donziger, John Keker, J. Little,
and M. Werdegar regarding "FYI," dated February 11, 2013, and
an English translation thereof ......................................................SA6008

**PX 1689** Attachment M to the declaration of Alberto Guerra Bastidas
- Banco Pichincha deposit records, dated March 2010, and an
English translation thereof....................................................... SA6018.1

**PX 1703** "Ayuda Memoria del Proceso [Memory Aid for the
Action]," and an English translation thereof ................................SA6019

**PX 1706A** English translation of bank records of Alberto Guerra for
period ending November 5, 2009 ..................................................SA6036

**PX 1707A** English translation of bank records of Alberto Guerra for
period ending December 3, 2009..................................................SA6038

**PX 1708** Bank records of Alberto Guerra, and an English translation
thereof ........................................................................................SA6040

**PX 1713** Banco Pichincha records of deposits for Alberto Guerra
(2009–2011), and an English translation thereof ..........................SA6043

**PX 1718** Banco Pichincha record of deposit for Alberto Guerra dated
February 2010, and an English translation thereof........................SA6075

**PX 1719** Banco Pichincha records of deposits for Alberto Guerra
dated December 2009, and an English translation thereof.............SA6078

xx

**PX 1746** Email from Steven Donziger to Luis Yanza regarding "Importante para discutir este fin de semana [Important to discuss this weekend]," dated November 27, 2009, and an English translation thereof...........................................................SA6081

**PX 1751** Email from Pablo Fajardo to Luis Yanza and Steven Donziger regarding "Novedad [News]," dated October 27, 2009, and an English translation thereof...............................................SA6086

**PX 2143** Summary chart of evidence of investor contributions to the Lago Agrio litigation and related litigations.................................SA6089

**PX 2164** Summary charts comparing text from the Lago Agrio judgment to the Lago Agrio Plaintiffs' unfiled work product........SA6090

**PX 2170** Interactive application showing side-by-side comparisons of the Lago Agrio judgment and other documents ...........................SA6121

**PX 2175** Summary chart of overlap and common errors found in the Lago Agrio judgment, Selva Viva Data Compilation, and Stratus Compilation ...............................................................................SA6122

**PX 2218** Timelines of selected publicly available materials or public statements authored by Defendants, their co-conspirators, and relevant third parties related to the Lago Agrio litigation .............SA6132

**PX 2382** Email from Emma Ozanne to David Lowe, et al. regarding Potential Buford Investment in Ecuador, dated September 6, 2010..........................................................SA6134.1

**PX 2387** Image of Hugo Gerardo Camacho Naranjo reading Chevron's complaint in this action...............................................SA6135

**PX 2413** "Pressure Chart" produced by Steven Donziger (DONZ-HDD-0201477).........................................................................SA6137

xxi

**PX 2439** Email from Douglas Beltman to Pablo Fajardo and Steven Donziger regarding "Plan de Trabajo-Texpet cleanup," dated August 1, 2008 ................................................................SA6138

**PX 2473** PCA Case No. 2009-23, In the Matter of an Arbitration before a Tribunal Constituted in Accordance with the Treaty between the United States of America and the Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investments, Signed 27 August 1993 (the "Treaty") and the Uncitral Arbitration Rules 1976, between 1. Chevron Corporation, 2. Texaco Petroleum Company and The Republic of Ecuador, First Partial Award on Track, dated September 17, 2013 ........................................................SA6140

**PX 2494** Article titled "Ecuador says had no role in alleged bribery case," posted on Reuters, dated September 12, 2009 ...................SA6216

**PX 2514** Petition submitted by Pablo Fajardo to the Provincial Court of Justice of Sucumbíos, dated August 23, 2010, and an English translation thereof ......................................................SA6220

**PX 2524** Email string from Juan Pablo Saenz to Steven Donziger regarding "Chevron Charged With Dirty Tricks in Ecuador," dated September 2, 2009.............................................................SA6237

**PX 2551** Pablo Fajardo Mendoza Requests for Clarification and Expansion, dated January 6, 2012, and an English translation thereof ................................................................SA6242.1

**PX 2553** Order in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 2011-0106, dated February 17, 2012, and an English translation thereof ...................................................................SA6243

**PX 6703** Informational Bulletin titled "After 17 Years of Struggle we are Closer to the Judgment," dated December 2010, and an English translation thereof.........................................................SA6252

xxii

PAGE

**PX 7033A** Regular Meeting of the Executive Committee of the Udapt, Minutes No. 3, dated January 15, 2013, and an English translation thereof ...................................................................SA6261

**PX 7421** Article by Peter Maass titled "Slick," dated March 2007 .......SA6276

**PX 7441** Email from Steven Donziger to Susan Martin, Scott Moorhead, and Kent Caperton regarding "draft ltr for Cuomo," dated April 2, 2009....................................................................SA6287

**PX 7447** Document titled "Amazon Watch Ecuador Campaign, Draft Proposal/Confidential," dated June 4, 2009.................................SA6301

**PX 7502** Declaration of Ramiro Fernando Reyes Cisneros, dated October 12, 2012 .......................................................................SA6304

**PX 7511** Article titled "Ecuador's president denounces Chevron as 'enemy of our country'" featured in The Raw Story, dated August 17, 2013 ......................................................................SA6318

**PX 7608** Email from Steven Donziger to John McDermott regarding "important document attached," dated January 19, 2010...............SA6320

**PX 8000** Delaware Certificate of Good Standing for Chevron Corporation, dated February 24, 2012..........................................SA6344

**PX 8001** Delaware Certificate of Good Standing for Texaco Inc., dated February 24, 2012 ............................................................SA6345

**PX 8002** Delaware Certificate of Good Standing for Texaco Petroleum Company, dated February 24, 2012 .............................SA6346

**PX 8004** Excerpts from a brief filed by Texaco Inc. in *Aguinda v. Texaco Inc.*, Case No. 93-cv-7527 (JSR) (S.D.N.Y.), dated January 11, 1999 .......................................................................SA6347

xxiii

PAGE

**PX 8005** Excerpts from a brief by the plaintiffs in *Aguinda v. Texaco Inc.*, Case No. 93-cv-7527 (JSR) (S.D.N.Y.), dated January 11, 1999.........................................................................................SA6353

**PX 8025** Petroecuador Special Supplement article titled "Petroproduccion Eliminara 264 Piscinas con Desechos en la Amazonia [Petroecuador will eliminate 264 contaminated pits in the Amazonia]," dated October 5, 2006, and an English translation thereof ...................................................................SA6357

**PX 8035** Report prepared by FUGRO-McClelland (West), Inc. titled "Final Environmental Field Audit for Practices 1990-1992, PetroEcuador-Texaco Consortium Oriente, Ecuador," dated November 1992 ........................................................................SA6362

**PX 8036** Draft Report prepared by HBT AGRA Limited titled "Environmental Assessment of the Petroecuador-Texaco Consortium Oil Fields, Volume I: Environmental Audit Report," dated October 1993 ..................................................................SA6664

**PX 8037** Report prepared by HBT AGRA Limited titled Environmental Audit and Assessment of the Petroecuador-Texaco Consortium Oil Fields until June 30, 1990, Volume II: Environmental Management Plan," dated October 1993 ..............SA6826

**PX 8044** Response and Request for Continuance regarding Order to Show Cause Dated June 19, 2013, dated June 24, 2013 ...............SA6968

**PX 8064** Report by John Connor titled "Response to Statements be Mr. Cabrera Regarding Alleged Impacts to Water Resources in the PetroEcuador-Texaco Concession Area," dated August 29, 2009, and an English translation thereof ......................................SA6973

**PX 8065** Report by Ernesto Baca titled "Response to Mr. Cabrera Regarding his Evaluation of Petroecuador's Pit Remediation Program (PEPDA)," dated August 29, 2008, and an English translation thereof ...................................................................SA7035

xxiv

PAGE

**PX 8070** "Anexo 4A: Expert Opinion of John A. Connor Regarding
Remediation Activities and Environmental Conditions in the
Former PetroEcuador-Texaco Concession, Oriente Region,
Ecuador," dated September 16, 2010............................................SA7097

**DX 605EK** Sampling report for Sacha 14, dated December 15, 2004,
and submitted to the Lago Agrio record at page 72,335...............SA7316

**DX 605EN** Sampling report for LA06, dated December 19, 2005, and
submitted to the Lago Agrio record at page 100,978 ...................SA7318

**DX 605EO** Sampling report for LA Central, dated April 4, 2006, and
submitted to the Lago Agrio record at page 119,378 ...................SA7320

**DX 1377A** Motion filed by Adolfo Callejas on behalf of Chevron in
*Maria Aguinda y Otros v. Chevron Corp.*, Case No. 106-2011, in
the Sole Division of the Provincial Court of Justice of
Sucumbíos, Nueva Loja, Ecuador, dated March 9, 2011, and a
certified English translation thereof ............................................SA7322

# SA1

**SA1 is a video exhibit and can be found on the enclosed DVD**

Title of Clip: CRS159-00-CLIP-06

| SPEAKER | ORIGINAL | TRANSLATION (Spanish) | TRANSLATION (English) |
|---|---|---|---|
| | | | |
| STEVEN DONZIGER | Ah-- ¿cómo ve lo siguiente? ¿Listo? | | Uh-- how do you see the following? Ready? |
| | | | |
| JUAN PABLO SAENZ MENA | Sí. | | Yes. |
| | | | |
| DONZIGER | Que-- como parte de los daños, cobrar-- cobramos Texaco un valor en dólares [campanilla] de cada barril que descargaron al medio ambiente en su agua de formación. Es decir, fijamos un precio, la diferencia entre el costo de no hacerlo y el costo de hacerlo. Es un dólar, dos dólares, cincuenta centavos, no sé, de cada barril, ¿calculamos entonces diez mil millones de dólares más? porque en Estado--ese es-- esa es la ganancia inmoral-- | | That-- as part of the damages, charge-- we charge Texaco a dollar amount [chime] for every barrel they unloaded in the environment in its formation water. That is, we set a price, the difference between the cost of not doing it and the cost of doing it. It's one dollar, two dollars, fifty cents, I don't know, for each barrel. Do we then calculate ten billion dollars more? Because in the States--that is-- that is immoral profit-- |
| | | | |
| SAENZ | O sea, lo que ellos se ahorraron por no haber-- | | I mean, what they saved themselves for no having-- |
| | | | |
| DONZIGER | Es ilegal, exacto, con violar la ley. | | It's illegal, exactly, by violating the law. |
| | | | |
| | [voces superpuestas] | | [overlapped voices] |
| | | | |
| SAENZ | [ininteligible] | | [unintelligible] |
| | | | |
| DONZIGER | Entonces, bajo la teoría de un robo, eso es teoría de un robo, hay que-- decimos en inglés, disgorge, es decir, en-- devolver eso. | reintegrar | Then, under the theft theory, that is theft theory, you have to--- in English we say, disgorge, that is, en-- return that. |
| | | | |
| JULIO MARCELO PRIETO MENDEZ | Teníamos un cálculo de esto nosotros, que siempre decíamos que se ahorró, que decíamos, ochenta centavos por cada... | | We used to have a calculation for this, we always used to say that he saved himself, what we said, eighty cents for each... |
| | | | |
| DONZIGER | Exacto. | | Exactly. |
| | | | |
| PRIETO | ...por cada barril. | | ...for each barrel. |

