neither the only nor even the most recent appellate decision in Ecuador on Law 55, as the record also reflects. Another appellate court in Ecuador reached a contrary conclusion on Law 55 four months after the decision on which the Republic relies, and Texaco so informed Judge Rakoff. The Superior Court of Portoviejo (Ecuador) held on October 13, 1998 that Law 55 does not apply to a case that has been re-filed in Ecuador following its dismissal by a U.S. court on *forum non conveniens* grounds. JA4522-23, ¶ 32; JA4527-28. Curiously, neither the Republic's nor plaintiffs' brief cites this decision.

In affirming a *forum non conveniens* dismissal to Ecuador, the Eleventh Circuit in *Millon Air* held that the U.S. district court had not abused its discretion in rejecting plaintiffs' Law 55 argument. The District Court had relied on the Porteviejo court's decision in doing so. *See* 251 F.3d at 1313 (stating with reference to the district court's reliance on the Portoviejo court's decision, "we cannot say that [the district court's] determination as to the current interpretation of Law No. 55 in Ecuador was clearly erroneous"). The *Millon Air* court quoted the following language from the Portoviejo decision:

_____

Law 55's constitutionality. Only Ecuador's Constitutional Tribunal can do so, and it has not yet addressed the issue. JA5874, ¶ 9. During oral argument in the District Court, the Republic's counsel stated that the Superior Court's decision on Law 55 "was not a decision on the merits and therefore could not be reviewed by [the Supreme Court]." JA6014.

**SA50**

> It should be supposed that law 55 is in effect when a
> foreign judge has taken up the cause and is hearing it, *but
> not in a case in which the foreign judge has refused to
> hear the lawsuit,* as has done the Broward County Judge
> in his decision.

*Id.* at 1309 (emphasis added).  Thus, the most recent appellate decision in Ecuador

rejects plaintiffs' and the Republic's interpretation of Law 55 and holds that Law

55 does not apply to cases that a U.S. court has dismissed because of *forum non*

*conveniens*. *Id.* at 1308-09.  It follows that Judge Rakoff, like the district court in

*Millon Air*, did not abuse his discretion in concluding on the same record that

Ecuador is an available forum.

Prominent jurists in Ecuador have attacked Law 55 and the July 6, 1998

decision referenced in the Republic's brief.  A former Supreme Court Justice of

Ecuador has opined that the July 6, 1998 Superior Court decision is wrong and that

Law 55 is unconstitutional and invalid because Ecuador's President never signed

the legislation.  JA5912, ¶ 1.  Ecuador's Attorney General also noted in his

January 5, 1999 Declaration that "some jurists and Law professors have given their

opinions against the constitutionality of the Law and *any time it may be challenged*

*as unconstitutional in Ecuador's competent court.*"  JA6273, ¶ 7 (emphasis added).

In any event, Judge Rakoff provided plaintiffs a safeguard that ensures their

ability to pursue their claims.  As other courts have done, he qualified his

dismissals to allow plaintiffs to return to his court in the event the courts of

Ecuador ultimately decline jurisdiction based on Law 55. *Aguinda*, 142 F. Supp. 2d at 547. The *Millon Air* court approved this procedure. 251 F.3d at 1313 (stating that "the alleged uncertainty over Law 55 was not an obstacle to dismissal" in view of the district court's willingness to reassert jurisdiction in the event jurisdiction in Ecuador is ultimately declined). In *Patrickson*, Civ. Action No. 97-01516HG (D. Haw. 1998), a federal district court did the same in dismissing a putative class action tort case. JA 5112; JA5131 (the court "has no basis for concluding that the courts of Ecuador are not available . . . ," but permitting plaintiffs to "return to this Court and, upon proper motion, the Court will resume jurisdiction over the action as if the action had not been dismissed on *forum non conveniens* grounds" in the event Ecuador's courts decline jurisdiction).

Finally, this Court should understand the Republic's self-interest in urging on appeal an interpretation of Law 55 that ignores the Portoviejo court's holding. As the Government of Ecuador and Petroecuador know, Texaco will implead them in future litigation in Ecuador for their role in conducting, authorizing, and regulating the activities at issue and then continuing them long after the Consortium ended. Texaco cannot do so in U.S. litigation given the Republic's refusal to waive its or Petroecuador's sovereign immunity and be bound by the rulings of any U.S. court. JA 4990. Hence, it is in their own interest to urge a position on this controversial law that limits the Republic's and Petroecuador's

accountability to plaintiffs while allowing the Republic to issue public

pronouncements of support for plaintiffs' position.

> (2)   **Ecuador's Adequacy:**   Plaintiffs argue that Ecuador provides

an inadequate forum because the procedures under its civil law system are less

beneficial than those available in federal court.  Pl. Br. at 14, 28-31.  This

argument is  incorrect in several respects.  As noted, plaintiffs rely on incorrect

factual assertions concerning:  (i) the compulsory power of Ecuador's courts, (ii)

the ability of plaintiffs in Ecuador to commence a lawsuit for environmental

wrongs without exhausting administrative remedies, and (iii) the ability of

plaintiffs to sue private companies (as opposed to the Government of Ecuador

only) for environmental wrongs.  *See supra* n.13.  Prior and ongoing litigation in

Ecuador and the affidavit testimony of Texaco's experts contradict these

misstatements.[21]  *Id.*

---

[21]   Plaintiffs rely principally on the affidavit of Professor Wray (JA211) to support their factual errors. Pl. Br. at 14, 28-31. After comparing Texaco's evidence with Professor Wray's affidavit on these points, Judge Rakoff correctly noted that Professor Wray rendered "a typically conclusory opinion" and "cites no authority to justify his conclusions." *Aguinda*, 142 F. Supp. 2d at 542.

Judge Rakoff is not the first federal judge to find unpersuasive an affidavit of Professor Wray concerning Ecuador's judicial system. In holding that Ecuador provides an adequate forum in another mass tort case, a federal court in Texas noted similar deficiencies in an affidavit by Professor Wray. *Delgado*, 890 F. Supp. at 1360 ("The court is also reluctant to adopt Professor Wray's attempt to explain" why plaintiffs would be unable to pursue their tort claims in Ecuador;

**SA53**

In any event, the procedural differences cited by plaintiffs (*i.e.*, the absence of class actions and U.S. style discovery, and distinctions between U.S. and Ecuadorian trial procedures) do not render Ecuador an inadequate forum. *See Blanco*, 997 F.2d at 982 (quoting *Borden, Inc. v. Meiji Milk Prods. Co.* 919 F.2d 822, 829 (2d Cir. 1990) ("some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate.")). As the district court stated in *Polanco*:

> We must be careful not to let our justifiable pride in the English common law system . . . obscure the fact that much of Western Europe and other South American countries besides Guatemala are firmly grounded in the Civil Law tradition [which relies on written submission of evidence, restricts cross-examination and does not provide a jury trial].

941 F. Supp. at 1527 (quoting *Bolanos v. Gulf Oil Corp.*, 502 F. Supp. 689 (W.D. Pa. 1980), *aff'd*, 681 F.2d 804 (3d Cir. 1982)); *see also In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India*, 634 F. Supp. 842, 867 (S.D.N.Y. 1986), *aff'd as modified*, 809 F.2d 195 (2d Cir. 1987) (dismissing action and describing as "imperialism" the idea that an American court should "inflict[] its rules, its standards, and values on a developing nation").

---

"Professor Wray offers no proof beyond his own conclusory statement" to support his assertions).

To be an adequate forum, Ecuador need not be a forum equally hospitable to plaintiffs' claims. *See Abouchalache v. Hilton Int'l Co.*, 464 F. Supp. 94, 98 (S.D.N.Y. 1978), *aff'd sub nom. Collins v. Hilton Int'l Co.*, 628 F.2d 1344 (2d Cir. 1980); *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001) ("An adequate forum need not be a perfect forum."). Nor must it provide the same causes of action or remedies as a U.S. court. *See DiRienzo*, 232 F.3d at 57 ("Even if particular causes of action or certain desirable remedies are not available in the foreign forum, that forum will usually be adequate so long as it permits litigation of the subject matter of the dispute . . . ."); *see also Borden*, 919 F.2d at 829 (noting that an alternative forum need not "provide precisely the same remedies and in the same time-frame"); *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 159 (2d Cir. 1980).

