# 14-826-cv

## 14-832-cv(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———— ◆ ————

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

—v.—

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants,*

(*Caption continued on inside cover*)

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## SUPPLEMENTAL APPENDIX
## VOLUME II OF XXXV
## (Pages SA96 to SA326)

---

THEODORE B. OLSON, ESQ.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8668

WILLIAM E. THOMSON, III, ESQ.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

RANDY M. MASTRO, ESQ.
ANDREA E. NEUMAN, ESQ.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff-Appellee Chevron Corporation*

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

**TABLE OF CONTENTS**

PAGE

**Docket Entries**

Exhibits to Declaration of Kristen Hendricks in Support of Motion for
    Preliminary Injunction, filed February 6, 2011

    Exhibit 1 to Hendricks Declaration—
    Unreleased footage from the film *Crude* ........................................... SA1
    (Dkt. 6-2)

    Exhibit 2 to Hendricks Declaration—
    Transcript of unreleased footage from the film *Crude* ....................... SA2
    (Dkt. 6-10)

    Exhibit 22 to Hendricks Declaration—
    Excerpts from a statement made by Rafael Correa at a press
    conference in Lago Agrio, Ecuador, dated April 27, 2007, and a
    certified English translation thereof .................................................. SA9
    (Dkt. 20-6)

Exhibit B Part 2 to Affirmation of Sheldon Elsen In Support of
    Opposition to Preliminary Injunction, filed February 8, 2011

    Excerpts from Brief for Defendant-Appellee in *Aguinda v.
    Texaco, Inc.*, No. 01-7756(L) (2d Cir.), dated December 20,
    2001 ........................................................................................... SA21
    (Dkt. 62-3)

Exhibit 513 to Second Supplemental Declaration of Kristen
    Hendricks in Support of Motion for Preliminary Injunction,
    filed February 15, 2011

    Email from Douglas Beltman to Lorena Gamboa,
    dated March 9, 2008 .................................................................... SA92
    (Dkt. 108-13)

ii

PAGE

Chevron Corporation's Amended Complaint, filed April 20, 2011 .......... SA96
    (Dkt. 283)

Exhibits to Declaration of Kristen L. Hendricks in Support of
    Chevron Corporation's Motion for an Order of Attachment and
    Other Relief, filed November 29, 2011

    Exhibit 1031 to Hendricks Declaration—
    Expert Opinion of John A. Connor, P.E., P.G., B.C.E. E. titled
    "Remediation Activities and Environmental Conditions in the
    Former Petroecuador-Texaco Concession, Oriente Region,
    Ecuador," dated September 16, 2010...............................................SA327
    (Dkt. 355-13)

    Exhibit 1044 to Hendricks Declaration—
    Email chain between Michael San Sebastian and David Mills
    with the subject "Follow up," dated August 25, 2008 ....................SA429
    (Dkt. 355-22)

    Exhibit 1052 to Hendricks Declaration—
    Report prepared by Dr. R. Wasserstrom and titled "Disputing the
    Statements Made on Alleged Cultural Damages Caused to
    Indigenous Peoples by the Petroecuador-Texaco Consortium,"
    dated October 1, 2010.................................................................SA433
    (Dkt. 355-25)

    Exhibit 1053 to Hendricks Declaration—
    Report prepared by Eduardo Bedoya, PhD, titled "The
    Demographic Situation of the Cofalin," dated April 2, 2006...........SA447
    (Dkt. 355-25)

Declaration of Mary Beth Maloney in Further Support of Plaintiff
    Chevron Corporation's Motion for an Order of Attachment and
    Other Relief, filed December 20, 2011...........................................SA455
    (Dkt. 370)

iii

PAGE

Exhibits to Declaration of Anne Champion in Support of Chevron
        Corporation's Motion for Summary Judgment or Partial
        Summary Judgment on Defendants' Affirmative Defenses of Res
        Judicata and Collateral Estoppel, filed March 2, 2012

        Exhibit 2185 to Champion Declaration—
        2006 U.S. State Department Country Report on Human Rights
        Practices - Ecuador, dated March 6, 2007 ......................................SA477
        (Dkt. 401-8)

        Exhibit 2208 to Champion Declaration—
        Article titled "Ecuadorean President Rafael Correa's assault on
        media freedom," published by the Washington Post, dated
        January 11, 2012 ........................................................................SA482
        (Dkt. 402-1)

        Exhibit 2210 to Champion Declaration—
        Article titled "Judge in Ecuador libel case flees country,"
        published by the Miami Herald, dated February 23, 2012...............SA485
        (Dkt. 402-1)

        Exhibit 2211 to Champion Declaration—
        Article titled "Ecuador's Assault on Free Speech," published by
        the New York Times, dated February 21, 2012...............................SA488
        (Dkt. 402-2)

        Exhibit 2323 to Champion Declaration—
        Article by Mario Vargas Llosa, titled "The leader's honor,"
        published by El Pais, dated February 26, 2012, and a certified
        English translation thereof...........................................................SA493
        (Dkt. 402-14)

Exhibit 3103 to Declaration of Jason B. Stavers in Support of
        Chevron Corporation's Motion for Partial Summary Judgment on
        All Claims, Counterclaims and Affirmative Defenses, and
        Summary Judgment on Defendants' Affirmative Defense of
        Collateral Estoppel, filed January 28, 2013

iv

CSR Press Release titled "Chevron Offering Bribes to
Ecuadorian Judges, Investigation Reveals,"
dated January 21, 2013 ................................................................SA507
(Dkt. 754-1)

Exhibits to Declaration of Anne Champion in Support of Plaintiff
Chevron Corporation's Motion to Sanction and Hold the
Donziger Defendants and LAP Representatives in Contempt of
Court for Disobeying the Court's Discovery Orders, filed March
12, 2013

Exhibit 3504 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendant Steven Donziger, dated
June 7, 2012 ................................................................................SA511
(Dkt. 895-1)

Exhibit 3505 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendants The Law Office of
Steven R. Donziger, and Donziger & Associates, PLLC,
dated June 7, 2012 ......................................................................SA514
(Dkt. 895-1)

Exhibit 3506 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendant Hugo Gerardo Camacho
Naranjo, dated June 7, 2012.........................................................SA517
(Dkt. 895-1)

Exhibit 3507 to Champion Declaration—
Excerpts from Chevron Corporation's First Set of Requests for
Production of Documents to Defendant Javier Piaguaje
Payaguaje, dated June 7, 2012 ....................................................SA520
(Dkt. 895-1)

v

PAGE

Declaration of Steven Donziger in Support of Donziger's Opposition
　　to Chevron's Motion for Partial Summary Judgment on All
　　Claims, Counterclaims, and Affirmative Defenses, and Summary
　　Judgment on Defendants' Affirmative Defense of Collateral
　　Estoppel, filed March 18, 2013 ......................................................SA523
　　(Dkt. 922)

Exhibit 3725 to Declaration of Jason B. Stavers in Further Support of
　　Plaintiff Chevron Corporation's Memorandum of Law in
　　Response to Motions by Counsel for Defendants for Leave to
　　Withdraw as Counsel, filed May 11, 2013

　　Excerpt from a hearing transcript from the action *Chevron Corp.
　　v. Page*, No. RWT 11-395 (D. Md.)), dated January 25, 2013.........SA526
　　(Dkt. 1141-4)

Exhibit 96 to Declaration of Jason B. Stavers on Behalf of Chevron
　　Corporation in Support of Its Notice Pursuant to Rule 44.1 of the
　　Federal Rules of Civil Procedure of Intent to Raise Issues of
　　Foreign Law, filed September 11, 2013

　　Excerpts from the June 8, 2013 Deposition of Dr. Farith Ricardo
　　Simon Campaña ..........................................................................SA530
　　(Dkt. 1413-12)

Excerpts from the oral argument before the U.S. Court of Appeals for
　　the Second Circuit in *In re Naranjo*, No. 13-772 (2d Cir.), dated
　　September 26, 2013 ....................................................................SA542

Exhibit 4310 to Declaration of Jason B. Stavers in Opposition to
　　Defendants' Motion to Impose Termination Sanctions, filed
　　September 30, 2013

　　Report by Douglas Farah titled "The Current Situation of
　　Ecuador, and the Rule of Law and Criminalization in
　　[REDACTED]" ..........................................................................SA555
　　(Dkt. 1475-10; 1475-11)

vi

Exhibit D to Declaration of Jason B. Stavers in Support of Chevron's
    Supplemental Statement in Response to Defendants'
    Supplemental Submission Pursuant to Rule 44.1, filed November
    20, 2013

    Excerpts from May 24, 2013 deposition transcript of Juan Pablo
    Alban Alencastro..........................................................................SA589
    (Dkt. 1751-4)

Exhibit G to Declaration of Jason B. Stavers ISO Opposition to
    Defendants' Motion to Stay, filed March 31, 2014

    Ruling from the Supreme Court of Gibraltar in
    *Chevron v. James Russell DeLeon and Torvia Limited*,
    dated March 14, 2014 ................................................................SA596
    (Dkt. 1894-7)

**Designated Deposition Testimony**

Excerpts from the Deposition Testimony of Charles Calmbacher,
    dated March 29, 2010 ................................................................SA669

Excerpts from the Deposition Testimony of Hugo Gerardo Camacho
    Naranjo, dated May 14, 2013 .......................................................SA677

**Trial Testimony**

PX 3000 Direct Testimony of Ricardo Reis Veiga ...............................SA682

PX 3100 Direct Testimony of Christopher Bogart.................................SA726

PX 3200 Direct Testimony of David L. Russell ....................................SA745

PX 3300 Direct Testimony of Sara McMillen .......................................SA789

PX 3700 Direct Testimony of Robert A. Leonard, PhD .........................SA826

PX 3800 Direct Testimony of Patrick Juola, Phd ..................................SA856

vii

PAGE

PX 3900 Direct Testimony of Samuel Hernandez, Jr. ............................ SA868

PX 4000 Direct Testimony of James I. Ebert, PhD ................................ SA917

PX 4100 Direct Testimony of Spencer Lynch ....................................... SA928

PX 4200 Direct Testimony of Keith Rayner, PhD ................................. SA976

PX 4300X Direct Testimony of Adolfo Callejas Ribadeneira ................ SA995

PX 4400 Direct Testimony of Yerim Kim ............................................ SA1037

PX 4700 Direct Testimony of Sandra Elena ......................................... SA1082

PX 4800 Direct Testimony of Alberto Guerra Bastidas ....................... SA1126

PX 4900R Direct Testimony of Troy A. Dahlberg ............................... SA1187

PX 5000 Direct Testimony of James Spigelman, AC QC ..................... SA1331

PX 5100 Direct Testimony of Michael Green ...................................... SA1338

PX 5200 Direct Testimony of Dr. Joshua Lipton ................................. SA1360

PX 5600 Direct Testimony of Joseph C. Kohn ..................................... SA1371

PX 5800 Direct Testimony of Rhonda I. Zygocki ................................ SA1400

PX 6000 Direct Testimony of Weston Anson ....................................... SA1410

PX 6200 Direct Testimony of Vladimiro Álvarez Grau ....................... SA1430

DX 1500 Direct Testimony of Karen Hinton ........................................ SA1570

DX 1600 Direct Testimony of Donald Rafael Moncayo Jimenez ......... SA1585

DX 1601 Direct Testimony of Alejandro Ponce-Villacis ..................... SA1606

viii

PAGE

DX 1750 Direct Testimony of Steven Donziger ...................................SA1616

DX 1800 Direct Testimony of Javier Piaguaje Payaguaje ....................SA1679

DX 1900 Direct Testimony of Humberto Piaguaje ..............................SA1695

Trial Transcript, dated October 15–November 26, 2013 ......................SA1715

    Opening Statements......................................................................SA1718

    Examination of Ricardo Reis Veiga ............................................SA1770

    Examination of Christopher Bogart.............................................SA1926

    Examination of David L. Russell.................................................SA1997

    Examination of Sara McMillen ...................................................SA2124

    Examination of Robert A. Leonard .............................................SA2342

    Examination of Adolfo Callejas Ribadeneira...............................SA2367

    Examination of Troy Dahlberg....................................................SA2511

    Examination of James Spigelman.................................................SA2587

    Examination of Alberto Guerra...................................................SA2604

    Examination of Jeffrey Isaac Shinder..........................................SA2943

    Examination of James Ebert .......................................................SA3022

    Examination of Michael Green ...................................................SA3042

    Examination of Yerim Kim..........................................................SA3053

    Examination of Joseph C. Kohn ..................................................SA3091

ix

PAGE

Examination of Patrick Juola ......................................................SA3231

Examination of Samuel Hernandez .............................................SA3243

Examination of Sandra Elena.....................................................SA3250

Examination of Nicolas Zambrano ..............................................SA3295

Examination of Keith Rayner......................................................SA3659

Examination of Rhonda Zygocki.................................................SA3670

Examination of Weston Anson....................................................SA3694

Examination of Vladimiro Alvarez Grau ......................................SA3699

Examination of Donald Rafael Mancayo Jimenez ........................SA3751

Examination of Karen Hinton ....................................................SA3843

Examination of Alejandro Ponce-Villacis ...................................SA3913

Examination of Joshua Lipton ...................................................SA4037

Examination of Javier Piaguaje Payaguaje ..................................SA4063

Examination of Steven Donziger.................................................SA4154

Examination of Humberto Piaguaje............................................SA4365

Examination of Daniel Blank.....................................................SA4440

Examination of Spencer Lynch ..................................................SA4485

Closing Statements ..................................................................SA4527

x

PAGE

## Trial Exhibits

**PX 4** Unreleased footage from the film *Crude* featuring Steven
  Donziger discussing judge and HAVOC inspection, dated March
  30, 2006 ................................................................................SA4664

**PX 4A** Transcript of unreleased footage from the film *Crude* ..............SA4665

**PX 5** Unreleased footage from the film featuring Steven Donziger
  discussing judge and HAVOC inspection *Crude*, dated March
  30, 2006 ................................................................................SA4667

**PX 5A** Transcript of unreleased footage from the film *Crude* ..............SA4668

**PX 6** Unreleased footage from the film *Crude* featuring Steven
  Donziger confronting Ecuadorian judge about the HAVOC
  inspection, dated March 30, 2006 ................................................SA4671

**PX 6A** Transcript of unreleased footage from the film *Crude*..............SA4672

**PX 7** Unreleased footage from the film *Crude* featuring Steven
  Donziger discussing judge and HAVOC inspection, dated March
  30, 2006 ................................................................................SA4677

**PX 7A** Transcript of unreleased footage from the film *Crude*..............SA4678

**PX 8** Unreleased footage from the film *Crude* featuring Steven
  Donziger discussing judge and HAVOC inspection, dated March
  30, 2006 ................................................................................SA4680

**PX 8A** Transcript of unreleased footage from the film *Crude*..............SA4681

**PX 9** Unreleased footage from the film *Crude* featuring Steven
  Donziger discussing judge and HAVOC inspection, dated March
  30, 2006 ................................................................................SA4682

**PX 9A** Transcript of unreleased footage from the film *Crude*..............SA4683

PAGE

**PX 11** Unreleased footage from the film *Crude* featuring Donziger discussing political nature of Lago Agrio litigation, dated April 3, 2006 ......................................................................................SA4685

**PX 11A** Transcript of unreleased footage from the film *Crude* .............SA4686

**PX 15** Unreleased footage from the film *Crude* featuring Steven Donziger discussing pressure campaign against Chevron's executives, dated July 24, 2006 ...................................................SA4689

**PX 15A** Transcript of unreleased footage from the film *Crude* .............SA4690

**PX 16** Unreleased footage from the film *Crude* featuring Steven Donziger discussing Ecuadorian officials, dated December 6, 2006 .......................................................................................SA4698

**PX 16A** Transcript of unreleased footage from the film *Crude* .............SA4699

**PX 18** Unreleased footage from the film *Crude* featuring Steven Donziger discussing the appointment of a global damages expert, dated December 6, 2006 ...................................................SA4701

**PX 18A** Transcript of unreleased footage from the film *Crude* .............SA4702

**PX 39** Unreleased footage from the film *Crude* featuring Steven Donziger and the Lago Agrio Plaintiffs' team meeting with Richard Cabrera, dated March 3, 2007 ........................................SA4705

**PX 39A** Transcript of unreleased footage from the film *Crude* .............SA4706

**PX 42** Unreleased footage from the film *Crude* featuring Steven Donziger and the Lago Agrio Plaintiffs' team meeting with Richard Cabrera, dated March 3, 2007 ........................................SA4711

**PX 42A** Transcript of unreleased footage from the film *Crude* .............SA4712

xii

PAGE

**PX 43** Unreleased footage from the film *Crude* featuring Steven
Donziger and others discussing the global inspection report,
dated March 4, 2007 ................................................................... SA4716

**PX 43A** Transcript of unreleased footage from the film *Crude* ............. SA4717

**PX 47** Unreleased footage from the film Crude featuring Steven
Donziger and others discussing the global inspection report,
dated March 4, 2007 ................................................................... SA4727

**PX 47A** Transcript of unreleased footage from the film Crude ............. SA4728

**PX 67** Unreleased footage from the film *Crude* featuring a meeting
among Steven Donziger, Atossa Soltani, and Luis,
dated June 6, 2007 ..................................................................... SA4732

**PX 67A** Transcript of unreleased footage from the film *Crude* ............. SA4733

**PX 81** Unreleased footage from the film *Crude* featuring Steven
Donziger discussing judges and politics in Ecuador, dated
November 21, 2006 ..................................................................... SA4737