| DONZIGER | Decimos más de cinco mil millones [voces superpuestas] | | We say more than five billion [overlapped voices] |
|---|---|---|---|
| PRIETO | Habría que hacer un cálculo bien de eso… | | We would have to run a good calculation of that… |
| DONZIGER | Sí. | | Yes. |
| PRIETO | …porque ochenta centavos, yo después hice cálculos también con-- con [voces superpuestas] | | …because eighty cents, later on I ran calculations also with-- with [overlapped voices] |
| DONZIGER | No, no, pero s-- asumimos que podemos hacer-- | | No, no, but s-- we assume that we can do-- |
| | [voces superpuestas] | | [overlapped voices] |
| ALEJANDRO PONCE VILLACIS | Y no daban. | | And it didn't add up. |
| PRIETO | Y no daban, no daban [risita]. O sea-- | | And it didn't add up, didn't add up [chuckles]. I mean-- |
| VILLACIS | ¿A cuánto te daba? | | What did it add up to? |
| PRIETO | Ni en los precios actuales del petróleo… o tal vez ahí, pero con los precios de ese tiempo no te daba para… | | No even with the current oil prices… or maybe there, but with the oil prices at the time it didn't even add up enough for… |
| DONZIGER | No-- | | No-- |
| PRIETO | …para un ahorro tan… | | …for a saving so… |
| DONZIGER | No, pero pedimos un experto en eso. | | No, but we request an expert on that. |
| PRIETO | Umjú [afirmativo] [voces superpuestas] [ininteligible] hacer una buena evaluación. | | Uh-huh [affirmative] [overlapped voices] [unintelligible] carry out a good assessment. |
| DONZIGER | Estimo que han ahorrado ocho mil millones por no haber cumplido con la ley y con la norma de Estados Unidos en esa época. | | I estimate that they have saved themselves eight billion dollars by not abiding with the law and with the norms of the United States at the time. |
| PRIETO | Shit! | ¡Mierda! | |

| | | | |
|---|---|---|---|
| DONZIGER | Y encima de todo lo demás, pedimos el devolvimiento de eso robo. Mi pregunta a-- a-- a m-- a-- a mis colegas abogados, abogados mucho más practicado en la ley de Ecuador, ¿sería posible que pedimos eso? pensando lo más creativo posible, por favor. | | And on top of everything else, we requested what was stolen to be returned. My question to-- to-- to m-- to-- to my colleagues, attorneys, attorneys with much more practice in Ecuador's law, would it be possible for us to request that? Thinking as creatively as possible, please. |
| PABLO FAJARDO | Yo no le veo... | | I don't see it... |
| DONZIGER | ¿No? | | You don't? |
| FAJARDO | ...opción. | | ...the option. |
| DONZIGER | ¿Ni pedir? | | Not even ask? |
| PRIETO | Podemos pedir, pero no vamos a-- a-- a [ininteligible] nadie. Aparecería como que estamos reformando la demanda en este punto. | | We can ask, but we're not going to-- to-- to [unintelligible] anybody. It would appear as if we're amending the lawsuit at this stage. |
| FAJARDO | Sí. Se puede hacer un... una cosa que puede ir en contra nuestra. | | Yes. it can be something that could work against us. |
| UMV | A-- antes de los fundamentos de derecho. | | Be-- before the legal foundations. |
| ALEXANDRA | [voces en el fondo] en justo no pedi... | | [background voices] specifically didn't . . . |
| FAJARDO | Yo-- | | I-- |
| LUIS FRANCISCO YANZA ANGAMARCA | Pero aún eso-- eso no sería para los-- bueno, tendrían derecho [voces superpuestas] | | But still, that-- that wouldn't be for the-- well, they would have the right [overlapped voices] |
| DONZIGER | Pero mira-- mira-- mira-- | | But look-- look-- look-- |
| YANZA | Pero más sería para el Estado. | | But it would be more for the nation. |
| DONZIGER | Sí, para el Estado. | | Yes, for the nation. |
| YANZA | Para el Estado, porque... | | For the nation, because... |
| DONZIGER | Eh-- pero ¿qué-- que piensa de la idea [ininteligible] los daños | | Eh-- but, what-- what [unintelligible] think of the idea |

| | | | |
|---|---|---|---|
| | que pedimos [ruido en el fondo]. Pedimos mucho más de lo esperamos. Si-- si-- si-- por ejemplo, si creemos tres mil [ininteligible] millones para limpiar y pedimos dieciocho mil millones, ¿van-- van a vernos como locos, o va a ver el juez, "eh, yo puede dar Texaco como ochenta por ciento de lo que quieren, entonces les voy a dar a ellos tres mil millones" 'Tonces, si pedimos dieciocho mil millones-- | | of [unintelligible] the damages we're asking for [background noise]. We ask for much more than what we expect. If-- if-- if-- for example, if we believe three[unintelligible] million to clean and we ask for eighteen billion, are they going to-- going to regard us as if we're crazy, or will the judge see, "eh, I can give Texaco about eighty percent of what they want, then I'm going to give them three billion" Then, if we ask for eighteen billion-- |
| FAJARDO | ¿Qué-- qué buscas? | | What-- what are you looking for? |
| SAENZ | El Código Civil. | | The Civil Code. |
| FAJARDO | Pa-- pa-- ¿Qué artículo es? | | Pa-- pa-- what section is it? |
| SAENZ | Es que debe ser el viejo. | | It has to be the old one. |
| FAJARDO | El viejo, ¿qué artículo es? | | The old one, what section is it? |
| ALEXANDRA | Veintidós cuarenta y uno. | | Twenty-two forty-one. |
| FAJARDO | Veintidós cuarenta y uno. | | Twenty-two forty-one. |
| VILLACIS | Es el-- es el de los daños. | | The one about-- the one about damages. |
| FAJARDO | ¿[ininteligible] treinta? | | [unintelligible] thirty? |
| | [voces superpuestas] | | [overlapped voices] |
| VILLACIS | Veintidós cuarenta y uno es el que dispone que toda persona que ha sufrido un daño tiene derecho a verlo reparar-- reparado. | | Twenty-two forty-one is the one that provides that any individual who has suffered any loss has the right to have it repair-- repaired. |
| FAJARDO | Sí. Sí. | | Yes. Yes. |
| ALEXANDRA | Y el veintis-- veintidós cincuenta y seis. | | And twentys-- twenty-two fifty-six. |
| VILLACIS | [ininteligible] | | [unintelligible] |
| | [risas] | | [laughs] |

| | | | |
|---|---|---|---|
| ALEXANDRA | Cincuentiseis. | | Fifty-six. |
| FAJARDO | Ya-- ya-- ya-- ya les ubico ya. | | Almost-- almost-- almost-- almost found it, almost. |
| | [puerta] | | [door] |
| DONZIGER | No sé, amigos. No--no sé. Pero como concepto, yo pregunto ¿pedimos mucho más de lo que realmente queremos como el táctica? [ruido en el fondo] ¿Pedimos ocho y esperamos tres, para que [ininteligible] diga, "Texaco, mira, yo corté la gran parte." | | I don't know, my friends. I-- don't know. But as a concept, I ask, do we ask for much more than what we really want as a strategy? [background noise] Do we ask for eight and expect three, so that [unintelligible] says, "Look, Texaco, I cut down the largest part." |
| VILLACIS | Podemos plantearlo [pausa]. Podemos plantearlo como táctica, pero-- | | We can suggest it [pause]. We can suggest it as a strategy, but-- |
| FAJARDO | [inaudible]este es. | | [inaudible]this is it. |
| DONZIGER | Pero es-- por ejemplo, allá siempre pide más de lo que realmente espera. | | But it's-- for example, there you always ask for more than what you actually expect. |
| VILLACIS | Ah-- el-- [suspira] | | Uh-- the-- [sigh] |
| DONZIGER | Pero aquí, eh-- todo es nuevo en este-- | | But here, uh-- everything is new in this-- |
| VILLACIS | Pero-- ah-- eh-- el proble-- el error fue no-- no-- no pedirlo al inicio. | | But-- uh-- eh-- the proble-- the mistake was not-- not-- not to ask for it from the beginning. |
| FAJARDO | ¿Qué cosa? | | What? |
| VILLACIS | No-- no-- no plantearlo al inicio, que debía haber una cantidad mínima, o sea, decir al menos, "el daño no es menor a diez mil millones de dólares, o veinte mil millones de dólares," lo que sea. Y-- y-- y dejarlo abierto así, sin claridad. | | Not-- not-- not suggesting it at the beginning, that there had to be a minimum amount, I mean, saying at least, "the damage is not to be less than ten billion dollars, or twenty billion," whatever. And-- and-- leave it open like that, without clarity. |
| | [ruido en el fondo] | | [background noise] |
| DONZIGER | Pero ¿cómo se puede poner una cifra en el inicio cuando [voces | | But, how can you set a figure at the beginning when [overlapped |

|  | superpuestas]? |  | voices]? |
|---|---|---|---|
| VILLACIS | Puedes poner una cifra y decir "no es menos de--" [ruido en el fondo] y puedes llegar a... |  | You can set a number and say, "it is no less than--" [background noise] and you can arrive to... |
|  |  |  |  |
| FAJARDO | En el actual. |  | In the current one. |
|  |  |  |  |
| SAENZ | [ininteligible] |  | [unintelligible] |
|  |  |  |  |
| VILLACIS | ...ochenta veces lo que tú has dicho, pero pones un límite bajo. Ahora el decirlo es tanto y cuando no estamos demandando que el juez señale un monto de indemnización en la demanda, eso es-- e-- es complicado. |  | ...eighty times what you have said, but you set a low limit. Now saying it is this much and when we are not suing, having the judge set a damage amount in the lawsuit, that is-- i-- is complicated. |
|  |  |  |  |
| DONZIGER | Peligroso. ¿Qué estaba pensando Alberto? |  | Dangerous. What was Alberto thinking? |
|  |  |  |  |
| VILLACIS | Tal vez las instrucciones de... |  | Maybe directions from... |
|  |  |  |  |
| DONZIGER | ¿De [ininteligible]? [fin de la grabación] |  | From [unintelligible]? [end of recording] |



GEOTEXT
Translations, Inc.

STATE OF CALIFORNIA          )
                             )
                             )
COUNTY OF SAN FRANCISCO )          ss


## CERTIFICATION


This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached transcription excerpt CRS161-

01-01-CLIP 1.


Steve Walsh, West Coast Client Manager
Geotext Translations, Inc.


State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this 1st day of September , 20 10 ,

by _____ Steve Walsh _____ ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature:

MELISSA PIERONI
COMM. # 1755133
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires July 3, 2011

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

127



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK      )
                       )      ss
COUNTY OF NEW YORK     )


### CERTIFICATION


This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached recording of a press conference

at the airport in Lago Agrio, Ecuador on April 27, 2007.


*Kristin Schreffler*

Kristin Schreffler, Project Manager
Geotext Translations, Inc.


Sworn to and subscribed before me

this __9__ day of _January_, 20 _11_ .

*Kathryn D. Wolf*

KATHRYN D. WOLF
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WO6210178
Qualified in Kings County
My Commission Expires August 10, 2013