Under these standards, Ecuador provides plaintiffs with an adequate alternative forum to pursue their civil tort claims. Its courts provide substantive causes of actions, remedies, and procedures that enable plaintiffs in both cases to sue all Consortium members as well as Texaco for plaintiffs' requested monetary and injunctive relief.[22] *See supra* pp. 34-36. The unavailability of class actions

---

[22]    Plaintiffs concede that Ecuador provides causes of action in tort for alleged injuries to persons and property resulting from the negligence or intentional wrongdoing of others, but argue that Ecuador is an inadequate forum because "its jurisprudence for all practical purposes does not recognize tort claims." Pl. Br. at 11. This argument lacks merit. Plaintiffs again rely on Professor Wray's affidavit

**SA55**

under Ecuador's civil law system does not make Ecuador an inadequate forum, as

this Circuit and other federal courts have held. *See Aguinda*, 142 F. Supp. 2d at

541 (citing cases). Class certification would be highly unlikely in these "mass

tort" cases anyway, as both Judge Rakoff and Judge Broderick concluded. *Id.*;

*Aguinda*, 1994 WL 142006, at *2; *id.*, 1994 WL 716025, at *1. In any event,

Ecuador's civil code permits individuals with similar claims to join in a single

lawsuit. JA4570, ¶ 9. Finally, the unavailability of American-style discovery also

does not make a foreign forum inadequate. *See In re Union Carbide*, 809 F.2d at

205-06 (foreign forum not inadequate despite more limited discovery); *Potomac*

*Capital Inv. Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V.*, No. 97 Civ. 8141,

1998 WL 92416, at *5 (S.D.N.Y. Mar. 4, 1998). The same is true with regard to

plaintiffs' other procedural points. *See Aguinda*, 142 F. Supp. 2d at 543 (citing

cases).

   Plaintiffs' next argument is that Ecuador's courts are corrupt, but "the

argument that the alternative forum is too corrupt to be adequate 'does not enjoy a

---

for support. *Id.* He claims that "very few" tort claims have been filed in Ecuador's
courts based on the number of tort cases resolved by Ecuador's Supreme Court in
recent years. *Id.* The District Court found that Professor Wray "supplies little
explanation or description of his methodology in reaching this conclusion, and it
appears to be based on nothing more than a tenuous inference from the fact that in
Ecuador (as in the United States) few tort cases reach the nation's Supreme Court."
*Aguinda*, 142 F. Supp. 2d at 540. Other federal courts have rejected similar
arguments. *Id.* (citing cases).

**SA56**

particularly impressive track record.'" *Millon Air*, 251 F.3d at 1311-12 (quoting

*Eastman Kodak*, 978 F. Supp. at 1084). The most persuasive evidence that

Ecuador can and does dispense independent and impartial justice in these cases is

the record of corruption-free litigation against Texaco's subsidiary and other

companies. *See supra* pp. 36-38 & n.15. This record provides practical proof that

litigants can and do obtain fair treatment and relief in Ecuador's courts, including

in cases relating to Consortium activities. The circumstances in Ecuador are not

remotely like those that prevailed in Liberia when this Court decided *Bridgeway*

*Corp.*, which involved a "dysfunctional foreign legal system[]." *Millon Air*, 251

F.3d at 1312 (citing *Bridgeway Corp.*, 201 F.3d at 141-42). The opposite is true in

Ecuador. *See id.* at 1313 n.3 (noting the recent stabilization of Ecuador's

government); *see also supra* p. 38-39.[23]

---

[23]      In *Bridgeway Corp.*, this Court approved the District Court's reliance on the
U.S. State Department Country Report on Liberia in determining that the Liberian
judicial system was not "a system that . . . provide[s] impartial tribunals or
procedures compatible with the requirements of due process." 201 F.3d at 137
(quoting *id.*, 45 F. Supp. 2d 276, 288 (S.D.N.Y. 1999)). The district court had
concluded that (i) while the action was pending, Liberia "was in a state of chaos"
during a civil war, (ii) the regular procedures governing the selection of justices
and judges had been abandoned with the suspension of Liberia's constitution, and -
as a result - the justices were subject to influence, and (iii) the existing courts
"were barely functioning" and the "due process rights of litigants were often
ignored." *Id.*, 45 F. Supp. 2d at 287. Similarly, the Second Circuit noted
"[t]hroughout the period of the civil war, Liberia's judicial system was in a state of
disarray and the provisions of the Constitution concerning the judiciary were no
longer followed." *Id.*, 201 F.3d at 138.

These cases also have received substantial attention from the Ecuadorian

government and media, environmental groups, human rights groups, indigenous

organizations and other non-governmental organizations. *See infra* p. 84. This

attention will continue regardless of forum. The public scrutiny these cases will

receive in Ecuador and/or Peru will further assure a fair adjudication of plaintiffs'

claims. JA6768, ¶ 9; JA6776, ¶¶ 1-2; *Aguinda*, 142 F. Supp. 2d at 545.

    (3)   **Peru's Availability and Adequacy:**  The *Jota* plaintiffs have

the choice of filing their claims either in Ecuador or Peru. Both forums are

available because Texaco has consented to be sued in either country. JA4570-71,

¶¶ 11-13; JA4516-18, ¶¶ 9, 11, 14; *Aguinda*, 142 F. Supp. 2d at 546.

    Peru also provides an adequate forum, as other federal courts have held. *See*

*supra* p. 41. Its courts can fairly and independently adjudicate the *Jota* plaintiffs'

claims, as described in the affidavits of Dr. Juan Guillermo Lohmann and Dr.

Alfonso de los Heros Perez Albela. JA5142-47; JA6541-42. Dr. Lohman, who

has been a practicing lawyer in Lima for twenty-five years, a professor of civil law

at both the Catholic University and the University of Lima, and a member of the

Commission in charge of reviewing Peru's Code of Civil Procedure, describes

Peru's constitutional due process protections, its legal system, legal procedures,

discovery rules and the availability of causes of action in Peru's courts for the *Jota*

plaintiffs. JA5142-47. Dr. Perez, a highly-credentialed lawyer in Peru with

experience both in and out of government, affirms the *Jota* plaintiffs "can obtain a fair and impartial hearing of their claims in the civil courts of Peru . . . without interference or outside influences." JA6541, ¶ 4.

Plaintiffs' brief challenges none of these facts and hardly mentions the District Court's findings as to Peru. Pl. Br. at 55.

> (4)   **Plaintiffs' Generalized Criticisms of Ecuador's Courts:**

Plaintiffs' brief understates the history of fair and impartial litigation in Ecuador against TexPet, other multinational corporations, and the Government of Ecuador. Instead, they rely on criticisms in U.S. State Department Country Reports and affidavits that are generalized in nature and do not relate to the parties or issues in these cases. Pl. Br. at 31-33.

The Country Reports have limited probative value because they do not focus in any detail on civil litigation and do not suggest that the *Aguinda* and *Jota* plaintiffs are likely to receive unfair treatment, particularly when Ecuador's courts have treated other plaintiffs fairly in cases against TexPet and other multinationals.[24]  Consistent with their statutory purpose, the Reports focus on

---

[24]    In his letter to the State Department, Judge Rakoff asked whether its observations in its Country Reports on Human Rights Practices for Ecuador and Peru related to the civil courts of those countries as well as their criminal court systems. JA6946-47. The State Department responded that U.S. embassies "do not, as a matter of course in the exercise of their functions, engage in an exhaustive review of the host nation's judicial system in civil cases," although the responses are not based exclusively on the country's criminal court system. JA6949.

human rights violations that "largely relate[] to criminal cases," as the District
court correctly noted. *Aguinda*, 2000 WL 122143, at *2; *see also* 22 U.S.C.
§ 2151n(d) (requiring the State Department to submit an annual report regarding
the status of internationally recognized human rights); *Aguinda*, 142 F. Supp. 2d at
544-45. Other federal courts have distinguished between State Department
criticisms and the ability of plaintiffs to assert civil claims in an alternative
forum.[25] In addition, plaintiffs have ignored statements in the Reports regarding
important reforms and improvements in Ecuador's judicial system. *Aguinda*, 142
F. Supp. 2d. at 544-45; *see also* JA6760, ¶¶ 2-4; JA6765, ¶ 2; JA6768, ¶¶ 7-8;
JA6751-52, ¶¶ 1-3.

Plaintiffs also cite affidavits focusing on broad criticisms of Ecuador's
judicial system and alleged due process problems in criminal prosecutions. Pl. Br.
at 13 n.3. Again, the distinction between plaintiffs' generalized affidavits and the
particularized evidence submitted by Texaco is telling. Plaintiffs have not
explained why Ecuador or Peru would be unable to dispense fair and impartial
justice should the *Aguinda* and *Jota* plaintiffs re-file their tort claims in their own

---

[25]    *See Stalinsky*, 41 F. Supp. 2d at 760 (dismissing to Honduras, stating that
"[t]he U.S. State Department Reports primarily discuss problems with the criminal
system in Honduras and extrajudicial executions . . . and are not particularly
relevant to the issue of Plaintiff's ability to get relief in the Honduran civil
courts"); *El Fadl*, 75 F.3d at 678 ("[Plaintiff]'s repeated reliance on a State
Department Report expressing 'concern about the impartiality' of the Jordanian
court system . . . is unavailing.").

civil courts against Texaco. *Id.* Texaco, by contrast, has submitted affidavits that specify the many substantive and procedural safeguards available to the *Aguinda* and *Jota* plaintiffs in Ecuador and Peru. These affidavits detail past and current litigation against TexPet, other multinational corporations, and Petroecuador, including cases filed by putative class members in *Aguinda*, without corruption or bias. *See supra* pp. 36-38 & n.15. This record includes not only affidavits from practicing lawyers with direct experience representing TexPet and other foreign companies in Ecuador's courts (JA4565; JA4569; JA4912; JA6531; JA6535; JA6760), but also two former justices of Ecuador's Supreme Court (JA4515; JA4903), the Dean of its leading law school (JA6765), and a member of Ecuador's judicial counsel that disciplines judges (JA6760).