**PX 81A** Transcript of unreleased footage from the film *Crude* ............. SA4738

**PX 169#** Steven Donziger's Notebook ................................................... SA4742

**PX 172** Excerpt from Steven Donziger's Notebook,
dated October 6, 2005 ................................................................. SA4861

**PX 174** Excerpt from Steven Donziger's Notebook,
dated November 18, 2005 ........................................................... SA4864

**PX 177** Excerpt from Steven Donziger's Notebook,
dated February 6, 2006 ............................................................... SA4866

**PX 184** Excerpt from Steven Donziger's Notebook,
dated July 25, 2006 .................................................................... SA4867

xiii

PAGE

**PX 191** Excerpt from Steven Donziger's Notebook,
dated December 16, 2006 ............................................................SA4872

**PX 223** Contract for Implementing of Environmental Remedial Work
and Release from Obligations, Liability and Claims by and
between the Government of Ecuador, Petroecuador, and Texaco
Petroleum Company, dated May 4, 1995, and an English
translation thereof ....................................................................SA4877

**PX 234** Letter from Ambassador E. Terán to Judge Rakoff regarding
"*Maria Aguinda, et al. v. Texaco Inc.*," dated June 10, 1996 ........SA4933

**PX 312** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated September 16, 2008, and an
English translation thereof...........................................................SA4934

**PX 314#** Comments on the Report of the Court-Appointed Expert
Richard Cabrera Vega in the Case of *Maria Aguinda y Otros v.
Chevron Corp.*, dated December 1, 2008......................................SA5198

**PX 316** Complaint filed in *Maria Aguinda Salazar, et al. v. Chevron
Corp.*, dated May 7, 2003, and English translation thereof ...........SA5214

**PX 354** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated October 29, 2007, and an
English translation thereof...........................................................SA5246

**PX 363** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated April 4, 2008, and an English
translation thereof ....................................................................SA5249

**PX 366** Filing by Pablo Fajardo in *Maria Aguinda y Otros v. Chevron
Corp.*, Case No. 002-2003, dated April 25, 2008, and an English
translation thereof ....................................................................SA5260

**PX 390** Special Power of Attorney and Legal Mandate Authorized by
A. Payaguaje and Others in Favor of: Attorney Pablo Fajardo,
dated November 5, 2010, and an English translation thereof ........SA5265

PAGE

**PX 391** Lago Agrio Plaintiffs' Filing authorizing Special Power of Attorney and Legal Mandate to Pablo Fajardo, dated November 8, 2010, and an English translation thereof .................................. SA5314

**PX 394** Official Circular by A. Mera, Legal Counsel to the Office of the President of the Republic of Ecuador, dated November 18, 2010, and an English translation thereof ...................................... SA5369

**PX 446** PCA Case No. 2009-23, In the Matter of an Arbitration before a Tribunal Constituted in Accordance with the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investments, signed 27, August 1993 (the "Treaty") and the Uncitral Arbitration Rules 1976 between: 1. Chevron Corporation, 2. Texaco Petroleum Company, and The Republic of Ecuador—First Interim Award on Interim Measures, dated January 25, 2012 ................................................................ SA5563

**PX 448** Order issued in the Provincial Court of Justice of Sucumbios, dated October 15, 2012, and an English translation thereof ....... SA5581.1

**PX 450** PCA Case No. 2009-23, In the Matter of an Arbitration before a Tribunal Constituted in Accordance with the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investments, signed 27, August 1993 (the "Treaty") and the Uncitral Arbitration Rules 1976 between: 1. Chevron Corporation, 2. Texaco Petroleum Company, and The Republic of Ecuador - Fourth Interim Award on Interim Measures, dated February 7, 2013 .......................................... SA5581.26

**PX 470#** ChevronToxico article titled "Chevron Hires Hit Man Anthropologist To Rewrite Indigenous History In Amazon - Shoddy Scholarship Infects Report Submitted To Court to Hide Possible Genocide Committed By Chevron Against Cofan," dated April 24, 2006 .................................................................... SA5582

xv

**PX 497#** Letter from Amazon Watch to Christopher Cox, Chairman
of the U.S. Securities and Exchange Commission, dated March
18, 2008 ...................................................................................SA5588

**PX 527R** ChevronToxico article by Amazon Defense Coalition titled
"Acclaimed Film About Chevron's Eco-Disaster In Ecuador To
Open In Nation's Capital," dated October 22, 2009......................SA5593

**PX 558** Retainer agreement among the Lago Agrio Plaintiffs, El
Frente de Defensa de la Amazonia, the Asamblea de Afectados
por Texaco, and Donziger & Associates, PLLC, dated January 5,
2011 .........................................................................................SA5597

**PX 583** Banco Pichincha Account Summary for Selva Viva, dated
June 14, 2005, and an English translation thereof.........................SA5610

**PX 687** Memorandum from Steven Donziger regarding "Strategic
Planning Memo/Ecuador Case," dated November 19, 2003 ..........SA5791

**PX 737** Email string from Steven Donziger to Jennifer DeLury Ciplet,
copying Atossa Soltani regarding "SEC letter,"
dated November 2, 2005 .............................................................SA5794

**PX 754** Letter from Atossa Soltani and Sarah Aird to Christopher
Cox, dated January 30, 2006........................................................SA5796

**PX 763** Email from David Russell to Steven Donziger regarding
"your letter to AW," dated February 14, 2006 ..............................SA5798

**PX 764** Letter from David Russell to Steven Donziger regarding
"Cease and Desist," dated February 14, 2006, .............................SA5801

**PX 774** Email string from Aaron Page to Steven Donziger, copying
alejandrop@usfq.ec regarding "genocide issue/important," dated
March 27, 2006 ..........................................................................SA5803

**PX 779** Email from Steven Donziger to Ponce Villacis regarding
"Need plan," dated June 14, 2006 ...............................................SA5804

xvi

**PX 781** Email string from Daria Fisher to Steven Donziger regarding "SEC investigation/Chevron," dated July 12, 2006......................SA5805

**PX 788** Email from Steven Donziger to David Russell regarding "I asked you once…," dated August 15, 2006 .............................SA5807

**PX 806R** Email from Steven Donziger to David Kuhn regarding "Book Proposal attached," dated November 3, 2006....................SA5809

**PX 843** Email from Pablo Fajardo to Steven Donziger, copying Luis Yanza regarding "PLANES PARA EL EXAMEN PERICIAL," dated March 21, 2007, and an English translation thereof............SA5849

**PX 858** Email string from S. Donziger to E. Fajardo Mendoza, copying L. Yanza "re 'PREOCUPACION CONFIDENTIAL'" ['CONCERN CONFIDENTIAL"], dated May 10, 2007, and an English translation thereof......................................................SA5861.1

**PX 883** Email from Steven Donziger to Luis Yanza and Pablo Fajardo regarding "Ideas para reunion con Richard [Ideas for meeting with Richard]," dated July 17, 2007, and an English translation thereof. ...................................................................SA5862

**PX 906** Email string between Pablo Fajardo and Steven Donziger regarding "follow up on press releases," dated August 24, 2007, and an English translation thereof...............................................SA5867

**PX 909** Email string between Steven Donziger and Pablo Fajardo regarding "Imputado con la situacion HAVOC [Pissed off with HAVOC situation]," dated September 3, 2007, and an English translation thereof ...................................................................SA5876

**PX 918** Declaration of Mark Anthony Quarles, P.G., dated September 17, 2007, filed in *Republic of Ecuador v. ChevronTexaco Corp*, 04 Civ. 8378 (LBS) (S.D.N.Y.)....................................................SA5881

**PX 931** Email from Steven Donziger to Chris Lehane regarding "let's talk," dated October 29, 2007 ....................................................SA5887

xvii

**PX 976** Email from Douglas Beltman to Michael Carney, T. Hodgson, Jennifer Peers, Ann Maest, Preston Sowell, Eric English, David Mills, C. Rodgers regarding "Ecuador annex schedule," dated February 26, 2008 .................................................................. SA5888

**PX 1018** Email from Douglas Beltman to Steven Donziger regarding "what do u think of this?," dated March 30, 2008, and an English translation thereof .................................................................. SA5899

**PX 1028** Email from Pablo Fajardo to Juan Pablo Saenz, Julio Prieto, Luis Yanza, Steven Donziger, Maria Eugenia Garces, Maria Guardalupe Yepez, and M. de Heredia regarding "SCHISMES Y SUGERENCIA [GOSSIP AND SUGGESTIONS]," dated April 2, 2008, and an English translation thereof ................................. SA5904

**PX 1103** Email from Juan Pablo Saenz to Steven Donziger regarding "Nuevo Boletin/importante [New Press Release/important]," dated February 2, 2009, and a English translation thereof ............ SA5907

**PX 1108** 2008 U.S. State Department Country Report on Human Rights Practices—Ecuador, dated February 25, 2009 ................... SA5918

**PX 1130R** Excerpts from the hearing before the House of Representatives, Tom Lantos Human Rights Commission, on Ecuador, Nigeria, West Papau: Indigenous Communities, Environmental Degradation, and International Human Rights Standards, dated April 28, 2009 ................................................... SA5929

**PX 1146** Memo from Steven Donziger to Kohn Team regarding "Activity Going Forward," dated July 2, 2009 ............................ SA5932

**PX 1156** Email from Steven Donziger to Joseph Kohn regarding "idea to retain a lawyer," dated September 4, 2009 ............................... SA5935

**PX 1171** Email chain between Andrew Woods and Juan Pablo Saenz regarding "RE: document organization," dated October 19, 2009 .............................................................. SA5936

xviii

PAGE

**PX 1204#** Report titled "Invictus Report" on funding enforcement of the Lago Agrio judgment and distributing its proceeds, dated 2010 .................................................................. SA5938

**PX 1269** Email from John McDermott to Steven Donziger copying Erica Englert and Michael Hoke regarding "Chevron v. Stratus," dated March 21, 2010 .............................................. SA5973

**PX 1279** Email from Julio Prieto to Steven Donziger, Juan Pablo Saenz, Luis Yanza and Pablo Fajardo regarding "Protection Action," dated March 30, 2010, and an English translation thereof ....................................................................... SA5974

**PX 1316** Email string among Eric Westenberger, Andrew Wilson, Ilaan Maazel, Edward Yennock, Steven Donziger, Laura Garr, and Jonathan Abady regarding "Draft affidavit," dated May 3, 2010 ................................................................ SA5977

**PX 1319** Email from J. Rockwell to Edward Yennock, Eric Westenberger regarding "Draft Affidavit," dated May 4, 2010 ................................................................ SA5982

**PX 1347** Email chain among Jay Horowitz and Andrew Wilson, copying Jonathan Abady, Steven Donziger, Ilaan Maazel, Eric Westenberger, Edward Yennock, Eric Daleo, and J. Rockwell regarding "Rule 60(b) and Stratus Materials," dated May 16, 2010 .............................................. SA5989

**PX 1348** Email chain among Steven Donziger and Andrew Wilson, copying Ilaan Maazel, Jonathan Abady, Eric Westenberger, Jay Horowitz, Eric Daleo, and Edward Yennock regarding "Colorado Disclosures?," dated May 17, 2010 .............................................. SA6001

**PX 1363** Email chain among Steven Donziger, Eric Westenberger, Ilaan Maazel, Andrew Wilson, Jim Tyrrell, Steven Donziger, Eric Daleo, Edward Yennock, Jonathan Abady, M. Jasinski, Ingrid Moll, B. Narwold, Julie Brickell, Laura Garr, and Andrew Woods regarding "Mini-revelation," dated May 27, 2010 .............SA6003

xix

PAGE

**PX 1385** Email from Eric Westenberger to Eric Daleo, copying
Edward Yennock, Steven Donziger and Jim Tyrrell regarding
"Tomorrow's Production to Chevron," dated July 1, 2010............SA6005

**PX 1399** Email from Eric Westenberger to Steven Donziger, copying
Eric Daleo and Edward Yennock regarding "Ecuador Filing,"
dated July 22, 2010 ....................................................................SA6007

**PX 1502** Email string among Steven Donziger, John Keker, J. Little,
and M. Werdegar regarding "FYI," dated February 11, 2013, and
an English translation thereof .....................................................SA6008

**PX 1689** Attachment M to the declaration of Alberto Guerra Bastidas
- Banco Pichincha deposit records, dated March 2010, and an
English translation thereof..................................................... SA6018.1

**PX 1703** "Ayuda Memoria del Proceso [Memory Aid for the
Action]," and an English translation thereof ...............................SA6019

**PX 1706A** English translation of bank records of Alberto Guerra for
period ending November 5, 2009 .................................................SA6036

**PX 1707A** English translation of bank records of Alberto Guerra for
period ending December 3, 2009.................................................SA6038

**PX 1708** Bank records of Alberto Guerra, and an English translation
thereof .......................................................................................SA6040

**PX 1713** Banco Pichincha records of deposits for Alberto Guerra
(2009–2011), and an English translation thereof ..........................SA6043

**PX 1718** Banco Pichincha record of deposit for Alberto Guerra dated
February 2010, and an English translation thereof........................SA6075

**PX 1719** Banco Pichincha records of deposits for Alberto Guerra
dated December 2009, and an English translation thereof.............SA6078

xx

**PX 1746** Email from Steven Donziger to Luis Yanza regarding "Importante para discutir este fin de semana [Important to discuss this weekend]," dated November 27, 2009, and an English translation thereof............................................................SA6081

**PX 1751** Email from Pablo Fajardo to Luis Yanza and Steven Donziger regarding "Novedad [News]," dated October 27, 2009, and an English translation thereof...............................................SA6086

**PX 2143** Summary chart of evidence of investor contributions to the Lago Agrio litigation and related litigations................................SA6089

**PX 2164** Summary charts comparing text from the Lago Agrio judgment to the Lago Agrio Plaintiffs' unfiled work product........SA6090

**PX 2170** Interactive application showing side-by-side comparisons of the Lago Agrio judgment and other documents ...........................SA6121

**PX 2175** Summary chart of overlap and common errors found in the Lago Agrio judgment, Selva Viva Data Compilation, and Stratus Compilation ...............................................................................SA6122

**PX 2218** Timelines of selected publicly available materials or public statements authored by Defendants, their co-conspirators, and relevant third parties related to the Lago Agrio litigation .............SA6132

**PX 2382** Email from Emma Ozanne to David Lowe, et al. regarding Potential Buford Investment in Ecuador, dated September 6, 2010.........................................................SA6134.1

**PX 2387** Image of Hugo Gerardo Camacho Naranjo reading Chevron's complaint in this action...............................................SA6135

**PX 2413** "Pressure Chart" produced by Steven Donziger (DONZ-HDD-0201477)..........................................................................SA6137

xxi

**PX 2439** Email from Douglas Beltman to Pablo Fajardo and Steven Donziger regarding "Plan de Trabajo-Texpet cleanup," dated August 1, 2008 .................................................................SA6138

**PX 2473** PCA Case No. 2009-23, In the Matter of an Arbitration before a Tribunal Constituted in Accordance with the Treaty between the United States of America and the Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investments, Signed 27 August 1993 (the "Treaty") and the Uncitral Arbitration Rules 1976, between 1. Chevron Corporation, 2. Texaco Petroleum Company and The Republic of Ecuador, First Partial Award on Track, dated September 17, 2013 ..........................................................SA6140

**PX 2494** Article titled "Ecuador says had no role in alleged bribery case," posted on Reuters, dated September 12, 2009 ..................SA6216

**PX 2514** Petition submitted by Pablo Fajardo to the Provincial Court of Justice of Sucumbíos, dated August 23, 2010, and an English translation thereof .....................................................................SA6220

**PX 2524** Email string from Juan Pablo Saenz to Steven Donziger regarding "Chevron Charged With Dirty Tricks in Ecuador," dated September 2, 2009 ...........................................................SA6237

**PX 2551** Pablo Fajardo Mendoza Requests for Clarification and Expansion, dated January 6, 2012, and an English translation thereof .................................................................................SA6242.1

**PX 2553** Order in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 2011-0106, dated February 17, 2012, and an English translation thereof .....................................................................................SA6243

**PX 6703** Informational Bulletin titled "After 17 Years of Struggle we are Closer to the Judgment," dated December 2010, and an English translation thereof...........................................................SA6252

xxii

PAGE

**PX 7033A** Regular Meeting of the Executive Committee of the Udapt, Minutes No. 3, dated January 15, 2013, and an English translation thereof ....................................................SA6261

**PX 7421** Article by Peter Maass titled "Slick," dated March 2007 .......SA6276

**PX 7441** Email from Steven Donziger to Susan Martin, Scott Moorhead, and Kent Caperton regarding "draft ltr for Cuomo," dated April 2, 2009....................................................SA6287

**PX 7447** Document titled "Amazon Watch Ecuador Campaign, Draft Proposal/Confidential," dated June 4, 2009.................................SA6301

**PX 7502** Declaration of Ramiro Fernando Reyes Cisneros, dated October 12, 2012........................................................SA6304

**PX 7511** Article titled "Ecuador's president denounces Chevron as 'enemy of our country'" featured in The Raw Story, dated August 17, 2013 ........................................................SA6318

**PX 7608** Email from Steven Donziger to John McDermott regarding "important document attached," dated January 19, 2010...............SA6320

**PX 8000** Delaware Certificate of Good Standing for Chevron Corporation, dated February 24, 2012..........................................SA6344

**PX 8001** Delaware Certificate of Good Standing for Texaco Inc., dated February 24, 2012 ............................................SA6345

**PX 8002** Delaware Certificate of Good Standing for Texaco Petroleum Company, dated February 24, 2012 ............................SA6346