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

TITLE OF CLIP:___kct 4 lado A_____

UMV = Unidentified Male Voice (Voz Masculina No Identificada)
UFV = Unidentified Female Voice (Voz Femenina No Identificada)

| SPEAKER | ORIGINAL | TRANSLATION (English) |
|---|---|---|
| | | |
| | [voces ininteligibles en el fondo] | [unintelligible background voices] |
| | | |
| UFV | Eh… Señor Presidente. | Ah… Mister President. |
| | | |
| PRESIDENT RAFAEL CORREA | Gracias. Bueno, compañeros, gracias, perdonen los inconvenientes, que ha habido algunas descoordinaciones, el… primero el helicóptero que tenían que transportarles incluso el día de ayer se dañó, pero, bueno. Eh… y hoy día, tuvimos un serio retraso en el horario, pero también hubo mal un mal tiempo y nos demoró una hora, una hora y media en el UB-15, en la Unidad Bloque 15. Compañeros, y hemos estado dos días, en lo personal, en unos de los días más fascinantes en mi vida, por una de las zonas más maravillosas del planeta, pero también más conflictivas del planeta: La Amazonía Ecuatoriana. Hemos empezado visitando varios sectores donde operó la compañía Texaco, y hemos podido comprobar lo evidente, lo inocultable, el destrozo ambiental, la destrucción ambiental que dejó en nuestra Amazonía esta compañía. Por favor, que el mundo sepa, que ustedes sepan, que el daño ambiental, los derrames de petróleo, las mil piscinas abiertas que dejó Texaco representan treinta veces un mayor daño y derrame de petróleo que el derrame del Exxon-Valdez ocurrido en Alaska. No quisiéramos pensar en el planeta todavía es— existen seres humanos de primera, segunda y tercera categoría, que ciertos crímenes ocurriendo [ininteligible] mundo y sí son sancionados, sino en el tercer mundo ahí, sí, hay que dejarlos impunes. El gobierno nacional no interfiere en el fuero judicial, hay un proceso por parte de las comunidades afectadas, pero, sí, es nuestro deber y nuestro derecho decir, "Ahí está la contaminación. La hemos tocado con nuestras propias manos, la hemos pisado, la hemos sentido, la hemos ole—olido." Pero es que es inocultable esa contaminación ambiental. Ya vemos, lamentablemente, los vende-patrias de siempre, esos abogados ecuatorianos que por siempre se han dedicado a defender petroleras, dicen que eso es de Petroecuador.  Por favor, hay piscinas donde Petroecuador no ha operado | Thank you. Alright, comrades, thank you, forgive the inconveniences, as there have been a few problems with coordination, the… first the helicopter which was supposed to transport you, became damaged yesterday as well, but, alright. Ah… and today, we had a serious scheduling delay, but there was also some bad weather which delayed us an hour, an hour and a half at UB-15, at Block Unit 15. Comrades, and for two days we have, personally, as part of some of the most amazing days of my life, gone through one of the most wondrous areas of the planet, but also one of the [areas] of the planet with the most conflict: The Ecuadorian Amazonia. We have started visiting several sectors where the Texaco company operated, and we have been able to confirm the environmental devastation, the environmental destruction which is evident and cannot be hidden, that this company left in our Amazonia. Please, may it be known by the world, may it be known by all of you, that the environmental damage, the oil spills, the thousand open pits left by Texaco represent thirty times more damage and spilled oil than the Exxon-Valdez spill which occurred in Alaska. We wouldn't want to think that on this planet there still ar—are human beings of first, second and third class, that certain crimes occurring [unintelligible] world and which are punished, but in the third world there, yes, they must remain unpunished. The national government does not interfere in the court system, there is a case on behalf of the affected communities, but, yes, it is our duty and our right to say, "The contamination is right there. We have touched it with our own hands, we have stepped in it, we have felt it, we have sm—smelled it." But it's that that environmental contamination cannot be concealed. We have already seen, unfortunately, the same old turncoats, those Ecuadorian attorneys who have always dedicated themselves to defending oil companies, they say |

| | |
|---|---|
| todavía. Están en las piscinas botadas de la Coca, de Texaco. Pregúntenles a los campesinos. Nos dicen que en el noventa y ocho se firmó un acuerdo, sí, ya no hay corrupción, donde hay un informe de Contraloría que pide hasta responsabilidades penales para los que firmaron un [sic] supuestas remediaciones ambientales. La remediación ambiental fue con una cuenta-piscinas, se cubrió ahí con un poco de tierra, escarban un poco, como ustedes lo han visto, y sacan el petróleo a menos de un metro de profundidad. No nos engañemos. Aquí hubo un crimen de lesa humanidad. Es más, habría que analizar la posibilidad de iniciar un juicio en ese sentido, porque ha habido exterminio de pueblos enteros por la contaminación que se ha—ha—ha hecho en la Amazonía. Y todo, todo impacto ambiental, desastre ambiental, tarde o temprano se traduce en un problema social. Ahí está un problema social. Campesinos cuyas tierras no reproducen, enfermos con cáncer, enfermedades de la piel, etcétera.  El gobierno nacional va a emprender todo un programa de reubicación de asentamiento, esos compañeros campesinos que viven en áreas contaminadas. Por supuesto, Petroecuador sigue contaminando. Si es otra cosa. No llame—sólo Texaco, estamos de acuerdo, por supuesto ahí hay piscinas de Texaco. Más de mil dejó. Pero Petroecuador con tecnologías anticuadas tiene… | that is Petroecuador's. Please, there are pits where Petroecuador has not operated yet. They are at the pits dumped at Coca, [which are] Texaco's. Ask the peasants. They tell us that in '98, an agreement was signed, yes, there's no more corruption, whereas there's a Comptroller's report which calls for even criminal liability against those who signed off on supposed environmental remediation [jobs]. The environmental remediation was with a pit-counter, a little soil was used to cover up there, they dig a little, as you all have seen, and they extract oil from less than a meter deep. Let's not deceive ourselves. There was a crime against humanity here. What's more, we need to analyze the possibility of initiating a trial in that sense, because there has been extermination of entire communities due to the contamination that has—has—has been done in the Amazonia. And every, every environmental impact, environmental disaster, sooner or later translates into a social problem. There's a social problem there. Peasants whose lands do not reproduce, [those] sick with cancer, [those] sick with skin diseases, etcetera. The national government will undertake a program to relocate settlements, those peasant comrades who live in contaminated areas. Of course, Petroecuador continues to contaminate. That's something different. Don't call—just Texaco, we agree, of course there are Texaco pits. It left over a thousand of them. But Petroecuador, with outdated technology, has… |
| UMV | [inaudible] | [inaudible] |
| CORREA | … un pésimo manejo ambiental. Por eso hemos recorrido varias instalaciones petroleras, sobre todo el Bloque-15, el bloque más moderno que tiene Ecuador y que en estos momentos es de Petroecuador, hemos visitado instalaciones del propio Petroecuador. El Campo Aucas, donde… | … dreadful environmental management practices. That's why we have toured several oil facilities, especially Block-15, the most modern block that Ecuador has and which belongs to Petroecuador at this time, we have visited the facilities of Petroecuador itself. The Aucas Field, where… |
| UMV | [inaudible] Sacha. | [inaudible] Sacha. |
| CORREA | … perdón: el Campo Sacha, donde hemos respaldado totalmente las investigaciones para mejoramiento en el tratamiento ambiental de los residuos petroleros y los carburíferos. Ahora se utiliza biotecnología, bacterias, para degradar los hidrocarburos. El Campo Sacha tiene un laboratorio, se le va a dar todo el impulso para | … sorry: the Sacha Field, where we have totally supported the research for improved environmental remediation for oil residue and carbons. Now, biotechnology, bacteria, is being used to break down hydrocarbons. The Sacha Field has a laboratory, it will be provided with strong support for making that technology widely |

| | | |
|---|---|---|
| | poder generalizar esta tecnología. El Bloque-15, la Unidad del Bloque-15, el UB-15, hoy, en manos de Petroecuador, muy exitosamente, también, de hace muchos años tiene una [sic] manejo biotecnológico de los residuos de petróleo con mucho éxito. Para que vean la descoordinación que ha habido, pese a que el UB-15 también es parte de Petroecuador ya, no ha habido contacto entre Campo Sacha, el laboratorio de Campo Sacha, y la planta de tratamiento del UB-15, vamos a hacer estas coordinaciones para que, lo más pronto posible, se generalice a gran escala la tecnología bacteriana para tratar los desechos petroleros y minimizar, no nos engañemos, es imposible evitar, pero minimizar el impacto ambiental de la explotación petrolera. | available. Block 15, the Block 15 Unit, UB-15, today, in the hands of Petroecuador, with much success, as well, has used biotechnology for many years to manage oil residue with great success. In order for you all to see the lack of coordination there has been, despite the fact that the UB-15 is also part of Petroecuador now, there has been no contact between the Sacha Field, the Sacha Field laboratory, and the UB-15 treatment plant, we will put this coordination together so that, as soon as possible, the bacteria technology becomes widespread for the treatment of oil waste and to minimize, let's not kid ourselves, it's impossible to prevent, but to minimize the environmental impact of oil exploitation. |
| UMV | [ininteligible] | [unintelligible] |
| CORREA | … les decía que… si Ecuador ya es maravilloso, con menos inequidad, con menos injusticia, fuera el paraíso terrenal. Y ¿cuánta injusticia hay? Ahí están las tercerizadoras explotando a los trabajadores sin vergüenza de que cambie del mes al mes la razón social para no tener ninguna responsabilidad. Y la indolencia de petroleras privadas, y con vergüenza tengo que decir de la propia Petroecuador, que no se preocupa de las condiciones en que trata las tercerizadoras sus trabajadores sino que quien le ofrece el menor costo. Por eso, ya se ha dado las instrucciones que Petroecuador entre sus bases tendrá que poner que al menos el setenta por ciento de lo que paga a tercerizadora deberá ir al trabajador. En los actuales momentos, si paga mil dólares por un trabajador, el trabajador le llega a trescientos y los setecientos se fue a la tercerizadora. ¿Hasta cuándo tanta explotación? [ruido] Entonces se ha dado las instrucciones para que en las licitaciones, Petroecuador exija un porcentaje mínimo de pago a los trabajadores de la tercerización de lo que están recibiendo las tercerizadoras. Vamos a pedir que eso también al sector privado. Basta de tanta indolencia. El problema fue para ellos mismos. Decirte un resentimiento contra esa petrolera porque los trabajadores no tienen estabilidad y son explotados por la tercerizadora. Pero no sólo eso. Para reformar esa Ley de Tercerización, que es una explotación a los trabajadores, para limitar los abusos a la contratación colectiva pública que impida a Petroecuador captar esos nuevos trabajadores, darle estabilidad, tenemos | … I was telling you [plural] that… if Ecuador is already marvelous, with less inequality, less injustice, it would be heaven on earth. And how much injustice is there? There are the outsourcers who are shamelessly exploiting workers by changing their legal name from month to month in order to escape any liability. And the indolence of private oil companies, as well as [that of], I'm ashamed to say, even Petroecuador itself, which does not concern itself with the conditions suffered by its workers at the hands of outsourcers, but instead with whoever offers it at the lowest cost. For this reason, instructions have been given that Petroecuador, from within its bases, will have to indicate that at least seventy percent of what it pays to the outsourcer must go to the worker. At present, if it pays one thousand dollars for a worker, the worker receives three hundred while the seven hundred went to the outsourcer. How long can so much exploitation continue? [noise] Thus, instructions have been given so that for public bids, Petroecuador must demand a minimum percentage of the payment received by the outsourcer go to the outsourcer's workers. We will ask that of the private sector as well. Enough with so much indolence. The problem was for themselves. To tell you [of] ill will against that oil company because the workers do not have stability and are exploited by the outsourcer. But that's not all. To reform the Outsourcing Law, which exploits workers, to limit the abuses of public collective contracting which prevents Petroecuador from capturing those new |