In summary, the presence of political, economic and social problems or State Department criticisms does not make a foreign nation's judicial system an inadequate alternative forum. Instead, the standard is whether the remedies available to plaintiffs for their particular claims in their own civil courts are "clearly inadequate." *Piper Aircraft*, 454 U.S. at 254; *see also Diaz v. Aerovias Nacionales de Colombia, S.A.*, No. 90 Civ. 1215, 1991 WL 35855, at *1 (S.D.N.Y. Mar. 12, 1991), *aff'd*, 948 F.2d 1276 (2d Cir. 1991) (dismissing to Columbia, noting "[w]hile it is true that terrible things have happened in Columbia as a result of the civil unrest referred to by the plaintiff, and that judges have been murdered

and threatened, the subject matter of that unrest and of those crimes has had

nothing to do with and *has not interfered with the disposition of ordinary civil

cases*") (emphasis added); *Iragorri v. United Techs. Corp.*, 46 F. Supp. 2d 159,

163 (D. Conn. 1999) (dismissing to Colombia, stating that "while Colombia's drug

cartel implicates concerns about the criminal justice system and prosecutions, *there

has been no showing of its impact on the civil justice system*") (emphasis added),

*vacated sub nom., on other grounds, Iragorri v. Int'l Elevator, Inc.*, 243 F.3d 678

(2d Cir. 2001), *reh'g en banc, Iragorri v. United Techs. Corp.*, 2001 WL 1538928.

This explains why numerous federal courts have dismissed cases on *forum non

conveniens* grounds to Latin American, Central American, Asian and African

nations despite economic, social and political unrest in those nations and despite

U.S. State Department criticisms of their judicial systems.[26] The District Court

acted well within its discretion in holding on this record that Ecuador and/or Peru

can dispense fair and impartial justice in these civil cases.

---

[26]    *See, e.g., PT United Can Co.*, 138 F.3d at 68 (dismissing to Indonesia despite street protests and widespread civil disorder in the midst of the country's worst financial crisis in decades); *Blanco*, 997 F.2d at 981 (dismissing to Venezuela, despite allegations of "systemic deficiencies" in the judicial system and newspaper articles depicting unrest); *Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) (affirming dismissal to the Philippines, in part because "no showing was made that political unrest in the Philippines has had an adverse effect upon the judicial system there"); *Mercier v. Sheraton Int'l Inc.*, 935 F.2d 419, 427 (1st Cir. 1991) (holding that political "upheaval" in the Middle East did not render Turkey an inadequate forum).

C.   <u>The Private Interest Factors Favor Dismissals</u>:  Plaintiffs' brief never mentions that *Aguinda* and *Jota*, according to their own allegations, involve thousands of foreign claimants and substantial physical evidence located in Ecuador.  Not once do they make even a passing reference to the elements of proof of those claims.  Instead, they suggest that if Texaco "directed" certain field operations in Ecuador (which it did not), then it follows that a New York court and jury is conveniently situated to decide all liability and damages issues in an environmental case of this type that allegedly involves "more than two thousand square miles" (Pl. Br. at 29) and over twenty years of activities in the Oriente by scores of different parties (*e.g.*, ranchers, miners, loggers, other energy companies, and others).  *See supra* pp. 31-34.  This argument fails because the factual premise and legal conclusion are both wrong.  Texaco never directed the Consortium's operations in Ecuador.  *See supra* pp. 26-31 & n.11.  This is not a case, as discovery showed, where "witnesses and documentary evidence" favor litigation in New York because of alleged decision-making in the United States by Texaco personnel.  *Iragorri*, 2001 WL 1538928, at *6.  Plaintiffs even stipulated that they had "no knowledge, information or documents having any tendency to prove or disprove" their allegation of Texaco decision-making in the United States.  JA1219; *see also supra* p. 12.

But even if Texaco personnel had "directed" the Consortium's practices, a court would still be obliged to analyze "a line of causation from the negligence in New York" to the events at issue in the foreign country in order to determine liability and damages. *See Abouchalache*, 464 F. Supp. at 97.[27] The pre-trial discovery and trial of these cases would require foreign fact witnesses, on-site investigations, and proof beyond the compulsory process of this jurisdiction under any reasonable assessment of plaintiffs' liability and damages claims. Fact determinations regarding preexisting and current conditions and usages of Oriente lands and water will occur in Ecuador. This will include relevant witness testimony going back over the 25 year history of the Consortium's and other companies' operations and forward through Petroecuador's and other companies' continuing activities in the Oriente after the Consortium ended.

In litigation in Ecuador, plaintiffs could obtain discovery through the Court from all Consortium members in addition to discovery from Texaco through letters

---

[27]    *See also Piper Aircraft*, 454 U.S. 235 (wrongful death action dismissed in favor of litigation in Scotland on *forum non conveniens* grounds even though design, maintenance, and testing of product occurred in the United States); *De Melo v. Lederle Lab.*, 801 F.2d 1058 (8th Cir. 1986) (product liability action brought by Brazilian consumer against U.S. Corporation that developed, tested and patented product in the U.S. dismissed on *forum non conveniens* grounds); *Harrison v. Wyeth Lab. Div. of Am. Home Prods. Corp.*, 510 F. Supp. 1 (E.D. Pa. 1980), *aff'd*, 676 F.2d 685 (3d Cir. 1982) (product liability action dismissed in favor of litigation in England despite claim that production and marketing decisions were made in the United States at defendant's corporate headquarters).

rogatory to the extent not already produced in these cases and available to plaintiffs

by Texaco's stipulation. JA4518-19, ¶¶ 17-18. By contrast, neither Texaco nor

plaintiffs could obtain discovery from the Republic or Petroecuador in U.S.

litigation, and innumerable other witnesses and evidence also would be beyond

reach. All the allegedly damaged land and water is located in Ecuador or Peru, and

litigation here would preclude essential site visits.[28] The named plaintiffs and class

members, none of whom reside in the United States, would be obliged to travel to

New York for trial to prove or disprove personal injury and property claims. This

expense and inconvenience during both the discovery and trial stages would be

avoided by litigation in Ecuador.[29] While plaintiffs point to the residence of

potential experts in the United States (Pl. Br. at 27), courts give little weight to the

---

[28]    *Blanco*, 997 F.2d at 975, 983 (affirming dismissal on *forum non conveniens* grounds in part because view of premises in Venezuela was necessary).

Plaintiffs suggest, apparently seriously, that Texaco need not concern itself with conducting its own site tests in Ecuador or making its own assessment of causation, damages, and affirmative defenses, because plaintiffs' counsel have provided Texaco photographs, cost estimates, and videotapes that they prepared. Needless to say, that argument misses the point. Pl. Br. at 29.

[29]    *Piper Aircraft Co.,* 454 U.S. at 257-59; *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224 (2d Cir. 1996) (affirming dismissal on *forum non conveniens* ground in part because relevant witnesses and documents were located in Great Britain); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (dismissing action in part because of prohibitive cost of bringing witnesses to United States for trial).

location of expert witnesses. *See Potomac Capital Inv. Corp.*, 1998 WL 92416, at *8 ("The location of expert witnesses, however, is entitled to little weight.").

Plaintiffs argue that Texaco's ability to join Petroecuador and the Government of Ecuador in litigation in Ecuador is unimportant because TexPet and its affiliated companies allegedly assumed responsibility "for the damages suffered by plaintiffs here" in a settlement with Petroecuador and the Government of Ecuador. JA4130-31, ¶¶ 14-17; JA4134-4205; Pl. Br. at 30. This argument badly misstates the settlement agreement. First, that agreement addressed potential claims against TexPet by the Government of Ecuador concerning Government-owned lands--not plaintiffs' alleged injuries. JA 4137-60. Second, it expressly provides that it should "never" be construed as an admission of liability, as plaintiffs attempt to do here. JA 4142-43 (the settlement agreement "shall never be offered or admitted as evidence against TexPet, or construed as a confession or admission of liability in any lawsuit or legal procedure."). Third, Texaco did not release the Government for damages caused by the Government or Petroecuador, and Texaco intends to implead the Government and Petroecuador because they, not Texaco, are responsible for plaintiffs' alleged injuries. *Id.* A critical point in these lawsuits, with which plaintiffs have never come to grips, is Petroecuador's controlling role not only in dictating and participating in the allegedly negligent

practices during the Consortium's existence but also in continuing thereafter the very same operating practices that plaintiffs are attacking. JA4129-30, ¶¶ 9-10.