**PX 8004** Excerpts from a brief filed by Texaco Inc. in *Aguinda v. Texaco Inc.*, Case No. 93-cv-7527 (JSR) (S.D.N.Y.), dated January 11, 1999 ........................................................SA6347

xxiii

PAGE

**PX 8005** Excerpts from a brief by the plaintiffs in *Aguinda v. Texaco Inc.*, Case No. 93-cv-7527 (JSR) (S.D.N.Y.), dated January 11, 1999 ........................................................................................ SA6353

**PX 8025** Petroecuador Special Supplement article titled "Petroproduccion Eliminara 264 Piscinas con Desechos en la Amazonia [Petroecuador will eliminate 264 contaminated pits in the Amazonia]," dated October 5, 2006, and an English translation thereof ................................................... SA6357

**PX 8035** Report prepared by FUGRO-McClelland (West), Inc. titled "Final Environmental Field Audit for Practices 1990-1992, PetroEcuador-Texaco Consortium Oriente, Ecuador," dated November 1992 ...................................................................... SA6362

**PX 8036** Draft Report prepared by HBT AGRA Limited titled "Environmental Assessment of the Petroecuador-Texaco Consortium Oil Fields, Volume I: Environmental Audit Report," dated October 1993 ................................................... SA6664

**PX 8037** Report prepared by HBT AGRA Limited titled Environmental Audit and Assessment of the Petroecuador-Texaco Consortium Oil Fields until June 30, 1990, Volume II: Environmental Management Plan," dated October 1993 ............... SA6826

**PX 8044** Response and Request for Continuance regarding Order to Show Cause Dated June 19, 2013, dated June 24, 2013 ................ SA6968

**PX 8064** Report by John Connor titled "Response to Statements be Mr. Cabrera Regarding Alleged Impacts to Water Resources in the PetroEcuador-Texaco Concession Area," dated August 29, 2009, and an English translation thereof ..................................... SA6973

**PX 8065** Report by Ernesto Baca titled "Response to Mr. Cabrera Regarding his Evaluation of Petroecuador's Pit Remediation Program (PEPDA)," dated August 29, 2008, and an English translation thereof ................................................... SA7035

xxiv

PAGE

**PX 8070** "Anexo 4A: Expert Opinion of John A. Connor Regarding
Remediation Activities and Environmental Conditions in the
Former PetroEcuador-Texaco Concession, Oriente Region,
Ecuador," dated September 16, 2010............................................SA7097

**DX 605EK** Sampling report for Sacha 14, dated December 15, 2004,
and submitted to the Lago Agrio record at page 72,335 ...............SA7316

**DX 605EN** Sampling report for LA06, dated December 19, 2005, and
submitted to the Lago Agrio record at page 100,978 ....................SA7318

**DX 605EO** Sampling report for LA Central, dated April 4, 2006, and
submitted to the Lago Agrio record at page 119,378 ....................SA7320

**DX 1377A** Motion filed by Adolfo Callejas on behalf of Chevron in
*Maria Aguinda y Otros v. Chevron Corp.*, Case No. 106-2011, in
the Sole Division of the Provincial Court of Justice of
Sucumbíos, Nueva Loja, Ecuador, dated March 9, 2011, and a
certified English translation thereof ............................................SA7322

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

               Plaintiff,

    v.

STEVEN DONZIGER, THE LAW OFFICES OF
STEVEN R. DONZIGER, DONZIGER &
ASSOCIATES, PLLC, PABLO FAJARDO
MENDOZA, LUIS YANZA, FRENTE DE
DEFENSA DE LA AMAZONIA A/K/A AMAZON
DEFENSE FRONT, SELVA VIVA SELVIVA
CIA, LTDA., STRATUS CONSULTING, INC.,
DOUGLAS BELTMAN, ANN MAEST, MARIA
AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA
AGUINDA SALAZAR, LIDIA ALEXANDRA
AGUINDA AGUINDA, PATRICIO ALBERTO
CHIMBO YUMBO, CLIDE RAMIRO AGUINDA
AGUINDA, LUIS ARMANDO CHIMBO
YUMBO, BEATRIZ MERCEDES GREFA
TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA
AGUINDA, CELIA IRENE VIVEROS
CUSANGUA, FRANCISCO MATIAS
ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, OLGA GLORIA GREFA
CERDA, LORENZO JOSÉ ALVARADO
YUMBO, NARCISA AIDA TANGUILA
NARVÁEZ, BERTHA ANTONIA YUMBO
TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILA
GREFA, ROSA TERESA CHIMBO TANGUILA,
JOSÉ GABRIEL REVELO LLORE, MARÍA
CLELIA REASCOS REVELO, MARÍA
MAGDALENA RODRÍGUEZ BARCENES,
HUGO GERARDO CAMACHO NARANJO, JOSÉ
MIGUEL IPIALES CHICAIZA, HELEODORO
PATARON GUARACA, LUISA DELIA
TANGUILA NARVÁEZ, LOURDES BEATRIZ
CHIMBO TANGUILA, MARÍA HORTENCIA

11 Civ. 0691 (LAK)


AMENDED COMPLAINT

JURY TRIAL DEMANDED

VIVEROS CUSANGUA, SEGUNDO ÁNGEL      :
AMANTA MILÁN, OCTAVIO ISMAEL          :
CÓRDOVA HUANCA, ELIAS ROBERTO         :
PIYAHUAJE PAYAHUAJE, JAVIER PIAGUAJE  :
PAYAGUAJE, DANIEL CARLOS LUSITANDE    :
YAIGUAJE, BENANCIO FREDY CHIMBO       :
GREFA, GUILLERMO VICENTE PAYAGUAJE    :
LUSITANTE, DELFÍN LEONIDAS PAYAGUAJE  :
PAYAGUAJE, ALFREDO DONALDO            :
PAYAGUAJE PAYAGUAJE, TEODORO          :
GONZALO PIAGUAJE PAYAGUAJE, MIGUEL    :
MARIO PAYAGUAJE PAYAGUAJE, FERMIN     :
PIAGUAJE PAYAGUAJE, REINALDO          :
LUSITANDE YAIGUAJE, LUIS AGUSTÍN      :
PAYAGUAJE PIAGUAJE, EMILIO MARTÍN     :
LUSITANDE YAIGUAJE, SIMON LUSITANDE   :
YAIGUAJE, ARMANDO WILFRIDO PIAGUAJE   :
PAYAGUAJE, and ÁNGEL JUSTINO          :
PIAGUAGE LUCITANTE,                   :
                                      :
            Defendants.               :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

PARTIES AND RELEVANT NON-PARTIES ........................................................... 4

    Plaintiff ................................................................................................................ 4

    RICO Defendants ................................................................................................. 4

    Non-Party Co-Conspirators ................................................................................. 6

    Remaining Defendants ....................................................................................... 12

SUBJECT MATTER JURISDICTION AND VENUE .............................................. 13

PERSONAL JURISDICTION ................................................................................... 13

FACTUAL BASIS FOR CLAIMS ........................................................................... 19

A.    Background ......................................................................................................... 19

    1.    TexPet Participates in Ecuador's State Oil Consortium and Negotiates
        Release From Liability in Return for Specified Remediation .............. 19

    2.    U.S. Plaintiffs' Lawyers Devise Baseless Litigation Against Chevron
        in Ecuador ........................................................................................... 28

B.    The Conspirators Are Corrupting the Judicial Process to Extort a Payment
    From Chevron ..................................................................................................... 31

    1.    Pressuring the Lago Agrio Court and Manufacturing Evidence ........................... 33

        a.    Implementing Pressure Tactics and Colluding With Ecuadorian
            Government Officials ................................................................... 33

        b.    Taking Advantage of a Weakened and Increasingly Corrupt
            Ecuadorian Judiciary ................................................................. 40

        c.    Manipulating and Falsifying Their Own Experts' Findings to
            Corrupt the Judicial Inspection Process ..................................... 42

            (i)    Inducing an Expert to Report Biased and False Results ............... 43

            (ii)    Filing Falsified Expert Reports ..................................... 46

Page

d.  Arranging Cabrera's Appointment as Global Assessment
Expert and Secretly Writing His Supposedly "Independent"
Report..................................................................................... 50

(i)  Weeks Before the Court Appointed Cabrera, the RICO
Defendants Meet With Him to Plan His "Independent"
Expert Report ............................................................. 51

(ii)  The Court Appointed Cabrera as Its "Independent"
"Global Assessment Expert"........................................ 55

(iii)  While Cabrera Staged Mock Inspections, the RICO
Defendants and Their Co-Conspirators Secretly
Ghostwrote His Report ................................................ 56

(iv)  The "Cabrera Report":  The RICO Defendants'
Repeated Fraud ........................................................... 66

(v)  The RICO Defendants' Fraudulent Endorsements of
Their "Cabrera Report" and Procurement of Other
Endorsements Through Misrepresentations.................. 70

(vi)  The RICO Defendants' Payments to Cabrera for Work
He Did Not Perform.................................................... 74

(vii)  The RICO Defendants' Attempt to Launder the
"Cabrera Report" ........................................................ 76

2.  Colluding With the Republic of Ecuador to Bring Sham Charges
Against Chevron's Attorneys.................................................................. 79

3.  Launching Public Attacks on Chevron Based on Misleading
Statements and Lies to Force Chevron to Pay Up ................................. 85

a.  The Fraudulent Media Blitz.................................................... 85

b.  Misrepresenting the "Independent" and "Neutral" Cabrera
Report..................................................................................... 92

c.  The RICO Defendants Make False Statements to U.S. State
and Federal Government Officials............................................ 95

d.  The Conspirators Attempt to Manipulate Chevron's Stock
Price to Coerce a Favorable Settlement .................................. 98

e.  The RICO Defendants Falsely Accuse Chevron of Murder to
Generate Outrage and Force Chevron to Pay ........................ 103

ii

Page

C.    The Conspirators' Campaign of Lies and Obstruction in U.S. Courts ........................... 105

      1.    Attempting to Obstruct Chevron's Discovery Proceedings by Making
            False and Misleading Statements Before U.S. District Courts and
            Courts of Appeals ................................................................................ 106

            a.    The RICO Defendants' Initial False Representations to U.S.
                  Courts That They Had No Relationship With Cabrera and No
                  Role in Preparing the "Cabrera Report" ................................................ 108

            b.    The RICO Defendants' Subsequent False and Misleading
                  Statements in an Attempt to Justify and Excuse Their
                  Emerging Misconduct ................................................................. 113

      2.    Making False Statements to Deceive New York Courts in Connection
            With Chevron's Section 1782 Applications and Other Actions ........................ 121

      3.    Obstructing Judicial Proceedings by Tampering With Witnesses,
            Withholding Documents, and Making False Statements to This Court .............. 123

D.    Chevron Has Suffered Substantial Damages as a Result of the RICO
      Defendants' Conspiracy, and Enforcement of the Corrupt Judgment in the
      Lago Agrio Litigation Would Deepen the Harm ............................................. 127

CLAIMS FOR RELIEF ................................................................................. 136

      FIRST CLAIM FOR RELIEF
      (Violations of RICO, 18 U.S.C. § 1962(c)) ....................................................... 136

      SECOND CLAIM FOR RELIEF
      (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)) ..................... 151

      THIRD CLAIM FOR RELIEF
      (Fraud) .................................................................................................. 153

      FOURTH CLAIM FOR RELIEF
      (Tortious Interference With Contract) ............................................................. 154

      FIFTH CLAIM FOR RELIEF
      (Trespass to Chattels) ............................................................................... 156

      SIXTH CLAIM FOR RELIEF
      (Unjust Enrichment) ................................................................................. 158

      SEVENTH CLAIM FOR RELIEF
      (Civil Conspiracy) .................................................................................... 159

Page

EIGHTH CLAIM FOR RELIEF
     (Violations of New York Judiciary Law § 487) .................................................. 160

NINTH CLAIM FOR RELIEF
     (Request for Declaratory Judgment That the Judgment by the Lago
     Agrio Court Against Chevron is Unenforceable and Non-
     Recognizable) ................................................................................................... 161

PRAYER FOR RELIEF ........................................................................................... 163

iv

Plaintiff Chevron Corporation ("Chevron") for its Amended Complaint against the Defendants listed below alleges as follows:

### INTRODUCTION

1.     Over the course of several years, defendant Steven Donziger and his co-defendants and co-conspirators have sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States. It has been carried out by a U.S.-based enterprise comprised of, among others, U.S. plaintiffs' lawyers led by Donziger; U.S. environmental consultants, led by Stratus Consulting, Inc., Ann Maest, and Doug Beltman; their Ecuadorian colleagues, led by Pablo Fajardo and Luis Yanza; and their front organizations, the Amazon Defense Front and Selva Viva. These conspirators are collectively referred to herein as the "RICO Defendants."[1] Their co-conspirators in the enterprise include, among others, U.S. law firms and attorneys, such as Joseph Kohn of Kohn Swift & Graf, P.C., Emery Celli Brinckerhoff & Abady LLP, Motley Rice LLC and Patton Boggs LLP; U.S. environmental "activists," such as Atossa Soltani, Amazon Watch, and Rainforest Action Network; U.S. public relations consultants, such as Karen Hinton; and additional financiers, such as Russell DeLeon and the Burford Group.

2.     The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it. The RICO Defendants have sought to inflict maximum "damage to [Chevron's] reputation," to put "personal psychological

---

[1] Forty-seven of the 48 Ecuadorian individuals who are named in the caption of the Lago Agrio complaint are also named as defendants here (the exception being one who is now deceased). Whether or not these 47 individuals were actively involved with the corrupt acts described in this Amended Complaint, or knew or should have known about them, the Lago Agrio Litigation and multiple acts in United States courts have been undertaken in their names, as well as in the name of the Amazon Defense Front, by the other defendants or those acting in concert with them on their behalves. Thus, they are vicariously liable for the torts of their agents undertaken on their behalves, can in no way benefit from a corruptly obtained judgment, and any relief Chevron procures by means of this action or other legal avenues applies equally to these 47 Ecuadorian individuals, who necessarily would thereby be acting in concert with their corrupt agents.

1

pressure [on] their top executives," to disrupt Chevron's relations with its shareholders and investors, to provoke U.S. federal and state governmental investigations, and thereby force the company into making a payoff.

3.　　　To effect this plan, the RICO Defendants and their co-conspirators initiated a sham litigation in Lago Agrio, Ecuador (the "Lago Agrio Litigation"), claiming to seek money damages for "collective environmental rights" of the "affected" "communities" to remediate alleged petroleum contamination in Ecuador's Oriente region. The Lago Agrio Litigation was directed and funded in significant part from the United States by United States residents, such as Donziger and Kohn. In prosecuting the Lago Agrio Litigation, the RICO Defendants and their co-conspirators have engaged in a series of corrupt acts. For example, they have submitted in the Lago Agrio Litigation fabricated evidence in the form of expert reports in the name of a U.S. environmental consultant, Dr. Charles Calmbacher, that he did not draft or approve. They also pressured U.S. environmental consultant David Russell to generate an inflated $6 billion damages figure, which they never filed in Lago Agrio but instead touted in the press and, via co-conspirator Amazon Watch, submitted to the U.S. Securities and Exchange Commission in an attempt to trigger a Sarbanes-Oxley investigation. And they arranged the appointment of Richard Stalin Cabrera Vega ("Cabrera") as the Ecuadorian court's sole expert to conduct a "global damages assessment." They then secretly met with Cabrera to plan his report and—in the United States—ghostwrote the report and its annexes that Cabrera adopted "pretty much verbatim." The U.S.-based consultant RICO Defendants drafted "comments" purporting to criticize "the Expert's work and conclusions," even though they had written his initial report themselves, and then ghostwrote "Cabrera's" responses to their own "comments," increasing his fake damage assessment to more than $27 billion. In addition, the RICO Defendants have adopted a strategy to intimidate Ecuadorian judges, whom they have described as "mak[ing] decisions based on who they fear the most, not based on what the laws should dictate," and they have colluded with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys.

2

4.      To pressure Chevron in the United States, the RICO Defendants have cited this fabricated evidence, Cabrera's supposedly "independent" report and these trumped-up criminal charges in false statements to the U.S. Congress, the U.S. Department of Justice, state and federal regulatory agencies, including the Securities and Exchange Commission, the U.S. media, and Chevron shareholders, among others.  They have also made false statements to U.S. courts in an attempt to cover up their wrongdoing and to obstruct Chevron's discovery efforts.  In fact, when U.S. discovery proceedings were poised last March to require disclosure of the RICO Defendants' collusion with Ecuadorian court expert Cabrera, the RICO Defendants sought to delay the truth from coming out.  As one of the Ecuadorian lawyers told Defendant Donziger at the time, "the effects" of disclosure "are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)."  U.S. counsel agreed, admitting in a remarkable series of internal emails that "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator."  Undeterred, however, Donziger and other U.S. counsel then conspired to "cleanse" the Cabrera scandal by submitting to the Lago Agrio court last September new expert reports which largely relied on the tainted "Cabrera" report, but hiked the damages sought to $113 billion.

5.      The RICO Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq*., with predicate acts of extortion, mail and wire fraud, money laundering, obstruction of justice, and witness tampering, among others.  In addition, Defendants' conduct constitutes common law fraud, unjust enrichment, intentional interference with contract, trespass to chattels, and civil conspiracy, among others.  As a result, Defendants' misconduct entitles Chevron to injunctive relief precluding Defendants from attempting to enforce the judgment emanating from the proceedings in Lago Agrio, Ecuador, a declaratory judgment that the Lago Agrio judgment is unenforceable, damages, and other relief.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiff**

6.      Plaintiff Chevron Corporation ("Chevron") is a Delaware corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California 94583.  Chevron is therefore a citizen of Delaware and California.