| | | |
|---|---|---|
| | que ir a la Asamblea Nacional Constituyente. Mientras tanto, apoyaremos, escúchenme bien, trabajadores tercerizados. Se ha dado la imposición militar y trabajo para que apoye la creación de tercerizadoras comunitarias, es decir, los propios trabajadores, los doscientos trabajadores de una tercerizadora se olvidan de su patrono, ellos arm—arman una tercerizadora para que sean contratados por Petroecuador. Por ejemplo, era preferencia de esta clase de tercerizadoras y ahí sí, si se paga mil dólares, que vayan novecientos para el trabajador y cien para el fondo común. Pero que se acabe esta explotación que hay en estos momentos significa la tercerización laboral. Si un problema muy grave existe no sólo en la Amazonía, sino todo el—en todo el país. Les pido a los compañeros tercerizadados un poco de paciencia, estamos luchando fuertemente contra tercerizadoras ilegales, en la Asamblea podemos reformar la Ley de Tercerización, podemos--eh-- limitar la contratación colectiva pública para que Petroecuador pueda contratar establemente a los trabajadores tercerizados. Mientras tanto, la mejor opción es que ustedes mismos crean sus tercerizadoras para que no sean explotados por nadie. Finalmente, compañeros, en la mañana de hoy, dormimos en el Bloque-15, pero fuimos al campo Edén Yuturi, donde vimos, primero, las instalaciones más modernas de América Latina, hoy manejada por Petroecuador. Y todos estos aguaderos del desastre que decían una vez que salga de Occi, del manejo de Occi, estos campos van a quebrar. Se han mejorado muchos procesos. | workers, to lend it stability, we must go to the Constituent National Assembly. In the meantime, and listen closely, we will support outsourced workers. Military imposition has been allowed for as well as work in support of creating community outsourcers, that is to say, the workers themselves, the two hundred workers of an outsourcer, forget about their employer, they set—set up an outsourcer so they can be contracted by Petroecuador. For example, this type of outsourcer preferred, and if a thousand dollars is paid, nine hundred would go to the worker and one hundred to a common fund. But stopping this current exploitation means labor outsourcing. There is a very serious problem not just in the Amazonia, but in the—in the entire country. I ask you, outsourced comrades, to be a little patient, we are fighting hard against illegal outsourcers and at the Assembly we can reform the Outsourcing Law. We can limit collective public contracting so that Petroecuador will be able to hire outsourced workers on a steady basis. In the meantime, the best option is for you yourselves to create your outsourcers so that you are not exploited by anybody. Finally, comrades, this morning, we slept at Block-15, but we went to the Eden Yuturi field, where we saw, first, the most modern facilities in all of Latin America, which are managed today by Petroecuador. And all of these doomsayers had said that once getting out of Occi, of Occi management, these fields will go belly-up. Many processes have been improved. |
| UMV | [inaudible] | [inaudible] |
| CORREA | Algunos dirán, ah, pero se redujo la producción. Claro, porque Occi no invirtió y no abrió ninguno de los pozos de abril del dos mil seis. Pues ya sabía que se iba a declarar la caducidad del campo, o la caducidad del Bloque. Entonces, eso se siente un año después; no es que se sienta enseguida la falta de apertura de nuevos pozos, pero de aquí hasta diciembre, esperamos recuperar los anteriores niveles de producción que les insisto. | Some would say, oh, but production was reduced. Of course, because Occi didn't invest and never opened any of those wells from April of 2006. Well, it already knew that the field would be declared outdated, or the outdating of the Block. Then, that is felt a year later; it's not that the impact of not opening new wells is felt immediately, but from now until December, we hope to regain the prior production levels that I'm telling you about. |
| UMV | Con nuevos campos. | With new fields. |
| CORREA | Su descenso no es culpa de Petroecuador. Fue culpa de Occi. Deliberadamente dejó de abrir | Their decline is no fault of Petroecuador. It was the fault of Occi. It deliberately stopped opening |

| | Spanish | English |
|---|---|---|
| | nuevos pozos. Todo caso, con mucho orgullo hemos visto cómo técnicos ecuatorianos pueden manejar estos campos de igual o mejor forma que la hací—que lo hacía la compañía Occidental. Fuimos al, ¿cómo se llama? al sistema de… informático. | new wells. In any case, it is with much pride that we have seen how Ecuadorian technicians are able to manage these fields the same as or better than when—the Occidental company was doing it. We went to, what is it called? the computer system. |
| UMV | [inaudible] sistema informático Scada. | [inaudible]Scada information system. |
| CORREA | El Scada, un sistema informático que permite determinar enseguida nivel de presión, fuga, nivel de los tanques, en tiempo real, vamos a implementar ese sistema en Petroecuador en todo los campos de Petroecuador para inmediatamente detectar fugas de petróleo, etcétera, porque aquí también hay mucha corrupción, compañeros. La remediación ambiental se ha vuelto una corruptela y un negocial. Se rompe, expresamente, la tubería para después reclamar indemnizaciones por parte de ciertas personas… | Scada, an information system which allows immediate determination of pressure levels, leaks, tank levels, in real time, is the system we will be implementing in Petroecuador at all of Petroecuador's fields to immediately detect oil leaks, etc., because here, there is also a lot of corruption, comrades. The environmental remediation has become a corrupt enterprise and a business arrangement. The pipelines are broken purposefully to then later request compensation by certain persons… |
| UMV | [ininteligible] | [unintelligible] |
| CORREA | … u obligar a contratar a ciertas compañías remediadoras. El año pasado ¿saben cuánto gastamos en remediación amb—ambiental? Ciento cuarenta millones de dólares. ¿Se imaginan lo que hubiéramos podido hacer de eso? Y son las mismas empresas de siempre. Hay corrupción dentro de—de Petroecuador y corrupción de empresarios ecuatorianos. Por ejemplo, un señor Gapelo; me dicen que es dueño, de algunas de estas, eh, remediadoras, y a cada rato tiene contrato, y éste parece que está metido en telefónicas, en todo. Aquí hay grandes [ininteligible] que se nos han llevado el peso del país. Y se les acabó la fiesta, señores mafiosos. Aquí hay un gobierno patriota, honesto, que no le va a permitir más depreciaci— depredación de la riqueza nacional, más corruptelas. Entonces, una buena táctica para evitar también los perjuicio ambiental, los derrames, etcétera, en la modernización de los sistemas de control, por eso ese sistema Scada, lo vamos a implementar en todos los campos de Petroecuador, para inmediatamente detectar fugas, baja presión y el punto donde existe esa fuga, e irlo inmediatamente a reparar y evitar mañor—mayores daños ambientales. Además que la reparación la hará la propio—la propia Petroecuador para evitar estas corruptelas que, les insisto, han estado dentro, pero fuera | … or force hiring certain remediation companies. Last year, do you know how much we spent on env—environmental remediation? One hundred forty million dollars. Can you imagine what we could have done with that? And those are the same businesses as always. There's corruption with—within Petroecuador and corruption of Ecuadorian businessmen. For example, a mister Gapelo; I'm told that he owns some of these, uh, remediation companies and he always has contracts, and it seems that he is into the telephone business, into everything. There are large [unintelligible] which have carried the load of the country. And the party is over, mafiosos. Here, there is a patriotic, honest government which will not allow further plunder - plundering of the national wealth, further corruption. So, a good tactic to also avoid such environmental harm, the spills, and so on, in the control systems modernization, which is the reason for the Scada system, [is that] we will implement it in all of Petroecuador's fields, to immediately detect leaks, low pressure and the point where the leak is located, and then immediately go repair it and avoid [incomplete word] greater environmental damages. In addition, the remediation will be done by Petroecuador it—itself to prevent these corrupt practices that, I insist, have been inside, but also outside Petroecuador. In some |

también de Petroecuador. En algunas comunidades que a propósito rompen la tubería para reclamar después indemnizaciones y en ciertos empresarios ecuatorianos que son unos verdaderos *gangsters*. Visitamos E—Edén Yuturi, visitamos la perforación de un nuevo pozo, lo cual va a permitir aumentar la producción, una verdadera maravilla, sobre todo algo que [ininteligible] mucho, visitamos la forma de procesar los desechos pet—de petróleo de la más moderna del mundo, con tecnología bacteriana donde el noventa al noventa y cinco por ciento de residuos es asimilado por el suelo y bacterias desagregan ese hidrocarburo de componentes hidrocarburos y esa tierra puede ser utilizada, mientras que los residuos que en verdad no pueden ser descompuestos se los ponen es—en fosas de cemento que luego serán cubiertas, pero una mínima parte, una fosa de veinticinco por veinticinco, o sea, un impacto mínimo. Esa tecnología la vamos a generalizar en todos los campos de Petroecuador. Y finalmente, visitamos el cantón El Carmen, que el treinta de abril de... perdón, el cantón Putumayo, El Puerto El Carmen, que el treinta de abril celebran una nueva fecha más de cantonización, en donde gozamos nuevamente la alegría de la amistad, el cariño de nuestra gente, del arte de nuestra gente, ¿no?, con—con [ininteligible], etcétera, así que aquí hay un inmenso abrazo a los compañeros de Putumayo, particularmente, Puerto El Carmen, y decirles que con el Plan Ecuador, ese plan de paz, desarrollo, de justicia en respuesta al Plan Colombia, militarista, guerrerista, violento, esperamos mejorar un poco las condiciones de vida, de generar las poblaciones fronterizas nortes de la sel—del... de la frontera norte de nuestra patria, y en particular, esos pueblos amazónicos tanto tiempo abandonados. No es posible, no podemos tolerar, no podemos dormir tranquilos mientras la región que tiene mayor incidencia la pobreza, la Amazonía, es al mismo tiempo, paradójicamente, una triste ironía, la región donde sale la riqueza del país. Algo pasa ahí. Algo intolerable. Algo totalmente injustificado. Eso no lo podemos seguir permitiendo, tenga la seguridad la Amazonía que este gobierno hará todo lo que sea posible para reparar esa inmensa postergación de la que han sido objeto. Sin embargo, les insisto, pese a reconocer la injusticia regional, social de la cual han sido víctimas, no podemos permitir la anarquía, y con

communities where they purposefully break the pipelines in order to later file for compensation and among certain Ecuadorian businessmen, who are truly gangsters. We visited E—Yuturi Eden, we visited the drilling site for a new well, which will allow for an increase in production, a true wonder, especially something that [unintelligible] very much, and we visited the way to process the oi—oil waste at the most modern facility in the world, with bacterial technology in which between ninety and ninety-five percent of residue is assimilated by the soil and bacterias separate that hydrocarbon from hydrocarbon components and that soil can be used, while the waste which truly cannot be decomposed is placed is—in cement pits which are later covered, but minimally, a twenty-five by twenty-five pit, that is, a minimum impact. That technology is something we are going to use in all Petroecuador fields. And finally, we visited the El Carmen canton, where on April 30th... forgive me, the Putumayo canton, El Puerto El Carmen, where on April 30th they celebrate another anniversary of cantonization, where we again enjoyed the joy of friendship, the warmth of our people, the art of our people, right?, with—with [unintelligible], and so on, thus here is a huge hug to the Putumayo comrades, in particular, Puerto El Carmen, and tell them that with the Ecuador Plan, that plan of peace, development, [and] justice in response to the Colombia Plan, [which is] militant, war-bent, violent, we expect lifestyle conditions to improve somewhat, to generate border populations north of the jun—of the... of the northern border of our country, in particular, those Amazon communities which have been abandoned for so long. It's not possible, we cannot tolerate, we cannot sleep soundly while the region which has the highest poverty rate, the Amazonia, is, at the same time, paradoxically, a sad irony, the area from which the country's riches emerge. Something's happening there. Something intolerable. Something totally unjustified. We cannot continue to allow that, Amazonia can rest assured that this government will do all that is possible to repair that tremendous delay that you all have endured. However, I stress to you [plural] despite acknowledging the regional and social injustice, of which you have been victims, we cannot allow anarchy, and with a firm, yet generous, but firm hand, this government shall not allow such illegal logging in our forests. It will