The ability to implead the Government and Petroecuador clearly favors litigation in Ecuador as opposed to the United States, and the District Court was correct in so holding. Indeed, it is doubtful that a trial court here could provide Texaco with due process given Ecuador's and Petroecuador's preeminence in the activities at issue. *See Piper Aircraft*, 454 U.S. at 259 ("inability to implead potential third-party defendants clearly supported holding the trial in Scotland"); *Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117, 1126 (S.D.N.Y. 1992) ("It is well established that inability to implead possible third party defendants is a factor weighing against the retention of jurisdiction.").

There are other practical reasons why these cases should be pursued in Ecuador or Peru. Even if witnesses and other evidence could be brought to the United States, serious translation problems would exist. The plaintiffs and 55,000 putative class members come from more than eight different indigenous groups in Ecuador and Peru. JA35-47, ¶¶ 11-27; JA51, ¶ 38; JA3863-69; ¶¶ 13-24. They and other foreign witnesses speak numerous different indigenous dialects such as Quichua. JA4130, ¶ 11. Ecuadorian and Peruvian courts are equipped with translators to overcome this language barrier. JA4516-17, ¶ 10. *See Schertenleib*

*v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978) (dismissing action in part because of "serious problem of translation" of documents and testimony).

Plaintiffs argue that "it is highly doubtful" plaintiffs can secure counsel in Ecuador, but they cite no support in the record for this claim. Pl. Br. at 35. Other litigants in Ecuador have engaged counsel to sue TexPet, as evidenced by the history of litigation against TexPet in Ecuador. *See supra* pp. 36-38 & n.15.

In summary, Judge Rakoff had overwhelming support in the record for finding that the private factors favor *forum non conveniens* dismissals. *Aguinda*, 142 F. Supp. 2d at 547.

### D. The Public Interest Factors Also Favor Dismissals

The record also supports Judge Rakoff's findings on the public interest factors. There is a strong public interest in resolving disputes at their origin, particularly trespass and nuisance claims involving localized injury to real property, such as the *Aguinda* and *Jota* plaintiffs have asserted.[30]

---

[30] *Gilbert*, 330 U.S. at 509 ("There is a local interest in having localized controversies decided at home."); *Piper Aircraft*, 454 U.S. at 261 ("The American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here."); *Immobleria Barcanona,* 634 F. Supp. at 785 (dismissal on *forum non conveniens* grounds, holding that an action involving property in Ecuador "is absolutely a matter of local interest").

**SA68**

The application of foreign law in these cases also favors dismissal.[31]

Ecuador's courts are far better suited to apply their own laws based on a civil code

system, particularly in a case of this magnitude.[32]  Plaintiffs cite two cases to

support their argument that the District Court would not confront difficulties in

applying Ecuadorian law in these cases (Pl. Br. at 39), but those cases involved

breach of contract royalty claims.  The issues and claims in these cases, which

---

[31]      Under New York's choice of law rules, which this Court must apply under
*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), this Court must choose
"the law of the jurisdiction which, because of its relationship or contact with the
occurrence or the parties, has the greatest concern with the specific issues raised in
the litigation" -- *i.e.*, Ecuador in these cases. *Babcock v. Jackson*, 12 N.Y.2d 473,
481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).

      Plaintiffs argue incorrectly that "federal law" will govern their ATCA claim.
While "federal courts have never definitively resolved [the] choice-of-law
question" concerning which substantive law governs ATCA claims, *Wiwa*, 226 F.3d
at 105 n.12, this Court has held that the district court should conduct a choice of
law inquiry for ATCA claims under the standards set forth by the U.S. Supreme
Court in *Lauritzen v. Larsen*, 345 U.S. 571 (1954). *See Filartiga v. Pena-Irala*,
630 F.2d 876, 889 (2d Cir. 1980). In *Lauritzen*, the Court considered, *inter alia*,
the "place where the acts giving rise to the liability occurred" and the "domicile of
the injured" in determining whether to apply Danish or U.S. law to plaintiff's Jones
Act claim. 345 U.S. at 583-87 (considering choice of law factors; holding Danish
rather than American law applied to Jones Act claim asserted by Danish plaintiff).
These factors require the application of Ecuadorian law to plaintiffs' ATCA claim
here, assuming it would even survive a motion to dismiss. *See infra* at 71.

[32]      *Schertenleib*, 589 F.2d at 1165; *Calavo Growers of Cal. v. Generali Belgium*,
632 F.2d 963, 967 (2d Cir. 1980) (complex case involving Belgian law dismissed
so that it could proceed in Belgium); *Sibaja v. Dow Chem. Co.*, 757 F.2d 1215,
1218 n.5 (11th Cir. 1985) (retaining jurisdiction "would force the Court to conduct
a complex exercise in comparative law and consider a foreign law with which the

stretch back over more than two decades of Government-regulated activities in
Ecuador, are far more complex and present thousands of individualized liability
and site-specific causation and damages issues that courts in Ecuador can best
resolve.

The public interest also favors dismissal where a court would be required to
evaluate plaintiffs' socio-cultural claims of damage to their "ancient traditions,"
"culture," and "way of life" in Ecuador. *See Piper Aircraft*, 454 U.S. at 251; JA41-
43, ¶¶ 20-22; JA51, ¶ 38. Ecuador's (or Peru's) courts have a vital interest in
setting their own negligence standards. The standards applicable in a New York
forum are not necessarily relevant in foreign forums, as numerous courts have
held.[33]

---

Court is not familiar and which is in a foreign language. The avoidance of such
comparisons is one of the objectives of the doctrine of *forum non conveniens*").

[33]     *See, e.g., Polanco*, 941 F. Supp. at 1528 ("Guatemala's interest in setting the
standards by which products manufactured there will be judged permeates this
entire case . . . . Perhaps Guatemala prefers economic growth to tort compensation
of individuals. The Court does not know, and will not presume to decide for
Guatemala where its interests lie. That choice is for Guatemalans.") (citations
omitted); *Abiaad v. Gen. Motors Corp.*, 538 F. Supp. 537, 543 (E.D. Pa.), *aff'd*,
696 F.2d 980 (3d Cir. 1982) ("The standards applicable in Pennsylvania and the
United States simply have no relevance in Abu Dhabi. The balance of risks and
benefits inherent in any products liability and negligence analysis is more properly
determined by the locality in which they are to apply, for questions of the degree of
protection from injury to be extended, and consequences of the liability to be
imposed are matters of intense local concern."); *Hyland Therapeutics Div.*, 807 F.
Supp. at 1130 (noting "the unique significance of the foreign forum's interest in

These plaintiffs also demand jury trials. It would be unfair to require citizens of this district to serve as jurors in this lengthy action relating to property and people exclusively in Ecuador and Peru. *See Alfadda*, 159 F.3d at 46 ("The interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily in favor of France."). Conversely, litigation in this forum would deny any role in the decision of the case whatsoever to Ecuador and its citizens, the nation with the most interest in the litigation and with courts best equipped to apply relevant law. *See supra* pp. 31-34.

The "court congestion" factor favors neither party. The record demonstrates that courts in Ecuador can and do dispense justice efficiently and in a reasonable time period. JA4570, ¶ 7; *see supra* pp. 36-39. Similarly, "the recent filling of all judicial vacancies and the resulting full complement of judges for the District makes [court congestion] of little or no present significance," as this Court stated in *Guidi*. 224 F.3d at 147 n.5.

---

implementing its own risk-benefit analysis, informed by its knowledge of its community's competing needs, values, and concerns").

## III. PLAINTIFFS' ATCA CLAIM DOES NOT MANDATE THE EXERCISE OF U.S. JURISDICTION

### A. Plaintiffs' Environmental Claims Fail to State an ATCA Claim:

"To make out a claim under [the ATCA], three elements must be satisfied: (1) an

alien sues (2) for a tort (3) committed in violation of a treaty or the law of nations."

*Kadic*, 70 F.3d at 238. Plaintiffs have not alleged a treaty violation. *See supra* n.1.

Hence, the question is whether these foreign plaintiffs have stated a tort claim

under the "law of nations." The answer is no.[34]

For a tort to violate the "law of nations," the alleged offense must be

"definable, obligatory (rather than hortatory), and universally condemned."