**RICO Defendants**

7.      The defendants listed in paragraphs 8 through 17 are the individuals who have conspired to engage in a pattern of racketeering activity, have each committed numerous criminal acts as part of their scheme to defraud and extort Chevron, and have each participated in the operation or management of the criminal enterprise.  These defendants shall be referred to herein as the "RICO Defendants."

8.      Defendant Steven Donziger ("Donziger") is currently a "consulting" attorney for the Amazon Defense Front in the Lago Agrio Litigation and, as he described himself, "the person primarily responsible for putting [the Lago Agrio] team together and supervising it." Donziger is an individual residing in New York, New York, with an intention to reside there indefinitely, and is therefore a citizen of the State of New York.  Exercise of jurisdiction over Donziger is reasonable and proper in this District for the reasons set forth in paragraph 25, *infra*.

9.      Defendant the Law Offices of Steven R. Donziger is a sole proprietorship located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York.  Exercise of jurisdiction over the Law Offices of Steven R. Donziger is reasonable and proper in this District for the reasons set forth in paragraph 26, *infra*.

10.     Defendant Donziger & Associates, PLLC is a professional limited liability corporation located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York.  Exercise of jurisdiction over Donziger & Associates, PLLC is reasonable and proper in this District for the reasons set forth in paragraph 26, *infra.*

11.     Defendant Pablo Fajardo Mendoza ("Fajardo") is counsel of record for the Amazon Defense Front as well as purportedly counsel of record for the named plaintiffs in the

4

Lago Agrio Litigation. Fajardo is an individual residing in Ecuador, with an intention to reside there indefinitely, and is therefore a citizen of Ecuador. Exercise of jurisdiction over Fajardo is reasonable and proper in this District for the reasons set forth in paragraph 28, *infra*.

12.     Defendant Luis Yanza ("Yanza") is the co-founder of the Amazon Defense Front and is or has been the General Manager for Defendant Selva Viva. Yanza is an individual residing in Ecuador, with an intention to reside there indefinitely, and is therefore a citizen of Ecuador. Exercise of jurisdiction over Yanza is reasonable and proper in this District for the reasons set forth in paragraph 29, *infra*.

13.     Defendant Frente de Defensa de la Amazonia, a/k/a the Amazon Defense Front or Amazon Defense Coalition (the "Frente" or the "Front"), is a "non-profit" organization purporting to represent the "plaintiffs" in the Lago Agrio Litigation. The Front is the designated "beneficiary" and "trustee" of a trust ordered by the judgment in the Lago Agrio Litigation (the "Judgment Trust"), and intends to administer the proceeds from the judgment entered against Chevron. The Front is a non-profit organization registered under the laws of Ecuador with offices located in the town of Nueva Loja (Lago Agrio) in the province of Sucumbíos, Ecuador. The Front is therefore a citizen of Ecuador. Exercise of jurisdiction over the Front is reasonable and proper in this District for the reasons set forth in paragraph 30, *infra*.

14.     Defendant Selva Viva, a/k/a Selva Viva Selviva CIA, Ltda. ("Selva Viva") is or was an Ecuadorian limited liability company with an office located at 1240 Shirys Street, Tumbaco, Ecuador. Selva Viva is therefore a citizen of Ecuador. Defendant the Front created Selva Viva to administer funds for the litigation. Defendant the Front controls Selva Viva, Defendant Donziger is or has been the President of Selva Viva, and Defendant Yanza is or has been the General Manager of Selva Viva. Exercise of jurisdiction over Selva Viva is reasonable and proper in this District for the reasons set forth in paragraph 31, *infra*.

15.     Defendant Stratus Consulting, Inc. ("Stratus") provided various environmental consulting services to the RICO Defendants, and was involved in producing the purportedly "independent" expert report filed in the Lago Agrio Litigation. Stratus is a private corporation

5

incorporated in Colorado with its main office at 1881 Ninth Street, Suite 201, Boulder, Colorado 80302, and is therefore a citizen of Colorado. Exercise of jurisdiction over Stratus is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

16.     Defendant Douglas Beltman ("Beltman") is an Executive Vice President of Stratus. Beltman is an individual residing in Colorado, with an intention to reside there indefinitely, and is therefore a citizen of Colorado. Exercise of jurisdiction over Beltman is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

17.     Defendant Ann Maest ("Maest") is a Managing Scientist at Stratus. Maest is an individual residing in Colorado, with an intention to reside there indefinitely, and is therefore a citizen of Colorado. Exercise of jurisdiction over Maest is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

**Non-Party Co-Conspirators**

18.     Certain other non-party individuals and business entities played roles, direct or indirect, in the scheme to defraud and extort Chevron. Foremost among these individuals and business entities are the following:

a.  Joseph Kohn ("Kohn") of the law firm Kohn Swift & Graf P.C. is an attorney who was a "consulting" attorney for the Amazon Defense Front in the Lago Agrio Litigation, and a primary source of funds for that litigation and for many of the illegal activities described in this Amended Complaint. Kohn is a resident of Pennsylvania.

b.  Kohn Swift & Graf P.C. ("Kohn Swift") is a professional corporation located at One South Broad Street, Suite 2100, Philadelphia, Pennsylvania 19107. Kohn Swift has bankrolled the Lago Agrio Litigation as one of its "flagship cases" and funded the co-conspirators' other illegal activities.

c.  Joshua Lipton ("Lipton") is the President of Stratus and is a resident of Colorado. Together with the RICO Defendants, Lipton coordinated and oversaw the use of Stratus and other resources by the RICO Defendants to ghostwrite the Cabrera

6

Report and publicize its findings. To these ends, Lipton met with Donziger to discuss the RICO Defendants' plan to draft portions of the Cabrera Report and was included in various correspondence concerning Stratus's work in ghostwriting the Cabrera Report.

d.  David Chapman ("Chapman") is a Principal at Stratus and is a resident of Colorado. Chapman proposed drafting the Cabrera Report to Donziger, worked with Lipton and the RICO Defendants to coordinate the use of Stratus resources in the ghostwriting of the Cabrera Report, and participated in the subsequent obstruction of Chevron's efforts to uncover evidence of the fraud in U.S. court proceedings. He met with Donziger to discuss the RICO Defendants' plan to ghostwrite the Cabrera Report, signed Stratus's report endorsing the Cabrera Report, and perjured himself in a deposition when he testified that he had no reason to believe that Stratus had provided work product to Cabrera.

e.  William Powers ("Powers") is a subcontractor for Stratus and is a resident of California. Powers had responsibility for components of the fraudulent scheme to ghostwrite the Cabrera Report; he worked on two annexes of the Cabrera Report and drafted portions of Cabrera's supplemental report.

f.  Amazon Watch is a "non-profit" organization with its main office at 221 Pine Street, San Francisco, California 94104. Amazon Watch undertakes various projects ostensibly on behalf of environmental and human rights causes in the Amazon basin. In connection with the Lago Agrio Litigation, Amazon Watch applied its experience and resources in public, media and government relations to use the Cabrera Report and other false and fraudulent claims as the basis for the RICO Defendants' public pressure campaign against Chevron. With the Amazon Defense Front, Amazon Watch maintains at least one of the RICO Defendants' websites, chevrontoxico.com, and through that and other means, distributes false

and misleading statements as part of the RICO Defendants' extortionate scheme. Kohn and Kohn Swift are significant financial supporters of Amazon Watch.

g.  Atossa Soltani ("Soltani") is the founder and executive director of Amazon Watch and, in that capacity, Soltani repeatedly distributed false and misleading statements about Chevron and the Lago Agrio Litigation as part of the RICO Defendants' extortionate scheme. She has also worked with Donziger, Yanza and other RICO Defendants to coordinate the public pressure campaign against Chevron, and to develop the RICO Defendants' strategy of manipulating the Lago Agrio court through intimidation and collusion with the Republic of Ecuador. Soltani is a resident of California.

h.  Rainforest Action Network ("RAN") is a "non-profit" organization with its main office at 221 Pine Street, San Francisco, California 94104. The organization specializes in boycotts, demonstrations, and other high-profile means of exerting pressure on corporations that it perceives threaten the world's rainforests. In close concert with Amazon Watch (with which it shares a headquarters location), RAN has organized demonstrations and boycotts against Chevron and distributed false and misleading statements about Chevron and the Lago Agrio Litigation. RAN also maintains at least one of the websites, changechevron.org, through which the RICO Defendants distribute false and misleading statements.

i.  Richard Stalin Cabrera Vega ("Cabrera") is a mining engineer and court expert in the Lago Agrio Litigation and a resident of Ecuador. The RICO Defendants secured his appointment as a purportedly independent court expert in the Lago Agrio Litigation. He was paid by the RICO Defendants and their co-conspirators for his cooperation in signing a fraudulent report ghostwritten by the RICO Defendants and their co-conspirators and he has repeatedly misrepresented his independence.

j.  Alberto Wray ("Wray") is the former counsel of record for the plaintiffs in the
    Lago Agrio Litigation and is a resident of Washington, D.C.  Wray previously
    served on Ecuador's Supreme Court and has significant political connections in
    Ecuador.  The RICO Defendants have used Wray's connections to procure the
    sham criminal investigations of Chevron's attorneys.

k.  Cristóbal Bonifaz ("Bonifaz") of the Law Offices of Cristóbal Bonifaz was
    counsel of record for plaintiffs in two actions that were filed in the Southern
    District of New York, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (S.D.N.Y. Nov.
    3, 1993), and *Jota v. Texaco, Inc.*, No. 94 Civ. 9266 (S.D.N.Y. Dec. 28, 1994).
    Bonifaz is a resident of Massachusetts.  Until in or about 2006, Bonifaz was also a
    consulting attorney for the Front, and purportedly the named plaintiffs, in the
    Lago Agrio Litigation.

l.  Juan Pablo Saenz ("Saenz") is an Ecuadorian attorney who claims to represent the
    plaintiffs in the Lago Agrio Litigation and is a key intermediary between the
    RICO Defendants and the Republic of Ecuador.  He has also signed false and
    misleading declarations filed in U.S. courts, including in the Southern District of
    New York.

m.  Julio Prieto ("Prieto") is an Ecuadorian attorney who claims to represent the
    plaintiffs in the Lago Agrio Litigation.  Prieto was a key participant in the RICO
    Defendants' obstruction of justice in U.S. courts and he proposed litigation and
    public relations activities in the United States that the RICO Defendants
    undertook in order to obscure the evidence of their fraudulent scheme.

n.  Karen Hinton ("Hinton") is a spokeswoman for the Front in the United States and
    is a resident of Virginia.  Hinton assisted the RICO Defendants in the
    development of their public pressure campaign and, often in concert with Amazon
    Watch, has authored false and misleading press releases and media statements

about the Lago Agrio Litigation in furtherance of the RICO Defendants'
extortionate scheme.

o. E-Tech International ("E-Tech") is an environmental consulting firm located at
231 Las Mananitas, Santa Fe, New Mexico 87501. E-Tech provided various
environmental consulting services to the RICO Defendants and helped the RICO
Defendants secretly draft Cabrera's work plan and otherwise colluded with
Cabrera.

p. Burford Capital Limited, Burford Group Limited, Burford Group LLC, Burford
Advisors LLC, and Treca Financial Solutions (collectively, "Burford") are
associated entities in the business of litigation finance. Burford Capital Limited is
registered in the Bailiwick of Guernsey and is publicly traded on the London
Stock Exchange's AIM Market. Burford Group Limited is also a Guernsey
corporation, and it operates in the United States through its subsidiary Burford
Group LLC, which has its principal office at 1185 Avenue of the Americas, New
York, New York 10036. Burford Advisors also has its principal office at 1185
Avenue of the Americas, New York, New York 10036. Treca Financial Solutions
is registered in the Cayman Islands, and is a funding vehicle established by
Burford to funnel financial support to the RICO Defendants. Burford began
working with the RICO Defendants in 2009 and began funding the Lago Agrio
Litigation in 2010.

q. Russell DeLeon ("DeLeon") is a law school friend of Donziger's and
entrepreneur whose businesses include PartyGaming Plc, an online gambling
company headquartered in Gibraltar. DeLeon has funded the RICO Defendants'
activities for several years, providing over $1 million in support, and has made
payments directly to Ecuadorians, including Fajardo and others. DeLeon has
funneled some or all of this funding through Torvia Limited, a company
incorporated under the laws of Gibraltar.

10

r.   Emery Celli Brinckerhoff & Abady LLP ("Emery Celli") is a law firm located at 75 Rockefeller Plaza, 20th Floor, New York, New York 10019. Emery Celli has spearheaded the RICO Defendants' obstruction and cover-up efforts in the United States, making numerous meritless filings in opposition to Chevron's discovery proceedings in U.S. courts in an express effort to delay those proceedings and "buy time" for the RICO Defendants' criminal scheme.

s.   Patton Boggs LLP ("Patton Boggs") is a law firm with its principal office at 2550 M Street, NW, Washington, D.C. 20037. Patton Boggs has developed the RICO Defendants' strategy for pursuing the assets of Chevron and its subsidiaries around the world on the basis of the fraudulent judgment in Ecuador, and has also been instrumental in the cover-up and obstruction of Chevron's U.S. discovery proceedings.

t.   Motley Rice LLC ("Motley Rice") is a law firm with an office located at One Corporate Center, 20 Church St., Hartford, Connecticut 06103. Motley Rice has participated in the obstruction of Chevron's U.S. discovery efforts.

u.   H5 is a California corporation with its principal office at 71 Stevenson St., San Francisco, California 94105. H5 has participated in planning and implementing the RICO Defendants' scheme, including the "cleansing" of the Cabrera Report and the obstruction of Chevron's U.S. discovery efforts.

19.    At all relevant times, each and every non-party named in paragraph 18 was acting in concert with, or as an agent for, one or more of the RICO Defendants and, further, as described in more detail below, conspired with one or more of the other RICO Defendants to perform the acts averred herein.

11

**Remaining Defendants**

20.     The Lago Agrio Litigation was ostensibly brought on behalf of forty-eight named individual Ecuadorians,[2] referred to herein as the Lago Agrio Plaintiffs.  At all relevant times, the Lago Agrio Plaintiffs have been individuals residing in the Republic of Ecuador.  The Lago Agrio Plaintiffs are those individuals identified in Appendix A to this Amended Complaint, which is incorporated by reference as if set forth herein in its entirety.

21.     The Lago Agrio Plaintiffs' Complaint seeks no individual damages in the Lago Agrio Litigation, and the signatures for twenty of the Lago Agrio Plaintiffs on the power of attorney form submitted along with the complaint in the Lago Agrio Litigation are the product of forgery.  Defendant Fajardo, in a sworn declaration submitted to this Court in January 2011, has affirmed that he represents the Lago Agrio Plaintiffs as their attorney in the Lago Agrio Litigation and is authorized to pursue and defend their interests in other domestic and foreign courts.  According to Fajardo, the Lago Agrio Plaintiffs gave him "the power to represent them" in the Lago Agrio Litigation in 2006.  At that time, they purportedly signed documents appointing him as their "Common Attorney," which required him "to undertake all appropriate legal action to defend the[ir] rights" and authorized him "to appear on their behalf in connection with the Lago Agrio Litigation and if necessary to delegate this power to others."  Subsequently, in November 2010, "at least forty-one (41)" of the Lago Agrio Plaintiffs allegedly signed notarized powers of attorney "affirming" Fajardo's "powers to represent them in pursuit and defense of their interests before the courts in Ecuador and in all other countries, including the United States."  Moreover, in these powers of attorney, the Lago Agrio Plaintiffs purportedly "ratified and approved each and every action to date performed by [Fajardo] or by any other persons authorized by [Fajardo] to act in defense of the [Lago Agrio] Plaintiffs' interests in the Lago Agrio Litigation and in all other related actions."  In his declaration, Fajardo represented

---

[2] One of these individuals, Esteban Lusitante Yaiguaje, is now deceased and thus is not named as a defendant in this case.

12

that the Lago Agrio Plaintiffs who signed the powers of attorney in November 2010 "affirmed that as lead counsel I have the authority to make and sign contracts, hire and retain legal consultants, and designate to others all or part of my power to represent the [Lago Agrio] Plaintiffs." He also stated that he retained several U.S. law firms to assist with the representation of the Lago Agrio Plaintiffs, including Patton Boggs, Emery Celli, and Motley Rice.

22.     Whether or not the individual Lago Agrio Plaintiffs were or are aware of the fraud that has been perpetrated by the RICO Defendants and their co-conspirators in their names, the Lago Agrio Plaintiffs cannot benefit from the fraud and corrupt acts perpetrated ostensibly on their behalf.

## SUBJECT MATTER JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over Chevron's claims under 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c). Chevron's first claim for relief arises under 18 U.S.C. § 1961 *et seq.*, as hereinafter more fully appears. There is also complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Chevron's state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Chevron's state law claims under 28 U.S.C. § 1367.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965.

## PERSONAL JURISDICTION

25.     Exercise of jurisdiction over Defendant Donziger is reasonable and proper in this District because Donziger is a citizen of the State of New York and because he conducts extensive business activities within the State. Donziger is the sole proprietor of the Law Offices of Steven R. Donziger, which is located and does business in New York. Through his activities in New York, Donziger has served as the ringleader in the enterprise to defraud and extort

13

Chevron, working closely with the other RICO Defendants in this action. For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over Donziger is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. 301.

26.    Exercise of jurisdiction over the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC is reasonable and proper in this District because the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC are citizens of New York, and because they conduct extensive business activities in the State. Further, by and through the activities of Donziger described above, the Law Offices of Steven R. Donziger and Donziger & Associates PLLC have served as key players in the conspiracy against Chevron. For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. 301.