| | | |
|---|---|---|
| | mano firme, aunque generosa, pero firme, este gobierno no permitirá más talas ilegales en nuestros bosques. No permitirá más medidas de hecho y tomas de infraestructura productiva, o, en general, paros, anarquía, desmanes, etcétera. | not continue to allow protests and takings of production infrastructure, or, generally, work-stoppages, anarchy, disorder, and so on. |
| UFV | Gracias, a siguiente demos— damos paso a las preguntas. Fabián Loza de Gamavisión, por favor. Una sola [inaudible]. | Thank you, next we go—we go to questions. Fabián Loza of Gamavisión, please. Only one [inaudible] |
| FABIAN LOZA | [ininteligible] el… algunos de esos, eh, extremistas son las [ininteligible] usted cuando, este, dijo [ininteligible] explotar las minas de cobre, también algo [ininteligible]. La nación [ininteligible] y [ininteligible]. | [unintelligible] the… some of those, uh, extremists are the ones that [unintelligible] you when, uhm, he said [unintelligible] exploit the copper mines, also something [unintelligible]. The nation [unintelligible] and [unintelligible]. |
| CORREA | [ininteligible] no le he escuchado a [ininteligible] pero que, créame que no me interesa mucho tampoco lo que [ininteligible] quiso. El problema minero, claro, muy serio, lo está tratando el Ministro de Energía, les voy a leer mayor información. Vamos a tener que hacer un Ministerio de Minas. Se ha destrozado la patria. En los últimos años se ha dado más de tres mil setecientas concesiones, donde el Estado ni siquiera tiene regalías… | [unintelligible] I have not listened to [unintelligible] but believe me, I am not interested much in what [unintelligible] wanted. The mining problem, clearly very serious, but the Minister of Energy is working on that, I'm going to read you further information. We are going to have to create a Ministry of Mining. Our country has been devastated. In recent years, over three thousand seven hundred concessions have been given, in which the state doesn't even have royalties… |
| UMV | Cuatro mil ciento doce. | Four thousand one hundred twelve. |
| CORREA | … cuatro mil ciento doce, me dice. ¿Eh? | … four thousand one hundred twelve, you said. ¿Right? |
| UMV | Sólo doce—dieciséis por ciento tiene permiso de extracción manifiesta [inaudible]. | Only twelve—sixteen percent have extraction permits showing [inaudible] |
| CORREA | Ahora, usted va al Oriente, antes cogía su piedrita para construir un muro, ahora va a coger una piedra y tiene que pagar normalmente a un ex diputado por la concesión, ¿verdad? Entonces, estamos tratando responsablemente ese problema, y no nos interesa lo que digan o dejen de decir políticos de siempre. En todo caso, ya que toca el asunto del cobre, otro ejemplo de lo que se ha vivido en la Amazonía, y eso va a terminar, señores. No lo vamos a permitir. Cada día se asaltan de dos a tres pozos en Petroecuador. Se roban los cables. El asunto es tan descarado que usted vaya a Lago Agrio va a ver ferreterías 'compro cobre' cuando tienen minas de cobre, es el cobre de los cables robados. Eso tampoco lo vamos a permitir. Aquí la Fiscalía no hace nada. Probablemente por | Now, you go to the Oriente, you used to be able to pick up a stone and build a wall, now you go pick up a rock and you usually have to pay an ex politician for the concession, right? So, we're dealing with this problem in a responsible manner, and we are not interested in what the same old politicians say or fail to say. In any case, now that you mention the issue of copper, another example of what has occurred in the Amazonia, and that's going to end, ladies and gentlemen. We are not going to allow it. Each day two or three of Petroecuador's wells are attacked. They steal the cables. This is so blatant that if you go to Lago Agrio, you will see "I buy copper" hardware stores, when they have copper mines, which is the copper from the stolen cables. We will not allow that either. Here, the |

| | | |
|---|---|---|
| | corrupción. Probablemente por miedo, porque sí estamos hablando de crimen organizado. Yo le digo a esos Fiscales, hoy día me voy a reunir con el Fiscal General de la Nación; tienen todo el respaldo de la fuerza pública pero tienen que cumplir su deber. Si tienen temor, mejor renuncien. Una posición más honesta. Pero hay que cumplir con el deber. Lo mismo los jueces. Porque aquí, toda esta anarquía se debe a la impunidad. No pasa nada. Cerraron carreteras, tomaron pozos, se roban cables, se pone la denuncia, y no pasa absolutamente nada. Señores, compañeros, fiscales, jueces, escúchenme,  lean mis labios. Esa impunidad se acabó. El gobierno y la revolución ciudadana no lo va a permitir más. Así que a cumplir con su deber, compañeros, con todo el respaldo del gobierno, o si tienen miedo, si que no es por corrupción sino por temor, porque son bandas, crimen organizado es que estamos enfrentando, es más honesto dejar sus cargos y que alguien con los pantalones bien puestos cumpla con su deber. Pero esta impunidad que hay frente a los delitos que se comete en Amazonía no puede continuar. | Prosecutor's Office does nothing. Probably due to corruption. Probably due to fear, because we are talking about organized crime. I tell this to the Prosecutors, today I'm going back meet with the Federal Prosecutor General; they have the full backing  of law enforcement, but they have to fulfill their duty. If they are afraid, they should just resign. A more honest position. But duties must be fulfilled. Same with the judges. Because here, all of this anarchy is due to impunity. Nothing happens. They closed off roads, took over the wells, stole cables, the complaint is filed, and absolutely nothing happens. Ladies and gentlemen, comrades, prosecutors, judges, listen to me, read my lips. That impunity is over. The government and the citizen's revolution will not allow it anymore. Therefore, fulfill your duty, comrades, with the full backing of the government, or if you are in fear, if not due to corruption then due to fear, because they're gangs, organized crime that we are facing, it's more honest to leave your posts for someone who has the backbone to fulfill your duty. But this impunity that exists for the crimes being committed in Amazonia can no longer continue. |
| UFV | La siguiente pregunta [inaudible] | The next question [inaudible] |
| UFV | [inaudible] difundió el—la información de que [ininteligible] del Banco Mundial habían sido declarados personas [ininteligible]. ¿Les puede explicar qué significa eso? ¿Es una presión para que se expulse a los representantes del Banco Mundial? Eh, ¿cómo se explica esa declaratoria de personas [inaudible]? | [inaudible] distributed the—the information that [unintelligible] of the World Bank had been declared [unintelligible] people. Can you explain what that means? Is it pressure so that the representatives from the World Bank will pull out? Uh, how do we explain the declaration regarding the people [inaudible]? |
| CORREA | Es expulsar a representantes del Banco Mundial. En junio y julio del dos mil cinco, el Banco Mundial, de la forma más descarada, nos negó el desembolso de cien millones de dólares que ya había sido aprobado para el país. El préstamo al que hacemos referencia tenía una serie de condiciones hasta se— a diciembre del dos mil cuatro. Entre ellas aprobar la Ley [ininteligible] Salarial que tanto problema le está dando al país, tanta complicación. El Ecuador cumple todo eso. Ya venía el veintiuno de abril Pamela Cox, vicepresidente del Banco Mundial a darnos el cheque porque el Directorio aprobó el—el préstamo, como dice el informe, "por haber cumplido con todos los requisitos en el plazo señalado." ¿Qué pasa? Se cae el gobierno servil de Lucio Gutiérrez el veinte de abril, viene Rafael | It's to expel the World Bank representatives. In June and July of 2005, the World Bank, also very brazenly, denied us a one hundred million dollar disbursement which had been approved for the country. The loan to which we refer had a series of conditions until se—to December 2004. Among them, to enact the Salary [unintelligible] Law, which has given the country so many problems, so many compilations. Ecuador fulfills all of that. Pamela Cox, Vice-President of the World Bank, was coming to give us the check on April twenty-first because the Board approved the—the loan, as the report says, "because all of the requirements were fulfilled within the specified timeframe." What happens? The subservient government of Lucio Gutierrez collapses on April twentieth, enter Rafael Correa, |

**SA18-SA20 INTENTIONALLY LEFT BLANK**

makes a foreign forum inadequate. *Id.* at 541 (citing authorities). Judge Rakoff

also found that plaintiffs' mass tort claims were unlikely to meet the requirements

for class certification even if the cases were to remain in the United States, as

Judge Broderick had concluded twice previously in *Aguinda. See id.*, No. 93 Civ.

7527, 1994 WL 716025, at *1 (S.D.N.Y. Dec. 17, 1994), and *id.*, 1994 WL

142006, at *2. "[H]ence the alleged deprivation of this device may be no

deprivation at all." *Id.*, 142 F. Supp. 2d at 541. He found no persuasive authority

for their other procedural argument that environmental contamination cases must

first be pursued before administrative agencies in Ecuador, and an administrative

exhaustion requirement would not make Ecuador an inadequate or unavailable

forum in any event. He also concluded that Ecuador's and Peru's discovery rules,

which are patterned on the civil law systems of many European nations, do not

render Ecuador and Peru inadequate forums. *Id.* at 542-43.

Regarding plaintiffs' assertion that Ecuador's judicial system is corrupt, he

found "not the slightest indication" in the record of any impropriety in the many

TexPet cases litigated in Ecuador in the past 30 years or in the civil cases now

pending in Ecuador against TexPet and other multinational corporations. *Id.* at

544. Some of those cases involved the same types of environmental tort claims as

---

*Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998) (applying the *Gilbert*
analysis).

these cases. Instead of addressing these analogous cases, plaintiffs relied on generalized criticisms of Ecuador's judiciary concerning human rights violations and other matters unrelated to the issues in these cases. Even then, Ecuador has reaffirmed its commitment to democracy and strengthened its procedural protections against judicial corruption following the failure of the short-lived military coup on January 22, 2000. These points, coupled with the public scrutiny these cases receive here and in Ecuador, make the possibility of corruption in future litigation "exceedingly remote" and certainly not enough on this record to meet the judicial standard for finding a foreign forum to be inadequate. *Id.* at 544-45.

The District Court then turned to the private interest factors under the *Gilbert* analysis and found they weigh "overwhelmingly in favor of dismissal of these cases," even after giving plaintiffs the benefit of a starting presumption favoring their choice of forum. *Id.* at 548. Those factors include (1) the residence of the *Aguinda* plaintiffs in Ecuador; (2) the ability of an Ecuadorian fact-finder to view the allegedly damaged lands and water located in Ecuador; (3) the alleged personal injury occurrences in Ecuador; (4) the location of witnesses as well as medical and property records in Ecuador; (5) Texaco's "essentially unrebutted showing" that evidence of the Consortium's activities is located in Ecuador; (6) Texaco's offer to make all U.S. discovery in these cases available in litigation

22

in Ecuador and Peru, thus further minimizing plaintiffs' argument that the U.S. is more convenient because documentary evidence might be located here; (7) the key roles of Petroecuador and the Government of Ecuador in directing and overseeing the Consortium's environmental practices for over 20 years; and (8) the "glaring facts" that neither the Republic of Ecuador nor Petroecuador, as the key players in the challenged activities, can be sued in the U.S. but are both subject to suit, impleader, and compulsory discovery in Ecuador. *Id.*

In response to plaintiffs' theory that Texaco had "directed" the Consortium's operations, *see supra* nn.2-3, he found no evidence of any meaningful Texaco direction and certainly not enough to alter the balance of interests favoring litigation in Ecuador or Peru. *Id.* at 547-48. The record proved that the challenged environmental practices had been "managed, directed, and conducted by Consortium employees in Ecuador" and not by Texaco employees in the United States. *Id.* at 548. The parent company's financial controls and budgetary oversight of its fourth-tier subsidiary did not evidence the type of direct operational control and U.S. decision-making alleged by plaintiffs. *Id.* at 549. Plaintiffs had even conceded by stipulation that they had "no knowledge, information, or documents" reflecting any Texaco conduct in the United States that caused actionable harm in Ecuador. *Id.* at 550 (quoting plaintiffs' stipulation); JA1219.

"Accordingly, the balance of the *Gilbert* 'private interest' factors heavily supports dismissal . . . ." *Id.* at 551.

Next, the District Court found that the public interest factors also support an Ecuadorian forum and, to the extent *Jota* plaintiffs prefer their own courts, a Peruvian forum. *Id.* at 551-52. Ecuador's Government had an uncontested role "in authorizing, directing, funding, and profiting" from the Consortium's activities. *Id.* at 551. Its announced public policies and legislation reflected a clear "preference . . . [for] oil exploitation over environmental protection." *Id.* In addition, Ecuador's courts are better situated to apply Ecuador's laws, which control here. *Id.* at 552.

Finally, the District Court rejected plaintiffs' argument that their ATCA claim warrants the denial of Texaco's *forum non conveniens* motion. *Id.* at 552-54. Their claim that the ATCA covers oil field environmental practices "lacks any meaningful precedential support" to the point that it would be "extremely unlikely to survive a motion to dismiss," noting that the Fifth Circuit had so held in a similar environmental case two years ago. *Id.* at 552; *Beanal*, 197 F.3d at 166-67 (dismissing ATCA claim alleging personal injuries and contamination of Indonesia's land and water by a U.S. mining company). But even assuming *arguendo* the ATCA might cover such matters, the evidence refutes plaintiffs' factual conjecture that Texaco had committed an ATCA violation by using the United States "as a base from which to direct violations of international law visited

24

on some foreign site." *Aguinda*, 142 F. Supp. 2d at 553. In any event, other

federal courts have held as a general matter that an ATCA claim does not change

the *forum non conveniens* analysis to the significant degree urged by plaintiffs. *Id.*

(citing *Wiwa*, 226 F.3d at 105 n.10). The presence of an ATCA claim here, even if

viable and even assuming a public policy interest favoring a federal forum, would

not materially alter the District Court's assessment that the balance of private and

public interest factors heavily favor litigation in Ecuador or Peru. *Id.*

The Court thereupon entered judgment for Texaco in both cases, and these

consolidated appeals followed.