*Beanal*, 969 F. Supp. at 370 (citing *Filartiga*, 630 F.2d at 881). "Were this not so,

the courts of one nation might feel free to impose idiosyncratic legal rules upon

others, in the name of applying international law." *Filartiga,* 630 F.2d at 881. No

"well-established, universally recognized norm[] of international law" (*id.* at 888),

prohibits these government-approved and regulated oil field production practices in

Ecuador, and plaintiffs have identified none. JA5918, ¶ 6; 5930-33, ¶¶ 41-51. The

---

[34]     This Court need not assume the existence of a valid ATCA claim simply
because plaintiffs have tried to plead what they describe as a "colorable" ATCA
claim. Pl. Br. at 41; *Kadic*, 70 F.3d at 238 (quoting *Filartiga*, 630 F.2d at 887-88)
("Because the [ATCA] requires that plaintiffs plead a 'violation of the law of
nations' at the jurisdictional threshold, this statute requires a more searching
review of the merits to establish jurisdiction than is required under the more
flexible 'arising under' formula of section 1331. Thus, it is not a sufficient basis
for jurisdiction to plead merely a colorable violation of the law of nations.").

Fifth Circuit held in 1999 that similar environmental allegations against a U.S.

company relating to mining operations in Indonesia did not state an ATCA claim.

In so ruling, it warned that "federal courts should exercise extreme caution when

adjudicating environmental claims under international law to insure that

environmental policies of the United States do not displace environmental policies

of other governments." *Beanal*, 197 F.3d at 167; *see also Amlon Metals, Inc. v.*

*FMC Corp.*, 775 F. Supp. 668, 671 (S.D.N.Y. 1991) (complaint based upon

environmental contamination failed to allege facts constituting a violation of the

law of nations). Plaintiffs point out nothing to refute the reasoning of *Beanal* other

than to say it is "not controlling in this Circuit" (Pl. Br. at 45), and the Sierra

Club's 30 page *amicus* brief ignores *Beanal* entirely.

   The *Beanal* court was correct in holding that no consensus exists among

developed and underdeveloped nations regarding environmental practices.[35] The

---

[35]   In addition to examining the case law, courts ascertain "[t]he law of
nations . . . by consulting the works of jurists." *Filartiga*, 630 F.2d at 880 (citation
omitted). International environmental law treatises agree there is no universal,
definable standard for imposing liability for environmental wrongs. *See* Philippe
Sands, *Principles of International Environmental Law I: Frameworks, Standards
and Implementation*, at 185-86 (1995) (cited by the *Beanal* court):

   The international community has *not* adopted a binding international
   instrument of global application which purports to set out the general
   rights and obligations of the international community on
   environmental matters. No equivalent to the Universal Declaration of
   Human Rights or the International Covenant of Civil and Political

principles embodied in United Nations Declarations regarding each nation's right

to develop its own natural resources do not establish definable, universal standards

of care and liability for environmental practices. JA5931-33, ¶¶ 44-50. For

example, the Rio Declaration, which plaintiffs cite in their brief (at p. 45 & n.19),

reserves to nations the exclusive right to "exploit their own resources pursuant to

their own environmental and developmental policies." JA5940, ¶ 58(N)(iii).

Likewise, the Stockholm Declaration, which plaintiffs also cite (at p. 45 & n.19), is

a set of non-binding, aspirational guidelines that cannot be considered the "law of

nations." JA5939, ¶ 58(N)(iii); *Amlon Metals*, 775 F. Supp. at 671 (noting

Stockholm Principles "do not set forth any specific proscriptions, but rather refer

only in a general sense to the responsibility of nations to insure that activities

---

Rights or Economic and Social Rights has yet been adopted or appears imminent.

Sands, at 633 ("In defining environmental damage, treaties and state practice reflect various approaches."); *id.* at 635 ("*There are no agreed international standards* which establish a threshold for environmental damage which triggers liability and allows claims to be brought.") (emphasis added); and *id.* at 637 ("*International law remains inconclusive* on general rules governing the standard of care to be shown in fulfilling international environmental obligations.") (emphasis added).

The *Restatement (Third) of Foreign Relations Law* excludes any reference to environmental wrongs in its list of practices that "violate international law." *Id.* at § 702 (listing genocide, slavery, murder or causing the disappearance of individuals, torture or cruel and inhuman punishment, arbitrary detention, and systematic racial discrimination).

within their jurisdiction do not cause damage to the environment beyond their

borders"). Plaintiffs' brief also refers generally to other "international legal

instruments" (at p. 45 & n.19), but none rises to the level of the "law of nations"

insofar as environmental torts are concerned. Nowhere in their brief do plaintiffs

ever identify the particular "law of nations" on which their claim rests because

there is none. *See Beanal*, 969 F. Supp. at 382-84; *see also* JA5917 (Aff. of

Professor M.H. Mendelson, Chair of International Law at University College,

University of London, rebutting plaintiffs' international law arguments).[36] The

ATCA "applies only to shockingly egregious violations of universally recognized

principles of international law," and the Consortium's oil field practices do not fall

within this category. *Zapata v. Quinn*, 707 F.2d 691, 692 (2d Cir. 1983) (per

curiam).

---

[36]    Earthrights International's *amicus curiae* brief is equally amorphous. It references "sources" that arguably might form the basis of an ATCA claim, none of which articulates a definable, universally recognized norm. JA5930-33, ¶¶ 41-51. It relies on affidavits submitted by Dinah L. Shelton to support its argument. Earthrights Br. at 13. Professor Mendelson explains in detail in his rebuttal affidavit why Ms. Shelton's opinions are "based on faulty methodological and substantive interpretations of customary international law" and why plaintiffs' claims do not state a claim under the law of nations. JA5936-44.

        Earthrights International's brief also tries to recast plaintiffs' environmental claims as "human rights," "right to life," "cultural integrity," "interference with family life," and even "race discrimination" claims in the hope of invoking some recognized law of nations. Earthrights Br. at 19, 31. Those arguments misstate the allegations of the Complaints. *See Beanal*, 197 F.3d at 168 (rejecting efforts by plaintiffs and *amici* to assert "cultural genocide" claim under the ATCA).

Plaintiffs' ATCA claim also fails for a separate reason the District Court did

not reach. Plaintiffs have not even alleged in their Complaints, as they must to

state an ATCA claim, that Texaco was a state actor and that the ATCA thus

reaches Texaco's alleged conduct as a private party. *See Beanal*, 969 F. Supp. at

374 ("The facts forming a basis for state action must be discernable from the face

of the complaint," and "Plaintiff cannot augment his complaint through his

opposition memorandum."). Far from alleging that Texaco (or even TexPet) was a

state actor, the 38-page *Aguinda* Complaint never once mentions the Government

of Ecuador.[37] Nor do plaintiffs' Complaints allege that Texaco violated a norm of

---

[37]     The Consortium's regulation by the Government of Ecuador does not
convert TexPet, let alone its parent company, into a state actor. *See Jackson v.
Metro. Edison Co.*, 419 U.S. 345, 350-51 (1974); *Blum v. Yaretsky*, 457 U.S. 991,
1004 (1982) (actions by state regulated nursing home did not rise to the level of
state action for purposes of 42 U.S.C. § 1983); *Kadic*, 70 F.3d at 245 ("The 'color
of law' jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a
defendant has engaged in official action for purposes of jurisdiction under the
Alien Tort Act.")

Likewise, TexPet's status as a minority equity owner in the Consortium
would not make it or its parent company a state actor. In *Beanal*, the court held
that a "government contract conferring a mining concession and government
investment in the operation are insufficient facts" to establish a relationship
between the defendant and the Indonesian government that would give rise to a
finding that defendant was a state actor. 969 F. Supp. at 379. Earthrights
International ignores this holding when it argues in its *amicus curiae* brief that
Texaco was a state actor because the Government of Ecuador "owned a stake in
Texaco's oil development project." Earthrights Br. at 11.

    *Doe v. Unocal Corp.*, 963 F. Supp. 880 (C.D. Cal. 1997), presents a different
fact situation. Plaintiffs there specifically alleged that the Government of

international law recognized by this Court in *Kadic* to apply to private companies without state action. *Id.*, 70 F.3d at 239-44. Even the Sierra Club acknowledges in its *amicus* brief (at p. 13) that these cases "concern the actions of a private corporation, not those of the Ecuadorian government."

**B.   Plaintiffs' ATCA Claim is Factually Unsupportable:** Serious factual problems undermine plaintiffs' ATCA argument even if they could overcome these legal hurdles and state a claim under the "law of nations." The factual foundation of their ATCA claim is their allegation that Texaco personnel in the United States "dictated" the Consortium's environmental practices in Ecuador, *see supra* nn.2-3, but they have never identified any particular "decisions made by Texaco *within the United States*" that purportedly violated the "law of nations." *Jota*, 157 F.3d at 159 (emphasis in original). The District Court correctly found on this record that plaintiffs had identified no meaningful support for their conjecture. *See supra* pp. 26-31 & n.11.