27.    Defendants Stratus, Beltman, and Maest are all residents of the United States. For Chevron's claims for violations of 18 U.S.C. § 1962, the exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together. For Chevron's claims under New York state law, exercise of jurisdiction over Defendants Stratus, Beltman, and Maest is proper pursuant to N.Y. C.P.L.R. 301 and 302. Through their agents and co-conspirators, Defendants Stratus, Beltman, and Maest have transacted and continue to transact business in the State of New York, and there is a substantial nexus between Defendants Stratus, Beltman, and Maest's purposeful availment of the New York forum and Chevron's claims.

28.    Exercise of jurisdiction over Fajardo is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302. Fajardo has transacted business and engaged in tortious conduct in the United States and New York which gives rise in part to Chevron's claims. Among other things, Fajardo (i) met with his co-conspirators in the United States multiple times to plan the ghostwriting of the Cabrera Report, including trips to New York to meet with Donziger and to

14

Boulder, Colorado; (ii) acted in the United States and New York to conceal the conspiracy and fraud, including falsely testifying in *In re Application of Chevron*, Case No. 10 MC 00002 (S.D.N.Y. Aug. 6, 2010) that Cabrera was "independent" while knowing the RICO Defendants' role in Cabrera's appointment and reports (*see id.*, Dkt. 31 at Ex. 46); (iii) solicited and obtained funds for the Lago Agrio Litigation while in the United States and, on information and belief, in New York; and (iv) caused to be filed in the Southern District of New York an action on behalf of the Lago Agrio Plaintiffs to stay the international arbitration that Chevron initiated pursuant to the United States-Ecuador Bilateral Investment Treaty (the "Treaty Arbitration"), *Yaiguaje et al. v. Chevron Corp. and Texaco Petroleum Co.*, No. 10 CV 316 (LBS) (S.D.N.Y. Jan. 14, 2010) ("*Yaiguaje*"). Fajardo has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Fajardo knew and intended would be felt in the United States and New York. For example, Fajardo has (i) directed a multitude of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States and New York to influence United States federal officials, State of New York officials, financial analysts, investors, and stockholders for the purpose of extorting money from Chevron. Also, as set forth more fully herein, Fajardo's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York. Fajardo was aware of the effects in the United States and New York of those acts, the activities of Fajardo's co-conspirators and agents were to the benefit of Fajardo, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Fajardo in committing those acts.

29.     Exercise of jurisdiction over Yanza is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302. Yanza has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims. Among other things, Yanza (i) met with his co-conspirators in the United States multiple times to plan the ghostwriting of the Cabrera Report, including trips to New York to meet with Donziger and to

Boulder, Colorado; (ii) caused funds to be transferred within the United States and from the United States to Ecuador in furtherance of the RICO Defendants' wrongful activities; (iii) attended Chevron shareholder meetings to attempt to pressure Chevron's stockholders and board of directors in furtherance of the conspiracy; (iv) solicited and received funds for the Lago Agrio Litigation while in the United States and, on information and belief, in New York and from persons in the United States and New York directly and through agents by other means for the purpose of carrying out the conspiracy and fraud; (v) attempted to conceal the conspiracy and fraud by making false and misleading statements in the United States and elsewhere; and (vi) caused to be filed in the Southern District of New York the *Yaiguaje* action on behalf of the Lago Agrio Plaintiffs to stay the Treaty Arbitration initiated by Chevron. Yanza has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Yanza knew and intended would be felt in the United States and New York. For example, Yanza has (i) directed multitudes of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States and New York to influence United States federal officials, State of New York officials, financial analysts, investors, and stockholders for the purpose of extorting money from Chevron. Also, as set forth more fully herein, Yanza's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York. Yanza was aware of the effects in the United States and New York of those acts, the activities of Yanza's co-conspirators and agents were to the benefit of Yanza, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Yanza in committing those acts.

30. Exercise of jurisdiction over the Front is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302. The Front has been designated beneficiary and trustee in the Lago Agrio Litigation and stands to benefit from the fraudulent judgment entered against Chevron. Yanza is the Front's co-founder, Fajardo is a leader within the organization, and at all times relevant herein Yanza and Fajardo were acting as the Front's co-conspirators, agents

16

and/or alter egos in perpetrating the conspiracy and fraud against Chevron. By and through its co-conspirators, agents and/or alter egos Yanza and Fajardo, the Front has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims, as set forth more fully above. The Front has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which the Front knew and intended would be felt in the United States and New York. Among other things, the Front: (i) directed multitudes of phone calls, emails, and other forms of communication to its co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; (ii) maintains or causes to be maintained a website intentionally directed towards a U.S.-based audience called www.texacotoxico.org through which the Front has attempted to conceal the conspiracy and fraud by making false and misleading statements and, on information and belief, raised funds from the United States and New York for the purpose of carrying out the conspiracy and fraud; (iii) solicited and received funds from persons in the United States and New York directly and through agents by other means for the purpose of carrying out the conspiracy and fraud; (iv) used Amazon Watch as its public relations firm in the United States to publish false and misleading statements to conceal the conspiracy and fraud; and (v) hired a Washington, D.C.-based lobbyist to pursue its and its co-conspirators' interests before the U.S. Congress. Also, as set forth more fully herein, the Front's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York. The Front was aware of the effects in the United States and New York of those acts, the activities of the Front's co-conspirators and agents were to the benefit of the Front, and its co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of the Front in committing those acts.

  31. Exercise of jurisdiction over Selva Viva is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302. Donziger is or has been the President of Selva Viva, Yanza is or was the General Manager of Selva Viva, and at all times relevant herein Donziger, Yanza and Fajardo were acting as Selva Viva's co-conspirators, agents and/or alter egos in

perpetrating the conspiracy and fraud against Chevron.  By and through its co-conspirators,

agents and/or alter egos Donziger, Yanza and Fajardo, Selva Viva has transacted business and

engaged in tortious conduct in the United States and New York which give rise in part to

Chevron's claims, as set forth more fully above.  Selva Viva has also directly transacted business

and engaged in tortious conduct in the United States which give rise in part to Chevron's claims.

The RICO Defendants use or have used Selva Viva as a conduit for funding their wrongful

activities in Ecuador.  Selva Viva has solicited and received several payments from Kohn Swift

in the United States in order to fund the Lago Agrio Litigation, and some of those payments were

subsequently channeled to Cabrera from a Selva Viva bank account.  Also, as set forth more

fully herein, Selva Viva's co-conspirators and agents have engaged in intentional, wrongful,

illegal, and/or tortious acts in the United States and New York.  Selva Viva was aware of the

effects in the United States and New York of those acts, the activities of Selva Viva's co-

conspirators and agents were to the benefit of Selva Viva, and its co-conspirators and agents

were working at the direction, under the control, at the request, and/or on behalf of Selva Viva in

committing those acts.

     32.     Exercise of jurisdiction over the Lago Agrio Plaintiffs is proper pursuant to N.Y.

C.P.L.R. 301 and 302 because the Lago Agrio Plaintiffs have purposefully availed themselves of

the New York forum by purportedly engaging New York attorneys and instituting and otherwise

participating in related litigation in this District.  The Lago Agrio Plaintiffs have reportedly hired

Defendant Donziger, a New York attorney, to represent their interests in the Lago Agrio

Litigation.  Additionally, they have reportedly hired co-conspirator Emery Celli, a New York law

firm, to represent them in litigation pending in this Court and elsewhere in the United States.  On

January 14, 2010, the Lago Agrio Plaintiffs were the named plaintiffs in an action filed in this

Court against Chevron to stay the Treaty Arbitration that Chevron initiated to obtain relief for the

Republic of Ecuador's violations of its obligations under the United States-Ecuador Bilateral

Investment Treaty, investment agreements, and international law, including Ecuador's failure to

abide by the negotiated settlement and releases relating to the remediation of the former

concession area. *See Yaiguaje*, No. 10 CV 316 (LBS) (S.D.N.Y. Jan. 14, 2010), Transcript of

Hearing, Mar. 10-11, 2010. The Lago Agrio Plaintiffs have also intervened in Chevron's 28

U.S.C. § 1782 proceedings in this Court (and in other federal district courts) by filing various

motions and briefs as "interested parties." The Lago Agrio Plaintiffs' involvement in the 1782

proceedings in this Court caused Judge Kaplan to specifically find that "they [have] subjected

themselves to the personal jurisdiction of this Court." *In re Application of Chevron*, 10 MC

00001 (LAK) (S.D.N.Y. July 22, 2010), 9/7/2010 Order at 23. There is a substantial nexus

between the Lago Agrio Plaintiffs' purposeful availment of the New York forum and Chevron's

claims under New York state law. For such claims, exercise of jurisdiction over the Lago Agrio

Plaintiffs is therefore proper pursuant to N.Y. C.P.L.R. 301-02.

## FACTUAL BASIS FOR CLAIMS

### A.   Background

33.   This Amended Complaint details how a group of U.S. plaintiffs' lawyers,

together with U.S. and Ecuadorian co-conspirators, set about fraudulently exploiting images of

environmental degradation in rural Ecuador to extort money from a U.S. company in a criminal

scheme. Many of the quotations included in this Amended Complaint were captured in video

footage in the making of *Crude: The Real Price of Oil*, a film commissioned by the RICO

Defendants and their co-conspirators in furtherance of their criminal scheme. Others come

directly from the RICO Defendants' own emails, letters and other documents.

### 1.   TexPet Participates in Ecuador's State Oil Consortium and Negotiates Release From Liability in Return for Specified Remediation

34.   In 1964, Ecuador granted oil exploration and production rights (known as a

"concession") in a designated part of the Oriente region of Ecuador to Texaco Petroleum

Company ("TexPet") and the Ecuadorian Gulf Oil Company ("Gulf"), which then formed what

came to be known as the consortium. Ecuador's state-owned oil company, Petroecuador

(formerly known as Corporación Estatal Petrolera Ecuatoriana or CEPE), became a stakeholder

in the consortium in 1974 and, on December 31, 1976, it became the 62.5% majority stakeholder.

35.     When the consortium began its exploration activities, TexPet and Gulf agreed that TexPet would serve as the operator on behalf of both companies. As operator, and per the terms of the 1965 Napo Joint Operating Agreement that governed the internal workings of the consortium, TexPet was "in direct charge of carrying out the [p]arties' work obligations and performing other duties" with their prior consent and approval. Each party was obligated to provide operating expenses and investment funds according to its ownership interest in the consortium. TexPet was required to render its services as operator at cost and, in consideration therefor, was to be indemnified and held harmless by the parties for any claims brought by third parties arising out of or related to its performance as operator.

36.     Once Petroecuador entered the consortium and after it became the majority owner, TexPet continued to serve as operator. As majority owner, however, Petroecuador contributed 62.5% of the consortium's investments and operating costs and approved all annual work programs and budgets. Petroecuador retained oversight of TexPet's activities as operator beyond the annual budgeting cycles by approving projects as they were implemented and answering monthly "cash calls" with the funds necessary for each month's operating expenses.

37.     TexPet continued in the role of operator until 1990 when Petroecuador assumed operations. In 1992 when the concession contract expired, Petroecuador took over 100% ownership of the former consortium fields and facilities. TexPet has not operated any oilfields in Ecuador since 1990, and has had no ownership interest in any oilfield operations in Ecuador since 1992. From 1992 to the present, Petroecuador has been the sole owner and operator of the former concession area.

38.     Before its termination, the consortium's activities generated over US$23 billion. The Republic of Ecuador retained 97.3% of this amount, however, through an array of income taxes, royalties, contributions for domestic consumption, and gross profit on Petroecuador's share. The money generated by the consortium represented more than 50% of Ecuador's gross national product during that period.

20

39.     TexPet's total profits over the life of the consortium were a small fraction of those realized by Ecuador—less than US$500 million.

40.     Since Petroecuador took over operational control in 1990, it has drilled 414 new wells—almost 30% more than were drilled during TexPet's 25 years as the operator—and, according to Ecuadorian public media sources, was responsible for more than 1,400 disclosed spills from 2000 to 2008 alone.  Petroecuador's environmental record has prompted Ecuador's current President, Rafael Correa to comment that Petroecuador "has dreadful environmental management practices."

41.     Defendant Fajardo—before he realized that such candor might undercut the conspiracy's attempts to extort Chevron—also spoke out against Petroecuador's environmental record:

> [Petroecuador is] unreliable because what Petro[ecuador] says is one thing and what it does is the complete opposite.  Since Texaco left here, Petro[ecuador] has inflicted more damage and many more disasters than Texaco itself.  But they'd never, ever say that.  So there's one spill after another; there's broken pipes, there's contamination of wetlands, of rivers, of streams in great magnitude.  But since it's a state-owned company, since it's the same people involved in the laws and all, no one says a thing.

42.     When Petroecuador took over as operator of the consortium in 1990, TexPet consented to Ecuador's request that it collaborate with Petroecuador to conduct an environmental audit of the consortium's oil fields.  TexPet insisted, however, that Petroecuador, as majority owner of the consortium, share responsibility for any necessary remediation that the audit identified in the same manner as the parties had shared all operating costs.  Ecuador acknowledged that TexPet was responsible for only its 37.5% share of the costs of remediating the environmental impact of the consortium's operations, and the parties recognized that TexPet could not be held responsible for the environmental impact of oil field operations conducted after its concession rights expired in 1992.

43.     In 1994, Ecuador publicly rejected the preliminary findings of the independent, joint audit and threatened to bring suit against TexPet for injuries to Ecuador's environment.

21

Ecuador further informed TexPet that Petroecuador would not participate with TexPet in conducting environmental remediation because it lacked the necessary money to fund its share of the work. Thus, instead of identifying remediation work to be funded jointly, Ecuador insisted that the parties identify a set of remediation obligations corresponding to TexPet's share of responsibility.

44.     On or about December 14, 1994, Ecuador, Petroecuador, and TexPet entered into a Memorandum of Understanding ("MOU") in which they agreed to define TexPet's "Scope of the Work of Environmental Reparation" with respect to the "biotic" and "abiotic" environment, and also secured from TexPet a commitment to "carry out socio-economic compensation projects in order to address problems . . . stemming from the oil operations. . . ." This compensatory effort would accrue to the benefit not of the government in a narrow sense, but rather of the larger population. In fact, elsewhere, the document expressly underscores that these projects had to "tak[e] into consideration the inhabitants of the Oriente Region." In exchange, the MOU obligated Ecuador to "negotiate the full and complete release of TexPet's obligations for environmental impact arising from the operations of the Consortium."

45.     The MOU furthered Ecuador's own constitutional duties toward its citizens. Under Article 19(2) of the extant Constitution, the authority to vindicate any environmental rights on behalf of the Ecuadorian people was held exclusively by the government of Ecuador. According to the Ecuadorian Ambassador to the United States, "It is the Republic's *obligation* to become involved in matters that directly impact the welfare of Ecuadorian citizens, territory and natural resources, and the very sovereignty of the Republic of Ecuador. The recent agreement between the Republic, Petroecuador and Texaco Petroleum Company, which was reviewed and supported by the Ecuadorian Congress, . . . demonstrates the Republic's determination to fulfill this obligation."

46.     Thus, as TexPet was winding down its operations, an Environmental Committee of the Ecuadorian Congress insisted that any settlement agreement between TexPet and Ecuador "indemnify or alleviate the negative environmental effects caused . . . to the Ecuadorian

22

population living in [the] Amazonian region," and stressed, to that end, that TexPet had to provide compensation in the "biotic, abiotic and socio-economic areas," and, with an "atmosphere of consensus[,] . . . tak[e] into consideration the inhabitants and authorities in the region." TexPet and the representatives of Ecuador and Petroecuador "t[ook] into consideration" the comments and suggestions from the Ecuadorian Congress. Local politicians from the Oriente region also played what they saw as a "leading role as the interested party" in the "negotiations to reach an understanding between Texaco and the Ecuadorian Government regarding environmental remediation in the Amazon."

47.     Defendant the Front also openly and actively participated in the negotiation of this settlement between TexPet and Ecuador. Defendant Yanza, President of the Front, sought an "audience" with the President of Ecuador "to explain directly the situation" of the people of the Oriente whom he purported to represent, so that their situation "may be taken into consideration when signing the agreements with [TexPet]." Yanza later submitted his group's "proposal" for defining the scope of work, which he claimed represented "far-reaching and vigorous work to reach consensus" among the population. Reflecting this cooperation with groups like the Front, Ecuadorian officials recently repeated, under oath, that the negotiations leading to these settlements were "open for all those who wanted to attend," and members of many environmental organizations, including the Front, did attend. These governmental officials saw themselves as the "facilitator[s]" of an open dialogue between the communities and TexPet, and followed orders from the "National Congress to take into account the problems that Amazonian groups were having." As a result of this dialogue, the environmental groups were "behind everything that was being done," leading to a final instrument that considered and accounted for the interests of individuals and communities in the concession areas. When the MOU was opened to public scrutiny, and while the Scope of Work was being defined, the Front was one of the groups that wrote to the Ministry of Energy and Mines to express their "agree[ment] that the process of understanding [between Ecuador and TexPet] and the immediate performance of the environmental remediation work should continue."

23

48.     Pursuant to the terms of the MOU, on or about March 23, 1995, Ecuador, Petroecuador, and TexPet executed a precise "Scope of Work" identifying the particular sites and projects that would constitute TexPet's remediation obligations, consistent with TexPet's former one-third ownership share of the consortium. The "Scope of Work" required the performance of not only a vast remediation effort by TexPet, but also a number of socioeconomic projects, including the payment of $1 million to a redress fund to "be used for the rehabilitation of the areas affected, establishing, together with the population, viable systems for the use of renewable natural resources, and . . . to improve the quality of life." The Ministry of Energy and Mines received that money, and was entrusted to administer the fund "for the benefit of the Indigenous Communities of the Amazonian region." TexPet also financed the establishment of education and medical centers in the Oriente, together with "logistical support" for those centers such as ambulances and aircraft.