### COUNTER-STATEMENT OF THE RELEVANT FACTS

Plaintiffs' summary of the record is inaccurate and incomplete. When fairly

presented, the record overwhelmingly supports *forum non conveniens* dismissals.

A.    **The History of the Consortium**: This Court summarized the

Consortium's undisputed history in *Jota*, 157 F.3d at 156 & nn.3-4. Without

repeating it here, the key point is that Ecuador and its state oil company had the

controlling interest in the Consortium for more than 17 years before these lawsuits

were filed and always played the major role in regulating, funding, and dictating its

activities. In operating these oil fields since 1990, Petroecuador chose to pursue,

with the Government's blessing, the practices with respect to produced water that

plaintiffs challenge in these lawsuits, and it continued to do so for many years after

25

**SA26**

June 30, 1992 when TexPet's equity interest ceased entirely. JA2564, ¶¶ 13-14

(Affidavit of plaintiffs' expert based on a field trip in 1995, stating that

Petroecuador was "currently" dumping daily 140,000 barrels of produced water in

the Oriente, including in the former Consortium area. Plaintiffs' brief mistakenly

attributes Petroecuador's 1995 dumping to Texaco. Pl. Br. at 7-8). Petroecuador's

and the Government's role and importance in adjudicating plaintiffs' claims cannot

be overstated, but plaintiffs' brief never discusses them.

      **B.**    **The Consortium's Operations**: Before June 30, 1990 when TexPet

operated the Consortium's oil fields, the Government of Ecuador had a direct,

hands-on involvement in all facets of the Consortium's operations. The

Government required the Consortium to employ directly or through subcontractors

"a minimum of Ecuadorian nationals equivalent to 95% of the labor force, 90% of

administrative personnel, and 75% of technical personnel, unless there were no

national technicians available; this shall be determined by the Ministry concerned."

JA2316, ¶ 36.1. These Ecuadorian personnel included skilled technicians such as

geologists, petroleum engineers, hydraulic engineers, mechanical engineers, field

managers, and other professionals. They staffed all Consortium operations,

including exploratory testing, drilling, construction, and maintenance. JA1766-67;

JA1875-77. The Consortium's Manager, who was an Ecuadorian national, had

responsibility for the entire operation. JA1690; JA1772-73; JA1636. He and his

field managers had the key operating roles. JA1750-55.

As the majority owner and regulator, the Government took an active role in overseeing the Consortium's operations. It approved the Consortium's work plans, drilling locations and practices, well completions, road construction, and other operations. JA2299, ¶ 14.1 (Executive Decree No. 925, providing that the "Ministry . . . shall permanently inspect and control production operations . . . ."); JA2307, ¶¶ 21-22; JA1636-40. Government inspectors in the field monitored the Consortium's on-site operations, including environmental matters.[9] *Id.* The Government authorized the Consortium to employ "specialized subcontractors," subject to Government oversight and approval of the subcontractors' technical background and their compliance with all legal and regulatory requirements. JA2317, ¶¶ 37.1-37.2. TexPet, not Texaco, entered into those contracts. JA1481-88. No operations occurred and no contract was effective without Petroecuador's

---

[9]    "They [Government representatives] were involved in approving water flood projects, wells that were drilled, [and] the production rate from the fields. They had engineers that would dictate how much crude oil to be produced. They were in every[thing] -- no construction project, no equipment could be installed without the government's approval." JA1692; *see also* JA1721-23; JA1837-38; JA1892-94; JA2307-08. In addition, a government Executive Decree required TexPet to provide the Ministry: (a) a program detailing all the activities to be performed each year (JA2307, ¶ 21.1); (b) a detailed report each year "specifying everything related to exploration, exploitation, production, reserves, transport, industrial activities . . . and other details of the work performed during the immediately preceding year" (JA2307, ¶ 22.1); and (c) quarterly reports concerning all drilling, production, and other activities (JA2308, ¶ 23.1).

27

prior approval as the majority participant responsible for 67.5% of the funding. JA1637-40; JA1837-38; JA1891-95.

Plaintiffs' claims center on the treatment and disposal of produced water in the Oriente (Pl. Br. at 5-10), but no one at the parent company made operational decisions regarding produced water.[10]  JA1617-26; JA1789-92; JA1802-04. After discovery targeting this issue, plaintiffs found no evidence to the contrary. They came up empty-handed when Judge Rakoff pressed them for evidence of Texaco's alleged U.S. decision-making.[11] The same is true of other operational decisions

---

[10]     This appeal is not the occasion to debate the legality of produced water discharges as opposed to reinjection. It suffices to note that plaintiffs have presented an inaccurate summary of the law and industry practice with respect to surface discharges of produced water, particularly over the 25 year period when the Consortium operated in Ecuador. Even today, surface discharges are not universally prohibited either in the United States or foreign countries, contrary to plaintiffs' suggestions. JA21 (Docket Number 142, Texaco Inc.'s Reply Memorandum of Law, at 17 n.10).

[11]     During oral argument on February 1, 1999, Judge Rakoff asked plaintiffs' counsel to show him their evidence of Texaco's alleged U.S. decision-making in view of their significant discovery on this point.

THE COURT: "What were the decisions that you claim and can support, now that you have discovery on this, [that] were taken in White Plains by Texaco, as opposed to the fourth-level subsidiary down in Ecuador, that support your causes of action?" JA6002-03.

THE COURT: "But the Court of Appeals stressed that you had represented to them, in distinguishing the decision of Judge Black [*Sequihua*] from this case, that you 'are challenging only decisions made by Texaco within the United States.' ***So I want to know, what are those decisions that were made by Texaco within the United States that are, according to what you apparently represented to the Court of Appeals, the fulcrum of your case?***" JA6003 (emphasis added).

attacked by plaintiffs in their Complaints, such as whether to line separating pits, where to put roads, and whether to put oil on road surfaces to keep down dust. JA1626-31; JA1777; JA1884-86. The Managing Director of TexPet in Ecuador testified that he was unaware of a single instance when someone from Texaco directed the Consortium's environmental practices. JA1641-42. The record is replete with evidence, including deposition testimony, supporting the District Court's finding that the challenged environmental practices had been "managed, directed, and conducted by Consortium employees in Ecuador" and not by Texaco. *Aguinda*, 142 F. Supp. 2d at 548; JA1724-28; JA1689; JA1818, 1825-29; JA1634-38; JA1640-41; JA1736-37; JA1666-70; JA1672-73. Plaintiffs' description of their evidence of Texaco decision-making as "uncontroverted" is plainly wrong. Pl. Br. at 27.

Unable to prove that Texaco "directed" the Consortium's practices, plaintiffs' brief, like their trial court submissions, resorts to misleading generalizations that prove nothing regarding **Texaco Inc**. They refer this Court to documents referencing "decisions . . . made in the United States," although not by

---

Plaintiffs' counsel's response was revealing. He stated that evidence regarding "the decision to dump the water production," which he described as "the heart of the case," "perhaps may not be on a piece of paper . . . ," meaning he had found nothing. JA6003. When the District Court pursued the issue, plaintiffs' counsel could point to no evidence of Texaco decision-making, as Judge Rakoff observed. JA6002-05.

Texaco Inc.; blueprints with "legends that indicated that they originated in the United States," although not at Texaco Inc.; the manner of TexPet's (not Texaco's) management "from the United States," and the like. Pl. Br. at 8-9. This is all plaintiffs have to offer after sifting through more than 70,000 pages of Texaco and TexPet documents dating back into the 1960's, taking depositions of TexPet and Texaco personnel, and reviewing 147 pages of discovery responses. These generalizations do not come close to establishing that **Texaco Inc.** personnel directed the Consortium's environmental practices, and they are insufficient in any event to tilt the balance of convenience factors in favor of the United States. Judge Rakoff gave plaintiffs every chance to support their claim, but they could not do so. It is too late to argue what plaintiffs think "[t]he facts will show" (Pl. Br. at 27), regarding Texaco's role when they have completed discovery on precisely this point and have nothing but uncorroborated accusations to support their fictive theory. This was not a matter of the District Court requiring plaintiffs to produce a "smoking gun," as they argue. *Id.* at 26-27. They have no material evidence to support their claim.

As a proxy for evidence of direct Texaco decision-making on produced water discharges, plaintiffs point to parent company budget approvals and financial supervision unrelated to the conduct attacked in plaintiffs' complaints. *Id.* at 9. This argument does not prove that Texaco "directed" Consortium activities in

Ecuador. As U.S. law requires,[12] Texaco maintains budget controls over its divisions and subsidiaries, but financial supervision does not equate to direct Texaco decision-making concerning the Consortium's operations. *See United States v. Bestfoods*, 524 U.S. 51, 70-72 (1998) (parent company's financial controls and services are typical of a parent-subsidiary relationship and do not prove direct parent company liability for a subsidiary's activities).

C.  <u>Ecuador's Interests in this Litigation</u>:  The record also proves that Ecuador has substantial public interests at stake in this litigation in addition to its proprietary ownership interest through Petroecuador, as Judge Rakoff concluded. Those interests include Ecuador's sovereign right to enact its own laws, manage its natural resource policies, and balance its economic and environmental priorities -- just as every other nation does. These points are unquestionably relevant to an assessment of the public and private factors in the *forum non conveniens* analysis, but plaintiffs have ignored them entirely.

Ecuador's oil production is centered in the Oriente, and Ecuadorian law classifies almost all the Oriente as "tierras baldias" (unoccupied lands) that the Republic owns. JA4905, ¶ 9. Ecuador has enacted legislation decreeing the Oriente's colonization and development to be economically desirable, vital to

---

[12]     U.S. securities laws obligate all publicly-traded companies to "devise and maintain a system of internal accounting controls." 15 U.S.C. § 78(m)(b)(2)(B).

national security, and "an urgent national priority . . . ." *Id.* at ¶¶ 8-9. In addition

to developing the Oriente's petroleum resources and a supporting infrastructure,

the Government actively encourages agriculture, ranching, mining, logging and the

rapid colonization of the area. Like our own homesteading laws relating to the

settlement of the Western United States, Ecuador "offer[s] land title only to settlers

who clear the rainforest for crops or pastures." *Id.* at ¶ 9; JA1681-82.

    In furtherance of these objectives, the Government of Ecuador required

TexPet to perform mandatory "compensation works" as a condition to participation

in the Consortium. Those works included building roads "for public use,"

constructing an airport and river ports "for public use," contributing

"US$20,000,000 for access roads to the Oriente" over a ten-year term, building

bridges "for public use," constructing houses and work camps under Government-

approved specifications, and developing cultural, sports, and recreational facilities

for workers. JA2313, ¶ 30.1; 2316-17, ¶¶ 36.3-36.4; JA2320, ¶ 45.1; *see also*

JA2295-97, ¶¶ 6.1, 8.1-8.2 (summarizing TexPet's required activities and

investments to "obtain the maximum recovery of reserves from a technical and

economic viewpoint").

    Under Ecuador's laws, the Republic owns the subsurface minerals, including

petroleum, as well as the surface lands for which plaintiffs demand money

damages and equitable relief. JA2289, ¶ 2.2 (Executive Decree No. 925); JA4903,

¶ 3; JA 4905, ¶ 9. Oil provides nearly 50% of Ecuador's annual budget, and numerous constitutional and statutory provisions confirm its importance. JA1917-18; JA4903-04, ¶¶ 3-4. Through its Ministry of Energy and Mines, the Government regulates Consortium activities, including all production and pipeline operations. JA4903-05, ¶¶ 4-7, 11; JA1916-17. It also regulates the environmental consequences of oil production. JA1917-18; JA4905-06, ¶¶ 10-12. The record clearly establishes that Ecuador has a vital public interest in setting its own standards for developing its resources and overseeing the resulting activities.