---

Myanmar was an agent of the private defendant and that those parties had conspired to commit human rights violations such as forced labor and slavery. (There are no such allegations in either the *Aguinda* or *Jota* complaints.) On August 31, 2000, the district court determined that plaintiffs' international law claims under the ATCA failed as a matter of law and granted summary judgment in Unocal's favor. *See Doe v. Unocal Corp.*, 110 F. Supp. 2d 1294, 1307, 1312 (C.D. Cal. 2000). Plaintiffs have appealed to the Ninth Circuit.

C.  **The ATCA Does Not Express a Special Policy Interest Favoring the Exercise of U.S. Jurisdiction**:  The original ATCA, in any event, does not express the special policy interest that plaintiffs suggest.  Neither the statutory language nor the case law supports plaintiffs' argument.

The statute confers jurisdiction on U.S. courts over claims by aliens for torts committed in violation of the "law of nations."  It does not suggest, however, that Congress intended to favor a U.S. court over a more convenient foreign tribunal that provides an alien plaintiff an adequate alternative forum.  *Aguinda*, 142 F. Supp. 2d at 553 ("nothing in that text [of the ATCA] suggests that the United States forum should therefore be given preference over a more convenient foreign forum which is adequate to handle the case").  While relatively few ATCA cases have been litigated over its 200 year history, no case holds that the original ATCA expresses the type of policy interest suggested by plaintiffs.

In *Wiwa*, this Court held that the Torture Victim Protection Act ("TVPA"), which amended the ATCA in 1991, expresses a policy interest favoring U.S. jurisdiction that should be considered in the *forum non conveniens* analysis in TVPA cases.  226 F.3d at 104-05.  The Court reached this conclusion based on two changes to the ATCA that are codified in the TVPA amendment:  (i) the change from merely extending the court's "jurisdiction" to providing specific substantive rights for U.S. citizens as well as aliens, and (ii) the change from describing the

claim as one for a tort committed in violation of the law of nations to providing a

substantive right to damages under U.S. law. *Id.* at 105. The Court, however,

reached no conclusion on whether the original ATCA expressed a policy favoring

jurisdiction under a *forum non conveniens* analysis. *Id.* at 105 n.10 (noting that the

original purpose of the ATCA "is forever hidden from our view by the scarcity of

relevant evidence"). Neither *Aguinda* nor *Jota* alleges that Texaco violated the

TVPA. Thus, the policy in the TVPA favoring U.S. jurisdiction is inapplicable.[38]

ATCA cases have recognized the significance of the *forum non conveniens*

doctrine and applied the doctrine.[39] The existing *Gilbert* analysis provides a

---

[38]    Both *amicus curiae* briefs misinterpret *Wiwa* to hold that the original ATCA itself -- as opposed to the TVPA amendment to the ATCA -- expresses a policy interest favoring U.S. jurisdiction. Earthrights Br. at 6-7; Sierra Club Br. at 2-10, 21-25. At page 21 of its brief, the Sierra Club misquotes critical language from page 106 of the *Wiwa* opinion to confuse this important distinction. The Sierra Club also claims that the TVPA applies only to U.S. citizens (Sierra Club Br. at 4 & n.1), when, in fact, it applies to both aliens and U.S. citizens. *Wiwa*, 226 F.3d at 104-05 (TVPA "extends its remedy not only to aliens but to any 'individual,' thus covering U.S. citizens as well").

[39]    *See In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 500 (9th Cir. 1992) ("traditional brakes" on the exercise of federal jurisdiction apply in ATCA cases; "[s]uch limitations as venue and the doctrine of *forum non conveniens* are available in § 1350 cases as in any other"); *Filartiga*, 630 F.2d at 890 (*forum non conveniens* is a "critical issue" on remand); *Eastman Kodak*, 978 F. Supp. at 1082-87 (while plaintiff alleged an ATCA claim, the court followed the *Gilbert* analysis and found "defendants easily bear their burden as to the balance of public and private interests;" court retained jurisdiction because Bolivia was an inadequate forum and not because of ATCA claim); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996) (weighing *Gilbert* factors in a TVPA case, retaining jurisdiction in part because Ghana was not an adequate forum); *see also*

federal court the flexibility to evaluate each ATCA claim in its particular context in deciding whether it can be pursued adequately in another, more convenient forum. In other words, the nature of the claim itself is another relevant element in the overall balancing test, but the fact that it has been labeled an ATCA claim does not determine the outcome. The U.S. Supreme Court and this Court have held with respect to other statutes providing for federal jurisdiction that the United States' interest in applying its own laws is not a "determinative factor" in the *forum non conveniens* analysis.[40] *See, e.g., Gilbert,* 330 U.S. at 507 (court may dismiss on *forum non conveniens* doctrine "even when jurisdiction is authorized by the letter of a general venue statute"); *Alfadda,* 159 F.3d at 47 (interest of the United States in enforcing its securities laws "*is merely one consideration* to be weighed in the totality of the *Gilbert* analysis") (emphasis added).

---

*Kadic,* 70 F.3d at 250 (noting that the U.S. government's "Statement of Interest" concerning the case "suggests the general importance of considering the doctrine of *forum non conveniens*").

[40]     *Capital Currency Exch.,* 155 F.3d at 611 (dismissing Sherman Act case, noting "we have never held that the United States' interest in applying its laws is a determinative factor to be considered in weighing convenience"); *Alfadda,* 159 F.3d at 46 (dismissing RICO case, rejecting plaintiffs' arguments "that the United States has a significant interest in applying RICO and securities laws to international transactions" and "that the United States' interest in applying its own securities and RICO laws . . . made the Southern District a more convenient forum"); *Allstate Life Ins.,* 994 F.2d at 1002 ("While appellants are correct in asserting that United States courts have an interest in enforcing United States

79

In *Wiwa*, this Court referred to Judge Edwards' concurring opinion in *Tel-Oren v. Libyan Arab Republic* as the "most learned exposition" of the ATCA's original purpose. 226 F.3d at 105 n.10 (citing *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 782-83 (D.C. Cir. 1984) (Edwards, J., concurring)). That opinion also undercuts plaintiffs' argument. Judge Edwards reasoned that the original purpose of the ATCA was to ensure that claims brought by an alien would be litigated in a federal rather than state court to prevent state courts from mishandling matters with international implications.[41] *Tel-Oren*, 726 F.2d at 782-83 (Edwards, J., concurring). But Judge Edwards did not suggest that the ATCA also favors U.S. jurisdiction over a more convenient foreign court that provides adequate remedies for a plaintiff's ATCA claim.

---

securities laws, this alone does not prohibit them from dismissing a securities action on the ground of *forum non conveniens*.") (citations omitted).

[41]    Other courts have noted a similar purpose of the ATCA. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964) (citing the ATCA as a statute "reflecting a concern for uniformity in this country's dealings with foreign nations and indicating a desire to give matters of international significance to the jurisdiction of federal institutions"); *Filartiga*, 630 F.2d at 885, 878 (noting Congress enacted the ATCA "as part of an articulated scheme of federal control over external affairs," and that the ATCA was part of an attempt by Congress to implement a "constitutional mandate for national control over foreign relations"). Some scholars have suggested an even more narrow purpose. *Wiwa*, 226 F.3d at 105 n.10 citing Joseph Modeste Sweeney, *A Tort Only in Violation of the Law of Nations*, 18 Hastings Int'l & Comp. L. Rev. 445 (1995).

### D.   Ecuador is a More Convenient Forum Even Assuming the ATCA

Favors a Federal Forum:  Plaintiffs argue that the District Court failed "to

consider whether Texaco's conduct . . . rises to the level of a violation of the law of

nations . . . ," and that this purported failure "tainted" the District Court's

balancing of the *Gilbert* factors.  Pl. Br. at 41.  This argument inaccurately

describes Judge Rakoff's decision.

He ruled, first, that plaintiffs' ATCA claim is so lacking in precedential

support as to be very unlikely to survive a motion to dismiss.  (Texaco had not

filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of

Civil Procedure 12(b)(6).  Thus, the District Court was not required to rule on that

question.)  Nonetheless, he went on to apply the *Gilbert* balancing test "even if one

assumes" plaintiffs had stated an ATCA claim and that the ATCA conveys a policy

interest similar to the policy interest in the TVPA.  *Aguinda*, 142 F. Supp. 2d at

554; *Wiwa*, 226 F.3d at 104-05.  Such a policy interest would not "nullif[y] or even

significantly diminish[] the doctrine of *forum non conveniens*, and the *Gilbert*

factors would still favor dismissal."  *Aguinda*, 142 F. Supp. at 554 (quoting *Wiwa*,

226 F.3d at 106).[42]

---

[42]   Highlighting the importance of the *forum non conveniens* doctrine even in a
torture case, the TVPA instructs a federal court to "decline jurisdiction" whenever
a claimant has not exhausted "*adequate and available local remedies.*"  *Kadic*, 70
F.3d at 245 (noting TVPA's exhaustion of remedies requirement); TVPA § 2(b)
(emphasis added).