49.     Following the execution of the Scope of Work, on or about May 4, 1995, Ecuador, Petroecuador, and TexPet executed a settlement agreement (the "1995 Settlement Agreement"). In consideration for its release from any future responsibility for environmental impacts, TexPet agreed to perform the defined "Environmental Remedial and Mitigation Work" and provide "socio-economic compensation" for the affected areas. The 1995 Settlement Agreement immediately "release[d], acquit[ted] and forever discharge[d]" TexPet from all claims based on "Environmental Impact" from the consortium's activities at sites not included in the Scope of Work and provided that TexPet would be released from any "Environmental Impact" associated with the sites covered by the Scope of Work upon completion of the prescribed remediation at each site. In other words, because Petroecuador continued to operate the oil fields, it assumed any residual or future responsibility, recognizing both its share of the past, as the former consortium's majority owner, and its control over the future, as sole owner and operator going forward.

50.     The settlement was purposefully broad. "Environmental Impact" was defined as "[a]ny solid, liquid or gaseous substance present or released into the environment in such

24

concentration or condition, the presence or release of which causes, or has the potential to cause harm to human health or the environment." Reflecting this breadth of coverage, the release "includ[ed] but [was] not limited to consequences of all types of injury that the Government or Petroecuador may allege concerning persons, properties, business, reputations, and all other types of injuries that may be measured in money, including but not limited to, trespass, nuisance, negligence, strict liability, breach of warranty, or any other theory or potential theory of recovery." The claims expressly released also included all "causes of action under Article 19-2 of the [1978] Political Constitution of the Republic of Ecuador," which, as discussed in paragraph 45, *supra*, placed the "duty [on] the State" to "oversee the preservation of nature" and guarantee all Ecuadorians "[t]he right to live in a pollution-free environment." The 1995 Settlement Agreement was signed by Abril Ojeda, Ecuador's Minister of Energy and Mines; Federico Vintimilla Salcedo, Executive President of Petroecuador; Ricardo Reis Veiga, Vice President of TexPet; and Rodrigo Pérez Pallares, legal representative of TexPet.

51.     The 1995 Settlement Agreement also obligated TexPet "to continue negotiations" with certain municipalities in eastern Ecuador that had also brought suit against the company. Filing materially identical complaints, the municipalities of Joya De Los Sachas, Orellana, Shushufindi, and Lago Agrio had each sued TexPet in 1994 in order to protect "the health of [their] citizens, the rivers of [their] communities." These municipalities purported to fulfill their quasi-sovereign duties to assist the Republic in meeting its environmental obligations to all citizens, and to exercise their own capacity to "carry out legal actions" necessary to protect the "collective needs of [their] community" of inhabitants, specifically those needs concerning health and the environment.

52.     In consideration for TexPet financing specified "social interest works," each municipality suit was settled in 1996, similarly "exempt[ing], releas[ing], exonerat[ing] and reliev[ing] forever" Texaco and TexPet "from any responsibility, claim, request, demand or complaint, be it past, current or future, for any and all reasons related to" the consortium's operations, "especially concerning damages possibly caused to the environment in said cantonal

jurisdiction of the Municipality." The parties also expressly agreed that "pursuant to Article 2386 [current Article 2362] of the Civil Code, this settlement shall have for the parties the effect of *res judicata* before the highest court." Each settlement agreement represented that the municipal government had consulted "with the entities and organizations representing the community of its inhabitants" in order to choose an appropriate reparation project. According to sworn statements of the relevant government officials, each agreement met "the interests of The Community and of its citizens as to any claims they may have against TEXPET." All of these settlements were "approve[d] . . . in full" by Ecuadorian courts because they "d[id] not violate any legal provision" and "cover[ed] all issues described in the [municipality] complaint[s]."

53.     In addition to the national and municipal governments, two Provinces also settled their potential claims against TexPet in the name of their residents and of the ecosystems within their respective territories. In 1996, the provincial government of Sucumbíos conferred "with entities and organizations representing the community of its inhabitants" in order to select an acceptable reparation project and avoid a potential lawsuit with TexPet. It ultimately demanded, "according to the interests of the community," that TexPet fund "social interest works," *viz.*, "provincial eco-production projects." A Consortium of Municipal Mayors in the Napo Province also endorsed a settlement contract that identified their potential disputes with TexPet relating to "the oil concession," and, especially, to "the impact or damages possibly caused to the environment." Like its counterparts in Sucumbíos and at the national level, it negotiated and settled with TexPet in order to safeguard environmental and communal entitlements. These agreements with the municipalities and provinces shall be referred to herein collectively as the "1996 Municipality Releases."

54.     Pursuant to the terms of the 1995 Settlement Agreement with Ecuador, TexPet selected Woodward-Clyde, one of the largest environmental engineering firms in the world at the time, from a list provided by Ecuador of acceptable contractors to perform the remediation. Woodward-Clyde conducted additional investigations of the well sites listed in the Scope of Work and developed a Remedial Action Plan, which identified the specific pits at each well site

26

requiring remediation under the criteria set out in the 1995 Settlement Agreement and specified the remedial action to be taken at each site. Ecuador reviewed Woodward-Clyde's Remedial Action Plan and conducted its own investigation of the sites to confirm that it was consistent with the MOU and the 1995 Settlement Agreement. In September 1995, Ecuador, Petroecuador, TexPet, and Woodward-Clyde each approved and signed off on the Remedial Action Plan.

55.     Between October 1995 and September 1998, Woodward-Clyde conducted all of the remediation required by the 1995 Settlement Agreement and the Remedial Action Plan on behalf of TexPet and at TexPet's expense. The remediation work was monitored and supervised by Petroecuador, the Ministries of Energy and Environment, and outside auditors. Ecuador issued a series of official records called "*Actas*" during this time certifying the adequacy of the remediation work that it had supervised and evaluated on an ongoing basis. In all, TexPet spent approximately $40 million (unadjusted dollars) on environmental remediation and community development in Ecuador pursuant to the 1995 Settlement Agreement in exchange for the releases granted by Ecuador.

56.     On September 30, 1998, Ecuador, Petroecuador, and TexPet executed the *Acta Final* (the "1998 Final Release"), certifying that TexPet had performed all of its obligations under the 1995 Settlement Agreement, and thus fully releasing TexPet from any and all environmental liability arising from the consortium's activities except for individual personal injury claims, such as to specific persons or property, which the parties understood as not being covered by the release. The 1998 Final Release was signed on behalf of Ecuador by Patricio Ribadeneira, the Minister of Energy and Mines; on behalf of Petroecuador by Ramiro Gordillo, Executive Chairman, and by Luis Alban Granizo, Manager of Petroproducción; and on behalf of TexPet by Rodrigo Pérez Pallares and Ricardo Reis Veiga.

57.     The validity of these agreements has been publicly acknowledged by the Republic of Ecuador, and—recently—by the Lago Agrio Plaintiffs as well. As noted above, *supra* paragraphs 45 and 50, at the time the 1995 Settlement Agreement and the 1998 Final Release were executed, the Republic of Ecuador was the only legal person or entity with

27

standing to represent and assert legal claims for environmental damage. Ecuador, and only Ecuador, could demand environmental remediation; individuals could assert only individual property damage or personal injury claims. Accordingly, TexPet's settlement with Ecuador and the affected municipalities and provinces fully discharged TexPet from any responsibility or liability that may have existed for environmental impact as a result of the consortium's activities, except individual personal injury claims.

**2.    U.S. Plaintiffs' Lawyers Devise Baseless Litigation Against Chevron in Ecuador**

58.    Certain plaintiffs' attorneys in the United States sought to exploit any environmental harm in the Oriente region by turning it into a financial windfall for themselves. These U.S. plaintiffs' attorneys (including Defendant Donziger, and co-conspirators Kohn and Bonifaz), devised a plan to use TexPet's former participation in the consortium as the basis for extracting large sums of money from TexPet's parent, Texaco, Inc. ("Texaco"). As Kohn described his motivation, "[A]t the end of the day . . . , it [would] be a lucrative case for the firm." As Donziger described it, "I sit back and dream . . . . Billions of dollars on the table. A movie, a possible book." In other words, a financial windfall of unprecedented proportion, and one that would make Donziger "quite wealthy." According to Donziger's estimates, he thought his "own fee right now would be around 200m[illion]."

59.    In 1993 and 1994, these U.S. plaintiffs' attorneys filed two lawsuits against Texaco in federal district court in New York, purportedly on behalf of classes of "30,000 residents" of the Oriente and "25,000 residents" of Peru. *See Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (S.D.N.Y. Nov. 3, 1993) ("*Aguinda*") and *Jota v. Texaco, Inc.*, No. 94 Civ. 9266 (S.D.N.Y. Dec. 28, 1994) ("*Jota*"). Those actions were dismissed on grounds including *forum non conveniens*, international comity, and failure to join indispensable parties Petroecuador and the Republic of Ecuador.

60.    Because Ecuador and Petroecuador had released TexPet from liability following its remediation efforts and because Ecuadorian law does not allow class actions, the U.S.

28

plaintiffs' attorneys required the government's cooperation to bring a potentially lucrative lawsuit in Ecuador. The U.S. plaintiffs' attorneys had no desire to sue Petroecuador or Ecuador for the harms that had occurred—despite their actual culpability—because, as Defendant Donziger explained, "[T]he government here will never pay for any judgment. In contrast, Texaco can pay." In order to get the "juicy check" that, as Fajardo put it, was the ultimate goal, the U.S. plaintiffs' attorneys struck a deal with the Ecuadorian government to enable those attorneys to bring an action against a convenient U.S. target.

61. The U.S. plaintiffs' attorneys agreed not to sue Petroecuador and assured the Republic of Ecuador that it would benefit from any judgment entered against Chevron in exchange for public and private governmental support for the U.S. plaintiffs' attorneys' case.

62. The U.S. plaintiffs' attorneys presented Ecuador's Attorney General with written promises not to pursue legal action against the Republic of Ecuador or Petroecuador or to collect a judgment against Ecuador if one were awarded to them. Bonifaz stated, "[I]f the U.S. court [in the *Aguinda* or *Jota* actions] finds both Petroecuador and Texaco guilty, we will not accept the percentage of the claim assigned to [Petroecuador]." And he admitted that the Lago Agrio Plaintiffs had "committed in legal documents not to sue Ecuador."

63. With reported legislative assistance from the U.S. plaintiffs' attorneys, Ecuador enacted the Environmental Management Act of 1999 (the "EMA"). For the first time, the EMA enabled private individuals to bring generalized environmental injury claims previously held exclusively by the state. It also extended standing for the first time to private citizens to enforce "collective environmental rights" for environmental harm. These actions are private in name only, however, because the EMA provides that any monetary judgment be awarded to the "community."

64. With a new and highly advantageous legal framework thus in place, the U.S. plaintiffs' attorneys, joined and assisted by other RICO Defendants and their co-conspirators, filed the Lago Agrio Litigation, *Maria Aguinda et al. v. Chevron-Texaco*, in May 2003 in the Superior Court of Nueva Loja, Ecuador. As a result of the EMA, and the RICO Defendants'

29

attempt to apply it retroactively, the Lago Agrio Litigation is unusual in structure. The ostensible plaintiffs in the Lago Agrio Litigation are forty-eight named individuals, but it is unknown whether these individuals consented to have the litigation brought in their names, as twenty of their signatures were forged in the very document that purported to provide authority to Ecuadorian counsel to file the complaint.

65.    The Lago Agrio Litigation does not seek damages based on personal injuries to the named Plaintiffs, which, along with claims for individual property damage, is the only type of claim individuals could bring (*see* paragraph 57, *supra*). Rather, relying on the EMA, the complaint seeks the costs of remediating broadly defined "environmental damages," the proceeds of which will not directly benefit the Lago Agrio Plaintiffs. Defendants Donziger, Fajardo and the other U.S. and Ecuadorian lawyers and investors reportedly expect up to 30% of the judgment. The Republic of Ecuador reportedly expects 90% of the benefit, although the RICO Defendants with assistance from Patton Boggs, H5 and other co-conspirators have already laid out plans to "keep the proceeds out of Ecuador," by placing the funds in a "trust" outside of the country, under the exclusive control of a trustee they approve. The RICO Defendants requested that the Front receive an additional amount equal to 10% of the judgment (a fact that Donziger thought "best if Chevron did not know" out of concern that it "could harm the image" of the litigation), and the trial court granted that request in its judgment. The individual Lago Agrio Plaintiffs, on the other hand, will not receive any portion of the judgment, and thus are at most only nominal plaintiffs.

66.    In effect, the RICO Defendants are planning to control nearly all of the proceeds from the judgment, shutting out the Lago Agrio Plaintiffs, the Republic of Ecuador, and Petroecuador and setting themselves up as a source of patronage through billions of dollars in remediation contracts that will be issued following an adverse judgment against Chevron, in a country whose entire annual Gross Domestic Product is just over $64 billion. In an email exchange with Fajardo and Donziger, for example, co-conspirator Julio Prieto noted that "Petroecuador is NOT the one who must contract the remediation companies . . . . That's our

30

job." And when the RICO Defendants heard that the Republic of Ecuador might be considering negotiating with Chevron directly, they pushed to have those conversations shut down, urging that no "representative of the Ecuadorian government . . . meet face to face with a representative of Chevron at this juncture[.]"

67.     The Lago Agrio complaint does not name the entity that has been responsible for environmental harm in the Oriente region since at least 1992: Petroecuador.  Pursuant to their agreement not to bring any claims against Petroecuador or the Republic of Ecuador itself, the Lago Agrio Plaintiffs' U.S. representatives caused Chevron to be named as the only defendant in the Lago Agrio Litigation, despite the fact that Chevron has never operated in Ecuador.  (Years after TexPet ceased operations in Ecuador, one of Chevron's subsidiaries merged with Texaco, TexPet's ultimate parent company.  Chevron thereby became an indirect shareholder of TexPet.)

**B.      The Conspirators Are Corrupting the Judicial Process to Extort a Payment From Chevron**

68.     The support of the Republic of Ecuador, the manipulation of the EMA, and the filing of the Lago Agrio Litigation provided the U.S. lawyers with the foundation for their criminal scheme.  Through the conduct of their criminal enterprise, the conspirators set about to manufacture false evidence and a fake "history" that they would repeat in every media outlet, before Congress, in front of state and federal investigative and administrative agencies, and with which they would seek to scare and mislead Chevron shareholders and investors.  All of this was done in furtherance of their scheme to coerce Chevron into making a massive payoff to the criminal enterprise.  As part of this scheme, the conspirators keep "jack[ing] up," in Donziger's words, their demand.  In 2003, they thought $6 billion was an aggressive number.  In 2008, they raised the stakes to $16 billion, then to $27 billion, and finally, to an outrageous $113 billion, before ultimately obtaining an $18.2 billion judgment in Lago Agrio.

69.     The RICO Defendants' criminal scheme has three main lines of attack:  One, intimidate or corrupt the Lago Agrio court and obtain a fraudulent judgment against Chevron based on manufactured evidence of liability.  Two, collude with the Republic of Ecuador to

procure sham criminal charges against Chevron's attorneys. Three, conduct a massive public pressure campaign designed to spread false and misleading information about Chevron and the Lago Agrio Litigation. These lines of attack are related but nonetheless distinct attempts to pressure Chevron into paying the RICO Defendants. Donziger has even admitted that the criminal charges and the pressure campaign were *not* simply means of supporting the Lago Agrio Litigation, but "other things in play outside of the legal case." The ultimate objective, in Donziger's words, is to cause "damage to [Chevron's] reputation," to put "personal psychological pressure [on] their top executives" through threats and attacks through the media and force Chevron into a payoff.

70.     Donziger has explained how the conspirators work to increase costs for Chevron on all fronts until it gives in to their extortionate demands:

> The work doesn't let up just because I'm in the U.S., at all. I mean, it's still really intense, you know, so it's always looking for ways to increase the leverage and increase the cost to Chevron for not doing anything. So, what's the cost? The cost is, right now, it's the cost of the risk of getting a huge multi-billion dollar judgment at trial, . . . it's the cost of all the hassle they have to put up with from the environmental groups, . . . it's the cost of their sullied reputation, you know, in the media.

71.     The RICO Defendants and their co-conspirators have shown no signs of stopping their attack. Indeed, Donziger has threatened to try to enforce the fraudulent judgment obtained in the Lago Agrio Litigation in the United States and in other foreign jurisdictions, observing that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . ." In a recent speech, Donziger asserted that the conspirators are assembling a legal team to "seize assets, seize boats," wherever Chevron's subsidiaries operate around the world—even though the Lago Agrio Plaintiffs previously told this Court that Chevron's defense against any Lago Agrio judgment should be restricted to New York's recognition act. Fajardo has likewise warned that the RICO Defendants plan to confiscate Chevron's assets in the United States in order to enforce the judgment. And Donziger has also stated that the conspirators' plan is to move on from Chevron and Ecuador and

32

reprise their criminal scheme again and again: "take legal fees we can earn from this case and do more cases like this in different places. With, you know, the same team, if possible."