Despite these Government policies, plaintiffs blame Texaco for changes to the Oriente and the residents' "way of life" and never acknowledge the Government's role. JA51-52, ¶ 39 (*Aguinda* Complaint). The truth is not so simplistic. These changes flow from Ecuador's "urgent national priority," JA4905, ¶ 9, of fostering and subsidizing the rapid colonization and development of the Oriente. *Id.* at ¶¶ 8-9. Ecuador's Government continues this policy today, almost a decade after the Consortium ended, despite the disapproval of groups (such as the *amici* in this case) that oppose any clearing or development of the rainforest region. Judge Rakoff recognized that Ecuador has chosen to make a deliberate trade-off favoring oil development, and he correctly concluded that it is not a U.S. court's role to second-guess Ecuador's priorities as a developing nation with an economy heavily dependent on oil and an announced national policy of opening

33

and colonizing the Oriente. *Aguinda*, 142 F. Supp. 2d at 551. He had full support
in the record for these findings.

D.  **Ecuador's Judicial System**: Plaintiffs' discussion of Ecuador's
judicial system is inaccurate[13] and omits critical facts in the record. Ecuador's
Government is a constitutional democracy with executive, legislative, and judicial
branches. JA4515, ¶ 3. Its judicial branch, headed by the Supreme Court, includes
special purpose courts and lower courts, which use a Civil Code based on Roman
law. JA4515-16, ¶¶ 3, 6. Thus, Ecuadorian legal norms are similar to those in
many European nations. Ecuador's Constitution guarantees due process and equal
protection, and its courts provide important procedural and substantive rights, as
former Supreme Court Justices of Ecuador, jurists, and practicing lawyers

---

[13]   Throughout their brief, plaintiffs misstate the facts concerning Ecuador's
legal system. For example, they assert that Ecuador's courts cannot compel
witnesses to testify in Ecuador's courts (Pl. Br. at 14, 28), when, in fact, courts
have full compulsory power over witnesses and evidence. JA4518, ¶ 17 ("The
court has the full range of subpoena powers over witnesses and evidence . . . .").
They argue that Ecuadorian law requires the filing of environmental contamination
cases with administrative agencies in lieu of courts, and that plaintiffs can only sue
the Government of Ecuador (as opposed to private parties) for alleged
environmental wrongs. Pl. Br. at 14. Numerous environmental lawsuits against
TexPet and other multinationals prove otherwise. *See infra* pp. 36-38; *see also*
JA4569-70, ¶¶ 1-6; JA5872, ¶ 3; JA4912, ¶¶ 1-2, 4; JA6535-36, ¶¶ 3-5; JA4906,
¶¶ 11-13. The other procedural differences between Ecuador and U.S. courts noted
by plaintiffs throughout their brief (*i.e.*, the absence of class actions, the lack of
U.S. style discovery, and differences in trial procedure) do not make Ecuador an
inadequate forum, as numerous U.S. courts have held. *See infra* pp. 52-57.

34

informed the District Court in affidavits. JA4515-19; JA4903-07; JA4566; JA4569-71.

Ecuadorian law entitles plaintiffs in both cases to sue both members of the former Consortium as well as Texaco in Ecuador. JA4517, ¶ 11; JA4906, ¶ 11. Under Ecuador's Constitution, its courts are open and available to the Peruvian plaintiffs in *Jota* as well as the Ecuadorian plaintiffs in *Aguinda*. JA4517-18, ¶ 14; 4906, ¶ 12.[14] Contingent fees are permitted in Ecuador. JA4516, ¶ 8. Courts in Ecuador have subpoena powers over witnesses and evidence, and they are empowered to inspect property and other evidence. JA4518, ¶ 17. A plaintiff in Ecuador may obtain pretrial discovery, including the production of documents,

---

[14]    Plaintiffs' counsel announced in their appellate brief that they had "discovered" after the District Court's dismissal that Ecuador imposes a "barrier" to litigation for their indigent clients in the form of an "exorbitant" filing fee equal to 1% of the damages sought. Pl. Br. at 12, 24, 40. On December 4, 2001, however, plaintiffs' counsel advised the panel by letter to the Clerk of this Court that the law in Ecuador had been amended on November 29, 2001 to reduce the filing fees and that filing fees for indigent plaintiffs are now "infinitesimal." Thus, it appears that plaintiffs no longer assert that filing fees in Ecuador impose a barrier to their clients.

    There is no support in the record for these arguments in any event. Their opening brief cites "Annex One" for the 1% filing fee (*id.*), but Annex One is not in the record. *See Kraebel v. New York City Dep't of Hous. Preserv. and Dev.*, 959 F.2d 395, 401 (2d Cir. 1992) (the Second Circuit has "repeatedly held that if an argument has not been raised before the district court, we will not consider it"); *Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 96 (2d Cir. 2000) (this rule "assumes extra importance" where no evidence exists in record).

depositions, site visits, and other discovery. JA4519, ¶ 18. In addition, Texaco has stipulated that plaintiffs and putative class members can use the voluminous discovery from the U.S. proceedings in Ecuador and Peru. JA4991-5002.

Litigants in Ecuador can bring a civil action for personal injury or property damage, and individuals with similar causes of action may join together in a single lawsuit. JA4517-18, ¶¶ 14-15; JA4570, ¶ 9. Unlike U.S. courts, courts in Ecuador can grant the equitable relief that plaintiffs seek in Ecuador with respect to government-owned land and natural resources as well as Petroecuador's ongoing operational practices. JA4517, ¶ 12. Litigation in Ecuador's courts also would avoid the serious language barriers that would confront a U.S. court and jury. JA4516-17, ¶ 10.

(1)   **Prior Civil Litigation in Ecuador**: Residents of Ecuador, including members of plaintiffs' putative class, have pursued and continue to pursue claims against TexPet, other multinational companies, the Government of Ecuador, and Petroecuador in Ecuador. These cases include claims of personal injury and property damage arising from the former Consortium's activities, and those cases have proceeded without corruption, bias, or inappropriate behavior.[15] As Judge Rakoff found, "[t]here is not the slightest indication, in any of the papers

---

[15]   *See* JA4569-70, ¶¶ 2-5; JA4912-13, ¶¶ 4, 8-9; JA4517, ¶ 11; JA4562, ¶ 3; JA4906, ¶¶ 11-13; JA5872-73, ¶ 3; JA6537-38, ¶¶ 4-6; JA6539, ¶ 4; JA6533, ¶¶ 6-7.

submitted on this issue, of any impropriety on the part of Texaco or any of its

affiliates, or indeed on the part of any present or former member of the

Consortium, with respect to any judicial or administrative proceeding of any kind

in Ecuador." *Aguinda*, 142 F. Supp. 2d at 544. In his January 31, 2000

Memorandum Order, 2000 WL 122143, Judge Rakoff reopened the record to

permit plaintiffs to present evidence on the question of corruption. Even then, they

offered no specifics to rebut Texaco's evidence on the corruption-free record of

litigation against TexPet and no reason to presume that litigation against Texaco

would proceed any differently.

Four different municipalities in the former concession area filed

environmental actions against TexPet in 1994 and 1995 in civil courts in the

Oriente. JA4569, ¶¶ 1-2. TexPet settled those cases in June 1996 through direct

negotiations with elected officials of those municipalities.[16] JA4569, ¶ 3. On June

8, 1994, an Ecuadorian court ordered the joinder of the Republic and Petroecuador

as defendants in a municipality's tort suit against TexPet relating to Consortium

operations. JA4569, ¶ 2; JA1417-28. An Ecuadorian court in 1995 awarded a

---

[16]    Plaintiffs suggest that TexPet's and the municipalities' negotiation of
satisfactory settlements indicates that plaintiffs are unable to pursue their claims in
Ecuador. Pl. Br. at 16-17. This inference is as unwarranted with respect to
litigation in Ecuador as it would be for U.S. litigation. Litigants in the United
States routinely settle rather than pursue cases through trial. They do so for less
than the exorbitant amounts prayed for in their complaints, which often bear little
relationship to actual injuries suffered.

municipality approximately $10 million in a lawsuit against Petroecuador for environmental damage, demonstrating that private litigants can and do pursue successful environmental tort claims even against governmental entities. JA4569-70, ¶ 4. (An appellate court reversed on procedural grounds. *Id.*). Ecuadorian residents have collected judgments and settlements in Ecuador against the Republic, Petroecuador, TexPet, and other oil companies for oil-producing activities. *Id.*; JA4906, ¶¶ 11, 13; JA4912-13, ¶¶ 4-9; JA4915-48; JA6760, ¶ 1. An attorney who successfully litigated against TexPet in Ecuador for many years and is now Chairman of Ecuador's judicial disciplinary committee affirms that Ecuadorian courts do not give preferential treatment to multi-national corporations like Texaco. JA6760-61, ¶¶ 1, 6; JA6766, ¶ 3.

Finally, Texaco confirmed in sworn interrogatory responses in *Aguinda* that neither it nor any affiliated company has ever made gifts, contributions, or payments to any elected or appointed official in Ecuador, and that no Texaco representative has ever communicated with any member of the judiciary concerning these lawsuits. JA6638-44.

(2)    **The Independence of Ecuador's Judiciary**: In response to the District Court's January 31, 2000 Memorandum Order, the parties submitted evidence concerning the independence and impartiality of Ecuador's judiciary following the short-lived coup in January 2000. That evidence further proves that

Ecuador provides an adequate legal forum and that its judicial system is even
stronger today than previously.

Ecuador reaffirmed its commitment to democracy following the failure of
the January 21, 2000 military coup. Its democratic, constitutional government
continues today, and its judiciary remains independent. JA6521-22, ¶¶ 11-14, 17;
JA6531-33, ¶¶ 2-4. Ecuador's military is not interfering with the judiciary's or
government's activities. JA6522, ¶ 17; JA6532, ¶ 3; JA6761, ¶ 5; JA6767, ¶ 6.
The current Government of Ecuador has taken and continues to take "vigorous
steps to further the independence and impartiality of the judiciary." *Aguinda*, 142
F. Supp. 2d at 544 (citing Decl. of Dr. Ramon Jimenez-Carbo (Apr. 5, 2000) and
U.S. State Dep't 2000 Country Report on Ecuador); *see also* JA6765-66, ¶ 2.

(3)    **Federal Court Decisions on the Adequacy of Ecuador's
Judiciary**: Plaintiffs' brief ignores numerous judicial decisions that have found
Ecuador to be an adequate alternative forum. The cases, which include putative
class action tort cases as well as other types of disputes, include: *Patrickson v.
Dole Food Co.*, Civ. Action No. 97-01516HG (D. Haw. 1998) (JA5069-5131)
(dismissing putative tort class action alleging injuries in Ecuador from defendants'
pesticide manufactured and marketed from the U.S.); *Espinola-E v. Coahoma
Chem. Co.*, Civ. Action No. 1:96-cv-360RR (S.D. Miss. 1998) (JA5132-41)
(dismissing tort action); *Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1359-60

(S.D. Tex. 1995), *aff'd*, 231 F.3d 165 (5th Cir. 2000) (dismissing putative tort class action); *Sequihua*, 847 F. Supp. at 64 (dismissing environmental and personal injury claims against Texaco and others by a putative class of Oriente residents); *Immobleria Barcanona, CIA, LTDA v. Citibank, N.A.*, 634 F. Supp. 782, 785 (S.D. Fla. 1986) (dismissing breach of contract action concerning land in Ecuador); *Ciba-Geigy Ltd. v. Fish Peddler, Inc.*, 691 So.2d 1111, 1115-17 (Fla. Dist. Ct. App. 1997) (dismissing tort action by Ecuadorian shrimp farmers alleging injuries in Ecuador from defendants' fungicide); and *Comre-Secor CIA LTDA v. Prime Computer, Inc.*, No. 83-3131, 1985 U.S. Dist. LEXIS 23055 (D.C. Mass. Jan. 29, 1985) (dismissing action regarding parties' distribution agreement). On June 29, 2001, another federal district court in the Southern District of New York also found Ecuador to be an adequate alternative forum in a tort case. *See Valarezo v. Ecuadorian Line, Inc.*, No. 00 Civ. 6387, 2001 WL 740773 (S.D.N.Y. June 29, 2001) (dismissing personal injury claim).