Unlike the record in *Wiwa*, the record in these cases presents compelling reasons for *forum non conveniens* dismissals. The defendant in *Wiwa* "offered only minimal considerations in support of an English forum," while Texaco has demonstrated convincingly that Ecuador is "an obviously better suited foreign forum for the adjudication of the dispute" by every legal and pragmatic standard. *Wiwa*, 226 F.3d at 107. The reasons include, among others, the "substantial physical evidence" that is difficult, expensive and, in most instances, impossible to transport. *Id.* Unlike *Wiwa*, these "mass tort" cases involve claims of widespread, site-specific environmental damage. The *Wiwa* court noted the absence of such issues and physical evidence in that case. *Id.* Contrary to *Wiwa*, which included some U.S. resident plaintiffs, *Aguinda* and *Jota* include no U.S. residents for whom the United States provides a presumptively convenient home forum. *See Iragorri*, 2001 WL 1538928, at *3 ("[W]hen a foreign plaintiff chooses a U.S. forum, it 'is much less reasonable' to presume that the choice was made for convenience," and "a plausible likelihood exists that the selection was made for forum-shopping reasons, such as the perception that the United States courts award higher damages . . . .") (citing *Piper*, 454 U.S. at 256); *Wiwa*, 226 F.3d at 102 (even a "neutral rule," as required by treaties requiring "no less favorable" treatment of foreign nationals, "should properly consider each party's residence as a factor that bears on the inconvenience that party might suffer if required to sue in a foreign

nation").

The *Aguinda* and *Jota* plaintiffs, unlike the *Wiwa* plaintiffs, also confront no risks to their safety by pursuing their claims in their own home courts, as past and ongoing lawsuits in Ecuador against Petroecuador, TexPet, and other companies prove. Plaintiffs cite a State Department warning to U.S. residents travelling to Ecuador's border with Colombia (Pl. Br. at 13), but the *Aguinda* plaintiffs already reside there and are not the persons for whom the warning was intended. *See Iragorri*, 46 F. Supp. 2d at 163 (dismissing to Columbia, noting that "*in this case, no particularized threats to these plaintiffs or witnesses has been demonstrated*") (emphasis added), *vacated sub nom.*, *on other grounds*, *Iragorri v. Int'l Elevator, Inc.*, 243 F.3d 678 (2d Cir. 2001), *reh'g en banc*, *Iragorri v. United Techs. Corp.*, 2001 WL 1538928.

In contrast to the TVPA torture claim in *Wiwa*, plaintiffs' claim here need not be labeled or pursued specifically as an ATCA claim in order to provide them relief. The ATCA affords them no special relief or remedy not already available through their other personal and property damage causes of action in Ecuador and Peru, as other litigants in Ecuador have demonstrated. *See PT United Can Co.*, 138 F.3d at 74 (causes of action in Indonesian courts adequately address the underlying controversy expressed in plaintiff's complaint); *DiRienzo*, 232 F.3d at 57; *see supra* pp. 36-38, 56. In fact, Ecuadorian courts can grant plaintiffs greater

equitable relief than an U.S. court. It will have jurisdiction over the Government

land and water at issue as well as Petroecuador's facilities and ongoing operations.

Finally, plaintiffs are not powerless litigants at the mercy of a large U.S.

company, as they would have this Court believe. They have substantial political

influence and visibility in Ecuador. In the last two decades, indigenous groups

have achieved "immense political power" in Ecuador and have shown themselves

to be a "real political and ethnic force at a national and international level,"

managing to change Ecuador's Constitution "[w]ithin a short time." JA6796, ¶¶ 2-

4; JA6797, ¶¶ 8-9; JA6767, ¶ 5. Over the course of these cases, these plaintiffs

have been supported by government officials, including attorney generals,

advocacy groups, and non-governmental organizations. *Id.* This support is certain

to continue in Ecuador and/or Peru.

It follows, therefore, that *forum non conveniens* dismissals would still be

appropriate even if this Court were to conclude the ATCA applies here and that the

statute expresses a policy interest favoring the exercise of federal jurisdiction.

## IV. PLAINTIFFS' COMITY ARGUMENT MISCONSTRUES THIS COURT'S INSTRUCTIONS

Plaintiffs contend that the District Court disregarded this Court's instructions

by failing to consider on remand the Government of Ecuador's position regarding

the proper forum for this litigation, and that comity required the District Court to

"recognize [the government's] position and allow this case to proceed in this

Court." Pl. Br. at 53-55. This argument misconstrues this Court's instructions in
*Jota*, 157 F.3d at 161. It also mischaracterizes the Government of Ecuador's
position, as expressed by its officials to the District Court, regarding the venue of
this litigation.

This Court directed the District Court on remand to reconsider Texaco's
comity motion in light of the Government of Ecuador's current position on
sovereign immunity and intervention. Read in context, this Court was suggesting
that Texaco's comity motion, which the District Court had granted previously,
might be less persuasive on remand if the Government were to reverse its earlier
opposition to U.S. litigation and express a desire to waive its sovereign immunity
and intervene in *Aguinda*. *Id.* at 160 ("With the *comity issue* remanded . . . , it will
then be appropriate for the District Court to reconsider the *merits of the comity
issue* in light of Ecuador's changed litigating position.") (emphasis added).

In any event, plaintiffs are wrong in stating that the District Court ignored
the Government's position in granting Texaco's *forum non conveniens* motion. Pl.
Br. at 54-55. The District Court's opinion states, with specific reference to this
Court's instruction in *Jota,* that he had received "clarification from the
Government of Ecuador as to its current posture respecting these lawsuits."
*Aguinda*, 142 F. Supp. 2d at 538. The Government's unequivocal refusal to allow
itself or its state oil company to be bound by a U.S. court's orders was a factor in

his decision. He specifically noted the "glaring facts" of their absence in U.S. litigation but their ability to be sued and have their testimony compelled in Ecuador. *Id.* at 550-51.

The Government's position on venue is also more neutral than plaintiffs' brief suggests. Following remand, Ecuador's Attorney General, echoing the position of Ecuador's Ambassador to the United States in her letter to the District Court (JA4990), stated in his written Declaration to the District Court that the Government does "not take any stand" on the litigation, that it did not wish to intervene, that it would not waive its sovereign immunity, and that prior Government officials should not "have participated whatsoever in any capacity." JA6268-74; *see supra* p. 15 & n.7.

Ecuador's Minister of Foreign Relations also took no position on the issue of venue in his letter to an Ecuadorian Congressman that plaintiffs have quoted. Pl. Br. at 54. (The Republic did not provide this letter to the District Court as a statement of its position.) Instead, the Minister stated that the issue should be decided under applicable principles of law and offered no opinion on what result those principles should yield. JA5686-87, ¶ 8 ("[T]he decision regarding the venue where the lawsuit should continue, whether in the United States or in Ecuador, *must be made by the courts of the United States in accordance with the rules of international procedure applicable to these cases*.") (emphasis added).

86

## V.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING PLAINTIFFS' DISQUALIFICATION MOTION

Plaintiffs ask this Court at the end of their brief to reconsider the District Court's denial of their recusal motion under an abuse of discretion standard (Pl. Br. at 58), but the Court has done so already. *In re Aguinda*, 214 F.3d at 202 ("We conclude that *the district judge did not abuse his discretion* in denying the motion for disqualification.") (emphasis added).  There is no need to repeat the exercise, particularly after this Court has twice denied plaintiffs' petition for rehearing. *See supra* pp. 18-19.

Plaintiffs' brief presents the same arguments as before, and they have identified nothing in this Court's thorough opinion that was incorrect.  *In re Aguinda*, 241 F.3d 194; Pl. Br. at 58 (referring the Court to plaintiffs' mandamus petition.)  Judge Rakoff's conduct was unquestionably proper when the facts are presented correctly and then considered under the ethical guidelines for judges and the relevant case law, all of which plaintiffs continue to ignore.  "No reasonable person" would believe that the circumstances of the judicial seminar would influence a judge's thinking, as the Court wrote. *Id.* at 203.  Those circumstances are "far too remote to create a plausible suspicion of improper influence." *Id.* at 202-03.

## VI. CONCLUSION

The District Court followed this Court's instructions on remand to the letter, and afforded plaintiffs every opportunity to develop their arguments, pursue discovery on their fabricated claim of Texaco decision-making, and try to demonstrate why these cases should be pursued here instead of Ecuador. After methodically reviewing a voluminous factual record, Judge Rakoff correctly held that Texaco had carried its burden of persuasion on its *forum non conveniens* motion and that these cases "have everything to do with Ecuador and nothing to do with the United States . . . ." *Aguinda*, 142 F. Supp. 2d at 537. Plaintiffs have not met the "clear-abuse-of-discretion standard" applicable to an appeal of a *forum non conveniens* dismissal. *Iragorri*, 2001 WL 1538928, at *7. Accordingly, Texaco respectfully requests this Court to affirm the ruling below.