      **1.**      **Pressuring the Lago Agrio Court and Manufacturing Evidence**

            **a.**      **Implementing Pressure Tactics and Colluding With**
                      **Ecuadorian Government Officials**

      72.     Central to the RICO Defendants' and their co-conspirators' scheme to defraud and extort Chevron is the fact that Ecuador's judiciary has developed systemic weakness and corruption, in addition to other significant flaws and shortcomings. The conspirators are aware of this fact, and have sought to exploit it. According to Donziger, "[T]he court is now in play, up for grabs, and accessible." Donziger has boasted that, unlike in the United States, the "game" is "dirty" and there are "almost no rules" in Ecuador. Donziger and his co-conspirators have sought repeatedly to capitalize on the Ecuadorian judiciary's weakness, threatening violence, bullying judges, and using political connections to obtain rulings in their favor based on the judges' fear of repercussions rather than the facts or law. Indeed, Donziger instructed one of his co-conspirators to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of." Attacking the judge was necessary, because, as Donziger put it: "[T]he only way the court will respect us is if they fear us—and . . . the only way they will fear us is if they think we have [s]ome control over their careers, their jobs, their reputations—that is to say, their ability to earn a livelihood." This fear and "constant pressure on the judge and the court" is essential to the RICO Defendants' and their co-conspirators' plan to obtain "a fast decision." With assistance from the highest levels of the Ecuadorian government, the RICO Defendants and their co-conspirators ensured that the Lago Agrio court would rule against Chevron, as it ultimately did.

      73.     The RICO Defendants and their co-conspirators do not view the enterprise in which they are engaged as a lawsuit. As Donziger has explained, the litigation "is not a legal case," but a "political battle that's being played out through a legal case." In other words, Donziger and his co-conspirators knew that what "we need to do is to get the politics in order . . .

[because] the only way we're going to succeed, in my opinion, is [i]f the country gets excited about getting this kind of money out of Texaco . . . . So you have to play to those . . . themes, [with] those feelings these people have." Consistent with this strategy, Donziger and the other RICO Defendants know that their "success" will have nothing to do with pursuing the Lago Agrio Litigation on the merits, but rather will depend on using that "litigation" as a vehicle or pretense with which to attack Chevron in the media and before U.S. governmental bodies and shareholders and force it into paying them off. In Donziger's own words, the conspirators have conducted the Lago Agrio Litigation as a "flat-out street brawl, extreme fighting through litigation" in which he and his co-conspirators are seemingly "only a short step away from smashing the faces of our counterparts with a closed fist, or taking out guns[.]"

74.     Donziger has acknowledged the RICO Defendants' and their co-conspirators' use of "pressure tactics" to influence and intimidate the Ecuadorian judiciary. Donziger admitted that such tactics are "something you would never do in the United States. . . . But Ecuador, you know . . . this is how the game is played, it's dirty." Donziger further declared that "there's almost no rules here" and that "the only language that I believe, this judge is gonna understand is one of pressure, intimidation and humiliation. And that's what we're doin' today. We're gonna let him know what time it is . . . . We're going to scare the judge, I think today." These fear tactics are effective, according to Donziger, because Ecuadorian judges "are really not very bright" and "make decisions based on who they fear the most, not based on what the laws should dictate." In fact, when an associate suggested to Donziger that no judge would rule against them because "[h]e'll be killed," Donziger replied that, although the judge might not actually be killed if he ruled against them, "he thinks he will be . . . . Which is just as good." As a colleague told Donziger, "The only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us." Donziger stated that this comment did not shock him. Donziger further asserted: "[The judges] don't have to be intelligent enough to understand the law, just as long as they understand the politics." And according to Donziger, "no judge can rule against us and feel like he can get away with it in terms of his career." These threats are

34

made all the more real given the prevalence of violence in the Oriente region of Ecuador.
Indeed, Fajardo has acknowledged that paid assassins in the Oriente will kill someone for as little
as $60, and the region is known to harbor elements of the terrorist group FARC.

75.     As part of their strategy to intimidate and coerce the Lago Agrio court, the RICO
Defendants and their co-conspirators plotted to raise what they called their own "private army," a
"specialized group" detailed "to watch over the court," for which, "if we need weapons, we can
provide weapons." According to Fajardo, it was "necessary" for the RICO Defendants and their
co-conspirators to "organize pressure demonstrations at the court" that will be a "little bit
aggressive" in order to "teach the court a lesson." During one meeting in which the "private
army" was discussed, Defendants Donziger and Yanza along with Amazon Watch founder
Soltani and Kevin Koenig, Amazon Watch's Northern Amazon Program Coordinator, discussed
their plans to organize and finance attempts "to control the court, to pressure the court."
Donziger elaborated that the conspirators "want to send a message to the court that, 'don't f[**]k
with us anymore—not now, and not—not later, and never.'" He observed that, "no one fears us
right now. And, until they fear us, we're not gonna win this case. I'm convinced." Accordingly,
the conspirators planned to "take over the court with a massive protest," with the goal of
"shut[ting] the court down for a day." According to Donziger, "[O]nly after that should we talk
to the judge about what he needs to do. The judge needs to fear us for this to move how it needs
to move, and right now there is no fear, no price to pay for not making these key decisions."
Realizing the ramifications of this plan, Soltani asked if the videotapes of the discussion could be
subpoenaed, advising: "I just want you to know that it's—it's illegal to conspire to break the
law."

76.     Ignoring these qualms, the RICO Defendants and their co-conspirators put their
plan into effect, organizing their "army" in demonstrations at inspection sites and at the
courthouse itself, intending to confront and instill fear into the court. Donziger described one
action to Joe Berlinger, the director of the film *Crude*: "[O]ur private 'army' . . . has been very
effective. Yesterday they followed a Texaco lawyer into the judge's chambers and had a

confrontation. This is a critical part of our strategy that is allowing the case to go forward."
Over the ensuing months, the conspirators' private army would make numerous appearances at
judicial inspections of environmental sites, at the courthouse, and in the streets of Lago Agrio,
always seeking to remind the judiciary that this was not litigation, but a "flat-out street brawl."
At one such protest at a judicial inspection of the Sacha Sur Station, the RICO Defendants and
their co-conspirators amassed their "army" of protesters who the judge would not permit to enter
the Station due to the risk that such a large mob would pose to the Station's operation. When
Donziger saw that what he described as his "army" would not be able to enter, he demanded that
the "f[**]kin' judge" come to the gate to deal with the mob himself and warned that "they're
provoking a violent incident." Although the RICO Defendants' and their co-conspirators'
"army" was rebuffed at this inspection, the RICO Defendants and their co-conspirators achieved
their purpose of letting the judiciary know that it was being watched by a potentially violent
group. In another incident, the conspirators organized a protest at the judge's office after a
canceled judicial inspection. The intimidation was successful, causing the judge to "sweat" and
"promis[e] to make a decision" on a new date by the following day.

77.     The RICO Defendants also employed extortion to get what they wanted. For
example, the RICO Defendants "wrote up a complaint against [Judge] Yanez, but never filed it,
while letting him know [they] might file it if he does not adhere to the law and what [they]
need." And on a task list he prepared in February 2006, Donziger wrote: "accuse [Judge] of
being involved in corruption with Chevron; ask for recusal."

78.     The RICO Defendants' and their co-conspirators' plan to instill fear in the
judiciary was only one approach to illegally obtaining a favorable ruling. Another approach
involved numerous attempts to personally influence, intimidate or negotiate with the judge in the
Lago Agrio Litigation, often through *ex parte* meetings. Donziger described such actions as
"lobbying." Donziger, for example, has held numerous meetings with presiding judges, often
over lunch at the judges' homes, during which he has "t[aken] advantage of the situation to
explain [the RICO Defendants'] theory of the case." During one such meeting, Donziger pressed

upon the judge the false assertion that "Texaco's sampling is full of s[**]t." Donziger has also asked his co-conspirators to meet with the judge in secret and press their case. And indeed, Fajardo and the Front—the organization that stands to receive a windfall from the judgment—have met directly with the judge, pressing the conspirators' interests and obtaining promises of cooperation from the judge.

79.     The RICO Defendants did all this because they believed that it worked. On one occasion, one of Donziger's co-conspirators suggested that in order to get the court to rule in their favor on an important legal point, "Maybe Pablo [Fajardo] can have one of his backroom conversations." In August 2006, co-conspirator Joseph Mutti updated Donziger that, "Luis [Yanza] reported that the judge appears to be backing down from his position regarding the cancellation of the inspections and that pressure must be brought to bear on him. Thus, it was resolved that two members of the coalition will be traveling to Lago next week to meet with the judge. Esperanza already met with him twice this week—once with an accompanying declaration—so he's already feeling the pressure." The RICO Defendants are not the only observers to note the impact that these tactics have had. *The Economist*, for example, observed: "The judge in Lago Agrio, Juan Núñez, . . . has made no secret of his sympathy for the plaintiffs."

80.     Not content merely to apply pressure themselves, and as part of their previous arrangement with the Ecuadorian government (*see* paragraphs 60-63, *supra*), the RICO Defendants and their co-conspirators have also enlisted Ecuadorian officials to pressure and intimidate the judiciary to rule against Chevron. As Donziger has explained the strategy, "We can have the best proof in the world, and if we don't have a political plan we will surely *lose*. On the other hand, we can [have] mediocre proof and a good political plan and stand a good chance of winning." Donziger understood that to get what the co-conspirators wanted, he had to do "political work at the highest level to make things happen, like get the government, for example, to take a position in a case that affects your clients." This was facilitated by the fact that, according to Donziger, the conspirators had "close ties" to "high-ranking Ecuadorian

37

government officials" in addition to the Front's "wide influence in Ecuador" and "ab[ility] to command meetings with government ministers and even the President."

81.     The collaboration between the RICO Defendants and Republic of Ecuador is so close that one U.S. District Court has concluded that it was "an established fact" that the Republic of Ecuador was supporting the Lago Agrio Plaintiffs. The Republic of Ecuador recently asserted in court filings that it has had a formal "*common interest agreement*" with representatives of the Lago Agrio Plaintiffs since 2006. In pursuit of that alleged common interest, the RICO Defendants and the Republic of Ecuador have coordinated their legal and public relations strategies, both directly and through Ecuador's U.S. legal counsel. As part of this cooperation, the RICO Defendants have received assistance from the highest levels of government in Ecuador, from "allies [who were] firmly entrenched at the top." For example, Donziger himself ghostwrote a letter from Ecuador's ambassador to the United States, Dr. Luis Gallegos, to *The Wall Street Journal*.

82.     The RICO Defendants have also worked with Winston & Strawn LLP ("Winston & Strawn"), the U.S. law firm hired by Ecuador to represent it against Chevron in proceedings in the United States. The RICO Defendants have provided information and other assistance to Winston & Strawn, including having Stratus provide scientific analysis and Donziger help with the drafting of legal documents. Donziger, aware that this level of cooperation crossed the line, was concerned it might lead Chevron to believe the RICO Defendants and the Ecuadorian government were "in bed" together. Thus, upon realizing he had been photographed alongside a Winston & Strawn attorney for a newspaper article, Donziger vowed to deny that the man in the photograph was him. However, Donziger recognizes that the RICO Defendants and the Republic of Ecuador have been "really helping each other."

83.     The RICO Defendants have also turned to the government to *shut down* Petroecuador's remediation, because of the negative impact it would have on their scheme. For example, in 2009, in an email to Donziger and other conspirators with the subject line "WORRISOME," Fajardo warned them that a newspaper was reporting that the government was

assuming responsibility for remediation, and, worse, that it believed it would cost an "extremely low" $96 million. Fearful that Chevron would "say that the State finally assumed its duty and is going to clean up what it ought to," Fajardo called on his co-conspirators to act. Donziger responded in an email to Juan Saenz, "You have to go to Correa to put an end to this s[**]t once and for all."

84.     Other members of the Ecuadorian government have also signaled to the Lago Agrio court the government's demand that Chevron be found liable. As the Ecuadorian Attorney General Diego García Carrión told a reporter in August 2008, the Correa administration's position in this case is clear: "The pollution is [the] result of Chevron's actions and not of Petroecuador." Again, in May 2010, Attorney General García "dismissed any responsibility on the part of the Ecuadorian State for the environmental damage caused in the Amazon region by the U.S.-based oil company Chevron-Texaco." And in September 2009, Ombudsman Fernando Gutiérrez announced: (i) the Lago Agrio Litigation "has absolute priority and the judgment must be rendered as soon as possible"; (ii) the case concerns "an assault on the entire country"; and (iii) in a direct signal to the Lago Agrio court, Chevron, rather than the State, bears full responsibility for any harm.

85.     This support was not arrived at independently, but through collusion between the RICO Defendants and the Republic of Ecuador. Ana Alban, then Ecuador's Minister of the Environment, communicated with Donziger directly, assuring him that the government was "giving the support that we can do" to the Lago Agrio Plaintiffs, reminding him that "we brought the President to the zone," and assuring him that she had a "very close" "friend of the Frente de Amazonia working with me doing all this."

86.     The fact that President Correa and other members of the government have sided with the Defendants and against Chevron sends a clear message to the Ecuadorian judiciary that it must find Chevron liable. And it sends a message to Chevron that it must pay money to the conspirators in the form of a "settlement" or face the fraudulent, politically influenced judgment that the RICO Defendants intend to try to enforce in U.S. courts or elsewhere.

**b.    Taking Advantage of a Weakened and Increasingly Corrupt Ecuadorian Judiciary**

87.    The RICO Defendants have been able to influence the proceedings because the independence and integrity of the Ecuadorian judiciary has eroded to where it is now greatly susceptible to these tactics, and to pressure from outside and through the executive branch. Indeed, the Ecuadorian presidency now wields de facto control and near-autocratic power over all Ecuadorian institutions.

88.    Various sources confirm the political branches' domination over Ecuador's judiciary in recent years and the judiciary's system-wide corruption.  For example, the World Bank's Worldwide Governance Indicators for 2009, compiled from 21 independent sources, ranked Ecuador below the 10th percentile of all countries surveyed with respect to the "rule of law"—down from the 31st percentile in 2003.  Ecuador's negative score is -1.28, which places it below North Korea (-1.25).

89.    The U.S. Department of State's annual Human Rights Report published in March 2010 also noted that "there continued to be serious problems" in Ecuador with respect to "corruption and denial of due process within the judicial system" and that the judiciary was "susceptible to outside pressure and corruption."  Similarly, as recently as July 15, 2010, the UN Special Rapporteur on extrajudicial executions described Ecuador's judicial system as "almost universally condemned for its inefficiency and mismanagement."

90.    Among the means by which President Correa has established his control over the judiciary is a policy whereby he has caused the issuance of a memorandum instructing all of his ministers that should any Ecuadorian court enjoin their ministry, and if the ministry is able to overturn the injunction on appeal, the ministry is to immediately sue the judge who entered the injunction *personally* for damages.

91.    There are numerous examples of this corruption and undue influence on display in the Lago Agrio Litigation.  While he was presiding over the trial, Judge Núñez publicly stated that the Lago Agrio Litigation had "taken too long" immediately after a two-hour luncheon with

40

President Correa, at which the President complained about delays and demanded "expedited treatment of cases that are of interest to Ecuador." Judge Núñez was ultimately forced to excuse himself from the case, not because of his apparent bias, but because of a bribery solicitation scandal where he was caught on video expressing his prejudgment against Chevron.

92.     Just after this bribery solicitation story broke and the videos become public, on September 2, 2009, co-conspirator Juan Pablo Saenz wrote to Donziger and assured him that the Front's "sources at the government tell us they're actively looking for [Ecuadorians involved in the scandal], to cut their heads off. We should focu[s] on [the Americans involved], since they're the Chevron stooges. Correa and his cronies will take care of the rest."

93.     On the following day, September 3, 2009, Judge Núñez filed a motion to excuse himself from the Lago Agrio Litigation. The next day, Prosecutor General Pesántez publicly declared that he had asked Judge Núñez to excuse himself "to prevent any delay of the trial." Pesántez then added that Chevron had "probably caused serious environmental damages for decades and also caused illnesses" and confirmed that the government of Ecuador expected to receive 90% of the prospective judgment against Chevron.

94.     Although Chevron filed a petition to annul all of Judge Núñez's biased and politically influenced rulings in the Lago Agrio Litigation, that petition was denied by Judge Núñez's replacement. Thus, Judge Núñez's improper and bad-faith judicial decisions continued to taint the Lago Agrio Litigation and undermine Chevron's rights, just as the RICO Defendants hoped they would. After all, the conspirators' underlying strategy has been that the more Chevron fears an unfair ruling in the sham Lago Agrio Litigation, the better target for an extorted payment it becomes.

95.     Against this backdrop of collusion and corruption, the RICO Defendants have obtained a judgment in their favor and against Chevron by playing the "game" "dirty" and currying favor from the Ecuadorian government. And this is all part of the conspirators' scheme to convince Chevron to pay up—or else. Chevron has initiated international arbitration under the Bilateral Investment Treaty, seeking relief from the Republic of Ecuador's violations of

international law and treaty obligations in connection with its failure to honor its contractual agreements. The Lago Agrio Plaintiffs and other parties named in this Amended Complaint are not and cannot be parties to the Treaty Arbitration, and Ecuador has asserted sovereign immunity against claims filed in courts of the United States.

c.    **Manipulating and Falsifying Their Own Experts' Findings to Corrupt the Judicial Inspection Process**

96.    At the outset of the litigation, the Lago Agrio court ordered a process known as a judicial inspection to assess the 122 former consortium oil production sites. In a process agreed to by both parties and the court, experts were nominated by each side and appointed by the court to investigate and report on conditions at the sites. The court nominated a third set of "settling experts" to resolve any differences between the experts nominated by the parties.