Plaintiffs' failure to cite *Millon Air*, 251 F.3d 1305, is particularly striking given their Law 55 and forum adequacy arguments. Only eight days before Judge Rakoff's dismissal order, the Eleventh Circuit held in *Millon Air*, in an opinion authored by Judge Newman (sitting by designation), that the trial court had not abused its discretion in finding Ecuador to be an adequate and available forum in a tort case stemming from an airplane crash in Ecuador.

To our knowledge, the only contrary federal authority is a decision twenty three years ago in a breach of contract case before Ecuador became a constitutional republic. *See Phoenix Canada Oil Co. v. Texaco Inc.*, 78 F.R.D. 445 (D. Del. 1978).

E.   <u>Peru's Judicial System</u>: Peru's legal system, like Ecuador's, is based on civil law and provides the same causes of action and relief for personal injury and property damage. JA5146-47, ¶¶ 17-22; JA6541-42, ¶¶ 4, 9. The same procedural rights exist, including subpoena power over witnesses and evidence. JA5144, ¶ 11. No barriers preclude suit in Peru. JA5145, ¶ 12. There are no filing fees, and contingency fees are permitted. *Id.* Spanish is the official language, but Peruvian courts provide interpreters to translate native dialects. JA5145, ¶ 13; JA6542, ¶ 9. U.S. courts have held, explicitly or implicitly, that Peru provides an adequate alternative forum. *See Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876 (5th Cir. 1987); *Torres v. S. Peru Copper Corp.*, 965 F. Supp. 899, 903 (S.D. Tex. 1996), *aff'd*, 113 F.3d 540 (5th Cir. 1997); *Vargas v M/V Mini Lama*, 709 F. Supp. 117, 118 (E.D. La. 1989).

Plaintiffs' brief relegates less than a page to the *Jota* case and does not challenge any particular finding by the District Court regarding Peru's availability or adequacy as an alternative forum. Pl. Br. at 55. Plaintiffs' argument on Peru simply adopts their earlier arguments as to why Ecuador is allegedly inadequate.

## SUMMARY OF ARGUMENT

*Aguinda* and *Jota* are "quintessential case[s] for [the] application of the *forum non conveniens doctrine*" by every applicable standard. *Sussman v. Bank of Israel*, 990 F.2d 71, 72 (2d Cir. 1993). Plaintiffs' claims concern Ecuador's lands, people, environment, laws, national policies, state oil company, and its continuing oil field practices today. They can sue all Consortium members as well as Texaco in Ecuador's courts, which provide causes of action, procedures, and remedies for tort cases. All the *Gilbert* private and public interest factors weigh in favor of dismissals, and these cases present none of the "rare circumstances" necessary for finding a foreign forum to be inadequate. *Piper Aircraft*, 454 U.S. at 254 & n.22. "It might reasonably be concluded that it would have been an abuse of discretion" if the District Court refused to dismiss these cases on this record. *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India*, 809 F.2d 195, 202 (2d Cir. 1987).

Plaintiffs' unsuccessful attempt to state an ATCA claim does not alter the balance of interests. As a matter of law, environmental torts do not violate the "law of nations," much less when allegedly committed by private actors like Texaco. Plaintiffs' factual allegations underlying their ATCA claim are baseless in any event. But even assuming for argument's sake the ATCA might apply, plaintiffs have identified nothing in the statute's language or history to support their

42

suggested outcome-determinative policy interest. A policy interest favoring the exercise of U.S. jurisdiction does not "nullif[y], or even significantly diminish[], the doctrine of *forum non conveniens*," as this Court recently held in *Wiwa*. 226 F.3d at 106. Adding that policy interest to the mix of considerations under the *Gilbert* balancing test would not change the outcome here given the overwhelming record in favor of *forum non conveniens* dismissals.

Finally, plaintiffs' efforts to revive their meritless disqualification motion rest on a mistaken premise. They urge this Court to review Judge Rakoff's denial on an abuse of discretion standard when this Court has done so already. *In re Aguinda*, 241 F.3d at 202. They also ignore the factual points and legal authorities discussed in this Court's prior opinion.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a *forum non conveniens* dismissal for clear abuse of discretion and accords the District Court substantial deference. *Iragorri*, 2001 WL 1538928, at *4 ("The decision to dismiss a case on *forum non conveniens* grounds lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been *clearly abused*.") (emphasis in original) (citing *Capital Currency Exch.*, 155 F.3d at 609 ("Our review of a *forum non conveniens* dismissal is *extremely limited*.") (emphasis added)). This Court's

"limited review, however, encompasses 'the right to determine whether the district court reached an erroneous conclusion on either the facts or the law.'" *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 145 (2d Cir. 2000) (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991)).

This Court reviews the District Court's denial of a recusal motion for abuse of discretion. *See In re Aguinda*, 241 F.3d at 200.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING THE COMPLAINTS BASED ON *FORUM NON CONVENIENS*

A. **Plaintiffs Have Ignored the Correct Legal Standard for Evaluating the Adequacy of an Alternative Legal Forum:** The case law is clear that the requirement of an adequate alternative forum ordinarily is satisfied if the defendant is amenable to process in the alternative forum, except in rare circumstances where the remedies are "clearly inadequate." *Piper Aircraft*, 454 U.S. at 254; *Murray v. British Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996) (alternative forum is adequate unless "the remedy offered by the other forum is clearly unsatisfactory"). An alternative forum is adequate if it "permits 'litigation of the subject matter of the dispute.'" *Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir. 1998) (quoting *Piper Aircraft*, 454 U.S. at 254 n.22); *DiRienzo*, 232 F.3d at 57 (alternative forum is adequate "so long as it permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available

44

in the alternative forum is not so inadequate as to amount to no remedy at all").

The Second Circuit and other federal courts have cautioned repeatedly that courts should exercise deference in evaluating foreign judicial systems and that a finding of inadequacy is therefore "rare."[17] Human rights reports, broad criticisms of foreign judiciaries, and generalized corruption allegations, such as plaintiffs assert here, are insufficient to prove that foreign forums are "clearly inadequate."[18]

---

[17]    *See PT United Can Co.*, 138 F.3d at 73 (affirming *forum non conveniens* dismissal to Indonesia, noting "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare") (citation omitted); *Blanco v. Banco Industrial De Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) (quoting *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) (refusing, despite charges of bias, corruption and political instability, to find Venezuelan courts inadequate: "'[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation'")); *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1076 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993) ("American courts are not prone to characterizing a sovereign nation's courts as 'clearly unsatisfactory.' International comity plays a part in this context as well."); *Millon Air*, 251 F.3d at 1311-12 (discussing the reluctance of federal courts to hold an alternative forum inadequate); *see also Stalinski v. Bakoczy*, 41 F. Supp. 2d 755, 760 (S.D. Ohio 1998) (dismissing to Honduras despite claims of corruption in the Honduran legal system; the court refused "to sit in judgment upon the integrity of the entire Honduran justice system").

[18]    *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (rejecting plaintiff's reliance on a State Department Report, and stating "a foreign forum is not inadequate merely because . . . of general allegations of corruption in the judicial system") (citation omitted); *Torres*, 965 F. Supp. at 903 (dismissing to Peru despite plaintiff's claims that Peruvian court was "corrupt" and that the judicial system was in "complete disarray"); *Stalinski*, 41 F. Supp. 2d at 761-62 (rejecting plaintiff's "general accusations" that Honduras was too corrupt to be adequate, notwithstanding statements in U.S. State Department Reports and by the

# SA46

The analysis turns, instead, on whether the foreign tribunal can dispense impartial justice in the particular case at issue.[19] Applying these standards here, the record establishes that plaintiffs have ample procedural safeguards and remedies in Ecuador and Peru. Therefore, Judge Rakoff's findings to that effect were not clearly erroneous. *See PT United Can Co.*, 138 F.3d at 73.

### B. Ecuador and Peru are Available and Adequate Forums:

(1) **Ecuador's Availability**: Ecuador and Peru are available forums for plaintiffs to pursue their claims because Texaco has consented unambiguously to be sued there. It also volunteered to accept other conditions to

---

Honduran Attorney General that the Honduran judicial system was corrupt); *Mayo Assocs. S.A. v. Union Bank of Switz.*, No. 97 Civ. 8835, 1998 WL 274283, at *3 (S.D.N.Y. May 27, 1998) (rejecting plaintiffs' argument that the judicial system of Jersey is corrupt and impartial); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) ("The 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record."); *Banco Mercantil, S.A. v. Hernandez Arencibia*, 927 F. Supp. 565, 567 (D.P.R. 1996) (rejecting claim that Dominican Republican courts were so corrupt as to be inadequate); *Polanco v. H.B. Fuller Co.*, 941 F. Supp. 1512, 1527 (D. Minn. 1996) (finding Guatemala to be an adequate forum despite claims of inefficiency and corruption in its courts).

[19] *See Stalinski*, 41 F. Supp. 2d at 761 (finding unpersuasive the statement of the Guatemalan Attorney General that Honduran courts were subject to bribery because the specific examples of bribery offered did not involve the defendants); *Eastman Kodak*, 978 F. Supp. at 1086 (refusing to dismiss to Bolivia because "most importantly, plaintiffs do not simply argue that the Bolivian system is corrupt in general," plaintiffs "allege that [defendant] is well-connected and has already used the criminal justice system to extort a commercial settlement from

facilitate litigation in those countries. *See supra* p. 15-16.

Ecuador's "Interpretive Law No. 55" does not make Ecuador an unavailable forum. Pl. Br. at 39; *Aguinda*, 142 F. Supp. 2d at 546 (quoting Law 55). That law is under attack in Ecuador on multiple grounds. JA5873-74; JA5912; JA4522-23, ¶ 32. Serious questions exist concerning its retroactive application to a case like *Aguinda* filed more than four years before Law 55's publication on January 30, 1998, and Ecuador's courts have not resolved the issue of Law 55's constitutionality. JA4520, ¶ 20; JA5873-74, ¶¶ 7-9; *see infra* n.20. While these cases were pending in the District Court, legislation was introduced in Ecuador's Congress to repeal the law. JA5874, ¶ 12.

Plaintiffs' Law 55 argument also sweeps too broadly. Plaintiffs acknowledge that Law 55 would not bar suits by the putative class members in either case. Pl. Br. at 40. Class members, as opposed to the named plaintiffs, have not yet selected a forum in which to sue and thus are not impacted by Law 55. The *Jota* plaintiffs also can file their cases in Peru where Law 55 has no application. At most, Law 55 would impact the named plaintiffs in *Aguinda*. Even then, there are serious questions regarding the law's applicability to cases, like these, dismissed by a U.S. court on *forum non conveniens* grounds. The most recent

---

[plaintiff]," and defendant "is likely to continue to use its influence if this case is litigated in Bolivia").

appellate decision in Ecuador held that Law 55 does not apply under such circumstances, as discussed below.

In response to questions by Judge Rakoff during oral argument on February 1, 1999, the Republic of Ecuador's counsel stated that Ecuador had no official position on Law 55, although he did agree that Ecuador provides an adequate forum for plaintiffs to litigate their tort claims. JA6015-17. In its recent *amicus curiae* brief to this Court, however, the Republic's counsel asserts that Law 55 is retroactive and that "plaintiffs will be unable to prosecute their suit in Ecuador." Republic Br. at 4. The Republic bases its new position on a July 6, 1998 decision by a Superior Court in Ecuador, which the Republic describes as "important supplemental information" about Law 55 and the "one case decided in Ecuador regarding the application of Law 55." *Id.* at 2-3.

The Republic's brief is wrong on both points. There is nothing "supplemental" about this particular decision. Texaco and plaintiffs brought it to the District Court's attention in their written submissions and discussed it during oral argument along with the Supreme Court decision referenced in the Republic's brief.[20] *See, e.g.*, JA5912, ¶¶ 2-6; JA5993-95. More importantly, this decision is

---

[20]     The decision of Ecuador's Supreme Court not to hear the July 6, 1998 appellate decision was not an endorsement of that decision and did not resolve the uncertainty regarding Law 55's constitutionality and retroactivity under Ecuadorian law. JA5873-74, ¶¶ 7-8. In fact, the Supreme Court's opinion never mentions Law 55. JA5878-89. The Supreme Court lacks jurisdiction to decide