Dated:  December 20, 2001

Respectfully submitted,

KING & SPALDING

By:  _George S. Branch_

George S. Branch
Daniel J. King
Richard T. Marooney, Jr.
Jeanette M. Viggiano

191 Peachtree Street
Atlanta, Georgia  30303
(404) 572-4600

-and-

1185 Avenue of the Americas
New York, New York  10036
(212) 556-2100

CHEVRONTEXACO, INC.

Ricardo R. Veiga
Timm A. Miller

2000 Westchester Avenue
White Plains, New York  10650
(914) 253-4469

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of Texaco Inc.'s BRIEF FOR DEFENDANT-APPELLEE to be served upon the following by overnight delivery.

> Joseph C. Kohn
> Martin J. D'Urso
> Craig W. Hillwig
> KOHN, SWIFT, & GRAF, P.C.
> 1101 Market Street, Suite 2400
> Philadelphia, Pennsylvania 19107

> Cristobal Bonifaz
> John Bonifaz
> LAW OFFICES OF CRISTOBAL BONIFAZ
> Tucker Taft Building
> 48 North Pleasant Street
> Amherst, Massachusetts 01002

> Amy Damen
> SULLIVAN & DAMEN
> 470 Mamaroneck Avenue
> White Plains, New York 10605

This 20th day of December, 2001.

_____
Richard T. Marooney, Jr.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 32(a)(7)(B), I hereby certify that by computerized count on King & Spalding's word processing program there are no more than 21,000 words in this brief. This brief complies with this Court's Order dated November 16, 2001 granting Plaintiffs-Appellants' motion to extend the word, line and page limitations of the parties' principal briefs by 50 percent, therefore permitting the parties to file principal briefs containing up to 21,000 words.

Dated:  December 20, 2001.

Richard T. Marooney, Jr.

# EXHIBIT 513

# SA93

| | |
|---|---|
| **From:** | Doug Beltman <dbeltman@stratus consulting.com> |
| **Sent:** | Sunday, March 9, 2008 9:45 PM |
| **To:** | Lorena Gamboa (lore_gamboa@yahoo.es) |
| **Subject:** | RE: questions |
| **Attach:** | ecovalue.Annex.formatted.english.doc.doc |

Hey Lorena:

I won't be in Quito this coming week, but I may be there the week after (the week of March 17). So this week we'll have to use email and phone. Sorry in advance for this long email, but we have to do it this way for now, at least.

First, thanks for the restoration paper with costs. I think it has all the information in it we need to justify and explain the restoration that will offset the habitat losses from oil exploration and development. The most accurate way to combine the costs for the different starting habitats (grassland, shrub, etc.) is to weight each cost according to how much of it will be done. For example, if 75% of the restoration will be on grasslands and 25% on shrublands, then we take 75% of the grassland cost and 25% of the shrubland cost and add them together. However, we do not know how much of each habitat will be restored, so we'll have to make simplifying assumptions. Here's my suggestion: we consider only restoration to natural systems, not anthropogenic, because it is natural systems that have been lost and therefore those should be restored. I also suggest that we take an average of the grassland and shrub costs under the assumption that an equal amount of each will be restored (not knowing any better or different). I don't think we should include the pioneer or secondary forest systems because those systems are already much closer to providing full ecosystem services than the other 2 habitat types. If we do include pioneer or secondary forests, then we have to include in our calculations of habitat that the restoration of these systems does not provide as much increase in ecosystem services as do restorations of grassland or shrubland, since there are more services to begin with before restoration begins. And incorporating that factor into our habitat calculations is a bit complicated, especially at this late point.

Second, your analysis of the impacted hectares. Remember that we here at Stratus are doing a calculation of the areas around wells and stations that are impacted by contamination, and that you should not include those areas in your analysis. If you do, then we are double-counting those areas. The areas that are included in our analysis are all of the pits; all of the well pads; all of the land within the station boundaries; and 50% of the area of the pits at wells as a rough approximation of the additional soil area that is contaminated at each well. For these 4 areas we are calculating the amount of habitat lost and the time over which it has been lost. The time of loss starts with the start date for each well or station. For well pads and stations, we assume that the loss will continue indefinitely (since most of them will continue to operate). Pits and other areas of soil contamination are assumed to be cleaned up in 2015. I've attached a copy of our draft annex on this for you too look at so you know exactly what we're doing.

My understanding was that your analysis will calculate the habitat losses for impacts other than the contamination at wells and stations. I do not think that contamination sufficient to impact the ecology extends very far beyond the pads, pits, and spills at the

STRATUS-NATIVE067644

wells - there simply isn't a migration pathway. There apparently was some pit flaring (burning of pits) at some of the wells, but this didn't appear to be very common, and the area affected is very difficult to estimate - and I think it quite unlikely that ecological impacts from contamination at wells extends 5 km. At stations, contamination probably extends beyond their boundaries because of the emissions from flares, and because of the discharge of produced water from stations (although current records from PetroEcuador report that nearly all of the produced water in the Concession is being reinjected). But again, the ecological impacts from flares are hard to estimate and probably aren't very great. Of course I could be wrong about this, but I haven't seen any data or information that suggests that I am.

Therefore, I do not think that your analysis should use wells as the center points of impact, since it isn't the wells themselves that are the source of the impact. Rather, it seems that the loss of habitat that you're quantifying is related more to roads and development than to the locations of wells. Therefore, you could apply your "zone" concept to roads instead of wells, with the zones being linear strips of increasing width that run parallel to roads. The roads themselves are zone 1 - clearly a complete loss of habitat. Zones 2 and 3 would then extend away from the roads, with decreasing degree of impact. Not knowing the ecology of the area, I don't know what distances to use for the strip widths. Perhaps you could get some ideas from aerial photos, or at least identify the strip of very high impact that runs alongside the roads where the vegetation is cleared for pipelines, powerlines, ditches, etc. I assume that you have a GIS layer for roads - if you don't, you could ask Tania at Selva Viva what she has.

As for the timeline of impacts, the spreadsheet of well development dates that I sent is a good indication of the timeline of development of the field as a whole. You could use this to estimate the extent of impact in each year. For example, if 5% of the wells were installed in the first year, then 5% of the area impacted by roads could be assumed to start to be impacted that year. You noted that there are some wells in the spreadsheet without start dates - we simply don't have the data for those. For the purposes of calculating the relative amount of development that occurred each year, we can simply ignore those from the calculations. The dates listed come from a spreadsheet we got from Selva Viva that listed several dates for each well, such as start of drilling, end of drilling, start of production, etc. Not all of the dates were filled in for each well in the sheet, and some didn't make sense (like the end date of drilling would be before the start date). So we took the earliest of any of the dates for each well and used that to represent the start of "operations" at the well - probably the start of drilling, but not always.

If Pablo has given you different directions, I defer to him - only I ask that you make sure you don't include the same areas that we're covering at wells and stations. If you don't think you have enough time to do something with roads and can only work from the well locations, then I'm not sure what to say. I think it will probably be difficult to defend or explain a model of habitat loss that is based on losses radiating outward from wells for 5 km. Perhaps there's a way to use wells as proxies for the epicenters of impact, but I haven't been able to think of it.

Doug

============================

Douglas Beltman
Executive Vice President

STRATUS-NATIVE067645

SA95

Stratus Consulting Inc.
303.381.8000
303.381.8200 (fax)
www.stratusconsulting.com
-----Original Message-----
From: Lorena Gamboa [mailto:lore_gamboa@yahoo.es]
Sent: Sunday, March 09, 2008 8:05 PM
To: Doug Beltman
Subject: questions
Dear Doug,
We are encountering some problems in the definition of the number of hectares by wells opened. This is because, in our model some of the zones of the wells overlap, except the zone 1 or critic zone. i.e. Each zone 1 has a total of 4,97 has.; zone 2 has a tatal of 73,17, zone 3 has a total of 234,42 has. If we only account for zone 1, then we will have a more accurate result but the number of hectares will be much less.
If we account the zones 2 and 3, and if the wells are close by and overlap, we may be accounting double. So the options are: either we just account for zone 1, or if you have the names of each well, we can analize each one of them and have a more accurate number of hectares.
A question we have is if the date represents the year of exploration, or the year of explotation of the wells.
Another problem is the 11 wells that do not have a date. Where are we going to place them?
We are hoping that you can come so that we can work these things directly as it is quite hard to do it through mail.
Did you get my paper on restoration?
I still have not worked out the spreadsheet to calculate the final numbers. Any ideas?
Regards,
Lorena
>
_____
Enviado desde Correo Yahoo! El correo favorito de los internautas.
http://es.docs.yahoo.com/mail/overview/index.html

STRATUS-NATIVE067646