97.    The RICO Defendants and their co-conspirators believed they could use and corrupt the judicial inspection process to their advantage. To this end, they designed a strategy to "choreograp[h]" the judicial inspections and to "create conflict, invit[ing] the press" to "entrap [Chevron] in the conflict." As Donziger put it, "The goal of the inspections [was] to win the legal case, not to produce an independent scientific report." From his perspective, the judicial inspection process was "all about politics and arguing and bulls[**]t and show." Part of that show was to organize a number of demonstrations at the judicial inspection sites—some threatened to become violent (*see* paragraph 76, *supra*)—to showcase the strength and will of the RICO Defendants' and their co-conspirators' "army" and to send a message to the judiciary that it was being watched.

98.    The RICO Defendants and their co-conspirators have also sought and obtained a court order prohibiting Petroecuador from conducting any remediation of the former consortium area. Fajardo spelled out to his colleagues, "[Petroecuador is] altering the evidence and it is possible that when our technicians go to the PG to take samples that they will find most of the waste has been removed. This could complicate things for us a bit." Fajardo explained that it was "urgent" that the RICO Defendants "coordinate" with Petroecuador "so they will desist

42

[remediating] until we've had a chance to extract the evidence we need." In response, Donziger cautioned Fajardo to "[b]e careful with written letters—informal and oral meetings are better[.] [W]e don't want Texaco to use some letter to say we are obstructing remediation." In another email to Donziger and other conspirators, Fajardo expressed concern that the government was assuming responsibility for remediation, and that it would cost an "extremely low" $96 million. The RICO Defendants then turned to the government for assistance in shutting down the remediation.

99. Ultimately, the judicial inspection process was short-lived. The first and only time settling experts issued a report for one of the judicial inspection sites was in February 2006, at which point they agreed with Chevron's expert's findings and concluded that TexPet's remediation met the standards agreed to with Ecuador. They further agreed that there was no evidence of contamination posing a risk to either human health or the environment.

100. When it became apparent to the conspirators that the judicial inspection process was not going to provide them with the record they needed to extort a payment from Chevron, they abandoned that process and set about developing their own false history and factual record, entirely under their control. Using a series of paid experts whom they pressured, misled or recruited to their scheme, the conspirators created an increasingly extreme and distorted record, and then manipulated the Lago Agrio court into accepting that false history as the product of independent analysis.

### (i)    Inducing an Expert to Report Biased and False Results

101. To create their first false data point, the RICO Defendants pressured their U.S. expert David Russell to develop an exaggerated damages estimate and continued to "use it to put out a figure that will scare Chevron and investors," long after Russell sent Donziger a cease-and-desist letter demanding that he stop using the estimate.

102. In 2003, Russell, who was retained by the RICO Defendants to oversee the judicial inspection process for the Lago Agrio Plaintiffs and prepare a damages analysis, initially estimated the cost of remediation to be approximately $6 billion. In Russell's own words, that

estimate was prepared in "a very short time, with only a week of review time in the jungle, and
heavily influenced by [Donziger] in the writing." At Donziger's insistence, and as evidence of
his heavy influence on Russell's initial calculation, Russell used the most expensive remedial
option available, because Donziger wanted a "large" damages estimate. Even so, Russell made
clear to Donziger and others that the quantitative data "ha[d] not [been] reliably established" and
that he and his team were "still at the guessing stage."

103.    As Russell continued his work, he realized that the evidence on the ground did
not support his damages estimate. By December 2004, he told Donziger "that Texaco may be
right when they indicate that the remediation is performing as designed, and degrading the
petroleum." Two months later he provided an update to Donziger in which he explained, "From
the data I have seen so far, we are not finding any of the highly carcinogenic compounds one
would hope to see when investigating the oil pits."

104.    After Russell prepared his estimate, he learned that the remediation work he
considered appropriate could be completed at a substantially lower cost and wrote Donziger in
February 2006 to demand that he stop using the unsupported and exaggerated $6 billion estimate.
In his letter, Russell informed Donziger that the information he had since learned "would cause
me to state that the 2003 cost estimate is too high by a substantial margin, perhaps by a factor of
ten, or more." (Emphasis in original.) And indeed, a year later, another of the co-conspirators,
Charles Champ, estimated that a remediation and related social and development projects could
be done for $1 billion, an estimate that itself is wildly exaggerated and calculated using fictional
cost assumptions. Nonetheless, the RICO Defendants have never publicly disclosed this
exaggerated figure because it is too low for their illicit purposes.

105.    In that same cease-and-desist letter, Russell objected to Donziger's and Amazon
Watch's use of the $6 billion estimate in their request to the U.S. Securities and Exchange
Commission ("SEC") for the SEC to "investigate Chevron under Sarbanes-Oxley" for allegedly
"underreporting their liabilities." Russell made clear that the "estimate is no longer valid and if

44

subpoenaed to testify, I will state that the costs are much lower based upon the knowledge

available to me at the time I was released from the project."

106.      Russell also emphasized in the letter that he wanted nothing more to do with

Donziger and the RICO Defendants' and their co-conspirators' pursuit of the litigation against

Chevron:

> <u>I do not want to get into the courts in the US, and do not want to be involved in</u>
> <u>your case against Texaco/Chevron</u>!
>
> I have not prepared any other cost estimate, nor do I intend to do so.  It is no
> longer any of my concern, except to see that the name of my company and my
> reputation are not abused by continued association with the Aguinda vs. Texaco
> lawsuit.  If subpoenaed, I will tell the truth about what I know about the existing
> costs, how the cost estimate was prepared, and what the differences in unit costs
> might be to cleanup contamination in Ecuador.
>
> I am trying to stay out of your way and out of your case, but by using and abusing
> the outdated cost estimate to flail Chevron, you keep dragging me back in to [sic]
> it!  The Ecuador project has been a sorry chapter in my life and I do not want to
> get re-involved with you or it on any basis.
>
> Several recent press releases using the 2003 cost estimate plus the most recent
> demand by Amazon Watch abuses me and my company.
>
> Get a new cost estimate generated in Ecuador.  You will have to do that under the
> terms of the Global Inspection as required by the Court in Ecuador.  That 2003
> cost estimate is a ticking time bomb which will come back to bite you, and very
> badly if anyone attempts due diligence on it.

(Emphasis in original.)

107.      Donziger did not mince words in response: "I don't care what the f[**]k that

guy says."  In a conversation with co-conspirator Soltani of Amazon Watch, Donziger

acknowledged that the "[p]rice tag" for remediation "would only be a guess" and that Russell's

$6 billion "very rough estimate" significantly overstated the true costs of remediation: "[The]

six billion dollar thing is out there.  The reality is, based on what this guy is telling me, [it] would

cost less than that.  Significantly less than that . . . ."  And in an email to his co-conspirators,

Donziger recognized that the "fact [Russell] sent this letter has a certain amt of danger for us."

Nonetheless, in a subsequent conversation with Defendants Fajardo and Yanza and others,

45

Donziger discussed requesting a higher amount than $6 billion so a judgment of a lower amount could be portrayed as favorable to Chevron: "But as a concept, I ask, do we ask for much more than we really want as a strategy? Do we ask for eight and expect three, so that [the judge] says, 'Look, Texaco, I cut down the largest part.'"

108.     And despite Russell telling Donziger that his estimate was inaccurate and that he did "not want to be involved in" the Lago Agrio Litigation and despite Donziger's assurance to Russell that he would stop using Russell's work, the RICO Defendants and their co-conspirators continued to use the exaggerated and disavowed $6 billion estimate. As Donziger explained it, "[G]iven that [the RICO Defendants] ha[d] worked with Russell's number all of these years," not continuing to use the $6 billion number "would make [them] look like fools." For example, Amazon Watch, exhibiting the same disregard of the facts as Donziger, continued to tout the $6 billion figure well after Russell sent Donziger his cease-and-desist letter. Amazon Watch's press releases asserted that Russell's company, Global Environmental Operations, endorsed the $6 billion damages estimate even though Russell implored Donziger to stop "abusing" the "name of [Russell's] company" by associating it with the Lago Agrio Litigation. For example, a March 20, 2007 press release entitled "Ecuador Court Speeds Up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination" issued by Amazon Watch states: "The only independent damage assessment, by the U.S. firm Global Environmental Operations, puts clean-up costs at $6.14 billion, exclusive of personal damages to thousands of residents of the area." In issuing this press release, the conspirators lied about having an expert estimate of $6 billion when they knew that Russell repudiated the $6 billion figure as "no longer valid" and "a ticking time bomb" well over a year earlier. Donziger has subsequently admitted that he had no other basis for the $6 billion figure when that press release was issued.

### (ii)     Filing Falsified Expert Reports

109.     Not only did the RICO Defendants and their co-conspirators pressure Russell to come up with a large, unsupported damages assessment, but they also submitted falsified expert

reports under the name of another of their U.S. experts, Dr. Charles Calmbacher, that contradicted his conclusions that he had found no evidence of harm.

110.    In 2004, the conspirators selected Dr. Calmbacher to be the expert in charge of their inspection and to act as the Lago Agrio Plaintiffs' testifying expert for four of the sites that were being inspected.

111.    Shortly after Dr. Calmbacher began his work in the field, Donziger informed him and the other members of the technical team that "[t]he goal is to win the legal case, not to produce an independent scientific report." Much to the RICO Defendants' dismay, Dr. Calmbacher did not abide by this admonition when he informed the RICO Defendants and their co-conspirators that, in his professional opinion, the sites he inspected did not require further remediation and did not pose a risk to human health or the environment. This, of course, was not what the RICO Defendants and their co-conspirators wanted to hear. Indeed, Donziger had instructed Dr. Calmbacher to find contamination during his site inspections.

112.    Dr. Calmbacher was uneasy with Donziger's instructions and the level of control the RICO Defendants tried to exert over his work. He was concerned regarding the methods and scope of analysis that the RICO Defendants and their co-conspirators planned to perform on the samples they collected. In his opinion, the analysis was insufficient to test all the aspects of the oil that he felt should be tested. When Dr. Calmbacher informed Donziger of his concerns, however, Donziger brushed them aside and decided to proceed with the limited and inadequate analysis he already had planned.

113.    When it became clear that Dr. Calmbacher's conclusions were unsatisfactory to the RICO Defendants and their co-conspirators, they submitted to the Lago Agrio Court judicial inspection samples bearing the name "Selva Viva Laboratory" on the chain of custody forms. But there is no Selva Viva Laboratory; rather, the "analysis" was performed—if it was performed at all—in the RICO Defendants' and their co-conspirators' team hotel room, and they borrowed the name "Selva Viva"—the same name as the RICO Defendant who was "created" "simply as a pass thru mechanism to administer funds for the litigation" in Ecuador—to lend

47

false authenticity to their sham inspection. The conspirators knew such activity was not without risk, and they worried that Dr. Calmbacher would "inform the court that the Selva Viva project is a fraud."

114.    Ultimately, the RICO Defendants and their co-conspirators decided that they did not need Dr. Calmbacher to agree with their position, and that if the facts did not support their case, they would manufacture new ones. Thus, after Dr. Calmbacher communicated his negative findings to the RICO Defendants and their co-conspirators, he was "terminated without warning or explanation" and Donziger ordered him to return to the United States. At the time, Donziger believed that "[Dr. Calmbacher] will still sign the perito [expert] reports, but we might have to write them in Quito."

115.    Dr. Calmbacher, however, was adamant that he would still be the one to "write the Perito reports," despite his differences with Donziger, because he needed "to comply with [his] obligation to the court and to maintain [his] professional integrity with the Ecuadorian court." In an email to Donziger, Dr. Calmbacher made clear that the RICO Defendants were not to alter any of the conclusions in his report:

> It also has been stressed to me that it is highly unusual for a perito [expert] to allow others to contribute to the writing of a report. Comments or review is acceptable, but the perito's opinion and findings are final. I therefore have and feel no obligation to allow your team of textile engineers and associated cron[i]es to review or edit my reports. I am assured, as perito of the court, that I am completely within my rights to write and submit my report independent of those who have nominated me for appointment as perito. My sole obligation is to tell the truth, as I see it, to the court, no matter the consequences for either party.

116.    After Dr. Calmbacher's rebuke, Donziger threatened to withhold payment from him in order to pressure Dr. Calmbacher to draft the reports in a manner that would back up the Lago Agrio Plaintiffs' assertions. Donziger described this strategy to Wray, Kohn and Bonifaz, but also noted that, if the problem was not resolved, "we are developing a Plan B that will be explained in person."

117.    Plan B put into play Donziger's view that "[s]cience has to serve the law practice; the law practice doesn't serve science." The RICO Defendants and their co-

48

conspirators cast aside Dr. Calmbacher's actual conclusions and set about manufacturing reports to be filed under Dr. Calmbacher's name, a fact that Chevron only learned for the first time at Dr. Calmbacher's March 2010 deposition that Chevron subpoenaed pursuant to 28 U.S.C. § 1782.

118.    The difficulty for the RICO Defendants was how to obtain Dr. Calmbacher's signature on the false conclusions they wanted to submit as "expert" findings. Their solution was to send Dr. Calmbacher initial drafts of the report, which correctly characterized his conclusions, for his review. Because the drafts appeared to accurately reflect his opinions, Dr. Calmbacher authorized the reports to be filed.

119.    Next, the conspirators prevailed upon Dr. Calmbacher to provide signature pages, along with several blank pages bearing his initials, which he did, based on the lie that these extra pages would be used to file the reports he had already authorized to be filed. At the conspirators' request, Dr. Calmbacher sent by overnight delivery service one set of these signed and initialed pages to Ecuador and the second set directly to Donziger in New York.

120.    The reports that the RICO Defendants and their co-conspirators filed under Dr. Calmbacher's name, however, are not the same as the reports that he authorized to be filed. Instead, as part of their Plan B, the RICO Defendants and their co-conspirators prepared different, fraudulent reports that misstated the evidence and concluded that the inspected sites presented a danger to the environment and required additional remediation. The conspirators printed their fraudulent reports on the pages that Dr. Calmbacher had initialed, used the signature pages that he had provided, and filed the forged reports with the court in Lago Agrio.

121.    Although Chevron has since informed the Lago Agrio court about the falsified Calmbacher reports, to date the court has refused to remove his reports from the record or take any corrective measures.

       **d.**     **Arranging Cabrera's Appointment as Global Assessment Expert and Secretly Writing His Supposedly "Independent" Report**

122.     When Dr. Calmbacher refused to cooperate in the scheme to defraud and extort Chevron and when the Lago Agrio court's settling experts began to confirm the RICO Defendants' and their co-conspirators' lack of evidence, the conspirators changed tactics. Realizing that neutral settling experts would not accept their fraudulent claims, the RICO Defendants and their co-conspirators requested that the Lago Agrio court abandon the judicial inspection process that had been agreed to by the parties. In its place, the conspirators arranged for the Lago Agrio court to create a new "global assessment" process and secured the appointment of a co-conspirator to the position of the purportedly neutral "global assessment expert" with whom they would work in secret to ghostwrite his report. Until Chevron uncovered the RICO Defendants' and their co-conspirators' underlying fraudulent behavior, their plan seemed to be working.

123.     To the Lago Agrio court, the conspirators proposed that a single expert be appointed, and that he and his team conduct a global assessment of the former concession area.

124.     To execute their scheme, the RICO Defendants assembled a team handpicked by the conspirators of U.S. scientists, Ecuadorians, engineers, and other experts, who would do the actual work charged to Cabrera. And after the report was filed, some of these individuals were disclosed as members of Cabrera's fictional team.

125.     In December 2006, more than two months before Cabrera was appointed by the court, Donziger discussed the RICO Defendants' and their co-conspirators' plan to ghostwrite the "independent" report with co-conspirator Soltani: "The judge is going to appoint a guy in Ecuador, um, to be the expert, but really, you know, we'll be supporting him with the work—our people, E-Tech, whoever we choose to use." As Donziger saw it, the expert would "ha[ve] to totally play ball with us and let us take the lead while projecting the image that he is working for the court." Indeed, the driving question for the plaintiffs during this period, was, as Donziger mused, "how can we control this perito?"

50

        (i)      **Weeks Before the Court Appointed Cabrera, the RICO**
                   **Defendants Meet With Him to Plan His "Independent"**
                   **Expert Report**

126.     The RICO Defendants and their co-conspirators put their expanded scheme to defraud and extort Chevron in motion in early 2007. The first order of business was to ensure that the court adopt the new "global assessment" process proposed by the RICO Defendants and their co-conspirators and appoint Cabrera as the global assessment expert.

127.     On January 16, 2007, Fajardo reported that he had been in contact with the Lago Agrio judge in person and had sent him an email message regarding who to appoint as the global assessment expert. Fajardo then set about persuading Cabrera to join them in their extortionate scheme in a series of secret meetings during February 2007. The RICO Defendants and their co-conspirators first appealed to Cabrera emotionally, impressing upon him "the importance of the case, what it means for history, how we can do something that we will always be remembered for, what this would mean for the country and world, etc." They also made it clear that he would be rewarded financially. Not only would Cabrera be paid a substantial sum for his "work," an amount that eventually totaled at least $263,000, but Donziger or one of his co-conspirators likely told Cabrera what Donziger had told another potential expert: "if he served as the global court expert and the plaintiffs won the case that he would have a job the rest of his life being involved in the remediation."

128.     Having convinced Cabrera to join their conspiracy and secure in the knowledge that the court would select Cabrera, the conspirators set to work with him to plan the writing of the report by the covert U.S. team the RICO Defendants and their co-conspirators had assembled. This report would develop into an essentially fictional description of the region that alleged massive harms with little or no valid data or analysis in support. And Cabrera would act as the RICO Defendants' and their co-conspirators' puppet.

129.     On March 3, 2007—two weeks *before* the court appointed Cabrera—Donziger, Fajardo and Yanza met with Cabrera to plan the report. Also present at this meeting were members of the U.S. team working with the conspirators to ghostwrite the Cabrera Report,